# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

PATRICK J. MAHONEY,

Plaintiff-Appellee,

v.

U.S. CAPITOL POLICE BOARD, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

## BRIEF FOR APPELLANTS

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

EDWARD R. MARTIN, JR.
  *United States Attorney*

MICHAEL S. RAAB
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Plaintiff-appellee is Patrick J. Mahoney.

Defendants-appellants are the U.S. Capitol Police Board, in its official capacity; Jennifer A. Hemingway, in her official capacity as Sergeant at Arms and Doorkeeper of the U.S. Senate and Chair of the Board; William P. McFarland, in his official capacity as Sergeant at Arms of the U.S. House of Representatives and Member of the Board; Thomas E. Austin, in his official capacity as Architect of the Capitol and Member of the Board; and J. Thomas Manger, in his official capacity as Chief of the Capitol Police and Ex-Officio Member of the Board.

There were no additional parties and no amici in district court.

### B.    Rulings Under Review

The rulings under review were entered in *Mahoney v. U.S. Capitol Police Board*, No. 21-cv-2314 (D.D.C.), by the Honorable James E. Boasberg. They are the May 17, 2024, order and opinion granting plaintiff's motion for summary judgment (Dkt. Nos. 111, 112); the May 28, 2024, amended opinion granting plaintiff's motion for summary judgment (Dkt. No. 114); and the

July 31, 2024, order and opinion denying the government's motion for reconsideration (Dkt. Nos. 122, 123).

The district court's May 17, 2024, opinion granting plaintiff's motion for summary judgment is available at *Mahoney v. U.S. Capitol Police Board*, 734 F. Supp. 3d 114 (D.D.C. 2024), and the district court's July 31, 2024, opinion denying the government's motion for reconsideration is available at *Mahoney v. U.S. Capitol Police Board*, No. 21-cv-2314, 2024 WL 4235429 (D.D.C. July 31, 2024).

### C.    Related Cases

This case was not previously before this Court.  This Court addressed a challenge to a different provision of the U.S. Capitol Police Board's regulations by the same plaintiff in *Mahoney v. U.S. Capitol Police Board*, No. 22-5094, 2022 WL 1177313 (D.C. Cir. Apr. 15, 2022) (per curiam) (affirming denial of motion for preliminary injunction).  Counsel is not aware of any pending related cases.

 */s/ Brian J. Springer*
Brian J. Springer

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ................................................... 3

STATEMENT OF THE ISSUES ....................................................... 3

PERTINENT STATUTES AND REGULATIONS ......................... 4

STATEMENT OF THE CASE .......................................................... 4

    A.    Statutory and Regulatory Background ............................ 4

    B.    Factual and Procedural Background ............................... 7

SUMMARY OF ARGUMENT .......................................................... 9

STANDARD OF REVIEW ............................................................... 12

ARGUMENT ..................................................................................... 12

I.    The Board's Regulation of Activity on the Capitol, House, and Senate Stairways Comports with the First Amendment. ...................... 12

    A.    The government has a powerful interest in ensuring access to and maintaining the security of its legislative institutions. ........................................................................ 12

    B.    The regulation of activities on the stairways advances the government's interest without impermissibly burdening expressive activity. ........................................................... 15

        1.    The regulation does not prohibit any category of expressive activity, but merely directs the public to the adjoining sidewalks and other grounds. ........................ 15

2. The regulations are tailored to address the underlying access and security concerns. ...........................18

3. The Board reasonably declined to convert the stairways into a public forum. ...............................................22

C. The district court's analysis does not withstand scrutiny. ...........28

1. The district court wrongly analogized the stairways to a public thoroughfare. ........................................................28

2. The district court's application of intermediate scrutiny was misguided. ........................................................35

II. At a Minimum, Any Relief Must Be Limited to Plaintiff. ......................44

CONCLUSION ...............................................................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                  **Page(s)**

*American Library Ass'n v. Reno,*
33 F.3d 78 (D.C. Cir. 1994) .................................................. 42

*Board of Airport Comm'rs of the City of L.A. v. Jews for Jesus, Inc.,*
482 U.S. 569 (1987) ............................................................ 36

*Brockett v. Spokane Arcades, Inc.,*
472 U.S. 491 (1985) ............................................................ 46

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ............................................................45

*Camreta v. Greene,*
563 U.S. 692 (2011) ............................................................ 48

*Clark v. Community for Creative Non-Violence,*
468 U.S. 288 (1984) ............................................................ 42

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
473 U.S. 788 (1985) ...................................................... 30, 31

*Dellums v. Powell,*
566 F.2d 167 (D.C. Cir. 1977) ............................................ 34

*Department of Homeland Sec. v. New York,*
140 S. Ct. 599 (2020) ..................................................... 45, 48

*Doran v. Salem Inn, Inc.,*
422 U.S. 922 (1975) ............................................................ 46

*Frisby v. Schultz,*
487 U.S. 474 (1988) ............................................................ 21

*Gill v. Whitford,*
585 U.S. 48 (2018) .............................................................. 44

*Hague v. Committee for Indus. Org.,*
307 U.S. 496 (1939) ............................................................ 29

*Heffron v. International Soc'y for Krishna Consciousness, Inc.,*
452 U.S. 640 (1981) ...................................................... 37, 38

*Hodge v. Talkin*,
799 F.3d 1145 (D.C. Cir. 2015) ...................................................... 12, 25, 26, 37

*Hulbert v. Pope*,
70 F.4th 726 (4th Cir.), *cert. denied*,
144 S. Ct. 494 (2023) ....................................................................... 34

*Initiative & Referendum Inst. v. U.S. Postal Serv.*,
685 F.3d 1066 (D.C. Cir. 2012) ...................................... 25, 26, 30, 43

*International Soc'y for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992) ....................................................................... 18, 35

*Jeannette Rankin Brigade v. Chief of Capitol Police*,
342 F. Supp. 575 (D.D.C.), *aff'd*,
409 U.S. 972 (1972) ....................................................................... 13

*Kroll v. U.S. Capitol Police*,
847 F.2d 899 (D.C. Cir. 1988) ......................................................... 39

*Labrador v. Poe ex rel. Poe*,
144 S. Ct. 921 (2024) ................................................................. 46, 47

*Lederman v. United States*,
291 F.3d 36 (D.C. Cir. 2002) ............................. 19, 20, 23, 32, 34, 41

*Lewis v. Casey*,
518 U.S. 343 (1996) .........................................................................44

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ......................................................................... 45

*Mahoney v. U.S. Capitol Police Bd.*,
No. 22-5094, 2022 WL 1177313 (D.C. Cir. Apr. 15, 2022) ............................ 14

*National Ass'n of Mfrs. v. Taylor*,
582 F.3d 1 (D.C. Cir. 2009) ............................................................. 38

*Nebraska Dep't of Health & Human Servs. v. Department of Health & Human Servs.*,
435 F.3d 326 (D.C. Cir. 2006) ......................................................... 45

*Oberwetter v. Hilliard,*
 639 F.3d 545 (D.C. Cir. 2011) ........................................ 26, 27, 31, 40

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
 460 U.S. 37 (1983) ..................................................... 17, 22, 35

*Pleasant Grove City v. Summum,*
 555 U.S. 460 (2009) ........................................................ 31

*Poe ex rel. Poe v. Labrador,*
 709 F. Supp. 3d 1169 (D. Idaho 2023) ...................................... 47

*Pouillon v. City of Owosso,*
 206 F.3d 711 (6th Cir. 2000) ............................................... 33

*Price v. Garland,*
 45 F.4th 1059 (D.C. Cir. 2022) ............................................. 18

*Tinius v. Choi,*
 77 F.4th 691 (D.C. Cir. 2023), *cert. denied,*
 144 S. Ct. 815 (2024) ................................................... 12, 13

*Trump v. Thompson,*
 20 F.4th 10 (D.C. Cir. 2021) ............................................... 14

*United States v. Brewster,*
 408 U.S. 501 (1972) ........................................................ 31

*United States v. Grace,*
 461 U.S. 171 (1983) .................................... 13, 23, 24, 26, 28, 30

*United States v. Kokinda,*
 497 U.S. 720 (1990) ........................................................ 26

*United States v. Mahoney,*
 247 F.3d 279 (D.C. Cir. 2001) .............................................. 13

*United States v. Mendoza,*
 464 U.S. 154 (1984) ........................................................ 48

*United States v. Nassif,*
 97 F.4th 968 (D.C. Cir. 2024), *cert. denied,*
 No. 24-5041, 2024 WL 4743113 (U.S. Nov. 12, 2024) ............. 28, 30, 32, 36

*United States v. National Treasury Emps. Union,*
    513 U.S. 454 (1995) ........................................................ 46

*United States v. O'Brien,*
    391 U.S. 367 (1968) ........................................................ 16

*Wagner v. Federal Election Comm'n,*
    793 F.3d 1 (D.C. Cir. 2015) ........................................... 38

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) .................................................. 17, 43

*Wells v. City & County of Denver,*
    257 F.3d 1132 (10th Cir. 2001) ..................................... 33

*Williams-Yulee v. Florida Bar,*
    575 U.S. 433 (2015) .................................................. 38, 39

**Statutes:**

2 U.S.C. § 1969(a) ................................................................... 4

2 U.S.C. § 1969(b) ................................................................... 4

28 U.S.C. § 1291 ..................................................................... 3

28 U.S.C. § 1331 ..................................................................... 3

40 U.S.C. § 5102(a) ................................................................. 4

40 U.S.C. § 5104(e)(2) ........................................................... 43

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ..................................................... 3

Fed. R. App. P. 4(a)(4)(A) ..................................................... 3

Fed. R. Civ. P. 23 ................................................................... 47

**Other Authorities:**

Architect of the Capitol, *Capitol Hill Facts*,
   https://perma.cc/KJA5-D2R4 ..................................................... 7, 24

Architect of the Capitol, *U.S. Capitol Building*,
   https://perma.cc/YZ5W-VJNA ................................................... 13

Harvey W. Crew et al., *Centennial History of the
   City of Washington, D.C.* (1892) ................................................32

Fed. Highway Admin., *Lesson 13: Walkways, Sidewalks,
   and Public Spaces*, https://perma.cc/B3CL-8S4Y .................................20, 21

Chris Marquette, *Capitol Police Agents Strained to Probe
   Increasing Threats Against Lawmakers*, Roll Call
   (Sept. 21, 2023), https://perma.cc/LWZ6-SU2Y .....................................14, 15

Justin Papp, *Suspect Arrested at Capitol with Molotov
   Cocktails Was Targeting Trump's Cabinet Picks*,
   Roll Call (Jan. 28, 2025, 5:42 PM), https://perma.cc/98C9-DDUU .............37

Justin Papp, *Threats Rose Again in 2024, Capitol Police Say*,
   Roll Call (Feb. 3, 2025), https://perma.cc/TZ8V-QYEU .............................. 14

Press Release, U.S. Capitol Police, *USCP Threat
   Assessment Cases for 2024* (Feb. 3, 2025),
   https://perma.cc/NC53-E5RB ...................................................... 14

*Stairway*, Collins English Dictionary,
   https://perma.cc/J78W-PTYZ .......................................................24

ix

## GLOSSARY

| | |
|---|---|
| Board | U.S. Capitol Police Board |
| J.A. | Joint Appendix |

## INTRODUCTION

This case involves a critical security measure to safeguard the Capitol and the congressional employees who work there. Since the September 11, 2001, terrorist attacks targeting multiple government buildings, the U.S. Capitol Police Board has restricted demonstration activities by members of the public on the eastern stairways leading to nonpublic entrances for the Capitol Rotunda and the House and Senate Chambers. In light of the unprecedented number of threats to Members of Congress in recent years and the events of January 6, 2021, the Board has recognized a continuing need to regulate such activities to ensure that Congress can carry out its legislative responsibilities in a safe and secure manner.

The district court credited the government's compelling interest in maintaining the security of the Capitol but nonetheless declared the Board's regulation on the lower halves of the stairways unconstitutional under the First Amendment based on the court's own views about what protections are necessary. The court discounted the Board's judgment that a limited restriction is warranted to prevent demonstrators from filling the pathways that lie next to and facilitate access to the buildings. And the court disregarded that individuals like plaintiff can engage in demonstration

activities on the sidewalks directly in front of the stairways and various other open spaces throughout the Capitol Grounds.

The district court's ruling creates significant vulnerabilities concerning the safety of the country's democratic institutions. The decision shrinks the physical space between the Capitol and demonstrators, allowing all manner of demonstration activities to occur in the immediate vicinity of the Capitol. Having demonstrators amass on the stairways adjacent to the Capitol threatens to impede access and leaves virtually no time or space for the Capitol Police to respond when a situation turns violent. The security challenges become exponentially more difficult to manage without a sufficient buffer around the building entrances.

The district court made matters worse by entering a remedy that went far outside the contours of resolving the actual controversy at issue. The court permanently enjoined the Board from enforcing the restriction on the bottom halves of the stairways not just as to the familiar demonstration activities by plaintiff, but as to the full array of demonstration activities by anyone. Nothing about this case brought by an individual plaintiff and adjudicated on a set of stipulated facts warrants extending relief beyond the proposed demonstration activities that were the focus of this lawsuit.

## STATEMENT OF JURISDICTION

In this action seeking to enjoin enforcement of the Board's regulations under the First Amendment, plaintiff invoked the district court's jurisdiction under 28 U.S.C. § 1331. J.A. 4. The district court granted summary judgment to plaintiff on May 17, 2024, J.A. 415, and denied the government's motion for reconsideration on July 31, 2024, J.A. 489. The government filed a timely notice of appeal on September 5, 2024. J.A. 512; *see* Fed. R. App. P. 4(a)(1)(B), (4)(A) (providing 60-day time limit from denial of reconsideration motion). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The U.S. Capitol Police Board has adopted regulations to safeguard the security and accessibility of the Capitol. In furtherance of those interests, the Board has restricted demonstration activities by members of the public on the stairways that are adjacent to the Capitol and that provide passageways to the Capitol's nonpublic entrances. The Board's regulations allow individuals like plaintiff to engage in demonstration activities on the adjoining sidewalks and other open spaces throughout the Capitol Grounds. The questions presented are:

1. Whether the Board's restriction on the stairways is consistent with the First Amendment.

2. Whether the district court erred in entering a universal injunction.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

The U.S. Capitol Grounds span hundreds of acres and are home to several important government buildings, including the U.S. Capitol Building and the wings for the U.S. House of Representatives and the U.S. Senate. *See* 40 U.S.C. § 5102(a). By statute, the U.S. Capitol Police Board has "exclusive charge and control of the regulation and movement of all vehicular and other traffic" within the grounds. 2 U.S.C. § 1969(a). The Board is "authorized and empowered to make and enforce all necessary regulations therefor." *Id.*; *see also id.* § 1969(b) ("Regulations authorized to be promulgated under this section shall be promulgated by the Capitol Police Board and such regulations may be amended from time to time by the Capitol Police Board whenever it shall deem it necessary . . . .").

The Board's implementing regulations manage "vehicular and pedestrian traffic on Capitol Grounds." J.A. 245 (§ 1.1). The Board has adopted rules governing demonstration activity—defined as "any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment," J.A. 355 (§ 12.1.10)—that "apply equally to all demonstrators, regardless of viewpoint," J.A. 355 (§ 12.1.20).

Most relevant here, the Board has determined that members of the public may not engage in demonstration activity on the stairways of the Capitol. *See* J.A. 356 (§§ 12.2.10-.20). This restriction "provide[s] for the safety" of Members of Congress and their staff and "prevent[s] destruction or damage" to the buildings. J.A. 245 (§ 1.2); *see also* J.A. 363 (§ 12.13) (reserving the right to impose other restrictions "in the interest of safety and in order to minimize the obstruction or impediment of vehicular and pedestrian traffic through or within the Capitol Grounds").

Recognizing that Members of Congress work in the Capitol, the Board allows Members to hold demonstration activities on the stairways of their own workplace so long as the activity "is being done in his or her official

capacity as a Member" and "is being organized or sponsored by [the] Member," with the Member "personally in attendance . . . at all times." J.A. 356 (§ 12.2.20). The regulations specify that this "exemption will not apply when a Member of Congress merely advocates for demonstration activity organized or sponsored by others." *Id.*

The regulations allow the public to conduct various forms of demonstration activity in close proximity to the eastern stairways. Groups of up to 30 people may demonstrate on the over 118-feet by 24-feet sidewalks at the base of the House and Senate stairways, so long as they do not impede traffic. J.A. 398-401 (¶¶ 14, 22, 26-28, 30). Those sidewalks run along a roadway where authorized vehicles can drive; just beyond the roadway, there are large grass lawns where demonstration activity is permissible, with a permit required for groups larger than 30 individuals, J.A. 356 (§ 12.3.10), 358 (§ 12.4.10). In general, demonstrators in these areas may set up short stages or platforms, J.A. 360 (§ 12.5.10(c)); may display signs and banners, J.A. 361 (§ 12.6); may have props up to 15 feet tall, J.A. 360 (§ 12.5.10(b)); and may use sound amplification equipment projected away from the buildings, J.A. 361 (§ 12.8.20).

## B. Factual and Procedural Background

This litigation concerns the restrictions on demonstration activity on the bottom seven steps of the Capitol stairway and the bottom 18 steps of the House and Senate stairways on the eastern side of the Capitol. The stairways ascend from the sidewalk and provide a pathway to nonpublic entrances for the Capitol Rotunda and the House and Senate Chambers. J.A. 398-99 (¶¶ 13, 17, 21). Part of the way up, all three stairways are accompanied by large stone blocks on either side that are built into the buildings and match their aesthetic style. J.A. 107, 113, 119. The Architect of the Capitol explains that "[t]he Capitol's East Front was planned, and still serves, as its principal entrance." Architect of the Capitol, *Capitol Hill Facts*, https://perma.cc/KJA5-D2R4.

Plaintiff is a Presbyterian minister who wishes to hold events that "involve praying, gathering, assembly, and protest" with his wife and other individuals. J.A. 403 (¶ 35). In his original complaint, plaintiff challenged numerous aspects of the Board's regulations on a variety of grounds. The district court dismissed some of the claims, *see* J.A. 69, and the Board revised its regulations in ways that made litigation of other claims unnecessary, *see* J.A. 90-96. The case proceeded to summary judgment on one issue—

7

whether the Board's restrictions violate the First Amendment insofar as they do not allow plaintiff to engage in his desired activities on the lower halves of the Capitol, House, and Senate stairways. *See* J.A. 464 (confining analysis to "the steps below the dividers on the three sets of steps near the east front plaza").

The district court granted summary judgment to plaintiff. The court acknowledged that the bases of the House and Senate stairways "are slightly elevated from" the surrounding sidewalk and that all three stairways "could be said to be part of the Capitol building" itself. J.A. 463. The court also recognized that the stairways "serve as an entryway for Members and their staff" to gain access to the buildings. J.A. 462. The court nonetheless treated the stairways as no different than a public thoroughfare like a sidewalk and applied heightened scrutiny. *See* J.A. 459-60, 464-65. The court did not question the government's "compelling interest in the security of the Capitol Building," J.A. 465 (quotation marks omitted), but the court concluded that the Board's restriction on the lower halves of the stairways is not sufficiently tailored to that interest, *see* J.A. 468.

As a remedy, the district court permanently enjoined the Board from enforcing its regulation of demonstration activity on the lower halves of the

stairways against anyone.  J.A. 471.  The court denied the government's

motion for reconsideration seeking to limit relief to plaintiff's proposed

demonstration activities.  J.A. 489.  However, the court subsequently granted

a stay pending appeal as to nonparties.  J.A. 532.  The court acknowledged

that this case presents "a serious legal question."  J.A. 536 (quotation marks

omitted).  And whereas "[p]laintiff is entitled only to relief that would

remedy the injuries forming the basis of his lawsuit," J.A. 538, the court's

universal injunction "creates a substantial risk of serious harm to the Capitol

and those who work inside" because it would "allow demonstrators closer

access to the Capitol Building, thus undermining the ability of Capitol Police

to respond to an unpredictable crisis," J.A. 537; *see also* J.A. 514-26.

## SUMMARY OF ARGUMENT

It is well established that the government has a legitimate interest in

ensuring the safety of the Capitol, where congressional employees carry out

their constitutional duties as representatives of the public.  Recent events

confirm the need for robust security measures to prevent harms to people

and property, as evidenced by the sharp uptick in the number of threats

made against Members of Congress, their families, and their staff over the

past several years.

The U.S. Capitol Police Board's regulation in this case serves these purposes in a manner fully consistent with the First Amendment. Since September 11, 2001, the Board has restricted the public from engaging in demonstration activities on the stairways that lead to nonpublic entrances for the Capitol Rotunda and the House and Senate Chambers. The restriction serves merely to require that demonstrations take place on the sidewalks immediately next to the House and Senate stairways or on the various other open spaces throughout the Capitol Grounds, rather than on the stairways themselves. The restriction operates not as a ban on any type of protected speech, but as a regulation on the location of expressive activity. Moreover, the restriction operates only on the pathways structurally integrated with the buildings to facilitate entry and exit, not on a traditional place for public assembly or forum for the expression of ideas. There is no suggestion in the record or in the district court opinion that the Board's regulations materially inhibit any category of protected speech.

The challenged restriction readily withstands any plausibly applicable level of First Amendment scrutiny. The restriction is a reasonable means of preserving the stairways as a safe passageway for legislators and their staff to enter and exit their office buildings. Directing demonstration activities off

the stairways materially advances the Board's aims of ensuring access to and maintaining the security of the Capitol. And the Board's regulations allow demonstrators to gather together to convey whatever message they choose with props, signs, banners, and sound systems on the sidewalks abutting the House and Senate stairways and the various other areas open for expressive activities on the Capitol Grounds.

The district court's rationales for invalidating this critical security measure are unavailing. The court contravened settled precedent in equating the stairways to a public thoroughfare like a sidewalk where, as a matter of tradition, people have long assembled to express and exchange ideas. The court further erred in discounting the numerous alternative channels of communication and in disregarding the Board's considered security assessment in favor of the court's own views about what protections are needed to accomplish the government's objectives. The weighty government interests underlying the restriction amply justify the limited intrusion on speech that arises from shifting demonstration activities down a handful of steps to the sidewalk and surrounding areas.

The district court compounded its errors by entering a permanent injunction prohibiting enforcement of the restriction on the lower halves of

the stairways against anyone. Article III and traditional principles of equity dictate that any remedy must be limited to redressing plaintiff's particular injuries. Plaintiff cannot seek relief for complete strangers who have never challenged the Board's regulations and whose activities may present considerably greater security risks because they are different in character and scope than the activities that were the focus of this litigation. These principles should have led the district court to confine any relief to plaintiff's proposed demonstration activities.

## STANDARD OF REVIEW

The district court's grant of summary judgment on plaintiff's First Amendment claim is reviewed de novo. *Hodge v. Talkin*, 799 F.3d 1145, 1155 (D.C. Cir. 2015).

## ARGUMENT

I. **The Board's Regulation of Activity on the Capitol, House, and Senate Stairways Comports with the First Amendment.**

A. **The government has a powerful interest in ensuring access to and maintaining the security of its legislative institutions.**

It is well established that the government has a significant interest in "protect[ing] the safety of persons and property." *Tinius v. Choi*, 77 F.4th 691, 699 (D.C. Cir. 2023) (quotation marks omitted), *cert. denied*, 144 S. Ct.

815 (2024); *see also United States v. Mahoney*, 247 F.3d 279, 286 (D.C. Cir. 2001) (recognizing government interest in "ensuring public safety and order" and "protecting property rights" (quotation marks omitted)). The government may lawfully take action to prevent activities that "threaten[] injury to any person or property," "obstruct[] . . . access to" federal buildings, or "interfere[] with the orderly administration of the building[s] or other parts of the grounds." *United States v. Grace*, 461 U.S. 171, 182 (1983).

Those interests take on heightened importance at the Capitol, where prominent public representatives spend substantial amounts of time and conduct official government business. Indeed, the Capitol Building itself is often regarded as a symbol of American democracy. *See* Architect of the Capitol, *U.S. Capitol Building*, https://perma.cc/YZ5W-VJNA (noting that the structure "has become a widely recognized icon of the American people and government"). On the Capitol Grounds, the government must be equipped to address threats of "damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff." *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 585 (D.D.C.), *aff'd*, 409 U.S. 972 (1972). A member of this Court has thus observed that "the Government assuredly has a compelling interest in the

security of the Capitol Building." *Mahoney v. U.S. Capitol Police Bd.*, No. 22-5094, 2022 WL 1177313, at *3 (D.C. Cir. Apr. 15, 2022) (Millett, J., concurring in the judgment).

The Board has justifiably recognized a continuing need for robust security measures to prevent harm to people and property. The Board's conclusion was informed by the events of January 6, 2021. *See Trump v. Thompson*, 20 F.4th 10, 15-16 (D.C. Cir. 2021). Furthermore, threats to Members of Congress, their families, and their staff have skyrocketed in recent years. *See* J.A. 407 (¶ 48). The Capitol Police recorded nearly 9,500 threats in 2024 alone, a surge from the prior year and a figure more than double the number just seven years earlier. *See* Press Release, U.S. Capitol Police, *USCP Threat Assessment Cases for 2024* (Feb. 3, 2025), https://perma.cc/NC53-E5RB; *see* Justin Papp, *Threats Rose Again in 2024, Capitol Police Say*, Roll Call (Feb. 3, 2025), https://perma.cc/TZ8V-QYEU (noting that the number of threats in 2024 was "only slightly lower than a peak of 9,625 recorded in 2021"). The Board's decisions about how to adequately safeguard congressional grounds and employees must "take into account" its limited resources and personnel as well as "the current threat environment." J.A. 407 (¶ 48 & n.9) (citing Chris Marquette, *Capitol Police*

*Agents Strained to Probe Increasing Threats Against Lawmakers*, Roll Call (Sept. 21, 2023), https://perma.cc/LWZ6-SU2Y).

**B.    The regulation of activities on the stairways advances the government's interest without impermissibly burdening expressive activity.**

**1.    The regulation does not prohibit any category of expressive activity, but merely directs the public to the adjoining sidewalks and other grounds.**

Since the September 11, 2001, terrorist attacks targeting multiple government buildings, the Board has restricted public demonstration activity on the stairways that lead directly to nonpublic entrances for the Capitol Rotunda and the House and Senate Chambers.  J.A. 407 (¶ 47).  The Board has determined that this limited restriction is necessary to preserve the stairways as building entry points for legislators and their staff and to protect the congressional buildings and employees so that Congress can conduct its legislative responsibilities in a safe and secure manner.  *See* J.A. 407 (¶ 48), 412 (¶ 68); *see also* J.A. 245 (§ 1.2) (describing the purpose of the regulations to "provide for the safety of all persons on Capitol Grounds" and to "prevent destruction or damage to Capitol Grounds").

At the same time, the regulations allow demonstration activity on the sidewalks in front of the stairways and in various other areas throughout the

Capitol Grounds. The challenged restriction therefore operates only to require that people who wish to engage in the specified activities do so on the adjoining sidewalks and open spaces surrounding the Capitol, rather than on the stairways themselves. In these areas off the stairways, the public is free to express any view about any topic, as the regulations are agnostic to viewpoint or content. *See* J.A. 355 (§ 12.1.20). And the access and security justifications for the restriction are wholly "unrelated to the suppression of free expression." *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

Thus, in both operation and effect, the restriction at issue simply directs people off the stairways to neighboring parts of the Capitol Grounds. This form of regulation implicates two strands of First Amendment doctrine that limit the degree of applicable scrutiny. First, by prescribing where certain activities take place, not what individuals may say, the regulations do not ban speech but merely restrict the location of expressive activity. Second, by applying to the stairways whose function is to allow government employees to gain access to the buildings, the restriction's reach is confined to portions of government property that are not in any event proper locations for expressive activity by the general public.

Although the restriction at issue here has no effect in any public forum, even the more rigorous First Amendment scrutiny that applies to speech regulations in public fora leaves considerable room for regulations that merely affect the location of expressive activity.  In the context of a public forum, restrictions on the time, place, or manner of expressive activity "must be narrowly tailored to serve the government's legitimate, content-neutral interests" and may not "burden substantially more speech than is necessary to further the government's legitimate interests."  *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989).  Such a restriction "need not," however, "be the least restrictive or least intrusive means" of serving the government's interests.  *Id.* at 798.  "Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  *Id.* at 799 (alteration and quotation marks omitted).

The regulation at issue here qualifies for an even more relaxed standard of review because the provision has no application to public property that "by tradition or designation" has been recognized as "a forum for public communication."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).  Outside of a public forum, the government has

"more leeway to regulate speech," *Price v. Garland*, 45 F.4th 1059, 1068

(D.C. Cir. 2022), and "[l]imitations on expressive activity . . . must survive

only a much more limited review," *International Soc'y for Krishna*

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992).  The challenged

regulation of activities on the stairways is thus susceptible, at most, to the

standard of review applicable to a nonpublic forum, under which the

restriction "need only be reasonable" and "not an effort to suppress the

speaker's activity due to disagreement with the speaker's view." *Id.*  As

discussed below, the Board's regulation readily satisfies any plausibly

relevant standard.

> **2.    The regulations are tailored to address the
> underlying access and security concerns.**

There can be no dispute that the regulation at issue here serves

substantial government interests.  The gathering of demonstrators right

next to the entrances for the country's legislative buildings bears a tight

relationship to the safety of the Capitol itself.  The district court credited

the government's "compelling interest in the security of the Capitol Building,"

J.A. 465 (quotation marks omitted), and recognized that the government's

objectives "are about as weighty as they come," J.A. 468.  The challenged

restriction reduces the grave dangers "to the Capitol and its occupants." *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002).

The restriction applies to those areas where the security risks are at their apex. The stairways are immediately adjacent to the Capitol where Congressmembers carry out their duties as elected representatives of the people. The House and Senate Chambers lie just beyond the nonpublic entrance doors at the top of the stairways. *See* J.A. 398-99 (¶¶ 13, 21). Allowing demonstrators to congregate on the stairs would place them alarmingly close to the buildings and their occupants, leaving virtually no time or space for the Capitol Police to take decisive action when circumstances devolve into violence. The events of January 6 demonstrate how rapidly situations can escalate and how difficult it can be to contain crowds, even when the Capitol Police has secured a perimeter further out from the buildings than the stairways. *See* J.A. 407 (¶ 48).

In addition to providing adequate maneuvering room for the Capitol Police to safeguard people and property, the regulations address other weighty access and safety concerns. The restriction prevents the stairways from being filled with demonstrators, which would threaten to impede the orderly ingress and egress of government personnel who regularly work in

the buildings, J.A. 412 (¶ 68), as well as dignitaries and high-ranking Executive Branch officials who routinely visit the Capitol. Having groups of people spending extended periods of time on the pathways that lead into and out of the buildings is plainly incompatible with facilitating employees' access to their workplace and with keeping an evacuation route clear in the event of an emergency. Furthermore, the uneven terrain of the stairways makes it more likely that individuals would injure themselves while demonstrating, and the Capitol Police officers need the elevated platform of the stairways as a vantage point and tactical base to monitor for and react to threats.

Conversely, neither the stipulated facts nor the district court's opinion include any meaningful explanation of why demonstrating on the adjacent sidewalks or other open spaces, rather than on the stairways, would be less effective to convey plaintiff's (or anyone else's) message. Demonstration activity is permitted on the "raised sidewalks that traverse almost the entirety of the eastern side of Capitol," including the sidewalks at the foot of the House and Senate stairways. J.A. 397 (¶ 7); *see Lederman*, 291 F.3d at 44 (noting that "the sidewalk . . . wraps around the Capitol's East Front almost without interruption"). Public sidewalks are commonly six feet wide, *see* Fed. Highway Admin., *Lesson 13: Walkways, Sidewalks, and Public*

*Spaces*, https://perma.cc/B3CL-8S4Y, but these expanses of sidewalk are more than four times wider, and each one stretches over 118 feet, or approximately the length of a standard commercial airplane, *see* J.A. 398-99 (¶¶ 14, 22). Although plaintiff would prefer to stand on the stairways, he has never claimed that he could not conduct his desired demonstration activities on the adjacent sidewalks.

Plaintiff has several other options available to him. Like the sidewalks that abut the stairways, the numerous walkways that zigzag throughout the Capitol Grounds can accommodate groups of up to 30 demonstrators, so long as they do not block the flow of traffic. J.A. 400-01 (¶¶ 26-27). There are also large grassy areas a stone's throw from the stairways where plaintiff can demonstrate with 29 others without a permit or more if he secures a permit. J.A. 356 (§ 12.3.10), 358 (§ 12.4.10). And, subject to some constraints not challenged here, plaintiff may use various means to project his message, such as a stage, props, signs, banners, a megaphone, or a sound system. J.A. 360 (§ 12.5.10(b)-(c)), 361 (§§ 12.6, 12.8.20). Such demonstrations are readily seen by the public and regularly covered by the media, providing an adequate avenue for speech. *See Frisby v. Schultz*, 487 U.S. 474, 483 (1988) (upholding ban on picketing focused on a single residence because the law did not

prohibit "[g]eneral marching through residential neighborhoods" and thus permitted "more general dissemination of a message").

The Board's regulations not only "leave open ample alternative channels of communication," *Perry*, 460 U.S. at 45, but also form part of a measured approach to easing restrictions when justified by an assessment of evolving security needs. The Board erected perimeter fencing in early 2021, but it has removed those barriers and reopened portions of the Capitol Grounds as time has passed without major incidents. *See* J.A. 356 (§ 12.2.20) (providing that Board may specify areas that are "closed or restricted for official use"). During this litigation, the Board amended its regulations to make them even more permissive. For instance, the Board increased "the size of the group allowed to engage in demonstration activity without a permit from 19 people to 30 people." J.A. 92. This continuous evaluation underscores the Board's focus on promoting a rich variety of expressive activities on the Capitol Grounds without compromising the safety and security of the nation's vital legislative institutions.

### 3. The Board reasonably declined to convert the stairways into a public forum.

The nature of the stairways underscores the reasonableness of the restriction at issue here. This Court has been careful to distinguish places on

the Capitol Grounds that resemble areas traditionally held open for expression from those "near or in the immediate vicinity of the Capitol itself." *Lederman*, 291 F.3d at 47 (quotation marks omitted). For example, in holding that the sidewalks in front of the House and Senate stairways constitute public fora, this Court observed that those sidewalks lack functions or features that would "warrant distinguishing" them from ordinary public sidewalks. *Id.* at 43; *see also Grace*, 461 U.S. at 182 (describing the sidewalks in front of the Supreme Court as "indistinguishable from other public sidewalks").

The stairways, by contrast, are attached to the legislative buildings and set apart from the adjoining sidewalks and the rest of the Capitol Grounds. The granite steps rise out of the ground and lead directly into the Capitol Rotunda and House and Senate Chambers, with the landings and doorways at the top visible from the ground. J.A. 107, 113, 119. The stairways provide a passage for employees to enter and exit the buildings through entrances closed to the public. *See* J.A. 412 (¶ 68) (stating that the stairways "can be used for ingress and egress to the Capitol by Members of Congress and Congressional staff"). Unlike a sidewalk or other public thoroughfare where, as a matter of tradition, people have gathered to express and exchange ideas,

the stairways serve the uniquely practical purpose of granting entry to a workplace.  *See Stairway*, Collins English Dictionary, https://perma.cc/J78W-PTYZ (defining "stairway" as "a means of access . . . consisting of a series of stairs").

The physical attributes of the stairways reinforce their role as extensions of the buildings.  Partway up each stairway, there are "large stone blocks" flanking either side that are built into the Capitol and have the same aesthetic style.  J.A. 398-99 (¶¶ 13, 17, 21).  And the steps closer to the base wrap around those stone blocks, J.A. 398-99 (¶¶ 12, 16, 20), giving the impression that these exterior stairways are formal entryways and integral parts of the buildings themselves.  Indeed, the Architect of the Capitol explains that "[t]he Capitol's East Front was planned, and still serves, as its principal entrance."  Architect of the Capitol, *Capitol Hill Facts*, https://perma.cc/KJA5-D2R4.  For this reason, the Statue of Freedom that sits atop the U.S. Capitol Dome does not look out toward the National Mall but instead "faces those who arrive" via the stairways.  *Id.*  Taken together, these features would indicate to anyone stepping off the sidewalk and onto the stairway "that they have entered some special type of enclave."  *Grace*, 461 U.S. at 180.

For the same essential reasons, this Court has held that the Supreme Court plaza and accompanying staircase are a nonpublic forum. *See Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015). This Court explained that the plaza and staircase are structurally part of a "path that ultimately ends at the courtroom itself." *Id.* at 1159 (quotation marks omitted). And the Court described the various ways in which the plaza and staircase are visually and "architectural[ly] integrat[ed] with the Supreme Court building," including that the plaza is surrounded by a wall and physically "elevated from the sidewalk." *Id.* at 1158. In this case, the district court did not dispute that this analogy hits "close[] to the mark." J.A. 463. The court acknowledged that the stairways "serve as an entryway for Members and their staff" to go inside the buildings. J.A. 462. And the court agreed that the stairways "could be said to be part of the Capitol building," with the bases of the House and Senate stairways "slightly elevated from the" surrounding sidewalk. J.A. 463.

This Court has similarly concluded that the interior sidewalks connecting a postal facility's parking lot to the facility's door are nonpublic fora, even though the surrounding neighborhood sidewalks are public fora. *See Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066 (D.C.

Cir. 2012). The Court relied on the "physical separation from ordinary sidewalks" and noted that the postal sidewalks "are built solely to provide efficient access to the post office" by "customers and employees," not as "public thoroughfares" or "gathering places." *Id.* at 1071; *accord United States v. Kokinda*, 497 U.S. 720, 728 (1990) (plurality opinion) (concluding that sidewalks "constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door" are nonpublic fora). The same is true of the legislative stairways in this case—their form and function render them equally unsuitable to use as a forum for public expression.

The lower halves of the stairways are not "transformed into 'public forum' property merely because the public is permitted to freely enter and leave [them] at practically all times." *Grace*, 461 U.S. at 178; *see also Hodge*, 799 F.3d at 1160 (noting that an area's "status as a nonpublic forum is unaffected by the public's unrestricted access"). As this Court recognized in concluding that the interior of the Jefferson Memorial is not a public forum, the fact that the government opens its property for the public to roam freely, "talk loudly, make noise, and take and pose for photographs" is not equivalent to welcoming visitors to use the space "for expressive purposes." *Oberwetter v. Hilliard*, 639 F.3d 545, 552-53 (D.C. Cir. 2011) (alteration and

quotation marks omitted). Likewise here, it does not matter that "members of the public, including tourists and others taking group photographs, may sit, stand[,] or congregate" on the bottommost portion of the stairways. J.A. 411-12 (¶ 67).

Just as the government may permissibly maintain a national memorial as a "space with a solemn commemorative purpose" where visitors may not "engage in disruptive demonstrations," *Oberwetter*, 639 F.3d at 552-53, the government can reserve the stairways as building entry points where demonstrations threaten to block access and impair security. This Court had "little trouble" upholding the prohibition on expressive conduct intended to draw onlookers at the Jefferson Memorial "in light of the purpose of the forum." *Id.* at 553 (alteration and quotation marks omitted). The Court observed that the challenged prohibition "reasonably advanced" the government's substantial interest "in promoting a tranquil environment at our national memorials" because "the restriction on expressive activity d[id] not sweep beyond the actual Memorial space." *Id.* at 554.

Here, similarly, the government has a substantial interest in preventing demonstrators from filling the stairways directly outside the Capitol. Such demonstration activities on these pathways would imperil the

safety and security of the Capitol and its occupants, while hampering the ability of congressional employees to access the buildings. The Board's regulations seek to preserve the stairways for the purpose of forming a path to and a security barrier around the nonpublic entrances to the country's legislative institutions. And the challenged restriction ends at the stairways, allowing expressive activity on the immediately adjacent public sidewalks and nearby open spaces.

### C. The district court's analysis does not withstand scrutiny.

#### 1. The district court wrongly analogized the stairways to a public thoroughfare.

The Supreme Court has limited the class of traditional public fora to those places "historically associated with the free exercise of expressive activities," like "streets, sidewalks, and parks." *Grace*, 461 U.S. at 177. That is why large portions of the Capitol Grounds, including "the sidewalks wrapping around the Capitol" and the "series of lawns . . . surrounding the Capitol buildings," qualify. *United States v. Nassif*, 97 F.4th 968, 975 (D.C. Cir. 2024), *cert. denied*, No. 24-5041, 2024 WL 4743113 (U.S. Nov. 12, 2024). But the district court offered no persuasive basis to expand that list to include the stairways without any showing that they are the type of property

that "time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515 (1939).

No venerable history or tradition justifies assigning the stairways this label. Instead, the district court largely relied on immaterial facts that are consistent with the stairways' status as a nonpublic forum. The court noted that "Members and their staff typically use other entrances to enter the Capitol building." J.A. 462. That congressional employees have other ways to go into the buildings does not detract from the stairways' functional purpose. The salient point is that government personnel can and do use the stairways "for ingress and egress to the Capitol," J.A. 412 (¶ 68), whereas the general public may not, *see* J.A. 397 (¶ 8) ("Tourists generally enter the Capitol through the Visitor Center [under the plaza]."). The conspicuous dividers approximately halfway up the steps that physically prevent the public from proceeding higher remove any doubt that the entrances at the top are nonpublic. J.A. 398-99 (¶¶ 13, 17, 21).

Nor did the Board convert the stairways into a perpetual public forum by allowing some "private expressive activities before 9/11." J.A. 462. Occasional instances in the recent past do not establish "with sufficient

historical regularity" that stairways have traditionally been used as a forum for expression. *Initiative & Referendum Inst.*, 685 F.3d at 1072 (quotation marks omitted). And "[t]he government does not create a public forum . . . by permitting limited discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). The Board did not make the stairways generally available for expressive purposes by tolerating some activities "on certain terms and conditions that changed throughout the years." J.A. 406 (¶ 43). And even if it had, "[t]he government need not indefinitely keep a designated public forum open to the public." *Nassif*, 97 F.4th at 976. The Board permissibly closed the stairways to such activities in the wake of the September 11 terrorist attacks, J.A. 407 (¶ 47), and it has continued that restriction particularly in light of "the events of January 6, 2021," and the recent threats against Members of Congress, J.A. 407 (¶ 48).

Current usage likewise does not alter the nature of the stairways. While the district court emphasized that "the public can and does access the steps for 'sightseeing, posing for pictures, and walking dogs,'" J.A. 462 (alteration omitted) (quoting J.A. 396 (¶ 6)), it is settled law that a piece of property does not become a public forum "simply because members of the public are permitted to come and go at will," *Grace*, 461 U.S. at 177. And the

allowance for demonstration activities "organized or sponsored by a Member of Congress" and "done in his or her official capacity" with the Member in attendance "at all times," J.A. 356 (§ 12.2.20), only reinforces that the regulations are designed to enable legislators to make use of their place of work in performing their official duties. *See United States v. Brewster*, 408 U.S. 501, 512 (1972) (noting that congressional duties can extend beyond "purely legislative activities" and include Member "speeches delivered outside the Congress"). By recognizing that the government may hold its own speech-related events on government property, the Board has at most "create[d] a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects" whose regulations are subject to the standards governing nonpublic fora. *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009).

The district court further erred in placing outsized reliance on generalities about legislative grounds in general and the Capitol Grounds in particular. Binding precedent makes clear that courts must "examine the history and characteristics of *the particular property at issue*." *Oberwetter*, 639 F.3d at 552 (emphasis added); *see Cornelius*, 473 U.S. at 801 ("[I]n defining the forum we have focused on the access sought by the speaker.").

Even in cases involving property that falls within the Capitol Grounds, this Court has conducted a more nuanced evaluation of the specific site at issue because "areas within a large public forum may be nonpublic if their use is specialized." *Lederman*, 291 F.3d at 46 (quotation marks omitted).

Thus, it is not dispositive to observe that "legislative grounds have been the stage" for protesting official policies. J.A. 459. Although "responsiveness to public clamor is a virtue in elected officials," it does not follow that every area "around their workplaces" must be made available for public expression. J.A. 464. Here, the Board simply recognized that the perimeters of the buildings encompass the structurally integrated stairways that facilitate access and do not lend themselves to all manner of demonstration activities. *Cf. Nassif*, 97 F.4th at 977 (concluding that the inside of the Capitol Building is a nonpublic forum). And the Board imposed a limited restriction to protect the legislature from impermissible violence and intimidation, a concern that has deep historical roots. *See* Harvey W. Crew et al., *Centennial History of the City of Washington, D.C.* 66 (1892) (describing incident in which the Continental Congress was forced to move out of Philadelphia after being "threatened by a mob of dissatisfied soldiers"

that formed the impetus to establish a separate district for the seat of government under federal protection).

The out-of-circuit decisions cited by the district court, J.A. 458-59, bolster, rather than undermine, the need to undertake a careful examination of the facts in each case. The Sixth Circuit explained that case law provides no "definitive answer" on whether city hall steps constitute a public forum and deemed it "a considerable stretch" to read Supreme Court precedent to dictate the result. *Pouillon v. City of Owosso*, 206 F.3d 711, 715-16 (6th Cir. 2000). In contrast to this case, that case lacked evidence or argument that "the steps of [the particular] public building ha[d] been traditionally restricted." *Id.* at 717. The Tenth Circuit had no need to engage in a forum analysis at all because the sole dispute between the parties was whether the stairway at issue was "a traditional or a designated public forum." *Wells v. City & County of Denver*, 257 F.3d 1132, 1146 (10th Cir. 2001). And the Fourth Circuit recognized that protests on legislative property must be balanced against "the safety of the public" and the buildings that serve as "the working offices of lawmakers whose business is essential to the whole

art and practice of governance." *Hulbert v. Pope*, 70 F.4th 726, 738-39 (4th Cir.), *cert. denied*, 144 S. Ct. 494 (2023).[1]

The district court's resort to the general notion that "the Capitol Grounds as a whole meet the definition of a traditional public forum," *Lederman*, 291 F.3d at 41, is similarly flawed. J.A. 456-58. As the court itself noted, "no case has squarely addressed the forum designation of the portion of the Eastern Steps at issue here." J.A. 456. That acknowledgement makes it all the more important not to discount the distinctive characteristics of the stairways that inform their status. *See Lederman*, 291 F.3d at 42 (noting that the inquiry asks whether the site "differs from the remainder of the public Grounds in ways that make it uniquely 'nonpublic'"). The district court's public-forum ruling erodes the government's ability to prevent grave security threats from arising "in the immediate vicinity of the Capitol itself." *Id.* at 47 (quotation marks omitted).

---

[1] This Court's decision in *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), is inapposite. As the district court recognized, this Court in *Dellums* "did not engage in any forum analysis as such," J.A. 458, as the central issue was whether to imply a constitutional damages action. The decision is of limited import in any event because the protest that precipitated the lawsuit was arranged and attended by Members of Congress, *see Dellums*, 566 F.2d at 173-74, and the Board has historically understood such activity to fall outside the regulatory restrictions, J.A. 405 (¶ 42).

## 2. The district court's application of intermediate scrutiny was misguided.

The district court did not question the serious "security concerns that animate the Board's restrictions here." J.A. 461. And the court acknowledged that the Board was acting "in pursuit of [these] admittedly noble goals." J.A. 467. The court nonetheless erroneously believed that the regulations are insufficiently tailored to achieve those objectives.

For the reasons already discussed, the Board's viewpoint-neutral regulations "need only be reasonable," *Lee*, 505 U.S. at 679, because the stairways are government property that is "not by tradition or designation a forum for public communication," *Perry*, 460 U.S. at 46. There can be no serious dispute that the Board's restrictions reasonably serve to safeguard the legislative buildings and the people who work there, and the district court did not conclude otherwise.

Even if intermediate scrutiny were applicable, the challenged regulation easily satisfies that standard. The district court gave short shrift to alternative channels of communication and erroneously characterized the restriction as a "near-total ban on expression." J.A. 465. That description is inapt. Not only do the Board's regulations allow various forms of expression (like having conversations and wearing expressive apparel) that do not

threaten to interfere with the stairways, but they also leave individuals free to engage in demonstrations on the spacious sidewalks directly in front of the stairways and the open spaces a short distance away, all visible from and within earshot of the Capitol. Plaintiff would be hard-pressed to claim that those options are inadequate means to convey whatever message he wishes, particularly when he can amass with small or large groups, J.A. 356 (§ 12.3.10), 358 (§ 12.4.10); display signs, banners, and props up to 15 feet tall, J.A. 360 (§ 12.5.10(b)), 361 (§ 12.6); and use sound amplification equipment, J.A. 361 (§ 12.8.20).

The Board's regulation directing certain organized activity off the stairways is readily distinguishable from the real and hypothetical bans on speech mentioned by the district court. *See* J.A. 465-66. The limited restriction at issue here is not akin to "an absolute prohibition" barring "*all* protected expression," including "talking and reading, or the wearing of campaign buttons or symbolic clothing," anywhere in an airport. *Board of Airport Comm'rs of the City of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574-75 (1987). Nor does it resemble "[a] categorical prohibition on all expressive activity within Capitol buildings." *Nassif*, 97 F.4th at 980. This case does not involve the sort of all-encompassing proscription that verges on "deny[ing]"

access within the forum in question" altogether. *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 & n.16 (1981).

The district court's concerns about overinclusiveness and underinclusiveness were similarly misplaced. As an initial matter, the court was mistaken to the extent it believed that the regulation would prohibit an impromptu debate between friends or colleagues about "the latest editorial in the *New York Times*" that happens to take place on the stairways. J.A. 466. The regulation addresses "gathering[s]" and other organized activity "for the purpose of expressing" views, J.A. 355 (§ 12.1.10), not casual conversations among passersby. *See Hodge*, 799 F.3d at 1168 (construing similar language to cover "joint conduct that is expressive in nature and aimed to draw attention").

More broadly, the district court had no valid basis to question that small groups of demonstrators on the stairways create safety issues. *See* J.A. 466. Lone actors and small factions can by themselves inflict serious harms on people and property.[2] And the court failed to consider the effects

---

[2] *See, e.g.*, Justin Papp, *Suspect Arrested at Capitol with Molotov Cocktails Was Targeting Trump's Cabinet Picks*, Roll Call (Jan. 28, 2025, 5:42 PM), https://perma.cc/98C9-DDUU (describing recent incident in which man with Molotov cocktails and knives who had plans to kill the Speaker of

*Continued on next page.*

in the aggregate. *See Heffron*, 452 U.S. at 652 ("The justification for the Rule should not be measured by the disorder that would result from granting an exemption solely to [the plaintiff].").  Demonstration activities are inherently unpredictable: with no warning, small groups of demonstrators can grow into unruly crowds that pose even more acute security risks.  The Board's security concerns are implicated when any number of demonstrators is granted close access to the Capitol.

The district court's invocation of underinclusiveness is no more persuasive.  The First Amendment "imposes no freestanding underinclusiveness limitation." *Wagner v. Federal Election Comm'n*, 793 F.3d 1, 27 (D.C. Cir. 2015) (en banc) (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015)).  Rather, "the primary purpose of underinclusiveness analysis is simply to ensure that the proffered [governmental] interest actually underlies the law" and to assess whether the law fails to "advance any genuinely substantial governmental interest." *National Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 17 (D.C. Cir. 2009) (quotation marks omitted).  This case raises neither concern, where it is evident that

---

the House and two recently confirmed Cabinet nominees was arrested outside the Capitol Building).

access and security were the Board's true interests and where restricting activities on the stairways materially advances those interests.

In any event, the district court's examples do not show that the regulations are underinclusive. The district court speculated that tourists and other public visitors could form "large enough groups" on the stairways to "presumably pose a serious threat." J.A. 466. But those situations tend to be less prone to volatility and more fleeting in duration. *See* J.A. 403 (¶ 36) (indicating that plaintiff's demonstrations would last an hour to an hour and a half). The Board justifiably views a transitory group informally standing together as presenting a "markedly different" danger than an organized group collectively demonstrating together. *Williams-Yulee*, 575 U.S. at 450.

A similar recognition underlies the regulatory authorization of demonstration activities "organized or sponsored" by Members of Congress acting in their "official capacity as a Member." J.A. 356 (§ 12.2.20). For Members, the Capitol is the workplace where they carry out their constitutional duties. From the perspective of access and security, they are familiar quantities who are differently situated than an unknown group of demonstrators. *Cf. Kroll v. U.S. Capitol Police*, 847 F.2d 899, 902 (D.C. Cir. 1988) (discussing "the oddity of having the United States Senate 'apply' for a

permit from its own Police Board").  The regulations sensibly treat spontaneous and prearranged events by the public as presenting materially different operational and logistical challenges than planned activities by Members of Congress.

The district court fundamentally misunderstood the import of this exemption, which does not allow any demonstration "so long as a Member sponsors [it] and stands nearby."  J.A. 467.  Rather, the exemption is concerned with the use of official government building space by government officials for official events.  That limitation is apparent on the face of the regulation, which exempts a Member-led activity only when it "is being done in his or her official capacity."  J.A. 356 (§ 12.2.20).  Indeed, the Board added this language for the specific purpose of clarifying that the exemption does not apply "when a Member of Congress merely advocates for demonstration activity organized or sponsored by others."  J.A. 413 (¶ 69).  These realities also refute plaintiff's argument that the regulatory exemption for activities by Members of Congress who hold a diverse range of views amounts to discrimination on the basis of viewpoint or content—a theory that even the district court did not embrace.  *See Oberwetter*, 639 F.3d at 553-54 (recognizing that the government may exclude private expression from

government property while hosting its own official events that express a particular viewpoint).

The access and security risks associated with the stairways are also different in kind than those associated with the adjoining sidewalks. On the vast expanse of sidewalk, there is plenty of room for anyone "entering and leaving the Capitol" to maneuver around "the occasional protester," and there is still a buffer between any protestors and the buildings. *Lederman*, 291 F.3d at 43. This Court concluded that the government's regulation of the sidewalks swept in too many activities that could not "reasonably be expected to . . . block traffic or threaten security." *Id.* at 45. That reasoning does not carry over to the stairways, which have space constraints and are flush against the buildings. Preventing demonstrators from clogging the pathways into the buildings and from amassing so close to their entrances is commensurate with the underlying access and security concerns.

The district court likewise misunderstood the relevance of alternative measures. It is not enough that a court can conceive of another way to accomplish the government's objectives. Rather, the government's chosen means "will meet the Supreme Court's 'narrowly tailored' requirement if a substantial portion of the burden it imposes furthers the Government's

interest, even though a less intrusive alternative might also exist."
*American Library Ass'n v. Reno*, 33 F.3d 78, 88 (D.C. Cir. 1994). Here, the
district court improperly second-guessed the Board's informed decision
about how to attain an adequate level of security at the Capitol. *See Clark v.
Community for Creative Non-Violence*, 468 U.S. 288, 299 (1984) (explaining
that discussion of less-restrictive alternatives "represent[ed] no more than a
disagreement with the [agency] over how much protection" was necessary).

The shortcomings of the district court's proffered alternatives are
manifest. "[L]imit[ing] the number of people who can demonstrate . . . at one
time" or "requir[ing] individuals . . . to obtain a permit," J.A. 467, would not
achieve the Board's objectives as effectively given that the presence of
demonstrators on the stairways is what gives rise to the access and security
concerns in the first place. A restriction applicable during "certain times of
the day," J.A. 468, ignores that employees enter and exit at all hours and that
the threat of damage to the buildings persists around the clock. And the
Board had sound reasons to opt against adopting an outright ban on "the use
of props" or subjecting every prospective demonstrator "to police screening."
*Id.* The first would be more restrictive than the Board's current regulation
of props, the second would be infeasible to implement, and both fail to

account for the fact that demonstrators can fashion makeshift weapons and can pose a threat even without weapons.

The challenged restriction on the stairways also serves to supplement subsections (D) through (F) of 40 U.S.C. § 5104(e)(2), which make it unlawful to willfully and knowingly engage in certain violent and obstructive conduct on the Capitol Grounds, including disorderly conduct to disrupt congressional proceedings. *See* J.A. 468. Those statutory prohibitions do not render unnecessary the Board's restriction on demonstration activity in a highly vulnerable area. The Board is entitled to rely on prophylactic rules, rather than after-the-fact punishments, to avoid harms to people and property. *See Initiative & Referendum Inst.*, 685 F.3d at 1073 ("[C]ertainly the Postal Service is free to adopt multiple means to ensure that customers visiting the post office can transact their business unimpeded."). At bottom, the district court erred in substituting its own beliefs in place of the Board's considered judgment about "the most appropriate method for promoting" the significant governmental interests in ensuring access to and maintaining the security of the Capitol. *Ward*, 491 U.S. at 800 (quotation marks omitted).

## II.    At a Minimum, Any Relief Must Be Limited to Plaintiff.

The district court compounded its errors by issuing universal relief in this lawsuit brought by one individual based on a set of stipulated facts. There was no basis for the court to permanently enjoin the Board from enforcing its restriction on demonstration activity on the lower halves of the stairways against anyone as a remedy for plaintiff's discrete asserted harms. Under bedrock principles of Article III and equity, the court committed plain legal error in failing to appropriately limit relief.

Extending relief beyond plaintiff's desired demonstration activities flouts the axiomatic Article III principle that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018).  As the district court recognized, "[p]laintiff is entitled only to relief that would remedy the injuries forming the basis of his lawsuit." J.A. 538.  But the court failed to adhere to that principle, entering an injunction that far exceeds "the inadequacy that produced [plaintiff's] injury in fact" and covers nonparties with no connection to plaintiff and no proven injury.  *Gill*, 585 U.S. at 66 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). When a court orders "the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court

44

could still be acting in the judicial role of resolving cases and controversies."
*Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020)
(Gorsuch, J., concurring in the grant of stay).

The sweeping relief entered in this case also cannot be squared with
traditional equitable principles that reinforce these constitutional limitations.
Reflecting the historical limits on equity and judicial power, binding
precedent instructs that equitable remedies "should be no more burdensome
to the defendant than necessary" to redress plaintiff's asserted injury.
*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting
*Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also Nebraska Dep't of
Health & Human Servs. v. Department of Health & Human Servs.*, 435 F.3d
326, 330 (D.C. Cir. 2006) ("We have long held that an injunction must be
narrowly tailored to remedy the specific harm shown." (alteration and
quotation marks omitted)). Yet here, the district court's injunction allows
nonparties to use the stairways for demonstration activities even when those
activities present considerably greater security risks because they are
different in character and scope than the activities that were the focus of this
litigation. Plaintiff has identified no persuasive reason to believe that

confining relief to the demonstration activities on which his lawsuit is based would not make him whole.

These fundamental principles apply with full force here. Courts have an unflagging duty not "to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied" and not to afford relief broader than "necessary to dispose of the case." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501-02 (1985) (quotation marks omitted). In First Amendment cases, as in any other, courts should not "provide relief to nonparties when a narrower remedy will fully protect the litigants." *United States v. National Treasury Emps. Union*, 513 U.S. 454, 478 (1995). The Supreme Court has operationalized that rule by approving of injunctions that do not "interfere with" enforcement of the law against anyone other than "the particular federal plaintiffs," *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975), and by narrowing injunctions that provide relief beyond "the parties before the Court," *National Treasury Emps. Union*, 513 U.S. at 477.

In accord with this usual practice, the Supreme Court recently entered a partial stay of a similarly overbroad injunction. *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024). In that case, the district court had issued an injunction prohibiting the defendant from enforcing state law against both

46

parties and nonparties throughout the pendency of the litigation, *see Poe ex rel. Poe v. Labrador*, 709 F. Supp. 3d 1169, 1199-200 (D. Idaho 2023), and the court of appeals denied a stay pending appeal. The Supreme Court stayed the district court's order "except as to" the plaintiffs. *Poe*, 144 S. Ct. at 921. That stay was premised on five Justices' explicit conclusion that universal injunctions providing relief outside the parties to the case are likely impermissible. *Id.* at 927 (Gorsuch, J., concurring in the grant of stay); *id.* at 933 n.4 (Kavanaugh, J., concurring in the grant of stay).

Plaintiff's stylization of his claim as a "facial challenge," J.A. 502, did not grant the district court power to enjoin the Board's regulations as to nonparties. No federal statute authorizes such relief in this situation, and plaintiff has never sought to satisfy the class-action requirements of Federal Rule of Civil Procedure 23 that address when a district court may bind nonparties to an action. A facial claim does not relieve courts of the obligation to enter party-specific relief. Indeed, the plaintiffs in *Poe* raised a facial challenge, but the Supreme Court nonetheless narrowed the injunction. *See* Response in Opposition to the Application for a Stay at 25-26, *Poe*, 144 S. Ct. 921 (No. 23A763). The word "facial" means only that the court's reasoning implies the restriction's invalidity in other applications, and stare

decisis principles dictate whether that result is binding in a future case. Here, the district court's universal relief pretermitted consideration of the legal issues by any other district judge, even though, unlike a decision of this Court, the district court's ruling lacks precedential effect for nonparties or other cases.  *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

These same observations refute the district court's suggestion that providing relief to nonparties was appropriate in this case because it involves a "Washington-based defendant" and regulations "geographically limited to Washington."  J.A. 510.  This rationale would produce an inequitable "asymmetr[y]," whereby nonparties can claim the benefit of a favorable ruling but are not bound by a loss.  *New York*, 140 S. Ct. at 601 (Gorsuch, J., concurring in the grant of stay).  It would also undermine the judicial system's goals of encouraging the "airing of competing views" by multiple judges.  *Id.* at 600; *cf. United States v. Mendoza*, 464 U.S. 154, 160 (1984) ("[A]llowing nonmutual collateral estoppel against the government . . . would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue.").  By issuing a permanent injunction encompassing all manner of demonstration

activity by anyone, the district court clearly defied its responsibility to tailor relief to resolving plaintiff's particular controversy.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney*
    *General*

EDWARD R. MARTIN, JR.
  *United States Attorney*

MICHAEL S. RAAB

  */s/ Brian J. Springer*
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*
  *brian.j.springer@usdoj.gov*

March 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,050 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Brian J. Springer*
Brian J. Springer

**CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Brian J. Springer*
Brian J. Springer

**ADDENDUM**

# TABLE OF CONTENTS

2 U.S.C. § 1969 ...................................................................................A1

Traffic Regulations ch. 12 ...................................................................A1

Traffic Regulations ex. G (Demonstration Area Map)....................................A9

**2 U.S.C. § 1969**

**§ 1969. Regulation of traffic by Capitol Police Board**

### (a) Exclusive charge and control of all vehicular and other traffic

The Capitol Police Board, consisting of the Sergeant at Arms of the United States Senate, the Sergeant at Arms of the House of Representatives, and the Architect of the Capitol, shall have exclusive charge and control of the regulation and movement of all vehicular and other traffic, including the parking and impounding of vehicles and limiting the speed thereof, within the United States Capitol Grounds; and said Board is authorized and empowered to make and enforce all necessary regulations therefor and to prescribe penalties for violation of such regulations, such penalties not to exceed a fine of $300 or imprisonment for not more than ninety days.  Notwithstanding the foregoing provisions of this section those provisions of the District of Columbia Traffic Act of 1925, as amended, for the violation of which specific penalties are provided in said Act, as amended, shall be applicable to the United States Capitol Grounds.  Prosecutions for violation of such regulations shall be in the Superior Court of the District of Columbia, upon information by the Corporation Counsel of the District of Columbia or any of his assistants.

### (b) Exclusive charge and control of all vehicular and other traffic

Regulations authorized to be promulgated under this section shall be promulgated by the Capitol Police Board and such regulations may be amended from time to time by the Capitol Police Board whenever it shall deem it necessary: *Provided*, That until such regulations are promulgated and become effective, the traffic regulations of the District of Columbia shall be applicable to the United States Capitol Grounds.

. . .

**Traffic Regulations ch. 12**

**§ 12.1. Demonstration Activity**

### § 12.1.10. Definition

Demonstration activity is defined as any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for

the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution.

### § 12.1.20. Applicability

The provisions of this chapter shall be applicable to any one (1) person or group of persons engaged in demonstration activity on Capitol Grounds. The provisions of this chapter shall apply equally to all demonstrators, regardless of viewpoint.

. . .

## § 12.2. General Requirements

### § 12.2.10. Permissible Demonstration Areas

Demonstration activity is allowed in designated areas as indicated on the "United States Capitol Grounds Demonstration Areas Map," as amended.

### § 12.2.20. Prohibited Demonstration Areas

No person or group of any size may engage in demonstration activity on the steps of the United States Capitol, on the steps of any building on Capitol Grounds or in any area otherwise closed or restricted for official use. In addition, projecting of images on any building on Capitol Grounds shall not be permitted. Demonstration activity by Members of Congress is exempt from this section if:

a. it is being done in his or her official capacity as a Member;

b. it is being organized or sponsored by a Member of Congress; and

c. the Member(s) is personally in attendance at the demonstration activity at all times.

The exemption will no longer apply to others at the demonstration activity if the organizing or sponsoring Member(s) departs the activity. The exemption will not apply when a Member of Congress merely advocates for demonstration activity organized or sponsored by others.

### § 12.3. Groups of Thirty or Less

#### § 12.3.10. No Permit Required

No person or group of thirty (30) or less persons shall be required to obtain a permit.

#### § 12.3.20. Availability

Space for one (1) person or group of thirty (30) persons or less is available on a first-come, first-served basis, subject to the provisions of this chapter.

#### § 12.3.30. Permit Encouraged

One (1) person or group of thirty (30) persons or less that desires to secure a specific demonstration area is encouraged to file an application for a permit. A permit holder will be given priority over any person or group occupying a demonstration area not in possession of a permit. The Board may remove or relocate any person or group of thirty (30) persons or less not in possession of a permit to accommodate permitted demonstration activity or special event as authorized by § 12.1.30.

#### § 12.3.40. Prohibitions

A person or group of thirty (30) persons or less shall not engage in the following:

(a) Segmenting from the Group. A person or group of thirty (30) persons or less may engage in demonstration activity without a permit provided that the demonstration activity is not merely a segment of the same group whose complement would consist of over (30) persons.

(b) Interference. No person or group of thirty (30) persons or less shall engage in demonstration activity that audibly or physically interferes with the demonstration activity of another person or group.

(c) Density. No person or group of thirty (30) persons or less shall occupy an area in which the density exceeds 4.95 square feet per person, including props and equipment. In no instance shall the per person density of any area exceed that set by the Federal Emergency Management Agency.

(d) Seven Day Limitation. No person or group of thirty (30) persons or less shall engage in demonstration activity for a period that exceeds more than seven (7) consecutive days.

(e) Continuous Daily Demonstration. No person or group of thirty (30) persons or less shall engage in demonstration activity having a duration of more than twenty-four (24) consecutive hours, including clean-up and the set-up and take down of props and equipment.

### § 12.3.50. Applicability of Other Provisions

With the exception of § 12.4, any person or group of thirty (30) persons or less is required to adhere to the provisions of this chapter.


## § 12.4. Groups Over Thirty

### § 12.4.10. Permit Required for Groups of Over Thirty

No group of over thirty (30) persons shall engage in demonstration activity on Capitol Grounds except pursuant to the terms of a permit issued by the Capitol Police Board.

### § 12.4.20. Permit Applications

(a) Advance Notice. All applications for permits shall be submitted in writing to the Capitol Police Board. An application shall be submitted in writing so as to be received by the Capitol Police Board at least five (5) business days in advance of the proposed demonstration activity.

(b) Contents. Permit applicants shall provide the following:

    1. Requested area of Capitol Grounds;

    2. Date, time, duration, and nature of the demonstration activity;

    3. Estimated number of participants;

    4. Sponsoring person or organization;

    5. Requested props and equipment; and,

    6. Name, address, telephone number and signature of applicant.

(c) Waiver. The Board may waive notice or reduce the number of days of advance notice if it determines that unforeseen or exceptional circumstances exist.

## § 12.4.30. Processing Applications and Issuance of Permits

(a) Approval.  The Capitol Police Board shall process applications in order of their receipt.  Properly completed applications will be given priority over applications that are defective.

(b) Issuance.  The Board shall issue a permit authorizing peaceable and orderly demonstration activity upon proper and timely application.

(c) Contents.  Each permit shall clearly identify:

> 1. The sponsoring person and organization;
>
> 2. The area on Capitol Grounds where the permitted demonstration activity is to take place;
>
> 3. The date, time and duration of the demonstration activity;
>
> 4. The nature of the event and detailed description of the activity; and,
>
> 5. The number of participants.

(d) Tacit Approval.  Should the Board fail to act on a properly completed and timely filed application within twenty-four (24) hours prior to the date of the proposed demonstration activity, such application shall be deemed approved by the Board.

## § 12.4.40. Terms and Conditions

In addition to any additional terms as set forth in the permit, no permit shall be issued that authorizes the following:

(a) Area.  No permit shall authorize a group to demonstrate in more than one (1) area per event simultaneously.

(b) Density.  No permit shall be issued that would exceed a density of five (5) square feet per person in the requested demonstration area, including props and equipment.

(c) Seven Day Limitation.  No permit shall be issued for a period of more than seven (7) consecutive days.

(d) Continuous Daily Demonstration Prohibited.  No permit shall authorize demonstration activity having a duration of more than twenty-four (24) consecutive hours, including cleanup and the set up and take down of props and equipment.

### § 12.4.50. Groups to Remain in Assigned Areas

All groups are required to remain in their assigned demonstration areas throughout the course of the demonstration activity. The same group may not hold a permit to more than one demonstration area at the same time.

### § 12.4.60. Revocation for Non-Compliance or For Cause

In any case in which the terms of the permit are violated, such permit may be revoked by the Capitol Police Board. The Board is authorized to revoke a permit if it determines that continuation of demonstration activity is likely to result in bodily harm or death to an individual, damage to or destruction of any real or personal property or that a breach of the peace is imminent and good order cannot otherwise be maintained.


## § 12.5. Props and Equipment

The following provisions apply to all persons or groups of persons bringing props and equipment onto Capitol Grounds.

### § 12.5.10. General

(a) Definition. Props and equipment include items such as stands, lecterns, sound amplification equipment, chairs, tables, portable sanitary facilities, press and news facilities or other similar items that are reasonably necessary as an integral part of demonstration activity.

(b) Height Restriction. No single prop, piece of equipment or combination thereof may exceed fifteen (15) feet in height.

(c) Stages, Risers and Platforms. No stage, riser or platform may exceed two (2) feet in height.

(d) Unattended Props and Equipment. No prop or piece of equipment shall be left unattended while on Capitol Grounds.

(e) Removal. All props and equipment must be capable of immediate removal.

(f) Twenty Four Hour Limitation. Props and equipment must be removed from Capitol Grounds at least once every consecutive twenty-four (24) hour period.

(g) Conclusion.  Demonstration activity is not considered concluded until all props and equipment are removed from Capitol Grounds within the permitted time.

## § 12.5.20. Additional Requirements for Permit Applications

(a) All permit applicants are required to list props and equipment in their application.

(b) Permit applicants must provide a description and the intended use of each such item in the permit application.

(c) Any stage, riser or platform must be clearly identified in the permit application and receive Board authorization prior to use.

(d) Permit holders are subject to any additional requirements pertaining to props and equipment as determined by the Board and set forth in the permit.

## § 12.6. Signs, Banners and Placards

Signs, banners and placards are permissible on Capitol Grounds provided the supports for these items have dull ends, do not exceed ¾ of an inch at their widest point and cannot in any way be construed as a weapon.  No nails, screws or bolt-type fastening devices may be protruding from the supports.

## § 12.7. Temporary Structures

No temporary structure of any kind may be erected on Capitol Grounds. Tents, cabanas, canopies and all other types of covered or enclosed structures are expressly prohibited.  No object shall be tied, fastened or suspended to any tree, pole or other landscape or architectural feature on Capitol Grounds.

## § 12.8. Amplification and Other Noise Disturbances

### § 12.8.10. Amplification Equipment

Amplification equipment is not permitted on the Lower West Front Terrace or any other location on Capitol Grounds as determined by the Board.

### § 12.8.20. Sound Projection

All sound amplification equipment must be projected away from the Capitol and all other Congressional office buildings.

### § 12.8.30. Unamplified Disturbances

No individual may utter loud, threatening or abusive language or engage in disorderly or disruptive conduct at any place on Capitol Grounds that interferes with any business being conducted in the Capitol or in any of the office building on Capitol Grounds at any time, including during periods of recess.

. . .

## § 12.13. Additional Conditions

The Board reserves the right to impose additional reasonable time, place and manner restrictions on any demonstration activity consistent with this chapter in the interest of safety and in order to minimize the obstruction or impediment of vehicular and pedestrian traffic through or within the Capitol Grounds.

**Traffic Regulations ex. G (Demonstration Area Map)**



UNITED STATES CAPITOL GROUNDS
DEMONSTRATION AREAS MAP

NOVEMBER 2012