**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 24-5207**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

PATRICK J. MAHONEY,

Plaintiff-Appellee,

v.

U.S. CAPITOL POLICE BOARD, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**JOINT APPENDIX – VOLUME II OF II**

———————————

JOSHUA WALLACE DIXON
ERIC ARTHUR SELL
   *Center for American Liberty*
   *1311 S. Main Street*
   *Suite 207*
   *Mount Airy, MD 21771*

   *Attorneys for Appellee*

YAAKOV M. ROTH
   *Acting Assistant Attorney General*

EDWARD R. MARTIN, JR.
   *United States Attorney*

MICHAEL S. RAAB
BRIAN J. SPRINGER
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7537*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*

   *Attorneys for Appellants*

# TABLE OF CONTENTS

## VOLUME I

**Page**

1. Plaintiff's Third Amended Verified Complaint (Dkt. No. 69) ..............J.A. 1

2. Order on Motion to Dismiss (Dkt. No. 79)............................................J.A. 69

3. Joint Status Report (Dkt. No. 84).........................................................J.A. 71

4. Order for Referral to Mediation (Dkt. No. 85)....................................J.A. 73

5. Joint Status Report (Dkt. No. 88).........................................................J.A. 75

6. Joint Status Report (Dkt. No. 89).........................................................J.A. 78

7. Joint Status Report (Dkt. No. 90).........................................................J.A. 80

8. Motion for Entry of Proposed Consent Decree and
   Order of Partial Dismissal (Dkt. No. 91) ..............................................J.A. 83

9. Consent Decree and Order of Partial Dismissal (Dkt. No. 92)..........J.A. 90

10. Exhibits to Stipulations of Fact
    (Dkt. Nos. 95-1 to 95-12, 95-14 to 95-21) ..................................................J.A. 98

11. Exhibits to Stipulations of Fact
    (Dkt. Nos. 96-1 to 96-21) ........................................................................J.A. 138

## VOLUME II

12. Amended Request for Judicial Notice (Dkt. No. 98)........................J.A. 180

13. Exhibits to Amended Request for Judicial Notice
    (Dkt. Nos. 98-4 to 98-6) ........................................................................J.A. 185

14. Stipulations of Fact (Dkt. No. 99-1) ....................................................J.A. 395

15. Order on Motions for Summary Judgment (Dkt. No. 111) ..............J.A. 415

16. Opinion on Motions for Summary Judgment (Dkt. No. 112) ..........J.A. 416

17. Amended Opinion on Motions for Summary Judgment
    (Dkt. No. 114) ..........................................................................................J.A. 444

18. Exhibits to Plaintiff's Opposition to Motion for Reconsideration
    (Dkt. Nos. 117-1 to 117-3) ......................................................................J.A. 472

19. Order on Motion for Reconsideration (Dkt. No. 122) .......................J.A. 489

20. Opinion on Motion for Reconsideration (Dkt. No. 123) ...................J.A. 490

21. Notice of Appeal (Dkt. No. 127)...........................................................J.A. 512

22. Exhibit to Motion for Stay Pending Appeal (Dkt. No. 128-1)..........J.A. 514

23. Exhibit to Plaintiff's Opposition to Motion for
    Stay Pending Appeal (Dkt. No. 130-1)..................................................J.A. 527

24. Order on Motion for Stay Pending Appeal (Dkt. No. 134) ..............J.A. 532

25. Opinion on Motion for Stay Pending Appeal (Dkt. No. 135) ...........J.A. 533

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **REVEREND PATRICK J. MAHONEY,** | **Civil Action No. 21-2314 (JEB)** |
| *Plaintiff*, | |
| **v.** | |
| **KAREN H. GIBSON, in her Official Capacity as U.S. Senate Sergeant at Arms and Doorkeeper and Chair, United States Capitol Police Board; WILLIAM P. MCFARLAND, in his Official Capacity as U.S. House of Representatives Sergeant at Arms and Member, United States Capitol Police Board; CHERE REXROAT, in her Official Capacity as Acting Architect of the Capitol and Member, United States Capitol Police Board; and J. THOMAS MANGER, in his Official Capacity as Chief of Police, United States Capitol Police and Ex-Officio Member, United States Capitol Police Board,** | **AMENDED REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION** |
| *Defendants*. | |

Plaintiff Rev. Patrick Mahoney ("Rev. Mahoney") hereby submits this Request for Judicial Notice ("RJN") requesting that the Court take judicial notice of the following public records under Rule 201 of the Federal Rules of Evidence. Defendants do not object to this RJN:

1. Opinion of the three-judge panel in *Jeannette Rankin Brigade v. Chief of Cap. Police*, 342 F. Supp. 575 (D.D.C. 1972), *aff'd* 409 U.S. 972 (1972), attached as Exhibit A. Rev. Mahoney requests that the Court take judicial notice of these documents for the purpose of establishing the fact that the three-judge panel held the Capitol Grounds are a traditional public forum in 1972, a decision that was affirmed by the Supreme Court later that year. *See* Pl.'s Mem. in Supp. Mot. Summ. J. at 8.

2. Opinion of the court in *United States v. Nicholson*, Nos. 20210-69A *et al.*, 97 Daily Wash. L. Rptr. 1213 (D.C. Ct. of Gen. Sess. June 19, 1969), *aff'd*, 263 A.2d 56 (D.C. App. 1970), attached as Exhibit B. Rev. Mahoney requests that the Court take judicial notice of these documents for the purpose of establishing the facts that (1) before the Traffic Regulations were enacted in 1976, demonstration activity was governed by an unwritten permit system administered by the United States Capitol Police, (2) under

this unwritten permit system, Members of Congress were allowed to engage in demonstration activity on the Eastern Steps, and (3) under this unwritten permit system, Members of Congress could—and did—grant unwritten permits for non-Members to engage in demonstration activity on the Eastern Steps. *See* Pl.'s Mem. in Supp. Mot. Summ. J. at 8.

3.  Opinion of this Court in *Lederman v. United States*, 89 F. Supp. 2d 29 (D.D.C. 2000) ("*Lederman I*"), *on reconsideration in part*, 131 F. Supp. 2d 46 (D.D.C. 2001), attached as Exhibit C. Rev. Mahoney requests that the Court take judicial notice of these documents for the purpose of establishing the facts that, at the time of the *Lederman* case, the then-effective version of the Traffic Regulations (1) allowed individuals to engage in demonstration activity on the eastern Capitol steps with a permit and (2) contained a Demonstration Areas Map that is materially indistinguishable from the Demonstration Areas Map that is in place today, with the only meaningful differences being (a) the prior Demonstration Areas Map allowed individuals to engage in demonstration activity on the eastern Capitol steps with a permit and (b) the current Demonstration Areas Map now designates some of the sidewalks within the No Demonstration Zone—including two slivers of a portion of the East Front sidewalk immediately to the east of the eastern House and Senate steps—as "Pedestrian Walkway[s]." *See* Pl.'s Mem. in Supp. Mot. Summ. J. at 9, 36–37 and n.12.

4.  Declaration of Scott Grossi dated September 8, 2021 (ECF 10-1), attached as Exhibit D. Rev. Mahoney requests the Court take judicial notice of this document for the purpose of establishing the facts that (1) prior to January 2, 2024, the United States Capitol Police Board interpreted the Traffic Regulations to have an unwritten exemption for members of Congress under which the Board allowed demonstration activity that was (a) organized by a Members of Congress, (b) organized by a non-Member but sponsored by a Member, or (c) organized by a non-Member but advocated for by a Member and (2) in response to the events of January 6, 2021, the Board temporarily restricted public access to many areas within the Capitol Grounds, but it has since lifted those access restrictions. *See* Pl.'s Mem. in Supp. Mot. Summ. J. at 10.

5.  Traffic Regulations for the United States Capitol Grounds, amended January 2, 2024 (the "Traffic Regulations"), attached as Exhibit E. Rev. Mahoney requests that the Court take judicial notice of the contents of the Traffic Regulations adopted by the United States Capitol Police Board on January 2, 2024. *See* Pl.'s Mem. in Supp. Mot. Summ. J. at 15–17 and *passim*.

6.  United States Capitol Demonstration Areas Map, Traffic Regulations Appx. G, (adopted Dec. 5, 2012), attached as Exhibit F. Rev. Mahoney requests that the Court take judicial notice of the contents of the Demonstration Areas Map, which is referenced in the newly revised version of the Traffic Regulations at Section 12.2.10 as Appendix G. *See* Pl.'s Mem. in Supp. Mot. Summ. J. at 16 and *passim*.

7.  Opinion of the D.C. Circuit Court of Appeals in *Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002) ("*Lederman II*"), attached as Exhibit G. Rev. Mahoney requests

that the Court take judicial notice of this document for the purpose of establishing the facts that, at the time of *Lederman II*, (1) the Traffic Regulations only prohibited demonstration activity that had the "intent, effect or propensity to attract a crowd or onlookers" and (2) the Traffic Regulations specifically excluded "wearing Tee shirts, buttons, or other similar articles of apparel that convey a message." *See* Pl.'s Mem. in Supp. Mot. Summ. J. at 37–38.

8. Memorandum Opinion of this Court in *Lederman v. United States*, Case No. 1:99-cv-3359-RWR, dated July 2, 2003, ECF 137 ("*Lederman III*"), attached as Exhibit H. Rev. Mahoney requests that the Court take judicial notice of this document for the purpose of establishing the fact that the Court in *Lederman III* held that the "core Capitol Grounds"—which it defined as Capitol Square—are a traditional public forum. *See* Pl.'s Mem. in Supp. Mot. Summ. J. at 25.

9. Amended Order for Permanent Injunction of this Court in *Lederman v. United States*, Case No. 1:99-cv-3359-RWR, dated July 2, 2003, ECF 138 ("*Lederman IV*"), attached as Exhibit I. Rev. Mahoney requests that the Court take judicial notice of this document for the purpose of establishing the fact that the Court in *Lederman IV* permanently enjoined the enforcement of the No Demonstration Zone at issue in that case, but against Mr. Lederman only. *See* Pl.'s Mem. in Supp. Mot. Summ. J. at 36.

These materials are the appropriate subjects of judicial notice because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. R. 201(a); *see also* Declaration of Eric A. Sell, dated January 15, 2024, attached as RJN Exhibit J (authenticating Exhibits A–I). Because the attached exhibits are "public records and government documents available from reliable sources," they are subject to judicial notice under Rule 201. *Johnson v. Comm'n on Presidential Debates*, No. CV 15-1580 (RMC), 2016 WL 4179269, at *4 (D.D.C. Aug. 5, 2016); *see also Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 365 (D.C. Cir. 2017) ("Courts may take judicial notice of official court records . . . .") (quoting *Veg-Mix, Inc. v. Dep't of Agric.*, 832 F.2d 601, 607 (D.C. Cir. 1987)); *Bernhardt v. Islamic Republic of Iran*, No. CV 18-2739 (TJK), 2023 WL 2598677, at *5 (D.D.C. Mar. 22, 2023) ("[J]udicial notice may be taken of public records and government documents available from reliable sources.").

By way of clarification, Rev. Mahoney further states that he is not certain this Request for Judicial Notice is necessary for the Court to consider the facts recited above. Rule 201 applies only

to "adjudicative fact[s]" and not "legislative fact[s]." "Adjudicative facts are . . . the facts of the particular case while legislative facts are those [facts] which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." *Schooley v. Islamic Republic of Iran*, No. CV 17-1376 (BAH), 2019 WL 2717888, at *2 (D.D.C. June 27, 2019) (cleaned up)); *see also Nat'l Org. for Women, Washington, D.C. Chapter v. Soc. Sec. Admin. of Dep't of Health & Hum. Servs.*, 736 F.2d 727, 738 (D.C. Cir. 1984) (Robinson, J., concurring) ("Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent  . . . . Legislative facts do not usually concern the immediate parties but the general facts which help the tribunal decide questions of law and policy and discretion."). Under this definition, the vast majority of the facts set forth above are likely "legislative," and the Court should notice them in connection with Rev. Mahoney's Motion independent of Rule 201. *See Ass'n of Nat. Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1163 n.24 (D.C. Cir. 1979) ("The Advisory Committee for the Federal Rules of Evidence embraced the general rule that legislative facts need not be developed through evidentiary hearings.").

Nevertheless, Rev. Mahoney submits this Request out of an abundance of caution in the event the Court deems these facts are "adjudicative." Because the parties have stipulated to a set of facts to govern summary judgment proceedings—subject to supplementation by facts that are properly noticed by the Court—Rev. Mahony simply wants to ensure that the Court considers these facts—however denominated—in connection with those proceedings.

Counsel for Rev. Mahoney has conferred with counsel for Defendants, who has indicated he does not object to this RJN.

4
J.A. 183

DATED: January 17, 2024

Respectfully submitted,

By:/s/Joshua Wallace Dixon
Joshua Wallace Dixon*
Eric A. Sell
(D.C. Bar ID: 1742565)
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771
(703) 687-6200

Harmeet K. Dhillon
(D.C. Bar ID: CA00078)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700
*Pro hac vice
Counsel for Plaintiff Patrick J. Mahoney

5

J.A. 184

# EXHIBIT D

J.A. 185

Page 10 of 363

Filed: 03/05/2025

Document #2104065

USCA Case #24-5207

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK J. MAHONEY,  )
                              )
        Plaintiff,            )
                              )
    v.                        )        Civil Action No. 21-2314 (JEB)
                              )
UNITED STATES CAPITOL         )
POLICE BOARD, *et al.*,       )
                              )
        Defendants.           )
                              )

## DECLARATION OF SCOTT GROSSI

I, Lieutenant Scott Grossi, have personal knowledge of the following facts and will testify to them, if called to do so:

1.      I am the Special Events Section Commander for the United States Capitol Police ("USCP" or "Department") and have served in this capacity since March 2020.  I have been a member of the USCP since March of 2003.

2.      The Capitol Police Board has designated the USCP Special Events Section to receive and process applications for individuals or groups to use the Capitol Grounds for demonstrations or other organized activities.

3.      As the Special Events Section Commander, I ensure that permits are processed in accordance with the *Traffic Regulations for the U.S. Capitol Grounds*, as established by the U.S. Capitol Police Board, and the USCP's *Guidelines for Conducting an Event on United States Capitol Grounds*.

4.      Under these regulations, "no group of twenty (20) persons or more shall engage in demonstration activity on Capitol Grounds except pursuant to the terms of a permit issued by the Capitol Police Board," or the USCP Special Events Section.  A permit is not required for groups

J.A. 186

of fewer than twenty individuals. (A true copy of the *Traffic Regulations for the U.S. Capitol Grounds* ("CTRs") is attached to this Declaration as Exhibit 1.) *See* CTR §§ 12.3.10, 12.4.10.

5.       Once processed by the Special Events Section and approved by the Chief of the Capitol Police, the permit authorizes individuals or groups to use the Capitol Grounds for a specific purpose and for a specified amount of time.

6.       The purpose of the Capitol Police Board regulations and guidelines is to ensure public health and safety during activities, while shielding the Congressional community from threats and violence.

7.       In fulfilling this purpose, the Capitol Police Board determines which areas within the Capitol Grounds may be temporarily restricted or permanently prohibited for public use or access. This determination may be based on events or circumstances ranging from Presidential Inaugural ceremonies to lingering threats posed by insurrectionist groups. (A true copy of the Demonstration Map is attached to this Declaration as Exhibit 2.)

8.       Section 12.2.10 of the CTRs, Permissible Demonstration Areas, specifically notes that, "Demonstration activity is allowed in designated areas as indicated on the 'United States Capitol Grounds Demonstration Areas Map,' as amended."

9.       Section 12.2.20 of the CTRs, Prohibited Demonstration Areas, notes further that, "No person or group of any size may engage in demonstration activity . . . in any area otherwise closed or restricted for official use."

10.     On January 6, 2021, thousands of insurrectionists stormed the Capitol Building and Capitol Grounds significantly damaging windows, doors, and other points of entry.

11.     On January 8, 2021, the Capitol Police Board restricted public access to certain areas within the Capitol Grounds to limit exposure and protect against threats to the damaged

USCA Case #24-5207      Document #2104065            Filed: 03/05/2025      Page 11 of 363

(Page 11 of Total)

Capitol Building and the Congressional community.  Outer and inner perimeter fencing was installed as an additional security measure.

12.    As of March 28, 2021, the Capitol Police Board authorized the removal of the outer perimeter fencing to permit demonstrations and other activity.  (A true copy of the March 28, 2021, Board Order is attached to this Declaration as Exhibit 3.)

13.    As of July 11, 2021, the Capitol Police Board authorized the removal of the inner perimeter fencing.

14.    The areas in closest proximity to the Capitol Building, the area known as Capitol Square (Areas 1, 8, 9, 10, and 11 on the Demonstration Map) remain temporarily restricted to demonstration groups of 20 or more.  Groups of fewer than 20 can demonstrate even without a permit in any area that is not fenced off or otherwise strictly prohibited, such as the Capitol steps. CTR § 12.3.10.

15.    I am aware that in July and August of 2021, the USCP and the Capitol Police Board were in discussions about which demonstration areas to re-open given the removal of the interior fence.  Ultimately, on September 2, 2021, the Board approved Board Order 21-15, which opened nine additional demonstration areas (although two remain temporarily closed for construction).  However, "based upon the recommendation of the United States Capitol Police, an evaluation of the current security posture of the Capitol complex, and the upcoming demonstrations on the Capitol Grounds and in the city" the five areas within Capitol Square were to remain closed to demonstrations of more than 19 people.  (A true copy of the September 2, 2021, Board Order is attached to this Declaration as Exhibit 4.)

3

J.A. 188

USCA Case #24-5207      Document #2104065      Filed: 03/05/2025      Page 13 of 363

16.     As the USCP Special Events Section Commander, I can only process permit requests for demonstrations or organized activity involving more than 19 people in non-restricted or non-prohibited areas.

17.     Since July 11, 2021, the USCP Special Event Section has received approximately 13 permit applications to access Area 1. We have been unable to process or permit the use of these areas by any of the groups with two exceptions, both for events on July 27, 2021.

18.     In July, the USCP Special Events Section processed an event sponsored by a Member of Congress for the afternoon of July 27, 2021, in Area 1, and that event was held.

19.     That same month, the USCP Special Events Section was also contacted by staff of a different Member's office seeking to have a separate event on the East Front of the Capitol within Capitol Square on July 22, 2021. Ultimately this event was held on the morning of July 27, 2021, in Area 1. Although this event ended up being sponsored by the American Conservative Union, to my understanding both the original requesting Member, an additional Senator, and their staff strongly advocated that a permit be granted for this event. The American Conservative Union event was attended by several Members, Senators, and their staff.[1]

20.     Traditionally events sponsored or organized by Members of Congress are not subject to the rules regarding demonstrations on Capitol Grounds due to the unique nature of a Member's constitutional duties.

21.     In addition, 40 U.S.C. § 5104 contains the statutory prohibition against engaging in disorderly or disruptive conduct on the Capitol Grounds, demonstrating within Capitol

---

[1]     https://www.rickscott.senate.gov/2021/7/photo-release-sen-rick-scott-at-cuba-libre-rally-where-is-joe-biden.

4

Buildings, or obstructing passage on the Grounds (*see* 40 U.S.C. § 5104(e)(2)(D), (F) and (G)).

The same statute, however, further provides:,

> **(3)** EXEMPTION OF GOVERNMENT OFFICIALS.—This subsection does not prohibit
> any act performed in the lawful discharge of official duties by—
>
> **(A)** a Member of Congress;
>
> **(B)** an employee of a Member of Congress;
>
> **(C)** an officer or employee of Congress or a committee of Congress; or
>
> **(D)** an officer or employee of either House of Congress or a committee of that
> House.

40 U.S.C. § 5104(e)(3).

22.   I am also aware that Member Cori Bush conducted an unpermitted

demonstration/sleep-in on the East Front stairs for several days in early August.  No permit

application was filed with the USCP Special Events Section for this demonstration.  (Note that

the East Front stairs are never permitted for demonstrations even when Capitol Square is

otherwise available for demonstrations.)

23.   During this event it is my understanding that Member Bush and other Members of

Congress were present during the demonstrations, which lasted overnight. When the attendance

of these Members ceased, the remaining demonstrators were told they were violation of the

demonstration rules and given appropriate warnings.

24.   I am aware that on or about July 9, 2021, Reverend Patrick J. Mahoney submitted

a permit application to the USCP Special Events Section.  He sought to conduct a demonstration

or organized activity in Area 1 on the Demonstration Map ("Lower Western Terrace" in his

request) related to the 20th anniversary of September 11th.

25.   Area 1 is near the Capitol Building on the Lower West Terrace.  Access to this

area, along with the entire area known as Capitol Square, an area bounded by First Streets, NE

and SE, Constitution Avenue, NW and NE, First Street, NW and SW and Independence Avenue, SW and SE, has been temporarily restricted to groups over 19 given its proximity to the Capitol Building and the continued concerns of large groups gathering to close to the Capitol. As permits are not required for groups of fewer than 20 and the area is no longer enclosed by a fence, Rev. Mahoney could have an event with fewer than 20 people at his chosen location, Area 1. Rev. Mahoney could also have an event with 20 or more people at the many other open demonstration areas near the Capitol, including one of the areas recently re-opened for demonstration by the Capitol Police Board on September 2.

26.     On August 19, 2021, the USCP Special Events Section informed Rev. Mahoney in writing that it could not process his application for Area 1 because Area 1 was temporarily closed for demonstrations.

27.     On August 20, 2021, the USCP Special Events Section informed Rev. Mahoney in writing: "Currently, Area 1 and the East Front Areas are not authorized for permitted demonstrations, but our office is available to assist you with finding an authorized area to conduct your First Amendment activity."

28.     On August 24, 2021, Rev. Mahoney submitted a revised application for a demonstration on September 11, 2021, this time requesting to hold a prayer vigil on Area 10 on the East Front. However, since that area also is temporarily closed, the USCP Special Events Section informed Rev. Mahoney on August 26, 2021 via email that "the areas on the East Front of Capitol Grounds, to include Area #10, are currently closed. We would be happy to work with you on the application for September 11, 2021, in one of the available locations on Capitol Grounds."

29.    Finally, I am aware of a pending permit application with the USCP Special Events
Section for September 18, 2021, for Area 15 (Union Square) by a group called Look Ahead
America that is holding a demonstration/rally titled "Justice for J6" to support the "political
prisoners" from January 6th.  The current permit states that the event is expected to attract 700
demonstrators.

<div align="center">*    *    *    *    *</div>

I declare under the penalty of perjury under the laws of the United States of America that
the foregoing is true and correct concerning my knowledge of Mr. Mahoney's permit application
as of September 8, 2021.

Executed on this 8th day of September 2021.

<div align="center">
Lieutenant Scott L. Grossi<br>
United States Capitol Police<br>
Special Event Section Commander
</div>

Page 16 of 363

Filed: 03/05/2025

Document #2104065

USCA Case #24-5207

(Page 16 of Total)

# EXHIBIT 1

J.A. 193

# TRAFFIC REGULATIONS

## FOR THE

# UNITED STATES CAPITOL GROUNDS



PROMULGATED BY
**THE CAPITOL POLICE BOARD**
UNITED STATES CAPITOL
WASHINGTON, D.C.

**FINAL PUBLICATION**

Amended
**FEBRUARY 17, 2019**

J.A. 194

# CHAPTER 12
# DEMONSTRATIONS AND SPECIAL EVENTS

## § 12.1. DEMONSTRATION ACTIVITY

### §12.1.10. DEFINITION

Demonstration activity is defined as any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution.

### §12.1.20. APPLICABILITY

The provisions of this chapter shall be applicable to any one (1) person or group of persons engaged in demonstration activity on Capitol Grounds. The provisions of this chapter shall apply equally to all demonstrators, regardless of viewpoint.

### §12.1.30. SPECIAL EVENTS

Certain events on Capitol Grounds are not considered "demonstrations" for the purposes of this chapter. They are authorized as follows:

  **a.** JOINT RESOLUTION. Parades, assemblages and display of flags, banners or devices designed to bring into public notice a party, organization or movement are not permitted on Capitol Grounds unless concurrently authorized by the President of the Senate and the Speaker of the House of Representatives. [31]

  **b.** BAND CONCERTS. Concerts performed by bands that are in the service of the federal government, at times which will not interfere with Congress, as authorized by the Architect of the Capitol.[32]

  **c.** LOUISIANA AVENUE. Parades, processions or assemblages on that part of Louisiana Avenue located within Capitol Grounds. The Capitol Police Board grants the Mayor of the District of Columbia the authority to permit the use of Louisiana Avenue for these events.[33]

  **d.** TOUR GROUPS. A group organized for the purpose of sightseeing and visiting the Capitol.

  **e.** CEREMONIAL EVENTS AND ENTERTAINMENT. Any small-scale event such as a school band, musical presentation or military reenlistment ceremony. Any

---

[31]   40 U.S.C. § 5104(f) ("Parades, Assemblages and Display of Flags"); 40 U.S.C. § 5106(a) ("Authority to Suspend") *See* Appendix F.

[32]   40 U.S.C. § 5107 ("Concerts on Grounds"). *See* Appendix F.

[33]   40 U.S.C. § 5106(c) ("Authority of Mayor to Permit Use of Louisiana Avenue"). *See* Appendix F.

group wishing to engage in this type of activity must
apply for and receive prior written approval from the
Board. These events shall only be conducted in assigned
areas and must comply with all restrictions, limitations
and conditions as determined by the Board.

## § 12.2. GENERAL REQUIREMENTS

### §12.2.10. PERMISSIBLE DEMONSTRATION AREAS

Demonstration activity is allowed in designated areas as indi-
cated on the "United States Capitol Grounds Demonstration
Areas Map," as amended.[34]

### §12.2.20. PROHIBITED DEMONSTRATION AREAS

No person or group of any size may engage in demonstration
activity on the steps of the United States Capitol, on the steps
of any building on Capitol Grounds or in any area otherwise
closed or restricted for official use. In addition, projecting of im-
ages on any building on Capitol Grounds shall not be permitted.

## § 12.3. GROUPS UNDER TWENTY

### §12.3.10. NO PERMIT REQUIRED

No person or group of less than twenty (20) persons shall be
required to obtain a permit.

### §12.3.20. AVAILABILITY

Space for one (1) person or group of less than twenty (20)
persons is available on a first-come, first-served basis, subject
to the provisions of this chapter.

### §12.3.30. PERMIT ENCOURAGED

One (1) person or group of less than twenty (20) persons that
desires to secure a specific demonstration area is encouraged
to file an application for a permit. A permit holder will be
given priority over any person or group occupying a demon-
stration area not in possession of a permit. The Board may
remove or relocate any person or group of less than twenty
(20) persons not in possession of a permit to accommodate
permitted demonstration activity or special event as autho-
rized by §12.1.30.

### §12.3.40. PROHIBITIONS

A person or group of less than twenty (20) persons shall not
engage in the following:

**a.** SEGMENTING FROM THE GROUP. A person or
group of less than twenty (20) persons may engage in
demonstration activity without a permit provided that
the demonstration activity is not merely a segment of

---

[34]  *See* Appendix G. Approved December 5, 2012.

the same group whose complement would consist of twenty (20) or more persons.

**b.** <u>INTERFERENCE</u>. No person or group of less than twenty (20) persons shall engage in demonstration activity that audibly or physically interferes with the demonstration activity of another person or group.

**c.** <u>DENSITY</u>. No person or group of less than twenty (20) persons shall occupy an area in which the density exceeds 4.95 square feet per person, including props and equipment.[35] In no instance shall the per person density of any area exceed that set by the Federal Emergency Management Agency.

**d.** <u>SEVEN DAY LIMITATION</u>. No person or group of less than twenty (20) persons shall engage in demonstration activity for a period that exceeds more than seven (7) consecutive days.

**e.** <u>CONTINUOUS DAILY DEMONSTRATION</u>. No person or group of less than twenty (20) persons shall engage in demonstration activity having a duration of more than twenty-four (24) consecutive hours, including clean-up and the set-up and take down of props and equipment.[36]

### §12.3.50. APPLICABILITY OF OTHER SECTIONS.

With the exception of §12.4, any person or group of less than twenty (20) persons is required to adhere to the provisions of this chapter.

## § 12.4. GROUPS OVER TWENTY

### §12.4.10. PERMIT REQUIRED FOR GROUPS OF TWENTY OR MORE

No group of twenty (20) persons or more shall engage in demonstration activity on Capitol Grounds except pursuant to the terms of a permit issued by the Capitol Police Board.

### §12.4.20. PERMIT APPLICATIONS

**a.** <u>ADVANCE NOTICE</u>. All applications for permits shall be submitted in writing to the Capitol Police Board.[37] An application shall be submitted in writing so as to be received by the Capitol Police Board at least ten (10)

---

[35] "Special Events Contingency Planning," Federal Emergency Management Agency (Mar. 2005).

[36] *Community for Creative Non-Violence v. Carvino, et al.,* 660 F. Supp 744 (D.D.C. 1987); *Community for Creative Non-Violence v. Kerrigan, et.al.,* 865 F.2d 382 (D.C. App. 1989). *See* Appendix H for all related case law.

[37] The Special Events Division of the United States Capitol Police has been designated to receive and process applications. Applications can be obtained by calling (202) 224-8891 or visiting www.uscapitolpolice.gov.

business days in advance of the proposed demonstration activity.

**b.** <u>CONTENTS</u>. Permit applicants shall provide the following:

1. Requested area of Capitol Grounds;
2. Date, time, duration, and nature of the demonstration activity;
3. Estimated number of participants;
4. Sponsoring person or organization;
5. Requested props and equipment; and,
6. Name, address, telephone number and signature of applicant.

**c.** <u>WAIVER</u>. The Board may waive notice or reduce the number of days of advance notice if it determines that unforeseen or exceptional circumstances exist.

### §12.4.30. PROCESSING APPLICATIONS AND ISSUANCE OF PERMITS

**a.** <u>APPROVAL</u>. The Capitol Police Board shall process applications in order of their receipt. Properly completed applications will be given priority over applications that are defective.

**b.** <u>ISSUANCE</u>. The Board shall issue a permit authorizing peaceable and orderly demonstration activity upon proper and timely application.

**c.** <u>CONTENTS</u>. Each permit shall clearly identify:

1. The sponsoring person and organization;
2. The area on Capitol Grounds where the permitted demonstration activity is to take place;
3. The date, time and duration of the demonstration activity;
4. The nature of the event and detailed description of the activity; and,
5. The number of participants.

**d.** <u>TACIT APPROVAL</u>. Should the Board fail to act on a properly completed and timely filed application within forty-eight (48) hours prior to the date of the proposed demonstration activity, such application shall be deemed approved by the Board.

### §12.4.40. TERMS AND CONDITIONS

In addition to any additional terms as set forth in the permit, no permit shall be issued that authorizes the following:

**a.** <u>AREA</u>. No permit shall authorize a group to demonstrate in more than one (1) area per event simultaneously.

**b.** <u>DENSITY</u>. No permit shall be issued that would exceed a density of five (5) square feet per person in

the requested demonstration area, including props and equipment.

    **c.** <u>SEVEN DAY LIMITATION</u>. No permit shall be issued for a period of more than seven (7) consecutive days.

    **d.** <u>CONTINUOUS DAILY DEMONSTRATION PRO-HIBITED</u>**.** No permit shall authorize demonstration activity having a duration of more than twenty-four (24) consecutive hours, including clean-up and the set up and take down of props and equipment.[38]

### §12.4.50. GROUPS TO REMAIN IN ASSIGNED AREAS

All groups are required to remain in their assigned demonstration areas throughout the course of the demonstration activity. The same group may not hold a permit to more than one demonstration area at the same time.

### §12.4.60. REVOCATION FOR NON-COMPLIANCE OR FOR CAUSE

In any case in which the terms of the permit are violated, such permit may be revoked by the Capitol Police Board. The Board is authorized to revoke a permit if it determines that continuation of demonstration activity is likely to result in bodily harm or death to an individual, damage to or destruction of any real or personal property or that a breach of the peace is imminent and good order cannot otherwise be maintained.

### § 12.5. PROPS AND EQUIPMENT

The following provisions apply to all persons or groups of persons bringing props and equipment onto Capitol Grounds.

### §12.5.10. GENERAL

    **a.** <u>DEFINITION</u>. Props and equipment include items such as stands, lecterns, sound amplification equipment, chairs, tables, portable sanitary facilities, press and news facilities or other similar items that are reasonably necessary as an integral part of demonstration activity.

    **b.** <u>HEIGHT RESTRICTION</u>. No single prop, piece of equipment or combination thereof may exceed fifteen (15) feet in height.

    **c.** <u>STAGES, RISERS AND PLATFORMS</u>. No stage, riser or platform may exceed two (2) feet in height.

    **d.** <u>UNATTENDED PROPS AND EQUIPMENT</u>. No prop or piece of equipment shall be left unattended while on Capitol Grounds.

    **e.** <u>REMOVAL</u>. All props and equipment must be capable of immediate removal.

---

[38] *Community for Creative Non-Violence v. Kerrigan, et.al.*, 660 F. Supp 744 (D.D.C. 1987); 865 F.2d 382 (D.C. App. 1989). *See* Appendix H for all related case law.

  **f.** <u>TWENTY FOUR HOUR LIMITATION</u>. Props and
   equipment must be removed frm Capitol Grounds at
   least once every consecutive twenty-four (24) hour
   period.[39]

  **g.** <u>CONCLUSION</u>. Demonstration activity is not consid-
   ered concluded until all props and equipment are re-
   moved from Capitol Grounds within the permitted time.

### §12.5.20. ADDITIONAL REQUIREMENTS FOR PERMIT APPLICANTS

  **a.** All permit applicants are required to list props and
   equipment in their application.

  **b.** Permit applicants must provide a description and the
   intended use of each such item in the permit applica-
   tion.

  **c.** Any stage, riser or platform must be clearly identified in
   the permit application and receive Board authorization
   prior to use.

  **d.** Permit holders are subject to any additional require-
   ments pertaining to props and equipment as deter-
   mined by the Board and set forth in the permit.

## § 12.6. SIGNS, BANNERS AND PLACARDS

Signs, banners and placards are permissible on Capitol Grounds
provided the supports for these items have dull ends, do not exceed ¾
of an inch at their widest point and cannot in any way be construed
as a weapon. No nails, screws or bolt-type fastening devices may be
protruding from the supports.

## § 12.7. TEMPORARY STRUCTURES

No temporary structure of any kind may be erected on Capitol
Grounds. Tents, cabanas, canopies and all other types of covered or
enclosed structures are expressly prohibited.[40] No object shall be tied,
fastened or suspended to any tree, pole or other landscape or archi-
tectural feature on Capitol Grounds.

## § 12.8. AMPLIFICATION AND OTHER NOISE DISTURBANCES

### §12.8.10. AMPLIFICATION EQUIPMENT

Amplification equipment is not permitted on the Lower West
Front Terrace or any other location on Capitol Grounds as
determined by the Board.

---

[39] *Id.*

[40] *See also* §16.6 ("Camping").

### §12.8.20. SOUND PROJECTION
All sound amplification equipment must be projected away from the Capitol and all other Congressional office buildings.

### §12.8.30. UNAMPLIFIED DISTURBANCES
No individual may utter loud, threatening or abusive language or engage in disorderly or disruptive conduct at any place on Capitol Grounds that interferes with any business being conducted in the Capitol or in any of the office building on Capitol Grounds at any time, including during periods of recess.

## § 12.9. ROAD RACES

### §12.9.10. DEFINITION
A road race is any type of sponsored running or cycling event, such as a marathon or triathlon.

### §12.9.20. PERMIT REQUIRED FROM NEIGHBORING AGENCY
No road race will be allowed to traverse Capitol Grounds when the route includes District of Columbia or National Park Service land unless a permit from the Metropolitan Police and National Park Service has been issued.

### §12.9.30. SUNDAYS
Road races are permitted on Sundays only.

### §12.9.40. NO RE-TRACING ON CAPITOL GROUNDS
Road races shall only pass through Capitol Grounds once; there will be no re-tracing of the route on Capitol Grounds.

### §12.9.50. CAPITOL SQUARE
A road race may not occupy more than two (2) streets that comprise Capitol Square.

### §12.9.60. AUTHORIZED ROUTE
Race coordinators must submit documentation that lays out the route of the race. Race participants must remain on the authorized route throughout the course of the race.

## § 12.10. MARCHES

### §12.10.10. PRIOR PERMIT REQUIRED
No march will be authorized without an existing permit from both the Metropolitan Police Department and the National Park Service.

### §12.10.20. AUTHORIZED ROUTE
Participants must submit documentation that lays out the route and remain on the authorized route throughout the march. Unless otherwise authorized by the Board, all marchers are to remain on sidewalks.

## § 12.11. DAMAGE TO CAPITOL GROUNDS

### §12.11.10.  RESTORATION OF GROUNDS

Any person or group of persons that engages in demonstration activity on Capitol Grounds shall restore the grounds to same condition that existed prior to that demonstration activity.

## § 12.12. PERSONAL ACTIVITIES

Wedding ceremonies, graduation ceremonies and other events of a personal nature are not permitted on Capitol Grounds.

## § 12.13. ADDITIONAL CONDITIONS

The Board reserves the right to impose additional reasonable time, place and manner restrictions on any demonstration activity consistent with this chapter in the interest of safety and in order to minimize the obstruction or impediment of vehicular and pedestrian traffic through or within the Capitol Grounds.

# EXHIBIT 2

J.A. 203



ARCHITECT OF THE CAPITOL
NO DEMONSTRATION PERMITTED
PEDESTRIAN WALKWAY – MUST NOT BE IMPEDED AT ANY TIME
DEMONSTRATION PERMIT AREA
ELECTRIC POWER LOCATIONS
SUBWAY STATION
CAPITOL POLICE BOARD IS VESTED WITH THE EXCLUSIVE CHARGE AND CONTROL OF THE REGULATION AND MOVEMENT OF ALL VEHICULAR AND OTHER TRAFFIC, INCLUDING DEMONSTRATION ACTIVITY, WITHIN THE UNITED STATES CAPITOL GROUNDS PURSUANT TO TITLE 2, UNITED STATES CODE SECTION 1969.
NOVEMBER 2012
UNITED STATES CAPITOL GROUNDS
DEMONSTRATION AREAS MAP
UNITED STATES CAPITOL
UNITED STATES SUPREME COURT
LIBRARY OF CONGRESS JEFFERSON BUILDING
LIBRARY OF CONGRESS ADAMS BUILDING
LIBRARY OF CONGRESS MADISON MEMORIAL BUILDING
CANNON HOUSE OFFICE BUILDING
LONGWORTH HOUSE OFFICE BUILDING
RAYBURN HOUSE OFFICE BUILDING
FORD HOUSE OFFICE BUILDING
RUSSELL SENATE OFFICE BUILDING
DIRKSEN SENATE OFFICE BUILDING
HART SENATE OFFICE BUILDING
FEDERAL JUDICIARY BUILDING
UNION STATION
UNION SQUARE
UPPER SENATE PARK
INDEPENDENCE AVENUE
CONSTITUTION AVENUE
PENNSYLVANIA AVENUE N.W.
MARYLAND AVENUE S.W.
LOUISIANA AVENUE N.W.
DELAWARE AVENUE N.E.
MASSACHUSETTS AVENUE N.E.
NEW JERSEY AVENUE N.W.
PAUL D. IRVING
CHAIRMAN
CAPITOL POLICE BOARD
TERRANCE W. GAINER
MEMBER
CAPITOL POLICE BOARD
STEPHEN T. AYERS, FAIA, LEED AP
MEMBER
CAPITOL POLICE BOARD
12/3/12
DATE APPROVED

# EXHIBIT 3

**CAPITOL POLICE BOARD**
**S-151 The Capitol**
**WASHINGTON, DC 20510**
PHONE (202) 224-2341

**KAREN H. GIBSON, Chair**
**TIMOTHY P. BLODGETT, Member**
**J. BRETT BLANTON, Member**
**YOGANANDA D. PITTMAN, Ex-Officio Member**

## CAPITOL POLICE BOARD ORDER 21.08

### CONCERNING CERTAIN DEMONSTRATION AREAS
### ON U.S. CAPITOL GROUNDS

With the removal of the outer perimeter fence, the Capitol Police Board hereby reopens the following areas for demonstrations as shown on the attached United States Capitol Grounds Demonstration Map: Areas 3, 5, 6, 12 and 15. These areas, along with the following areas that are remaining open (Areas 16, 17, 18 and 23), shall remain open for demonstrations that may not exceed 50 people per Capitol Police Board Order 20.12. The following areas, along with any adjacent sidewalks, shall remain closed to demonstrations: Areas 1, 2, 4, 7, 8, 9, 10, 11, 13, 14, 19, 20, 21, and 22.

So ORDERED and APPROVED this __28th__ Day of March 2021.

Karen H. Gibson
Chair

Timothy P. Blodgett
Member

J. Brett Blanton
Member

J.A. 206

# EXHIBIT 4




# CAPITOL POLICE BOARD
### S-151 The Capitol
### WASHINGTON, DC 20510
PHONE (202) 224-2341

**KAREN H. GIBSON, Chair**
**WILLIAM J. WALKER, Member**
**J. BRETT BLANTON, Member**
**J. THOMAS MANGER, Ex-Officio Member**

## CAPITOL POLICE BOARD ORDER 21.15

## CONCERNING CERTAIN DEMONSTRATION AREAS
## ON U.S. CAPITOL GROUNDS

The Capitol Police Board (Board) hereby reopens the following areas for demonstrations as shown on the attached United States Capitol Grounds Demonstration Map based upon the recommendation of the United States Capitol Police, an evaluation of the current security posture of the Capitol complex, and the upcoming demonstrations on the Capitol Grounds and in the city: Areas 2, 4, 7, 13, 14, 19, 20, 21, and 22.[1] These areas, and any other areas already opened from prior Board orders, may now host demonstrations that exceed 50 persons.

The following areas, along with any adjacent sidewalks, shall remain closed to demonstrations of 20 persons or more: Areas 1, 8, 9, 10, and 11.  The Board shall review closure of these areas within six months of the issuance of this order.

So ORDERED and APPROVED this  2nd  Day of September 2021.

Kelly Fado signed for General Gibson

**Kelly Fado**
Digitally signed by Kelly Fado
Date: 2021.09.02
13:09:40 -04'00'

Karen H. Gibson
Chair

**William J. Walker**
Digitally signed by William J. Walker
Date: 2021.09.01
18:37:59 -04'00'

William J. Walker
Member

**Blanton, Brett**
Digitally signed by Blanton, Brett
Date: 2021.09.02
11:53:18 -04'00'

J. Brett Blanton, P.E.
Member

Attachment

---

[1] Areas 2 and 4 are currently under construction, so they will remain temporarily closed until the completion of construction, when they can be fully opened for demonstration purposes.

# EXHIBIT E

# TRAFFIC REGULATIONS
## FOR THE
# UNITED STATES CAPITOL GROUNDS



PROMULGATED BY
**THE CAPITOL POLICE BOARD**
UNITED STATES CAPITOL
WASHINGTON, D.C.

**FINAL PUBLICATION**

AMENDED

**JANUARY 2, 2024**

# CAPITOL POLICE BOARD

UNITED STATES CAPITOL
WASHINGTON, D.C.

JUNE 1, 2014

WHEREAS it has been the long-standing intent and practice of Congress to retain exclusive control over the United States Capitol Buildings and Grounds;

WHEREAS said intent is reflected in the delegation of authority granted to the Capitol Police Board by Public Law 570, 79th Congress, approved July 31, 1946, *as amended,* which:

– VESTS the Capitol Police Board with exclusive charge and control of the regulation and movement of all vehicular and other traffic within Capitol Grounds, including parking and impounding of vehicles and limiting the speed thereof;

– AUTHORIZES AND EMPOWERS the Capitol Police Board to make and enforce all necessary regulations for such purposes;

– AUTHORIZES AND EMPOWERS the Capitol Police Board to prescribe penalties for violation of such regulations not to exceed a fine of $300 or imprisonment for not more than ninety (90) days;

– AUTHORIZES AND EMPOWERS the Capitol Police Board to promulgate and amend such regulations from time to time whenever the Board shall deem it necessary; and,

– PROVIDES THAT certain parts of the District of Columbia Traffic Act of 1925, *as amended*, for the violation of which specific penalties are provided in said Act, shall be applicable to Capitol Grounds.

WHEREAS, in the interest of securing public safety and for protection against personal injury or damage to property and while taking into account the unique nature, circumstances and law enforcement needs on Capitol Grounds;

WHEREAS, it is the sense of the Board that continuity with local traffic regulations is desired to the greatest extent possible:

J.A. 211

**NOW THEREFORE, BE IT RESOLVED THAT**, pursuant to the authority granted to it by Public Law 570, 70th Congress, approved July 31, 1946, *as amended*, the Capitol Police Board hereby:

– RESCINDS the Traffic and Motor Vehicle Regulations for the United States Capitol Grounds (June 1, 1983) and any amendments made thereto;

– REVISES the Traffic and Motor Vehicle Regulations for the United States Capitol Grounds by updating existing provisions and providing for specific traffic regulations unique to Capitol Grounds;

– RENAMES the Traffic and Motor Vehicle Regulations for the United States Capitol Grounds to "Traffic Regulations for the United States Capitol Grounds," to reflect the inclusion of pedestrian and other miscellaneous vehicle regulations;

– DIRECTS the Executive Assistant of the Capitol Police Board to publish the Capitol Police Board Code of Traffic Regulations for the United States Capitol Grounds in conformance with 2 U.S.C. § 1969(c);

Adopted by the Capitol Police Board by unanimous vote on August 13, 2013

**EFFECTIVE DATE**:  This revised Capitol Police Board Code of Traffic Regulations for the United States Capitol Grounds is hereby adopted and shall become effective after the expiration of ten days after the date of publication in one of more of the daily newspapers published in the District of Columbia at which time the existing traffic regulations shall no longer be in effect and shall be rescinded.

# TABLE OF CONTENTS

**ARTICLE I:  GENERAL PROVISIONS**

CHAPTER 1.   APPLICABILITY AND ENFORCEMENT
CHAPTER 2.   TRAFFIC SIGNS SIGNALS AND DEVICES
CHAPTER 3.   EQUIPMENT
CHAPTER 4.   INSPECTION STICKER REQUIREMENTS
CHAPTER 5.   IDENTIFICATION TAGS


**ARTICLE II:  MOTOR VEHICLES**

CHAPTER 6.   CRIMINAL DRIVING OFFENSES
CHAPTER 7.   MOVING
CHAPTER 8.   PARKING, STANDING AND STOPPING
CHAPTER 9.   TAXICABS AND VEHICLES FOR HIRE
CHAPTER 10.  FUNERALS


**ARTICLE III:  PEDESTRIANS, BICYCLES AND OTHER TRAFFIC**

CHAPTER 11.  PEDESTRIANS
CHAPTER 12.  DEMONSTRATIONS AND SPECIAL EVENTS
CHAPTER 13.  BICYCLES
CHAPTER 14.  PEDICABS
CHAPTER 15.  LOW-SPEED VEHICLES
CHAPTER 16.  RECREATIONAL ACTIVITIES AND SPECIAL RESTRICTIONS WITHIN CAPITOL
             GROUNDS

i

# TABLE OF CONTENTS

**ARTICLE I:   GENERAL PROVISIONS**

**CHAPTER 1.   APPLICABILITY AND ENFORCEMENT**

**§1.1.   AUTHORITY**
**§1.2.   PURPOSE**
**§1.3.   OBEDIENCE TO TRAFFIC REGULATIONS**
  §1.3.10.   Required Compliance with Traffic Regulations
  §1.3.20.   Failure to Comply with a Lawful Order
**§1.4.   APPLICABILITY**
  §1.4.10.   General
  §1.4.20.   Exemptions for Authorized Employees and Vehicles
  §1.4.30.   Presumption of Ownership
  §1.4.40.   Parental Negligence
  §1.4.50.   Waiver
**§1.5.   DUTIES AND PRIVILEGES FOR AUTHORIZED EMERGENCY VEHICLES**
  §1.5.10.   Privileges
  §1.5.20.   Audible Warning Signal Required
  §1.5.30.   Reckless Driving
  §1.5.40.   Compliance with Regulations and Directives
**§1.6.   PENALTIES**
  §1.6.10.   Fines and Imprisonment
**§1.7.   ADJUDICATION**
  §1.7.10.   D.C. Traffic Violations
  §1.7.20.   Hill-Specific Violations

**§1.8.   IMPOUNDMENT**
  §1.8.10.   Motor Vehicles May be Impounded for Violations
        (a)   Incapacitated Driver
        (b)   Obstruction
        (c)   Parking Violations
        (d)   Abandoned vehicles
        (e)   Excess of Meter
        (f)   Tow Zone
        (g)   Incident to Arrest
  §1.8.20.   Bicycles, Pedicabs and Low-Speed Vehicles may be Impounded for Violations

# TABLE OF CONTENTS

CHAPTER 2.   TRAFFIC SIGNS SIGNALS AND DEVICES

§ 2.1.   GENERAL
  §2.1.10.   Placement and Maintenance of Traffic Control Devices
  §2.1.20.   Exclusive Control
  §2.1.30.   Obedience to Traffic Signs, Signals or Devices
  §2.1.40.   Exemption for Illegible Signs
  §2.1.50.   Interference with Traffic Control Devices
§ 2.2.   UNAUTHORIZED TRAFFIC CONTROL DEVICES, MARKINGS AND SIGNS
  §2.2.10.   Unauthorized Signs
  §2.2.20.   No Notice Required
§ 2.3.   DRIVER OBEDIENCE TO TRAFFIC CONTROL SIGNALS
  §2.3.10.   Placement and Maintenance
  §2.3.20.   Obedience to all Traffic Signs
  §2.3.30.   Green Signal
  §2.3.40.   Green Arrow
  §2.3.50.   Steady Yellow Signal
  §2.3.60.   Steady Yellow Arrow
  §2.3.70.   Steady Red Signal
  §2.3.80.   Steady Red Arrow
  §2.3.90.   Proper Stopping
§ 2.4.   DRIVER OBEDIENCE TO FLASHING RED AND YELLOW SIGNALS
  §2.4.10.   Obedience to Signals
  §2.4.20.   Red Flashing Signal
  §2.4.30.   Yellow Flashing Signal
  §2.4.40.   Yellow Arrow
  §2.4.50.   Failure to Yield
§ 2.5.   DRIVER OBEDIENCE TO LANE-USE CONTROL SIGNALS
  §2.5.10.   General
  §2.5.20.   Downward Green Arrow
  §2.5.30.   Steady Yellow X
  §2.5.40.   Flashing Yellow X
  §2.5.50.   Steady Red X
  §2.5.60.   Traffic Controls Remain in Effect
§ 2.6.   PEDESTRIAN OBEDIENCE TO TRAFFIC CONTROL SIGNALS
  §2.6.10.   Application
  §2.6.20.   Green Signal
  §2.6.30.   Steady Yellow Signal
  §2.6.40.   Steady Red Signal
  §2.6.50.   Vertical Green or Thru Arrow
§ 2.7.   PEDESTRIAN SIGNALS
  §2.7.10.   Application
  §2.7.20.   Walk Signal
  §2.7.30.   No Crossing

J.A. 215

# TABLE OF CONTENTS

**CHAPTER 3.   EQUIPMENT**

**§ 3.1.   GENERAL PROVISIONS**
    §3.1.10.    Scope and Effect of Regulations
        (a)    Application
        (b)    Non-Conventional Design
        (c)    Additional Equipment
        (d)    Exemptions
    §3.1.20.    Incorporation by Reference
    §3.1.30.    Certification of Compliance

**§ 3.2.   UNSAFE VEHICLES**
    §3.2.10.    Unsafe Mechanical Condition

**§ 3.3.   LAMPS AND LIGHTING EQUIPMENT**
    §3.3.10.    Applicability
        (a)    Visibility
        (b)    Height
        (c)    As Enumerated
    §3.3.20.    Headlights Required
    §3.3.30.    Lamp Equipment
    §3.3.40.    Clearance Lamps
    §3.3.50.    Extended Load
        (a)    Additional Red Light
        (b)    Red Flag or Cloth
    §3.3.60.    Windshield Wipers

**§ 3.4.   HEADLAMPS**
    §3.4.10.    Two Headlamps Required
    §3.4.20.    Front Headlamps Required
    §3.4.30.    Motorcycles and Motorized Bicycles

**§ 3.5.   TAIL LAMPS**
    §3.5.10.    Rear Tail Lamp Required
    §3.5.20.    Two Tail Lamps Required
    §3.5.30.    Mounted Height
    §3.5.40.    Tags to be Illuminated
    §3.5.50.    Front and Rear Lighting

**§ 3.6.   STOP LAMPS, TURN SIGNALS AND REFLECTORS**
    §3.6.10.    Stop Lamps
        (a)    Vehicles Manufactured before 1957
        (b)    Vehicles Manufactured after 1957
        (c)    Truck Tractors
        (d)    Motorcycle
    §3.6.20.    Electric Turn Signals
    §3.6.30.    Rear Reflectors
    §3.6.40.    Mounted Height for Reflectors

iv

J.A. 216

# TABLE OF CONTENTS

§ 3.7.      ADDITIONAL EQUIPMENT REQUIRED ON TOW TRUCKS AND CRANES
    §3.7.10.      Warning Lamp
    §3.7.20.      Top Warning Lamps
    §3.7.30.      Rear Warning Lamps
    §3.7.40.      Single Warning Lamp
    §3.7.50.      Visibility
§ 3.8.      COLOR AND MOUNTING OF CERTAIN REFLECTORS, CLEARANCE LAMPS, SIDE
            MARKER LAMPS AND BACKUP LAMPS
    §3.8.10.      Front Clearance and Marker Lamps
    §3.8.20.      Rear Clearance and Marker Lamps
    §3.8.30.      Rear Lighting and Reflectors
    §3.8.40.      Clearance and Side Marker Lamps
    §3.8.50.      Conformance to SAE Standards
§ 3.9.      VISIBILITY OF REFLECTORS, CLEARANCE LAMPS AND MARKER LAMPS
    §3.9.10.      Visibility
    §3.9.20.      Front and Side Reflectors
    §3.9.30.      Front and Rear Clearance Lamps
    §3.9.40.      Side Marker Lamps
§ 3.10.     SPOT LAMPS AND AUXILIARY LAMPS
    §3.10.10.     Spot Lamps
    §3.10.20.     Fog Lamps
    §3.10.30.     Auxiliary Passing Lamps
    §3.10.40.     Auxiliary Driving Lamps
§ 3.11.     AUDIBLE AND VISUAL SIGNALS ON EMERGENCY VEHICLES
    §3.11.10.     Authorized Emergency Vehicles
    §3.11.20.     Unauthorized Use of a Siren
§ 3.12.     SIGNAL LAMPS AND SIGNAL DEVICES
    §3.12.10.     Stop Lamps
    §3.12.20.     Turning Lamps
    §3.12.30.     Placement of Turning Lamps
    §3.12.40.     Turning Indicator
    §3.12.50.     Glaring Light
§ 3.13.     ADDITIONAL LIGHTING EQUIPMENT
    §3.13.10.     Fender Lamps
    §3.13.20.     Running-Board Courtesy Lamp
    §3.13.30.     Back-Up Lamps
    §3.13.40.     Warning Lamps
                  (a)      Authorized Vehicles
                  (b)      Placement of Front Warning Lamps
                  (c)      Placement of Rear Warning Lamps
                  (d)      Warning Light Visibility
                  (e)      Warning Lamp Indicator
                  (f)      Visibility of Warning Lamp Indicator

# TABLE OF CONTENTS

**§ 3.14.    MULTIPLE-BEAM ROAD LIGHTING EQUIPMENT**
§3.14.10.    Arrangement of Lamps
§3.14.20.    Maximum Light Density
§3.14.30.    Minimum Light Density
§3.14.40.    Beam Indicator
§3.14.50.    Low Beams Required
§3.14.60.    Exception for Vehicles Manufactured before 1950

**§ 3.15.    SPECIAL REQUIREMENTS FOR LIGHTING EQUIPMENT**
§3.15.10.    Candlepower Limit
§3.15.20.    Maximum Four Lamps Permitted
§3.15.30.    Front Red Lights Prohibited
§3.15.40.    Flashing Lights Prohibited

**§ 3.16.    BRAKES**
§3.16.10.    Trailers
§3.16.20.    Service Brakes
§3.16.30.    Parking Brakes
§3.16.40.    Good Working Order

**§ 3.17.    HORNS AND WARNING DEVICES**
§3.17.10.    Audible Horn
§3.17.20.    Unreasonably Loud Horns
§3.17.30.    Audible Warning
§3.17.40.    Permissible Horns
§3.17.50.    Theft Alarm System

**§ 3.18.    WINDSHIELDS AND MIRRORS**
§3.18.10.    Signs and Posters
§3.18.20.    Mechanical Defrost
§3.18.30.    Windshield Wipers
§3.18.40.    Good Working Order
§3.18.50.    Cracked Windshield
§3.18.60.    Reflective Mirrors

**§ 3.19.    TIRE EQUIPMENT**
§3.19.10.    Unsafe Tires
§3.19.20.    Tire Thickness
§3.19.30.    Bald Tires
§3.19.40.    Protuberance
§3.19.50.    Permissible Uses

**§ 3.20.    BUMPERS AND FENDERS**
§3.20.10.    Front Bumper Required
§3.20.20.    Rear Bumper Required
§3.20.30.    Fender Required
§3.20.40.    Sharp Edges
§3.20.50.    Extended Fenders Prohibited

## TABLE OF CONTENTS

§ 3.21.   WINDOW GLAZING MATERIALS
　　　§3.21.10.　　Safety Glazing Materials
　　　§3.21.20.　　Safety Glazing Materials Defined
　　　§3.21.30.　　Rigid-Type Plastic Windows
　　　§3.21.40.　　Flexible-Type Plastic Windows
§ 3.22.   TINTED WINDOWS
　　　(a)　　Motor Vehicles
　　　(b)　　Mini-Vans
　　　(c)　　Permissible Tinting
§ 3.23.   MISCELLANEOUS EQUIPMENT
　　　§3.24.10.　　Speedometer Required
　　　§3.24.20.　　Television Equipment
　　　§3.24.30.　　Radar Detectors and Jammers
§ 3.24.   SEAT BELTS
　　　§3.24.10.　　Definitions
　　　§3.24.20.　　Seat Belt Required
　　　§3.24.30.　　Liability
　　　§3.24.40.　　Compliance with Standards
　　　§3.24.50.　　Vehicles for Hire
§ 3.25.   CHILD RESTRAINT
　　　§3.25.10.　　Definitions
　　　§3.25.20.　　Requirements
　　　　　　(a)　　Children Under Three
　　　　　　(b)　　Children Under Sixteen
　　　　　　(c)　　Exception
§ 3.26.   EXHAUST EMISSION SYSTEMS
　　　§3.26.10.　　Good Working Order
　　　§3.26.20.　　Pollution Control System
　　　§3.26.30.　　Visible Smoke and Fumes

J.A. 219

# TABLE OF CONTENTS

**CHAPTER 4.   INSPECTION STICKER REQUIREMENTS**

**§ 4.1.   GENERAL**
    §4.1.10.   Inspection of Equipment
**§ 4.2.   INSPECTION STICKERS**
    §4.2.10.   District of Columbia Residents
    §4.2.20.   Non-Residents
    §4.2.30.   Exemptions
**§ 4.3.   DETACHED AND CONDEMNED STICKERS**
    §4.3.10.   Detachment Mutilation and Loss
    §4.3.20.   Operating with Condemned Sticker

**CHAPTER 5.   IDENTIFICATION TAGS**

**§ 5.1.   PROPER DISPLAY OF TAGS**
    §5.1.10.   Vehicles Registered in the District of Columbia
    §5.1.20.   Miscellaneous Vehicles
    §5.1.30.   Non-Resident Tags
    §5.1.40.   Swinging Tags
    §5.1.50.   Illegible Tags
    §5.1.60.   Emblems
    §5.1.70.   Validation Stickers
    §5.1.80.   Tag Coverings
**§ 5.2.   REGISTRATION AND RECIPROCITY REQUIREMENTS**
    §5.2.10.   General
**§ 5.3.   FAILURE TO SURRENDER**
    §5.3.10.   Identification Tags
    §5.3.20.   Special License Tags or Parking Permit
**§ 5.4.   IMPROPER USE OF TAGS**
    §5.4.10.   Lending Tags and Registration
    §5.4.20.   Dealer Tags

J.A. 220

# TABLE OF CONTENTS

**ARTICLE II:   MOTOR VEHICLES**

**CHAPTER 6.   CRIMINAL DRIVING OFFENSES**

**§ 6.1.     PENALTIES**
**§ 6.2.     SPEEDING AND RECKLESS DRIVING**
    §6.2.10.        Reckless Driving
    §6.2.20.        Aggravated Reckless Driving
**§ 6.3.     FLEEING FROM A LAW ENFORCEMENT OFFICER IN A MOTOR VEHICLE**
    §6.3.10.        Definitions
    §6.3.20.        Fleeing
**§ 6.4.     LEAVING AFTER COLLIDING**
**§ 6.5.     OBJECT FALLING OR FLYING FROM VEHICLE**
**§ 6.6.     NEGLIGENT HOMICIDE**
    §6.6.10.        Negligent Homicide
    §6.6.20.        Negligent Homicide Included in Manslaughter
    §6.6.30.        Immoderate Speed not Dependent on Legal Rate of Speed
**§ 6.7.     IMPAIRED OPERATING AND DRIVING**
    §6.7.10.        Driving Under the Influence of Alcohol or a Drug
    §6.7.20.        Driving Under the Influence of Alcohol or a Drug: Commercial
                 Vehicles
    §6.7.30.        Operating a Vehicle While Impaired
    §6.7.40.        Operating Under the Influence of Alcohol or a Drug: Horse-Drawn
                 Vehicle
    §6.7.50.        Additional Penalties
              (a)        Commercial Vehicles
              (b)        Driving with a Minor

**CHAPTER 7.   MOVING**

**§7.1.     GENERAL**
    §7.1.10.        Applicability
    §7.1.20.        Operator Responsibilities
**§ 7.2.     SPEED RESTRICTIONS**
    §7.2.10.        Maximum Lawful Speed on Streets and Highways
    §7.2.20.        Maximum Lawful Speed in Driveways, Garages and under Archways
    §7.2.30.        Reasonable Speed for Conditions
    §7.2.40.        Duty of Due Care
    §7.2.50.        Excessive Speeding
**§ 7.3.     MINIMUM SPEED RESTRICTIONS**
    §7.3.10.        Reduced Speed Required
    §7.3.20.        Impeding Traffic
**§ 7.4.     PROPER USE OF THE ROADWAYS**
    §7.4.10.        Drive on Right Side of the Road

J.A. 221

# TABLE OF CONTENTS

§7.4.20.        Slow-Moving Vehicles Stay to the Right
§7.4.30.        Passing Vehicles Proceeding in Opposite Directions
§7.4.40.        Following too Close
§7.4.50.        Sufficient Space between Vehicles
§7.4.60.        Failure to Clear an Intersection
**§ 7.5.    DESIGNATED ROADWAYS**
§7.5.10.        One-way Traffic
§7.5.20.        Multiple-Lane Roadways
§7.5.30.        Divided Roadways
§7.5.40.        Driving through Median Prohibited

x

# TABLE OF CONTENTS

**§ 7.6.    OVERTAKING AND PASSING**
§7.6.10.        Application
§7.6.20.        Overtaking Vehicle to Pass on Left
§7.6.30.        Driving on Left Side of Roadway
§7.6.40.        Overtaken Vehicle to Give Way
§7.6.50.        Passing on the Right
§7.6.60.        Unsafe Passing on the Right
§7.6.70.        Unsafe Passing on the Left
§7.6.80.        Return after Overtaking
§7.6.90.        Overtaking Bicycles

      (a)        Bicycle Lanes
      (b)        3 Foot Distance

**§ 7.7.    TURNING AT INTERSECTIONS**
§7.7.10.        Application
§7.7.20.        Right Turns
§7.7.30.        Left Turn from a Two-way Street onto a Two-way Street
§7.7.40.        Left Turn from a Two-Way Street onto a One-Way Street
§7.7.50.        Left Turn from a One-Way Street onto a One-way street
§7.7.60.        Left Turn from a One-Way Street onto a One-way Street
§7.7.70.        Cut-Off Roadways
§7.7.80.        Unbalanced Traffic Lanes
§7.7.90.        Improper Turning

**§ 7.8.    TURNING REQUIREMENTS AND RESTRICTIONS**
§7.8.10.        Turning Around before a Curve or Crest of Grade
§7.8.20.        Safe Turn Required
§7.8.30.        Proper Turn Signal
§7.8.40.        Intention to Turn
§7.8.50.        Obedience to Traffic Markers
§7.8.60.        Obedience to Signs
§7.8.70.        U-Turn at an Intersection
§7.8.80.        Turning in Opposite Direction

**§ 7.9.    PROPER SIGNALS FOR TURNING AND STOPPING**
§7.9.10.        Proper Signals
§7.9.20.        Signal Equipment Required
§7.9.30.        Signal from the Left of the Vehicle

**§ 7.10.   STARTING, STOPPING AND BACKING**
§7.10.10.       Safe Starting
§7.10.20.       Sudden Stops or Decrease of Speed
§7.10.30.       Backing up Safely

TABLE OF CONTENTS

§ 7.11.    RIGHT OF WAY
        §7.11.10.    Driver Responsibility to Yield
                    (a)    Emerging from a Private Road or Driveway
                    (b)    Yield to Pedestrians on Sidewalk
                    (c)    Entering or Crossing a Roadway
        §7.11.20.    Intersections
                    (a)    Vehicle Turning Left
                    (b)    Same-Time Approach
                    (c)    Approaching from Opposite Direction
        §7.11.30.    Stop and Yield Signs
                    (b)    Approaching a Stop Sign
                    (b)    When Stopped at a Stop Sign
                    (c)    Approaching a Yield Sign
        §7.11.40.    Other Areas
                    (a)    Entering a Traffic Circle
                    (b)    Entering a Freeway
        §7.11.50.    Pedestrians
                    (a)    Marked or Unmarked Crosswalks
                    (b)    Crossing on "Walk" Signal
        §7.11.60.    School Buses
                    (a)    Flashing Warning Light
                    (b)    Wait to Proceed
§ 7.12.    EMERGENCY VEHICLES AND FIRE TRUCKS
        §7.12.10.    Move-over Law
        §7.12.20.    Duty of Care
        §7.12.30.    Following Fire Truck
        §7.12.40.    Driving over Fire Hose
§ 7.13.    COASTING
        §7.13.10.    Motor Vehicles
§ 7.14.    OBSTRUCTION AND PASSENGER INTERFERENCE
        §7.14.10.    Loaded Vehicle
        §7.14.20.    Excess Passenger Obstruction
        §7.14.30.    Passenger Interference
        §7.14.40.    Full Time and Attention
        §7.14.50.    Running Boards
        §7.14.60.    Designated Passenger Areas
        §7.14.70.    Suspended Objects
§ 7.15.    OPEN DOORS AND BOARDING
        §7.15.10.    Boarding in Motion
        §7.15.20.    Swinging Doors
        §7.15.30.    Open Doors

J.A. 224

# TABLE OF CONTENTS

§ 7.16.   **RIDING ON MOTORCYCLES**
    §7.16.10.    General
    §7.16.20.    Passengers
    §7.16.30.    Protective Helmet Required
    §7.16.40.    Protective Gear
§ 7.17.   **RESTRICTED STREETS**
    §7.17.10.    Closed Streets
    §7.17.20.    Driving over Barriers
    §7.17.30.    Bus Restrictions
§ 7.18.   **TRUCKS**
    §7.18.10.    Truck Interdiction
§ 7.19.   **SNOW EMERGENCY ROUTES**
    §7.19.10.    Effective Tires
    §7.19.20.    Parking Prohibition
§ 7.20.   **MISCELLANEOUS MOVING INFRACTIONS**
    §7.20.10.    Unnecessary Noise
    §7.20.20.    Parallel Parking
    §7.20.30.    Driving over Sidewalks
    §7.20.40.    Fixed Objects
    §7.20.50.    Overtaking a Stopped Vehicle
    §7.20.60.    Littering from Vehicle
§ 7.21.   **ALCOHOLIC BEVERAGES IN MOTOR VEHICLES**
    §7.21.10.    Open Container
    §7.21.20.    Trunk Cargo or Storage Area
    §7.21.30.    Closed Containers
    §7.21.40.    Definitions

(Page 49 of Total)

J.A. 225

# TABLE OF CONTENTS

**CHAPTER 8.   PARKING, STANDING AND STOPPING**

**§8.1.   GENERAL REQUIREMENTS**
     §8.1.10.          Applicability
                         (a)     Time Stated
                         (b)     Exceptions
                         (c)     Most Restrictive Provisions Apply
     §8.1.20.          Presumption in Reference to Illegal Parking

**§ 8.2.   PROPER PARKING**
     §8.2.10.          No Parking in Violation of Signs
     §8.2.20.          Park in the Direction of Traffic
     §8.2.30.          Park within 12" of Curb
                         (a)     Two-Way Streets
                         (b)     One-Way Streets
     §8.2.40.          Left-Side Parking Prohibited
     §8.2.50.          Motorcycle Parking

**§ 8.3.   GENERAL PARKING**
     §8.3.10.     Unpaved Areas
     §8.3.20.     Parking for Permit-Holders Only
     §8.3.30.     Park between the Lines
     §8.3.40.     Parking between Two Vehicles
     §8.3.50.     Reserved Parking Spaces for Disabled Individuals

**§ 8.4.   NO SIGN REQUIRED:  STOPPING, STANDING AND PARKING**
**§ 8.5.   NO SIGN REQUIRED:  STANDING OR PARKING ONLY**
**§ 8.6.   NO SIGN REQUIRED:  PARKING ONLY**
**§ 8.7.   OVERSIZED VEHICLES**

**§ 8.8.   LOADING AND UNLOADING:  VEHICLES**
     §8.8.10.     Discharging Passenger
     §8.8.20.     Impeding Traffic
     §8.8.30.     Momentary Stopping Permitted

**§ 8.9.   LOADING AND UNLOADING:  SCHOOL BUSES**
     §8.9.10.     Discharging Passengers
     §8.9.20.     Flashing White Lights Required
     §8.9.30.     Flashing Red Stop Light Required

**§ 8.10.   LOADING ZONES**
     §8.10.10.   Establishment of Loading Zones and Applicability
     §8.10.20.   Loading Restricted to Marked Loading Zones
     §8.10.30.   Reasonable Time Limit on Loading
     §8.10.40.   Meter Fare Required
     §8.10.50.   Time Limit
     §8.10.60.   Expired Meter
     §8.10.70.   Permissible Parking Times

# TABLE OF CONTENTS

**§ 8.11.   PARKING METERS AND PARKING METER ZONES**
  §8.11.10.   Parking Meter Zone
  §8.11.20.   Parking Prohibited
  §8.11.30.   No Parking Past Meter Limit
  §8.11.40.   Park within Marked Area
  §8.11.50.   No Parking beyond Zone
  §8.11.60.   Display of Receipt
  §8.11.70.   Purchasing Beyond Time Limit
  §8.11.80.   Illegal Parking
  §8.11.90.   No Charge Required
  §8.11.100. Unexpired Time is Transferrable
  §8.11.110. Exception for Government Vehicles

**§ 8.12.   RESTRICTED USE OF VALET PARKING, VALET STAGING, BUS, TAXICAB AND SIGHTSEEING ZONES AND STANDS**
  §8.12.10.   General
          (a)      No Parking or Standing
          (b)      Discharge of Passengers Permitted
  §8.12.20.   Driver to Remain near Vehicle
  §8.12.30    Bus Zone Restrictions
  §8.12.40.   Parking Restrictions Effective at all Times

**§ 8.13.   EMERGENCY PARKING PERMITS**
  §8.13.10.   Permissible Parking
  §8.13.20.   Parking for Emergency Purposes Only
  §8.13.30.   Permit must be Visible
  §8.13.40.   Transfer Prohibited
  §8.13.50.   Failure to Surrender

**§ 8.14.   RESIDENTIAL PERMIT PARKING**
  §8.14.10.   2 Hour Parking Limit
  §8.14.20.   Proper Affixation
  §8.14.30.   No Time Limit
  §8.14.40.   Visibility and Display
          (a)      Vehicles
          (b)      Motorcycles
          (c)      Expired Stickers
  §8.14.50.   Validity
  §8.14.60.   One Permit per Vehicle
  §8.14.70.   Parking or Standing Prohibited
  §8.14.80.   Permissible Parking
  §8.14.90.   Transfer of Stickers Prohibited

**§ 8.15.   VISITOR OR TEMPORARY PERMITS**
  §8.15.10.   Replication Unlawful

xv

J.A. 227

# TABLE OF CONTENTS

**§ 8.16.    TEMPORARY AND EMERGENCY PARKING RESTRICTIONS**
   §8.16.10.  Assemblies
   §8.16.20.  Construction
   §8.16.30.  Parades
   §8.16.40.  Emergencies
   §8.16.50.  Proper Display of Parking Permit Placards
          (a)    Placard:  Proper Display
          (b)    Stickers:  Display and Expiration
   §8.16.60.  Tampering with Signs
          (a)    Installation and Removal
          (b)    Vandalizing
          (c)    No Parking in Violation of Signs
   §8.16.70.  Advance Notice Waiver
**§ 8.17.    OFFICIAL GOVERNMENT PARKING**
   §8.17.10.  Proper Display
**§ 8.18.    STREET CLEANING PARKING PROVISIONS**
   §8.18.10.  No Parking
**§ 8.19.    SNOW EMERGENCY PARKING REGULATIONS**
   §8.19.10.  Snow Emergency Routes
**§ 8.20.    LITTERING AND DEBRIS**
   §8.20.10.  Glass and Other Debris
   §8.20.20.  Failure to Remove Harmful Material
   §8.20.30.  Towing and Removal of Wrecked Vehicles
**§ 8.21.    ADVERTISING**
   §8.21.10.  General
   §8.21.20.  De Minimus Display
**§ 8.22.    MISCELLANEOUS NON-MOVING VIOLATIONS**
   §8.22.10.  Unattended Vehicles
   §8.22.20.  Turning Wheels to Curb
   §8.22.30.  Idle Engine
   §8.22.40.  Display of Sale and Repair

xvi

# TABLE OF CONTENTS

**CHAPTER 9.   TAXICABS AND VEHICLES FOR HIRE**

**§ 9.1.   APPLICABILITY**
**§ 9.2.   FAILURE TO GIVE RECEIPT UPON REQUEST**
**§ 9.3.   DISPLAY OF IDENTIFICATION**
  §9.3.10.      Failure to Display
  §9.3.20.      Failure to Make Available for Inspection
  §9.3.30.      Identification must be Visible to Passenger
  §9.3.40.      Removal from Unattended Vehicles
  §9.3.50.      Passenger Rights Display
**§ 9.4.   SOLICITING PASSENGERS**
  §9.4.10.      Soliciting Prohibited
  §9.4.20.      Loitering
  §9.4.30.      Refusal to Haul
  §9.4.40.      Exceptions
  §9.4.50.      Held for Hire
  §9.4.60.      Availability
  §9.4.70.      Refusal of Service
**§ 9.5.   ON-CALL AND OFF-DUTY SIGNS**
  §9.5.10.      "On Call" Display
  §9.5.20.      "Off Duty" Display
  §9.5.30.      Proper Placement of Signs
  §9.5.40.      Signs must be Secured When Not in Use
**§ 9.6.   CRUISING LIGHTS**
  §9.6.10.      Cruising Light Required
  §9.6.20.      Cruising Light must be Illuminated
  §9.6.30.      Lights On "On Call"
  §9.6.40.      Lights Off "On Duty"
  §9.6.50.      Proper Working Condition
**§ 9.7.   TAXICAB STANDS**
  §9.7.10.      Available for Hire
  §9.7.20.      Loitering
  §9.7.30.      Blocking at Taxicab Stands Prohibited
  §9.7.40.      Parking Regulations Apply to Stands
**§ 9.8.   OPERATION OF TAXICABS**
  §9.8.10.      Hack License and Permit Required
  §9.8.20.      Safe Operation and Obedience to Laws
  §9.8.30.      No Loading in a Crosswalk
  §9.8.40.      Pulling to Curb

# TABLE OF CONTENTS

**§ 9.9.** **MANIFEST RECORD**
　　§9.9.10.　　Maintenance
　　§9.9.20.　　Contents
　　§9.9.30.　　Accuracy
　　§9.9.40.　　Alteration
**§ 9.10.** **VEHICLES FOR HIRE AND SIGHTSEEING VEHICLES**
　　§9.10.10.　　Identification License
　　§9.10.20.　　Operator License
　　§9.10.30.　　Sightseeing Vehicles
**§ 9.11.** **LIMOUSINES**
　　§9.11.10.　　License Required
　　§9.11.20.　　Identification Requirements

**CHAPTER 10.** **FUNERALS**

**§ 10.1.** **PERMIT REQUIRED**
　　§10.1.10.　　No Funeral Processions through Capitol Square
**§ 10.2.** **RESPONSIBILITIES OF FUNERAL PROCESSION MEMBERS**
　　§10.2.10.　　Stay to the Right
　　§10.2.20.　　Proceeding through an Intersection
　　§10.2.30.　　Headlight Display
　　§10.2.40　　Display of Headlights on Return
**§ 10.3.** **DRIVER RESPONSIBILITIES**
　　§10.3.10.　　Driving through a Funeral Procession

# TABLE OF CONTENTS

**ARTICLE III: PEDESTRIANS, BICYCLES AND OTHER TRAFFIC**

**CHAPTER 11. PEDESTRIANS**

**§ 11.1. GENERAL**
  §11.1.10.   Pedestrians Subject to Traffic Regulations
  §11.1.20.   Pedestrian Identification
            (a)   Identification for Infraction Only
            (b)   Penalty
**§ 11.2. RIGHT-OF-WAY IN CROSSWALKS**
  §11.2.10.   Application
  §11.2.20.   Jaywalking
  §11.2.30.   Obedience to Signals
**§ 11.3. NON-CROSSWALK CROSSING**
  §11.3.10.   Application
  §11.3.20.   Yield to Vehicular Traffic
  §11.3.30.   Proper Crossing
**§ 11.4. SIDEWALKS AND ROADWAYS**
  §11.4.10.   Stay to the Right
  §11.4.20.   Must use Sidewalks
  §11.4.30.   Stay to Left of Roadway
  §11.4.40.   Hitchhiking
  §11.4.50.   Move-over Law

**CHAPTER 12. DEMONSTRATIONS AND SPECIAL EVENTS**

**§ 12.1. DEMONSTRATION ACTIVITY**
  §12.1.10.   Definition
  §12.1.20.   Applicability
  §12.1.30.   Exemptions for Special Events
            (a)   Band Concerts
            (b)   Louisiana Avenue
            (c)   Tour Groups
            (d)   Ceremonial Events and Entertainment
**§ 12.2. GENERAL REQUIREMENTS**
  §12.2.10.   Permissible Demonstration Areas
  §12.2.20.   Prohibited Demonstration Areas

# TABLE OF CONTENTS

**§ 12.3.    PERSONS OR GROUPS OF THIRTY PERSONS OR LESS**
    §12.3.10.    No Permit Required
    §12.3.20.    Availability
    §12.3.30.    Permit Encouraged
    §12.3.40.    Prohibitions
            (a)    Segmenting from the Group
            (b)    Interference
            (c)    Density
            (d)    Seven Day Limitation
            (e)    Continuous Daily Demonstration
    §12.3.40.    Applicability of Other Sections.
**§ 12.4.    GROUPS OF OVER THIRTY PERSONS**
    §12.4.10.    Permit Required for Groups of Over Thirty
    §12.4.20.    Permit Applications
            (a)    Advance Notice
            (b)    Contents
            (c)    Waiver
    §12.4.30.    Processing Applications and Issuance of permits
            (a)    Approval
            (b)    Issuance
            (c)    Contents
            (d)    Tacit Approval
    §12.4.40.    Terms and Conditions
            (a)    Area
            (b)    Density
            (c)    Seven Day Limitation
            (d)    Continuous Daily Demonstration Prohibited
    §12.4.50.    Groups to Remain in Assigned Areas
    §12.4.60.    Revocation for Non-Compliance or for Cause
**§ 12.5.    PROPS AND EQUIPMENT**
    §12.5.10.    General
            (a)    Definition
            (b)    Height Restriction
            (c)    Stages, Risers and Platforms
            (d)    Unattended Props and Equipment
            (e)    Removal
            (f)    Twenty Four Hour Limitation
            (g)    Conclusion
    §12.5.20.    Additional Requirements for Permit Applicants
**§ 12.6.    SIGNS, BANNERS AND PLACARDS**
**§ 12.7.    TEMPORARY STRUCTURES**

# TABLE OF CONTENTS

**§ 12.8.    AMPLIFICATION AND OTHER NOISE DISTURBANCES**
    §12.8.10.    Amplification Equipment
    §12.8.20.    Sound Projection
    §12.8.30.    Unamplified Disturbances
**§ 12.9.    ROAD RACES**
    §12.9.10.    Definition
    §12.9.20.    Permit Required from Neighboring Agency
    §12.9.30.    Sundays
    §12.9.40.    No Re-Tracing on Capitol Grounds
    §12.9.50.    Capitol Square
    §12.9.60.    Designated Route
**§ 12.10.    MARCHES**
    §12.10.10.    Prior Permit Required
    §12.10.20.    Authorized Route
**§ 12.11.    DAMAGE TO CAPITOL GROUNDS**
    §12.11.10.    Restoration of Grounds
**§ 12.12.    PERSONAL ACTIVITIES**
**§ 12.13.    ADDITIONAL CONDITIONS**

**CHAPTER 13.    BICYCLES**

**§ 13.1.    GENERAL PROVISIONS**
    §13.1.10.    Application
    §13.1.20.    Bicycle Defined
    §13.1.30.    Tampering Prohibited
**§ 13.2.    HIGHWAYS AND SIDEWALKS**
    §13.2.10.    Riding on Sidewalks
    §13.2.20.    Obedience to Traffic Control Devices
    §13.2.30.    Duties of Bicycle Operators
**§ 13.3.    SAFE RIDING**
    §13.3.10.    Safe Operation
    §13.3.20    Seat Required
    §13.3.30    Extra Riders
    §13.3.40.    Carrying Articles
    §13.3.50.    Warning Device
    §13.3.60.    No Clinging
    §13.3.70.    Riding Abreast
    §13.3.80.    Overtaking and Passing
    §13.3.90.    Riding Into Path of Vehicle
**§ 13.4.    RIGHT OF WAY**
    §13.4.10.    Yield to Pedestrians on Sidewalk
    §13.4.20.    Yield to Pedestrians in Crosswalk
    §13.4.30.    Emerging and Entering

J.A. 233

# TABLE OF CONTENTS

**§ 13.5.    BICYCLE SAFETY EQUIPMENT**
  §13.5.10.  Bicycle Brake
  §13.5.20.  Front Lamp on Bicycle
  §13.5.30.  Rear Lamp on Bicycle
  §13.5.40.  Body Lamp on Bicycle Operators
      §13.5.60.  Prohibition on Sirens
**§ 13.6.    PARKING AND SECURING BICYCLES**
  §13.6.10.  Permissible Bicycle Parking
  §13.6.20.  Parked Bicycles
  §13.6.30.  Twenty-Four Hour Time Limitation
  §13.6.40.  Secured Bicycle Cannot Impede Traffic
  §13.6.50.  Securing Bicycles Prohibited in Certain Areas
  §13.6.60.  Buildings and Improved Areas


**CHAPTER 14.  PEDICABS**

**§ 14.1.    GENERAL PROVISIONS**
  §14.1.10.  Application
  §14.1.20.  Pedicab Defined
**§ 14.2.    HIGHWAYS AND SIDEWALKS**
  §14.2.20.  Public Roads
  §14.2.20.  Obedience to Traffic Control Devices
  §14.2.30.  Duties of Bicycle Operators
**§ 14.3.    SAFE RIDING**
  §14.3.10.  Applicability of Bicycle Regulations
  §14.3.20.  Safe Operation
    (a)  Passenger Limit
    (b)  Passengers must be Seated
    (c)  Seatbelts
    (d)  30 MPH Speed Limit
    (e)  Sidewalks
    (f)  Loading
    (g)  Loading
    (h)  Parking
    (i)  Securing
    (j)  Headlamps
    (k)  Tail Lamps
  §14.3.30.  Driving while Impaired

J.A. 234

# TABLE OF CONTENTS

§ 14.4.   SAFETY EQUIPMENT
  §14.4.10. Safety Requirements
    (a) Width
    (b) Length
    (c) Equipment
      1. *Seatbelts*
      2. *Brakes*
      3. *Head Lamps*
      4. *Tail Lamps*
      5. *Turning Lights*
      6. *Audible Signal*
      7. *Reflectors*
    (d) Reflexive Tape

CHAPTER 15.  LOW-SPEED VEHICLES

15.1. GENERAL PROVISIONS
  §15.1.10. Application
  §15.1.20. Low-Speed Vehicles Defined
  §15.1.30 Tampering Prohibited
§ 15.2. GENERAL SAFETY REQUIREMENTS
  §15.2.10. Reasonable and Prudent Speed
  §15.2.20. Safe Operation
  §13.2.30. Obedience to Traffic Control Devices
  §15.2.40. Duties of Low-speed Vehicle Operators
§ 15.3. SEGWAYS
  §15.3.10. Registration
  §15.3.20. Age
  §15.3.30. Maximum Speed Limit
  §15.3.40. Packages
  §15.3.50. Headphones
  §15.3.70. Riding on Sidewalks
  §15.3.80. Yield to Pedestrians on Sidewalk
  §15.3.90. Yield to Pedestrians in Crosswalk
  §15.3.100. Emerging and Entering

J.A. 235

# TABLE OF CONTENTS

**§ 15.4.   MOTORIZED BICYCLES**
    §15.4.10.    Minimum Age
    §15.4.20.    Sidewalks
    §15.4.30.    Roadway
    §15.4.40.    Seat Required
    §15.4.50.    Extra Riders
    §15.4.60.    Carrying Articles
    §15.4.70.    Warning Device
    §15.4.80.    No Clinging
    §15.4.90.    Riding Abreast
    §15.4.100.    Yield to Pedestrians in Crosswalk
    §15.4.120.    Emerging and Entering
    §15.4.130.    Overtaking and Passing
**§ 15.5.   ALL-TERRAIN VEHICLES AND DIRTBIKES**
    §15.5.10.    Prohibited
    §15.5.20.    Penalties
**§ 15.6   PARKING AND SECURING LOW-SPEED VEHICLES ON PUBLIC SPACE**
    §15.6.10.    Buildings and Improved Areas

xxiv

# TABLE OF CONTENTS

CHAPTER 16.   RECREATIONAL ACTIVITIES AND SPECIAL RESTRICTIONS WITHIN CAPITOL GROUNDS

§ 16.1.    LEGAL DEFINITION OF CAPITOL GROUNDS
§ 16.2.    PUBLIC USE AND RECREATION
          §16.2.10.    Restriction on Public Use
          §16.2.20.    Property Damage
          §16.2.30.    Climbing and Swinging
          §16.2.40.    Standing on Skylights and Entry into Work Areas
          §16.2.50.    Swimming and Entry into Pools
          §16.2.60.    Skating and Play Vehicles
          §16.2.70.    Game-Playing
          §16.2.80.    Kite-Flying
          §16.2.90.    Model Rockets and Boats
§16.3.     CROWD CONTROL
          §16.3.10.    Establishing a Police Line
          §16.3.20.    Obey an Order
          §16.3.30.    Unauthorized Entry
          §16.3.40.    Blocking and Obstructing Roadways
§ 16.4.    SLEEPING OR LYING DOWN
          §16.4.10.    Paved or Improved Areas
          §16.4.20.    Unpaved and Grassy Areas
§ 16.5.    WINTER ACTIVITIES
          §16.5.10.    Snowmobiling
          §16.5.20.    Sledding
          §16.5.30.    Skiing
§16.6.     CAMPING
          §16.6.10.    Camping Defined
          §16.6.20.    Camping Prohibited
          §16.6.30.    Storage of Personal Belongings
§ 16.7.    DRIVING INTO RESTRICTED AREAS
          §16.7.10.    Sidewalk and Non-roadway Areas
          §16.7.20.    East Front Plaza
§ 16.8.    ANIMALS WITHIN CAPITOL GROUNDS
          §16.8.10.    Non-Domesticated Animals
          §16.8.20.    Leash Law
§ 16.9.    METAL DETECTORS
§ 16.10.   OPEN FLAMES, GAS GENERATORS AND OTHER INCENDIARY DEVICES
          §16.10.10.   Open Flames
          §16.10.20.   Incendiary Device
          §16.10.30.   Gas Generators

xxv

# TABLE OF CONTENTS

**§ 16.11.   RESTRICTED VEHICLES**
    §16.11.10.   Commercial Vehicles
    §16.11.20.   Animal Drawn Vehicles
**§ 16.12.   SALE OF GOODS, COMMERCIAL ACTIVITY AND SOLICITATION**
    §16.12.10.   Conveyance of Goods and Merchandise
    §16.12.20.   Vending
    §16.12.30.   Commercial Advertising
    §16.12.40.   Solicitation
**§ 16.13.   TRIPODS AND PHOTOGRAPHY EQUIPMENT**
**§ 16.14.   TEMPORARY CLOSING OR CORDONING OFF OF CAPITOL GROUNDS**

**CHAPTER 17**
**UNION SQUARE**..................................................................................

§ **17.1. GENERAL PROHIBITION OF COMMERCIAL
    ACTIVITY**..................................................................

§ **17.2. UNION SQUARE**.......................................................

§ **17.3. AUTHORITY OF THE UNITED STATES
    CAPITOL POLICE BOARD**.........................................

§ **17.4. COMMERCIAL ACTIVITIY**..........................................

§ **17.5. PERMITS**..................................................................

§ **17.6. PROHIBITED ITEMS AND ACTIVITIES**......................

§ **17.7. SECURITY ASSESSMENTS**..........................................

    § 17.7.1. SECURITY ASSESSMENT................................

    § 17.7.2. INSPECTIONS..............................................

§ **17.8. PERMIT FEES**..........................................................

    § 17.8.1. PERMIT FEES..............................................

    § 17.8.2. APPROVAL OF THE FEE STRUCTURE.............

    § 17.8.3. REVIEW OF THE FEE STRUCTURE................

    § 17.8.4. CAPITOL TRUST ACCOUNT..........................

    § 17.8.5. USE OF FUNDS............................................

    § 17.8.6. PUBLICATION OF FEES................................

**XXIV**

xxvi

J.A. 238

TABLE OF CONTENTS

§ **17.9. FEE SCHEDULE AND OTHER REQUIREMENTS…..……..…**

§ 17.9.1. STILL PHOTOGRAPHY FEES……………….…..…………..

§ 17.9.1.1 STILL PHOTOGRAPHY FEES: SCHOOL PHOTOGRAPHY COMPANIES……………………………………………………………….

§ 17.9.2. FILMING FEES……………………………………………….

§ 17.9.3. BOND……………………………………………………………….

§ 17.9.4. INSURANCE………………………………………………….....

§ **17.10. DENIAL OF PERMIT APPLICATION………………..………….**

§ 17.10.1. DENIAL OF PERMIT APPLICATION……………….…..…..…

§ 17.10.2. RESUBMISSION………………………………………….......

§ 17.10.3. APPEAL…………………………………………………..……..


**APPENDICES ........................................................A1**

APPENDIX A-DEFINITIONS ..........................................A|3
APPENDIX B-2 USC 1969
    AUTHORITY TO REGULATE TRAFFIC..........................A|13
APPENDIX C-1
    D.C CODE 10-503.25........................................A|17
APPENDIX C-2
    D.C CODE 50-2301.01 .......................................A|21
APPENDIX C-3
    D.C CODE 50-2302.01 .......................................A|25
APPENDIX C-4
    D.C CODE 50-2303.01 .......................................A|29
APPENDIX C-5-18
    DCMR 3003.01 ......................................................A|31
APPENDIX D-1
    TRAFFIC REGULATIONS BY BOARD ..........................A|33
APPENDIX D-2
    CONDUCT OF PROSECUTIONS....................................A|37
APPENDIX E
    TRUCK INTERDICTION REGULATIONS ....................A|45
APPENDIX F
    40 USC 5104 ......................................................A|49
APPENDIX G
    DEMONSTRATION MAP ................................................A|55
APPENDIX H
    CASE LAW SUMMARIES ................................................A|57
APPENDIX I
    40 USC 5102 ......................................................A|61
APPENDIX J
    POLICE BOARD REGULATIONS PERTAINING TO
    FIREARMS EXPLOSIVES INCENDIARY DEVICES AND

# TABLE OF CONTENTS

OTHER DANGEROUS WEAPONS (1967). ....................A|81


**MAPS...............................................................................121**

BOUNDARY OF EXTENDED JURISDICTION
U.S. CAPITOL POLICE...............................................................................A|85
PROPERTIES UNDER THE JURISDICTION OF
ARCHITECT OF THE CAPITOL .........................................................A|86
U.S CAPITOL COMPLEX.......................................................................A|87

# TABLE OF CONTENTS

xxix

J.A. 241

# TABLE OF CONTENTS

## APPENDICES

APPENDIX A.          Definitions

APPENDIX B.          2 U.S.C. § 1969 (Regulation of Traffic by Capitol Police Board)

APPENDIX C.          Adjudication of Traffic Offenses in the District of Columbia

    APPENDIX C-1.     D.C. Code § 10-503.25 (Regulation of Traffic by the Capitol
                         Police Board)
    APPENDIX C-2.     D.C. Code § 50-2301.01 (Purposes)
    APPENDIX C-3.     D.C. Code § 50-2302.01 (Adjudication of Moving Infractions)
    APPENDIX C-4.     D.C. Code § 50-2303.01 (Adjudication of Parking and Pedestrian
                         Infractions)
    APPENDIX C-5.     18 DCMR § 3003.1.  (Empowers the Capitol Police to Issue
                         Notices of Infraction on Capitol Grounds)

APPENDIX D.          Prosecution of Traffic Offenses in the District of Columbia

    APPENDIX D-1.     D.C. Code § 10-503.25 (Traffic Regulations by the Capitol Police
                         Board)
    APPENDIX D-2.     D.C. Code § 23-101 ("Conduct of Prosecutions")

APPENDIX E.          Capitol Police Board Truck Interdiction Regulations

APPENDIX F.          40 U.S.C. § 5104 ("Unlawful Activities")

APPENDIX G.          U.S. Capitol Grounds Map of Permissible Demonstration Areas

APPENDIX H.          Case Law Summary of Constitutional Challenges to the Capitol Police
                         Board Traffic Regulations

APPENDIX I.          40 U.S.C. § 5102 ("Legal Description and Jurisdiction of United States
                         Capitol Grounds")

APPENDIX J.          Police Board Regulations Pertaining to Firearms, Explosives, Incendiary
                         Devices and Other Dangerous Weapons (October 31, 1967)

xxx

J.A. 243

# ARTICLE I
# GENERAL PROVISIONS

CHAPTER 1
# APPLICABILITY AND ENFORCEMENT

### § 1.1.   AUTHORITY
The Capitol Police Board has exclusive charge and control over the regulation and movement of all vehicular and pedestrian traffic on Capitol Grounds.  This includes the authority to promulgate and enforce regulations; to impound vehicles; and to impose speed limitations.[1]

### § 1.2.   PURPOSE
These regulations are set forth in order to: provide for the safety of all persons on Capitol Grounds; to prevent destruction or damage to Capitol Grounds; to preserve healthy and sanitary surroundings; and, to maintain Capitol Grounds in an attractive and intact condition for the enjoyment of all visitors.

### § 1.3.   OBEDIENCE TO TRAFFIC REGULATIONS
§1.3.10.   REQUIRED COMPLIANCE WITH TRAFFIC REGULATIONS
It is unlawful for any person to do any act forbidden or fail to perform any act required by these regulations.

§1.3.20.   FAILURE TO COMPLY WITH A LAWFUL ORDER
No person shall fail or refuse to comply with any lawful order or directions of any police officer or other individual vested by law with the authority to direct, control, or regulate traffic.  This subsection shall apply to pedestrians and to operators of any type of vehicle referenced in these regulations.

---

[1] 2 USC § 1969(a), Pub. L. No 79-570, § 14(a) (July 31, 1946):

"The Capitol Police Board, consisting of the Sergeant at Arms of the United States Senate, the Sergeant at Arms of the House of Representatives, and the Architect of the Capitol, shall have exclusive charge and control of the regulation and movement of all vehicular and other traffic, including the parking and impounding of vehicles and limiting the speed thereof, within the United States Capitol Grounds; and said Board is hereby authorized and empowered to make and enforce all necessary regulations therefor…"

*See* Appendix B.

J.A. 245

**§ 1.4. <u>APPLICABILITY</u>**

§1.4.10.     <u>GENERAL</u>
The provisions of these regulations shall apply to any operator of any motorized vehicle operating on Capitol Grounds, except where otherwise indicated.[2]

§1.4.20.     <u>EXEMPTIONS FOR AUTHORIZED EMPLOYEES AND VEHICLES</u>
The provisions of these regulations that restrict activities performed by authorized Congressional employees within the scope of their official duty shall not be applicable.

§1.4.30.     <u>PRESUMPTION OF OWNERSHIP</u>
When applicable, the owner of a vehicle shall be presumed to be the operator when any violations of these regulations may occur, unless he or she proves to the contrary.

§1.4.40.     <u>PARENTAL NEGLIGENCE</u>
The parent of any child and the guardian of any ward shall not authorize or knowingly permit any such child or ward to violate any of the provisions of the regulations.

§1.4.50.     <u>WAIVER</u>
The Board is authorized to waive any restriction or prohibition contained in these regulations as it deems necessary for the safety and security of those persons on Capitol Grounds.

---

[2] Duties for bicycles, pedicabs and low-speed vehicles are set forth in their respective chapters.

## § 1.5.  DUTIES AND PRIVILEGES FOR AUTHORIZED EMERGENCY VEHICLES

§1.5.10.  PRIVILEGES

The driver of an authorized emergency vehicle may do any of the following:

(a)  Park or stand, irrespective of the limitations set forth in these regulations;

(b)  Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;

(c)  Exceed the prima facie speed limit so long as it does not endanger life or property, with the exception of ambulances; and,

(d)  Disregard regulations governing direction of movement or turning in specified directions.

The above privileges may be exercised in the following circumstances:

(a)  When responding to an emergency call;

(b)  When in pursuit of an actual or suspected violator of the law; or,

(c)  When responding to, but not upon returning from, a fire alarm.

§1.5.20.  AUDIBLE WARNING SIGNAL REQUIRED

The exemptions granted in this section to an authorized emergency vehicle shall only apply when:

(a)  While in motion, the driver of the vehicle sounds an audible signal by bell, siren, or exhaust whistle; and,

(b)  The vehicle is equipped as specified in §3.12 of these regulations. [3]

§1.5.30.  RECKLESS DRIVING

The provisions of this section shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall these provisions protect the driver from the consequences of his reckless disregard for the safety of others.

§1.5.40.  COMPLIANCE WITH REGULATIONS AND DIRECTIVES

The operation of authorized emergency vehicles shall be consistent with Capitol Police Department Regulations and Directives.

---

[3] §3.12 ("Audible and Visual Signals on Emergency Vehicles").

J.A. 247

## § 1.6.  PENALTIES

§1.6.10.   FINES AND IMPRISONMENT

Penalties for the violations set forth in these regulations are not to exceed a fine of $300 or imprisonment for over ninety (90) days, with the exception of those penalties for offenses which originate from the District of Columbia Traffic Act of 1925 and are set forth by the District.[4]

## § 1.7.  ADJUDICATION

§1.7.10.   D.C. TRAFFIC VIOLATIONS

A violation of these regulations which mirrors an existing regulation in the District will be prosecuted in accordance with District law.[5]

§1.7.20.   HILL-SPECIFIC VIOLATIONS

Prosecutions for violation of regulations that are only applicable within Capitol Grounds shall be prosecuted by the District of Columbia Office of the Attorney General.[6]

---

[4] 2 USC § 1969(a), Pub. L. No 79-570, §14(a) (July 31, 1946):

"The Capitol Police Board…is hereby authorized…to prescribe penalties for violation of such regulations, such penalties not to exceed a fine of $ 300 or imprisonment for not more than ninety days…those provisions of the District of Columbia Traffic Act of 1925…for the violation of which specific penalties are provided in said Act…shall be applicable to United States Capitol Grounds.…"

*See* Appendix B.

*See* D.C. Code § 50-2201.01 *et seq.* for a current listing of traffic regulations that originate from the District of Columbia Traffic Act of 1925.

[5] S*ee* Appendix C for a listing of the statutes that, read together, set forth the adjudication of the minor and criminal traffic offenses in the District of Columbia.

[6] D.C. Code § 10-503.25(a); D.C. Code § 23-101:

Prosecutions for violations issued by the Capitol Police Board that do *not* mirror an already- existing offense in the District are prosecuted by the Attorney General for the District of Columbia, who has jurisdiction over police and municipal ordinances which carry a maximum punishment of a fine only or imprisonment not exceeding one year.

*See* Appendix D.

§ 1.8.    IMPOUNDMENT AND REMOVAL

§1.8.10.    MOTOR VEHICLES MAY BE IMPOUNDED FOR VIOLATIONS[7]

Members of the United States Capitol Police are authorized to
issue a notice of parking violation and may authorize the removal of a
vehicle from any public way to a city vehicle pound or authorized
garage or any other legal parking space in the public way under the
following circumstances:

(a)    INCAPACITATED DRIVER.  When a vehicle upon any public way
is so disabled as to constitute an obstruction to traffic and the
person or persons in charge of the vehicle are by reason of
physical injury incapacitated to such an extent as to be unable
to provide for its custody or removal;

(b)    OBSTRUCTION.  When an unattended vehicle is lawfully parked
so as to constitute a hazard or obstruction to the normal
movement of traffic;

(c)    PARKING VIOLATIONS.  When an unattended vehicle is found
parked:

1.    On a sidewalk, bicycle path, parkway, bridge or in
an underpass;

2.    Within 20 feet of a fire hydrant, in a fire lane, or
under a fire escape;

3.    Illegally in a space designated for persons with
disabilities;

4.    On an alley with less than 10 feet on either side;

5.    In a loading zone or common carrier vehicle stop;

6.    In violation of posted signs when snow
accumulation is equal to or greater than 2 inches, or

7.    Upon a roadway for the purpose of displaying the
vehicle for sale.

---

[7] 2 USC § 1969(a), Pub. L. No 79-570, §14(a) (July 31, 1946):

"The Capitol Police Board shall have . . . exclusive charge and control of the regulation and movement
of traffic . . . including the parking and impounding of vehicles . . . [.]"

*See* Appendix B.

J.A. 249

    (d)    ABANDONED VEHICLES.  When a vehicle has been abandoned or found to be a hazardous dilapidated motor vehicle;

    (e)    EXCESS OF METER.  When a vehicle illegally occupies a parking meter space for more than 24 hours;

    (f)    TOW ZONE.  When an unattended vehicle is parked illegally in an officially designed and marked "tow zone;"

    (g)    INCIDENT TO ARREST.  When towing or removal is necessary as an incident to an arrest.

§1.8.20.    BICYCLES, PEDICABS AND LOW-SPEED VEHICLES MAY BE IMPOUNDED FOR VIOLATIONS

The Board may cause the removal and impoundment of any bicycle, pedicab, or low-speed device that is found in violation of or being operated in violation of these regulations.  Such item shall be removed, transported to, and impounded in or at, any place designated by the Board.

J.A. 250

CHAPTER 2
# TRAFFIC SIGNS, SIGNALS, SYMBOLS AND DEVICES

§ 2.1.   GENERAL

§2.1.10.   PLACEMENT AND MAINTENANCE OF TRAFFIC CONTROL DEVICES
The Board shall place and maintain traffic control devices upon all streets, highways, and driveways within Capitol Grounds to:
(a)   Indicate and carry out the provisions of these regulations;
(b)   To regulate, warn, and to guide traffic; and,
(c)   To establish official parking spaces and areas as the Board deems necessary.

§2.1.20.   EXCLUSIVE CONTROL
No person or authority shall place or maintain any traffic control device upon any street or highway within the Capitol Grounds except by permission of the Board.  This subsection does not apply to the streets adjacent to Capitol Grounds under the control and jurisdiction of the Director of the District of Columbia.

§2.1.30.   OBEDIENCE TO TRAFFIC SIGNS, SIGNALS OR DEVICES
The driver of any vehicle shall obey the instructions of any official traffic control device placed in accordance with these regulations unless an exception is granted by the Board or unless otherwise directed by a police officer.  Whenever these regulations state that a sign is not required, such section shall be effective even though no signs are erected or in place.

§2.1.40.   EXEMPTION FOR ILLEGIBLE SIGNS
No provision of these regulations for which signs are required shall be enforced against an alleged violator if an official sign is not in proper position and sufficiently legible to be seen by an ordinarily observant person at the time and place of the alleged violation.

§2.1.50.   INTERFERENCE WITH TRAFFIC CONTROL DEVICES
No person shall alter, deface, injure, knock down, remove, or attempt to do any of these acts to an official traffic control device without lawful authority to do so.

J.A. 251

**§ 2.2.    UNAUTHORIZED TRAFFIC CONTROL DEVICES, MARKINGS AND SIGNS**

§2.2.10.    UNAUTHORIZED SIGNS

No person shall place, maintain, or display upon or in view of any highway any unauthorized sign, signal, marking, or device which:

(a)    Purports to be, is an imitation of, or resembles an official traffic control device;

(b)    Attempts to direct the movement of traffic; or

(c)    Interferes with the effectiveness of any official traffic control device or hides it from view.

§2.2.20.    NO NOTICE REQUIRED

The Board does not have to provide notice before removing any prohibited sign, signal, marking or device.  Any sign, signal, marking, or device prohibited by these regulations is hereby declared to be a public nuisance.

J.A. 252

### § 2.3.    DRIVER OBEDIENCE TO TRAFFIC CONTROL SIGNALS

§2.3.10.    PLACEMENT AND MAINTENANCE

Whenever traffic is controlled by traffic control signals exhibiting the words "GO," "CAUTION," or "STOP," or exhibiting different colored lights, arrows, or combinations of lights and arrows successively one at a time, only those colors set forth in this section shall be used, and the terms and lights shall indicate and apply to drivers of vehicles as set forth in this section.

§2.3.20.    OBEDIENCE TO ALL TRAFFIC SIGNS

In the event an official traffic control signal is erected and maintained at a place other than an intersection, the provisions of this section shall be applicable, except those provisions which by their nature could have no application.

§2.3.30.    GREEN SIGNAL

The color GREEN alone or the word "GO" on a traffic control signal shall have the following meaning:

(a)    Vehicular traffic facing the GREEN or "GO" signal may proceed straight through or turn right or left unless a sign at such place prohibits a turn in either direction or both directions; and

(b)    Vehicular traffic, including vehicles turning right or left, shall yield the right-of-way to other vehicles and to pedestrians lawfully within the intersection or an adjacent crosswalk at the time the GREEN or "GO" signal is exhibited.

§2.3.40.    GREEN ARROW

A GREEN ARROW shall have the following meaning:

(a)    Vehicular traffic facing such signal may cautiously enter the intersection only to make the movement indicated by the arrow; and

(b)    Vehicles shall yield the right-of-way to pedestrians lawfully within a crosswalk and to other traffic lawfully using the intersection.

§2.3.50.   STEADY YELLOW SIGNAL
A STEADY YELLOW SIGNAL alone shall have the following meaning:
(a)   Vehicular traffic facing a steady yellow signal is thereby warned that a related green signal is being terminated or that a red signal will be exhibited thereafter, or both; and
(b)   Vehicular traffic shall stop before entering the nearest crosswalk of the intersection, unless so close to the intersection that a stop cannot safely be made.

§2.3.60.   STEADY YELLOW ARROW
A STEADY YELLOW ARROW shall have the following meaning:
(a)   Vehicular traffic facing the signal is warned that vehicular movement in the direction that the arrow is pointing is about to be terminated by means of a steady full red, a steady red arrow, or simply by the green arrow being turned off; and
(b)   Vehicular traffic shall stop before entering the nearest crosswalk at the intersection, unless so close to the intersection that a stop cannot safely be made.

§2.3.70.   STEADY RED SIGNAL
A STEADY RED SIGNAL alone or the word "STOP" shall have the following meaning:
(a)   Vehicular traffic facing the signal shall stop before entering the crosswalk on the near side of the intersection or, if none, then before entering the intersection;
(b)   Stopped vehicles shall remain standing until green, green arrow, or flashing yellow is shown, except as provided in paragraph (c) of this subsection; and
(c)   A vehicle facing a steady red signal may cautiously enter the intersection to turn right after stopping. The vehicle shall yield right-of-way to pedestrians within an adjacent crosswalk and to other traffic lawfully using the intersection.

§2.3.80.   STEADY RED ARROW
A STEADY RED ARROW shall have the following meaning:
(a)   Vehicular traffic facing the signal destined to proceed in the direction that the arrow is pointing shall stop before entering the crosswalk on the near side of the intersection or, if none, the vehicle shall stop before entering the intersection; and
(b)   The vehicle shall remain standing until a green arrow or flashing yellow arrow is shown.

§2.3.90.   PROPER STOPPING
Any stop required shall be made at a sign or marking on the pavement indicating where the stop shall be made.  In the absence of any sign or marking, the stop shall be made at the signal.

J.A. 254

**§ 2.4.** <u>DRIVER OBEDIENCE TO FLASHING RED AND YELLOW SIGNALS</u>

§2.4.10. <u>OBEDIENCE TO SIGNALS</u>
Whenever flashing red, yellow, or yellow arrow signals are used they shall require obedience by vehicular traffic as set forth in this section.

§2.4.20. <u>RED FLASHING SIGNAL</u>
When a RED lens is illuminated with rapid intermittent flashes, drivers of vehicles shall stop before entering the nearest crosswalk at an intersection or at a limit line when marked, or, if none, then before entering the intersection, and the right to proceed shall be subject to the rules applicable after making a stop at a "STOP" sign.

§2.4.30. <u>YELLOW FLASHING SIGNAL</u>
When a YELLOW lens is illuminated with rapid intermittent flashes, drivers of vehicles may proceed through the intersection or past the signal only with caution.

§2.4.40. <u>YELLOW ARROW</u>
When a YELLOW ARROW is illuminated with rapid intermittent flashes, vehicular traffic facing such indication may cautiously enter the intersection to make the movement indicated by such arrow, but shall yield the right-of-way to pedestrians within a crosswalk, and to any vehicle lawfully in the intersection or approaching on another highway so closely as to constitute an immediate hazard.

§2.4.50. <u>FAILURE TO YIELD</u>
After a driver has yielded at a flashing yellow arrow in accordance with §2.4.40, the driver may proceed, and the drivers of all other vehicles approaching the intersection shall yield to the vehicle so proceeding. If the driver is involved in a collision with a pedestrian in a crosswalk or a vehicle in the intersection after making the movement indicated by a flashing yellow arrow without stopping, such collision shall be deemed prima facie evidence of failure to yield right-of-way.

J.A. 255

## § 2.5.  DRIVER OBEDIENCE TO LANE-USE CONTROL SIGNALS

§2.5.10.  GENERAL
The meanings of lane-use control signals and the requirements for obedience to such signals are set forth in this section.

§2.5.20.  DOWNWARD GREEN ARROW
A steady DOWNWARD GREEN ARROW means that a driver is permitted to drive in the lane over which the arrow signal is located.

§2.5.30.  STEADY YELLOW X
A steady YELLOW X means that a driver should prepare to vacate, in a safe manner, the lane over which the signal is located because a lane control change is being made, and to avoid occupying that lane when a steady RED X is displayed.

§2.5.40.  FLASHING YELLOW X
A flashing YELLOW X means that a driver is permitted to use a lane over which the signal is located for a left turn, using proper caution.

§2.5.50.  STEADY RED X
A steady RED X means that a driver shall not drive in the lane over which the signal is located.  This indication shall modify the meaning of all other traffic controls present.

§2.5.60.  TRAFFIC CONTROLS REMAIN IN EFFECT
When lane-use control signals are in use, drivers shall obey all other traffic controls and follow normal safe driving practices.

## § 2.6.  PEDESTRIAN OBEDIENCE TO TRAFFIC CONTROL SIGNALS

§2.6.10.  APPLICATION
Whenever traffic is controlled by traffic control signals exhibiting the words "GO," "CAUTION," OR "STOP," or exhibiting different colored lights successively one at a time, or with arrows, the terms and lights shall apply to pedestrians as set forth in this section.

§2.6.20.  GREEN SIGNAL
Pedestrians facing a GREEN SIGNAL or the word "GO," my proceed across the roadway within any marked or unmarked crosswalk, except where special pedestrian control signals show a "DON'T WALK" signal.

§2.6.30.  STEADY YELLOW SIGNAL
Pedestrians facing a STEADY YELLOW SIGNAL are thereby advised that there is insufficient time to cross the roadway, and any pedestrian then starting to cross shall yield the right-of-way to all vehicles.

§2.6.40.  STEADY RED SIGNAL
Pedestrians facing a STEADY RED SIGNAL or the word "STOP" shall not enter the roadway, except where special pedestrian control signals show a "WALK" signal.

§2.6.50.  VERTICAL GREEN OR THRU ARROW
Pedestrians facing a vertical GREEN OR "THRU" ARROW may proceed across the roadway in any marked or unmarked crosswalk.

## § 2.7.  PEDESTRIAN SIGNALS

J.A. 256

§2.7.10.    APPLICATION

Whenever special pedestrian control signals exhibiting the words "WALK," "DON'T WALK," OR "WAIT" are in place, such signals shall indicate and apply to pedestrians as set forth in this section.

§2.7.20.    WALK SIGNAL

Pedestrians facing a "WALK" signal may proceed across the roadway in the direction of the signal and shall be given the right-of-way by the drivers of all vehicles.

§2.7.30.    NO CROSSING

No pedestrian shall start to cross the roadway in the direction of a "DON'T WALK" or "WAIT" signal.

J.A. 257

J.A. 258

CHAPTER 3
# EQUIPMENT

§ 3.1.    GENERAL PROVISIONS

§3.1.10.    SCOPE AND EFFECT OF REGULATIONS

(a)    APPLICATION.  The rules and regulations contained in this chapter shall govern the requirements for equipment on vehicles using the streets and highways of Capitol Grounds.

(b)    NON-CONVENTIONAL DESIGN.  Vehicles may be exempted from this chapter if the District of Columbia has found that a vehicle is not of conventional design and construction or if proof is offered that the equipment required by this chapter is not available for replacement purposes or cannot be made available by the manufacturer.  In either case, the vehicle must have an "approved" inspection sticker issued by the Director.

(c)    ADDITIONAL EQUIPMENT.  Nothing contained in this chapter shall be construed to prohibit the use of additional parts and accessories on any vehicle so long as they are consistent with the provisions of this chapter.

(d)    EXEMPTIONS.  Unless specifically provided for in this chapter, the provisions of this chapter which require equipment on vehicles shall not apply to an authorized official government vehicle that requires special equipment by design or function.

§3.1.20.    INCORPORATION BY REFERENCE
The current edition of the District of Columbia Vehicle Inspection Lane Operator's Manual or, when applicable, the American Association of Motor Vehicle Administrators Vehicle Operator's Manual is incorporated by reference into this chapter.  In case of conflict between the provisions of the District of Columbia Vehicle Inspection Lane Operator's Manual and those contained in this chapter, the provisions of this chapter shall be applicable.

§3.1.30.    CERTIFICATION OF COMPLIANCE
All motor vehicles must display a manufacturer's certification of compliance, attesting that the vehicle complies with federal safety standards for use on public roads, streets, and highways, as required by the National Traffic and Motor Safety Act of 1966;[8] except that mopeds need not display such certification of compliance.

---

[8] 40 U.S.C. § 5104(d).

## § 3.2.   UNSAFE VEHICLES

§3.2.10.   UNSAFE MECHANICAL CONDITION

No person shall operate or permit the operation or use of any vehicle on Capitol Grounds which is mechanically unsafe, improperly equipped or otherwise unfit to be operated.  All equipment shall be in good working order and in proper condition and adjustment as required by this chapter.

## § 3.3.   LAMPS AND LIGHTING EQUIPMENT

§3.3.10.   APPLICABILITY

(a)   VISIBILITY.  The provisions of this chapter which set forth specific distances from which certain lamps and devices shall render objects visible or distances within which such lamps or devices shall be visible, shall apply during the times stated in this section with respect to a vehicle without load when upon a straight, level, unlighted highway under normal atmospheric conditions, unless a different time or condition is expressly stated.

(b)   HEIGHT.  The provisions of this chapter which require a specific mounted height of lamps or devices shall mean a distance measured from the center of the lamp or device to the level ground upon which the vehicle stands when the vehicle is without a load.

(c)   AS ENUMERATED.  The sections of this chapter which relate to clearance and marker lamps, reflectors, and stop lights shall apply as stated in those sections to vehicles of the type enumerated in those sections; namely, passenger buses, trucks, truck trailers, and certain trailers, semi-trailers, and pole trailers, respectively, when operated upon any street or highway.

§3.3.20.   HEADLIGHTS REQUIRED

No person shall operate a vehicle on Capitol Grounds from one-half (1/2) hour after sunset to one-half (1/2) hour before sunrise unless the lighted lamps and illuminating devices required by this chapter are properly displayed.  Properly displayed lamps and illuminating devices are also required when, due to insufficient light or unfavorable atmospheric conditions, a person or vehicle on the highway is not clearly discernible at a distance of five hundred feet (500 ft.).

§3.3.30.   LAMP EQUIPMENT

The vehicles cited in this section shall be equipped as required and all lamp equipment required shall be lighted at the times mentioned in this section.  Clearance and side marker lamps need not be lighted where there is sufficient light to render persons and vehicles on the highway at a distance of five hundred feet (500 ft.) clearly discernible.

§3.3.40.    CLEARANCE LAMPS
Whenever motor vehicles and other vehicles are operated in
combination during the time when lights are required, any lamp
(except tail lamps) need not be lighted which, by reason of its location
on a vehicle of the combination, would be obscured by another vehicle
of the combination.  Lighted clearance lamps must still be displayed
on the front of the foremost vehicle required to have clearance lamps,
and all lights required on the rear of the rear most vehicle of any
combination shall be lighted.

§3.3.50.    EXTENDED LOAD
(a)    ADDITIONAL RED LIGHT.  Whenever the load upon any vehicle
extends to the rear four feet (4 ft.) or more beyond the bed or
body of the loaded vehicle, there shall be a red light or lantern
to the sides and rear displayed at the extreme rear end of the
load and shall be plainly visible from distance of at least five
hundred feet (500 ft.).  This red light or lantern is required in
addition to the red rear light required upon every vehicle.
(b)    RED FLAG OR CLOTH.  At any other time when lights are not
required, there shall be displayed at the extreme rear end of the
extended load a red flag or cloth not less than twelve inches
square (12 in.) which is so hung that the entire area is visible to
the driver of a vehicle approaching from the rear.

§3.3.60.    WINDSHIELD WIPERS
In addition to the requirements of subsection §3.3.10, whenever a
motor vehicle's windshield wipers are operated for a continuous
period of time because of impaired visibility resulting from
unfavorable atmospheric conditions, the vehicle headlamps shall also
be lighted.
(a)    A violation of this subsection shall not constitute or be used as
evidence of negligence or contributory negligence, limit
liability of any party or insurer, or diminish the recovery for
damages arising out of the ownership, maintenance, or
operation of a motor vehicle.
(b)    A police officer may enforce the provisions of this subsection
only as a secondary action when the police officer detains a
driver of a motor vehicle for a suspected violation of another
traffic regulation.

J.A. 261

**§ 3.4.** <u>HEADLAMPS</u>

§3.4.10.   <u>TWO HEADLAMPS REQUIRED</u>
Each motor vehicle other than a motorcycle or motorized bicycle shall be equipped with at least two (2) head lamps which shall comply with the requirements and limitations set forth in this chapter.

§3.4.20.   <u>FRONT HEADLAMPS REQUIRED</u>
Each motor vehicle required to have two (2) head lamps shall have at least one (1) head lamp on each side of the front of the motor vehicle.

§3.4.30.   <u>MOTORCYCLES AND MOTORIZED BICYCLES</u>
Each motorcycle and motorized bicycle shall be equipped with at least one (1) and not more than two (2) headlamps which shall comply with the requirements and limitations of this chapter.

**§ 3.5.** <u>TAIL LAMPS</u>

§3.5.10.   <u>REAR TAIL LAMP REQUIRED</u>
Each motor vehicle, trailer, semi-trailer, pole trailer and any other vehicle which is being drawn at the end of a train of vehicles shall be equipped with at least one (1) tail lamp mounted on the rear. The lamp shall emit a red light plainly visible from a distance of five hundred feet (500 ft.) to the rear and only the tail lamp on the rear most vehicle need actually be seen.

§3.5.20.   <u>TWO TAIL LAMPS REQUIRED</u>
Each vehicle of the types listed in §3.5.10 registered in the District of Columbia and manufactured or assembled after September 15, 1955; other than truck tractors manufactured or assembled prior to January 1, 1968, motorcycles, and motorized bicycles; shall be equipped with at least two (2) tail lamps mounted on the rear, on the same level, and as widely spaced as practicable, which, when lighted as required, shall comply with the provisions of this section.

§3.5.30.   <u>MOUNTED HEIGHT</u>
Each tail lamp on each vehicle shall be located at a height of not more than seventy-two inches (72 in.) or less than fifteen inches (15 in.), measured from the center of the lamp to the level ground upon which the vehicle stands when the vehicle is without a load.

§3.5.40.   <u>TAGS TO BE ILLUMINATED</u>
Either a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty feet (50 ft.) to the rear.

§3.5.50.   <u>FRONT AND REAR LIGHTING</u>
Any tail lamp or tail lamps, together with any separate lamp for illuminating the rear registration, shall be wired to be lighted whenever the head lamps or auxiliary driving lamps are lighted.

## § 3.6.    STOP LAMPS, TURN SIGNALS AND REFLECTORS

§3.6.10.    STOP LAMPS

(a)    VEHICLES MANUFACTURED BEFORE 1957.  No motor vehicle, trailer, or semi-trailer manufactured or assembled before September 15, 1957 shall be operated on Capitol Grounds unless it is equipped with at least one (1) stop lamp meeting the requirements of §3.13.

(b)    VEHICLES MANUFACTURED AFTER 1957.  No motor vehicle, trailer or semi-trailer manufactured on and after September 15, 1957 shall be operated on Capitol Grounds unless it is equipped with at least two (2) stop lamps meeting the requirements of §3.13.

(c)    TRUCK TRACTORS.  Truck tractors manufactured or assembled after September 15, 1957 but prior to January 1, 1968 shall be equipped with at least one stop lamp meeting the requirements of §3.13.

(d)    MOTORCYCLES.  Motorcycles and motorized bicycles shall be equipped with at least one (1) stop lamp meeting the requirements of §3.13.

§3.6.20.    ELECTRIC TURN SIGNALS

No motor vehicle, trailer, or semi-trailer, manufactured or assembled on and after September 15, 1955 shall be operated on Capitol Grounds unless it is equipped with electric turn signals meeting the requirements of §3.13.  Motor driven cycles which attain a speed of thirty miles per hour (30 mph) or less in a distance of one (1) mile, motorized bicycles and motorcycles shall be exempt from this requirement.

§3.6.30.    REAR REFLECTORS

Each new motor vehicle sold and operated upon a street or highway, other than a truck tractor, shall carry on the rear, either as part of the tail lamps or separately, two (2) red reflectors, except that each motorcycle and motorized bicycle shall carry at least one (1) reflector meeting the requirements of this section; and, provided, that vehicles of the type listed in §3.6 shall be equipped with reflectors as specifically required in this chapter.

§3.6.40.    MOUNTED HEIGHT FOR REFLECTORS

Each reflector shall be mounted on the vehicle at a height not less than fifteen inches (15 in.) or more than sixty inches (60 in.) measured as set forth in §3.3.10(b), and shall be of such size and characteristics and so mounted as to be visible at night from all distances within three hundred feet (300 ft.) to fifty feet (50 ft.) from the vehicle when directly in front of lawful upperbeams of head lamps, except that visibility from a greater distance is required of reflectors on certain types of vehicles.

## § 3.7.   ADDITIONAL EQUIPMENT REQUIRED ON TOW TRUCKS AND CRANES

§3.7.10.   WARNING LAMP

Each tow crane or tow truck shall be equipped with flashing, blinking, or alternating warning lamp or lamps and the lamp or lamps shall only be operated while at the scene of a disabled vehicle or while actually towing a disabled vehicle.  Each warning lamp shall be of a type approved by the District of Columbia.

§3.7.20.   TOP WARNING LAMPS

When two (2) lamps are used to display the warning on a tow crane or tow truck, they shall be mounted at the same level on the top of the cab and as widely spaced laterally as practicable and shall display a flashing, blinking, or alternating white or amber light or any shade of color between white and amber to the front.

§3.7.30.   REAR WARNING LAMPS

The lamps used to display the warning to the rear on a tow crane or tow truck shall be mounted at the same level on the top of the cab and as widely spaced laterally as practicable and shall display a flashing, blinking, or alternating amber or red light or any shade of color between amber and red.

§3.7.40.   SINGLE WARNING LAMP

When a single warning lamp is used on a tow crane or tow truck, it shall be mounted on the top of the cab as near center as practicable and shall display a flashing, blinking, or alternating white or amber light or any shade of color between white and amber to the front, and an amber or red light or any shade of color between amber and red to the rear.

§3.7.50.   VISIBILITY

The warning light or lights on a tow crane or tow truck shall be visible from a distance of not less than five hundred feet (500 ft.) under normal atmospheric conditions.

J.A. 264

## § 3.8. COLOR AND MOUNTING OF CERTAIN REFLECTORS, CLEARANCE LAMPS, SIDE MARKER LAMPS AND BACKUP LAMPS

§3.8.10.   FRONT CLEARANCE AND MARKER LAMPS

Front clearance lamps and those marker lamps and reflectors mounted on the front or on the side near the front of a vehicle shall display or reflect an amber color.

§3.8.20.   REAR CLEARANCE AND MARKER LAMPS

Rear clearance lamps and those marker lamps and reflectors mounted on the rear or on the sides near the rear of a vehicle shall display or reflect a red color.

§3.8.30.   REAR LIGHTING AND REFLECTORS

(a)   All lighting devices and reflectors mounted on the rear of any vehicle shall display or reflect a red color.

(b)   The stop light or other signal device mounted on the rear of a vehicle may be red, amber, or yellow.

(c)   The light illuminating the license plate shall be white.

(d)   The light emitted by a back-up lamp shall be white.

§3.8.40.   CLEARANCE AND SIDE MARKER LAMPS

Clearance lamps shall be mounted on the permanent structure of the vehicle in a manner which will indicate the extreme width of the vehicle, and as near the top of the vehicle as practicable.  Clearance lamps and side marker lamps may be mounted in combination so long as that illumination is given as required herein with reference to both and on buses when the outside windows are illuminated.

§3.8.50.   CONFORMANCE TO SAE STANDARDS

All reflectors, clearance lamps, and marker lamps shall conform to the standards and specifications of the Society of Automotive Engineers applicable to such equipment current at the time the devices are attached.

### § 3.9.    VISIBILITY OF REFLECTORS, CLEARANCE LAMPS AND MARKER LAMPS

§3.9.10.    VISIBILITY

Each reflector on any vehicle referred to in §3.7 shall be of such size and characteristics and so maintained as to be readily visible at nighttime from all distances within five hundred feet (500 ft.) to fifty feet (50 ft.) from the vehicle when directly in front of upper beams of head lamps.

§3.9.20.    FRONT AND SIDE REFLECTORS

Reflectors required to be mounted on the front and sides of the vehicle shall reflect the required color of light to the front and sides, and those mounted on the rear shall reflect a red color to the rear.

§3.9.30.    FRONT AND REAR CLEARANCE LAMPS

Front and rear clearance lamps shall be capable of being seen and distinguished under normal atmospheric conditions at the times lights are required at a distance of five hundred feet (500 ft.) from the front and rear of the vehicle.

§3.9.40.    SIDE MARKER LAMPS

Side marker lamps shall be capable of being seen and distinguished under normal atmospheric conditions at the times lights are required at a distance of five hundred feet (500 ft.) from the side of the vehicle on which mounted.

## § 3.10.    SPOT LAMPS AND AUXILIARY LAMPS

§3.10.10.    SPOT LAMPS

No motor vehicle shall be equipped with more than two (2) spot lamps.  No part of the high-intensity portion of the beam shall be directed to the left of the prolongation of the extreme left side of an approaching vehicle or more than one-hundred feet (100 ft.) ahead of the vehicle.

§3.10.20.    FOG LAMPS

No motor vehicle shall be equipped with more than two (2) fog lamps mounted on the front at a height not less than twelve inches (12 in.) or more than thirty inches (30 in.) above the level surface upon which the vehicle stands and so aimed that when the vehicle is not loaded none of the high-intensity portion of the light to the left of the center of the vehicle shall at a distance of twenty-five feet (25 ft.) ahead project higher than a level of four inches (4 in.) below the level of the center of the lamp from which it comes.  Lighted fog lamps meeting the above requirements may be used with lower head-lamp beams as specified in §3.15.[9]

§3.10.30.    AUXILIARY PASSING LAMPS

No motor vehicle shall be equipped with more than two (2) auxiliary passing lamps mounted on the front at a height of not less than twenty-four inches (24 in.) or more than forty-two inches (42 in.) above the level surface upon which the vehicle stands.

§3.10.40.    AUXILIARY DRIVING LAMPS

No motor vehicle shall be equipped with more than two (2) auxiliary driving lamps mounted on the front at a height not less than twenty-four inches (24 in.) or more than forty-two inches (42 in.) above the level surface upon which the vehicle stands.

---

[9] §3.14 ("Multiple-Beam Road Lighting Equipment").

J.A. 267

**§ 3.11.** <u>AUDIBLE AND VISUAL SIGNALS ON EMERGENCY VEHICLES</u>

§3.11.10.   <u>AUTHORIZED EMERGENCY VEHICLES</u>

Each authorized emergency vehicle shall, in addition to any other equipment and distinctive markings required by these regulations, be equipped with a siren, exhaust whistle or bell capable of giving a signal audible from a distance of not less than five hundred feet (500 ft.) under normal conditions.  There shall be at least one (1) lighted lamp displaying a red light capable of flashing alternately and that is visible under normal atmospheric conditions from a distance of five hundred feet (500 ft.) to the front of the vehicle.

§3.11.20.   <u>UNAUTHORIZED USE OF A SIREN</u>

Whenever an emergency vehicle is equipped with a siren, the siren shall not be used except when the vehicle is being operated in response to an emergency call; or in the immediate pursuit of an actual or suspected violator of the law, in which case, the driver of the vehicle shall sound the siren when necessary to warn pedestrians and other drivers of the approach of the vehicle.

## § 3.12.   SIGNAL LAMPS AND SIGNAL DEVICES

§3.12.10.   STOP LAMPS

Any motor vehicle may be equipped and when required by these regulations shall be equipped, with a stop lamp or lamps on the rear of the vehicle which shall display a red or amber light, or any shade of color between red and amber, visible from a distance of not less than one-hundred feet (100 ft.) to the rear in normal sunlight, and which shall be actuated upon application of the service (foot) brake and which may be incorporated with one (1) or more other rear lamps.

§3.12.20.   TURNING LAMPS

Any motor vehicle may be equipped and when required shall be equipped with lamps showing to the front and rear for the purpose of indicating an intention to turn either to the right or left.

§3.12.30.   PLACEMENT OF TURNING LAMPS

When lamps are used for turn indicators, the lamps showing to the front shall be located on the same level and as widely spaced laterally as practicable, and when in use shall display a white or amber light, or any shade of color between white and amber, visible from a distance of not less than one-hundred feet (100 ft.) to the front in normal sunlight.  The lamps showing to the rear shall be located at the same level and as widely spaced laterally as practicable, and when in use shall display a red or amber light, or any shade of color between red and amber, visible from a distance of not less than one-hundred feet (100 ft.) to the rear in normal sunlight.

§3.12.40.   TURNING INDICATOR

When actuated, turn indicator lamps shall indicate the direction of the intended turn by flashing the light showing to the front and rear on the side toward which the turn is going to be made.

§3.12.50.   GLARING LIGHT

No stop lamp or signal lamp shall project a glaring light.

J.A. 269

## § 3.13. ADDITIONAL LIGHTING EQUIPMENT

§3.13.10.   FENDER LAMPS

No motor vehicle may be equipped with more than two (2) sidecowl or fender lamps. Each fender lamp shall emit a white or amber light without glare.

§3.13.20.   RUNNING-BOARD COURTESY LAMP

No motor vehicle may be equipped with more than one (1) running-board courtesy lamp on each side of the vehicle. Each running-board courtesy lamp shall emit a white or amber light without glare.

§3.13.30.   BACK-UP LAMPS

No motor vehicle may be equipped with more than two (2) back-up lamps either separately or in combination with other lamps. The back-up lamps shall not be lighted when the motor vehicle is in forward motion, nor shall they have a maximum intensity of more than seven-hundred-fifty (750) beam candlepower per lamp.

§3.13.40.   WARNING LAMPS

(a)   AUTHORIZED VEHICLES. Any authorized emergency vehicle or public utilities vehicle may be equipped with lamps which may be used for the purpose of warning the other operators of other vehicles of the presence of a vehicular traffic hazard requiring the exercise of unusual care in approaching, overtaking, or passing. When so equipped, these vehicles may display the warning in addition to any other warning signals required by this chapter.

(b)   PLACEMENT OF FRONT WARNING LAMPS. The lamps used to display a warning to the front shall be mounted at the same level and as widely spaced laterally as practicable, and shall display simultaneously flashing white or amber lights, or any shade of color between white and amber.

(c)   PLACEMENT OF REAR WARNING LAMPS. The lamps used to display a warning to the rear shall be mounted at the same level and as widely spaced laterally as practicable, and shall show simultaneously flashing amber or red lights, or any shade of color between amber or red.

(d)     WARNING LIGHT VISIBILITY.  Warning lights shall be visible at night from distance of not less than fifteen- hundred feet (1500 ft.) under normal atmospheric conditions.

(e)     WARNING LAMP INDICATOR.  When a vehicle is equipped with warning lamps there shall be an illuminated indicator to give the operator a clear and unmistakable indication that the lamps are turned on.

(f)     VISIBILITY OF WARNING LAMP INDICATOR.  The illuminated indicator shall consist of one (1) or more bright lights flashing at the same frequency as the warning lamps, and shall be plainly visible to drivers of all heights when seated in normal position in the driver's seat while driving in bright sunlight.

**§ 3.14.   MULTIPLE-BEAM ROAD LIGHTING EQUIPMENT**

§3.14.10.    ARRANGEMENT OF LAMPS
Except as provided otherwise in this section, the headlamps, the auxiliary driving lamp, the auxiliary passing lamp or combination of such lamps on motor vehicles shall be arranged so that the driver may select between distributions of light projected to different elevations. These lamps may be arranged so that the selection can be made automatically, subject to the limitations stated in this section.  This provision does not apply to motorcycles or motorized bicycles.

§3.14.20.    MAXIMUM LIGHT DENSITY
There shall be an uppermost distribution of light or composite beam so aimed and of such intensity as to reveal persons or vehicles at a distance of at least three-hundred and fifty feet (350 ft.) for all conditions of loading.

§3.14.30.    MINIMUM LIGHT DENSITY
There shall be a lowermost distribution of light or composite beam so aimed and of sufficient intensity to reveal persons and vehicles at a distance of at least one-hundred feet (100 ft.) ahead.  None of the high-intensity portion of the beam shall be directed to strike the eyes of the oncoming driver on a straight level road and under any condition of loading.

§3.14.40.    BEAM INDICATOR.
Each new motor vehicle with multiple-beam road lighting equipment shall be equipped with a beam indicator.  The beam indicator shall not be lighted unless the uppermost distribution of light from the head lamps is in use.  The indicator shall be designed and properly placed so that it is readily visible without glare to the driver of the vehicle.  This provision does not apply to motorcycles or motorized bicycles.

§3.14.50.    LOW BEAMS REQUIRED
When lights are required, each motor vehicle equipped with multiple-beam head lamps shall use the lower or city-driving beam when operating on the highways of the Capitol Grounds.

§3.14.60.    EXCEPTION FOR VEHICLES MANUFACTURED BEFORE 1950
Vehicles that are manufactured and sold before 1950 do not require additional auxiliary lamps.  Vehicles manufactured before 1950 do require a single distribution of light.  None of the high-intensity portion of the light shall:

(a)    At a distance of twenty-five (25 ft.) ahead, project at a level higher than five inches (5 in.) below the level of the center of the lamp;

(b)    At a distance of seventy-five (75 ft.) ahead, project higher than forty-two inches (42 in.) above the level on which the vehicle stands; and,

(c)    Be of intensity sufficient to reveal persons and vehicles at a distance of at least one hundred feet (100 ft.) ahead on a straight-level road.

## § 3.15.   SPECIAL REQUIREMENTS FOR LIGHTING EQUIPMENT

§3.15.10.   CANDLEPOWER LIMIT

Two (2) or more lighted lamps shall be displayed at all times as required by these regulations provided:

(a) Each lamp has at least four thousand (4,000) beam candlepower per lamp; and,

(b) One lamp is displayed on each side of the front of the motor vehicle.

This provision does not apply to motorcycles or motorized bicycles.

§3.15.20.   MAXIMUM FOUR LAMPS PERMITTED

Whenever a motor vehicle equipped with head-lamps as required in this chapter and also equipped with any auxiliary lamp(s), spot lamp, or any other lamp on the front projecting a beam of an intensity greater than three-hundred (300) candlepower, no more than a total of four (4) of any such lamps on the front of a vehicle shall be lighted at any one time when upon a street or highway.

§3.15.30.   FRONT RED LIGHTS PROHIBITED

No person shall drive or move any vehicle or equipment upon any highway with any lamp or device thereon displaying a red light visible from the front of the vehicle. This subsection shall not apply to any vehicle on which a red light visible from the front is expressly authorized or required by these regulations.

§3.15.40.   FLASHING LIGHTS PROHIBITED

Flashing lights are prohibited on all vehicles except on:

(a)   An authorized emergency vehicle;

(b)   Snow-removal equipment; or,

(c)   Any vehicle using the flashing light as a means for indicating a right or left turn or the presence of a vehicular traffic hazard.

J.A. 273

## § 3.16. <u>BRAKES</u>

§3.16.10.   <u>TRAILERS</u>

Each motor vehicle, trailer, semi-trailer and pole trailer, and any combination of such vehicles operated upon a street or highway shall be equipped with brakes in compliance with the requirements of this subsection.

§3.16.20.   <u>SERVICE BRAKES</u>

Each vehicle and combination of vehicles, except special mobile equipment as defined in these regulations, shall be equipped with service brakes complying with the performance requirements of this section.  The brakes should be adequate to control the movement of and to stop and hold the vehicle under all conditions of loadings and on any grade incident to its operation.

§3.16.30.   <u>PARKING BRAKES</u>

Each vehicle or combination of vehicles, except motorcycles and motorized bicycles, shall be equipped with parking brakes adequate to hold the vehicle on any grade on which it is operated under all conditions of loading on a surface free from snow, ice, or loose material.

§3.16.40.   <u>GOOD WORKING ORDER</u>

All brakes shall be maintained in good working order and shall be so adjusted to operate as equally as practicable with respect to the wheels on opposite sides of the vehicle.

**§ 3.17.**   **HORNS AND WARNING DEVICES**

§3.17.10.   AUDIBLE HORN
Each motor vehicle operated upon a highway shall be equipped with a horn in good working order and capable of emitting sound audible under normal conditions from a distance of not less than two hundred feet (200 ft.).

§3.17.20.   UNREASONABLY LOUD HORNS
No horn or other warning device shall emit an unreasonably loud or harsh sound or a whistle.

§3.17.30.   AUDIBLE WARNING
The driver of a motor vehicle shall only give audible warning with his or her horn when reasonably necessary to ensure safe operation.

§3.17.40.   PERMISSIBLE HORNS
No vehicle shall be equipped with nor shall any person use upon a vehicle any siren, whistle, or bell, except as otherwise permitted in these regulations.  This section does not apply to authorized emergency vehicles as set forth in §3.12.

§3.17.50.   THEFT ALARM SYSTEM
A vehicle may be equipped with a sound device designed to be used solely as a theft alarm system which shall be so arranged that it cannot be used or controlled by the driver or other person for any purpose other than as an alarm system.

J.A. 275

§ 3.18.   WINDSHIELDS AND MIRRORS

§3.18.10.   SIGNS AND POSTERS
No person shall drive any motor vehicle with any sign, poster, or other non-transparent material upon the front windshield, sidewings, or side or rear windows of the vehicle unless authorized under law.

§3.18.20.   MECHANICAL DEFROST
The windshield on a motor vehicle shall be equipped with a mechanically operated device for cleaning rain, snow, or other moisture from the windshield. This device shall be constructed to be controlled by the driver of the vehicle.

§3.18.30.   WINDSHIELD WIPERS
No motor vehicle manufactured after January 1, 1938 shall be operated on Capitol Grounds unless it is equipped with windshield wipers capable of wiping the right and left hand sides of the windshield.

§3.18.40.   GOOD WORKING ORDER
Each windshield wiper shall be maintained in good working order.

§3.18.50.   CRACKED WINDSHIELD
No motor vehicle shall be operated when the windshield is cracked, scarred, clouded, or otherwise defective so as to obstruct vision.

§3.18.60.   REFLECTIVE MIRRORS
Each motor vehicle shall be equipped with a mirror or mirrors so located as to reflect to the driver, under all conditions of loading, a view of the street or highway for a distance of at least two hundred feet (200 ft.) to the rear of such vehicle.[10]

---

[10] *See* 18 DCMR § 731.6 which requires certain vehicles be equipped with two adjustable rear-view mirrors.

## § 3.19.   TIRE EQUIPMENT

§3.19.10.   UNSAFE TIRES

No person shall drive or move any motor vehicle equipped with any tire in such condition as to endanger or be likely to endanger any person or property.

§3.19.20.   TIRE THICKNESS

Each solid rubber tire on a vehicle shall have rubber on its entire traction surface at least one inch (1 in.) thick above the edge of the flange of the entire periphery.

§3.19.30.   BALD TIRES

No person shall operate or move on any street or highway any motor vehicle, trailer or semi-trailer having any metal tire in contact with the roadway.

§3.19.40.   PROTUBERANCE

No tire on a vehicle moved on a street or highway shall have on its periphery any block, stud, flange, cleat, or spike or any other protuberance of any material other than rubber which projects beyond the tread of the traction surface of the tire, except as provided in §3.20.50.

§3.19.50.   PERMISSIBLE USES

It shall be permissible to use the following:

(a)   PROTUBERANCES.  Farm machinery with tires having protuberances which will not injure the street or highway;

(b)   TIRE CHAINS.  Tire chains of reasonable proportions upon any vehicle when required for safety because of snow, ice, or other conditions tending to cause a vehicle to skid; or

(c)   STUDDED TIRES.  Pneumatic tires containing metal type studs, the tips of which protrude beyond the rubber tread surface of such tire not more than one-eighth of an inch (1/8 in.), and the cross-sectional diameter of which do not exceed one-fourth of an inch (1/4 in.), inclusive of the casing but not including any flange or flanges embedded in the rubber of the tire; *provided*, that the use of studded tires is permitted only from October 15th through April 15th of each year.

**§ 3.20.    <u>BUMPERS AND FENDERS</u>**

§3.20.10.    <u>FRONT BUMPER REQUIRED</u>
Each motor vehicle, except motorcycles and motorized bicycles, shall be equipped with bumpers in front, securely attached and extending beyond the extreme front of the vehicle.

§3.20.20.    <u>REAR BUMPER REQUIRED</u>
Each motor vehicle of the passenger car class, taxicabs and buses shall be equipped with a bumper on the rear of each vehicle securely attached to and extending beyond the extreme rear of the vehicle.

§3.20.30.    <u>FENDER REQUIRED</u>
No motor vehicle designed primarily to carry passengers shall be operated with the fenders removed.

§3.20.40.    <u>SHARP EDGES</u>
No motor vehicle shall be operated if any part of the vehicle has a sharp or ragged edge that may snag any person or object while operating on Capitol Grounds.

§3.20.50.    <u>EXTENDED FENDERS PROHIBITED</u>
No motor vehicle shall be operated on Capitol Grounds if the fender, running board, bumper bar, or any other body part extends beyond the original margin or width of the fender line.

## § 3.21.   WINDOW GLAZING MATERIALS

§3.21.10.   SAFETY GLAZING MATERIALS

No motor vehicle manufactured or assembled after January 1, 1936 shall be operated on Capitol Grounds unless it is equipped throughout with safety glazing materials of a type approved by the District of Columbia.

§3.21.20.   SAFETY GLAZING MATERIALS DEFINED

For the purposes of this section, the term "safety glazing materials" shall be construed to mean transparent glazing materials so formulated, treated, or combined with other materials as to reduce, in comparison with ordinary sheet glass or plate glass, the likelihood of injury to persons by objects from exterior sources or by these safety glazing materials when the glazing materials are cracked or broken.

§3.21.30.   RIGID-TYPE PLASTIC WINDOWS

The use of rigid-type clear plastic is restricted to side curtains or readily demountable windows, rear windows in the tops of convertible passenger cars, back lights, rear quarter lights and doors, in truck or truck-tractor cabs, in rear doors or taxicabs, in house or freight trailers, in the lights of lower part of folding doors when not over ten inches (10 in.) in the least dimension, in interior partitions and auxiliary wind deflectors, in standee windows in buses, and in openings in the roofs of tops.

§3.21.40.   FLEXIBLE-TYPE PLASTIC WINDOWS

The use of flexible-type, clear plastic is restricted to side curtains or readily demountable windows; rear windows in the tops of convertible passenger cars; and house or freight trailers.

J.A. 279

## § 3.22.   TINTED WINDOWS

(a)   MOTOR VEHICLES.  No motor vehicle, other than a mini-van, may be operated or parked upon the public streets or spaces of Capitol Grounds with:

    1.   A front windshield or front side windows that allow less than 70% light transmittance; or

    2.   A rear windshield or rear side windows that allow less than 50% light transmittance.

(b)   MINI-VANS.  No mini-van may be operated or parked upon the public streets or spaces of Capitol Grounds with:

    1.   A front windshield or front side windows that allow less than 55% light transmittance, or

    2.   A rear windshield or rear side windows that allow less than 35% light transmittance.

(c)   PERMISSIBLE TINTING.  A motor vehicle may be operated or parked upon the public streets of the District of Columbia with a front windshield that allows less than 70% light transmittance above the AS-1 line, or within 5 inches from the top of the windshield.

## § 3.23.   MISCELLANEOUS EQUIPMENT

§3.24.10.   SPEEDOMETER REQUIRED

Each motor vehicle operating on Capitol Grounds shall be equipped with a device in good working order to register the rate of speed of the vehicle in motion.  Vehicles manufactured prior to January 1934 shall not be required to comply with this provision so long as proof is offered that machine parts for the maintenance of such devices are not available or where the manufacturer has dissolved or discontinued business.

§3.24.20.   TELEVISION EQUIPMENT

No television equipment shall be installed in or on any motor vehicle in a manner which will make the reception of the television visible to the vehicle operator while the vehicle is in motion.

§3.24.30.   RADAR DETECTORS AND JAMMERS

No person shall use or have in his possession in an automobile on Capitol Grounds any device used to detect or counteract police radar.

J.A. 280

§ 3.24.    SEAT BELTS

§3.24.10.    DEFINITIONS
The following definitions apply to the terms in this section only:
(a)    MOTOR VEHICLE:  an automotive transportation device with more than three (3) wheels and a seating capacity of eight (8) or less passengers, not including the driver.
(b)    PROPERLY RESTRAINED:  strapped around the waist or torso of a passenger by a safety belt built into the motor vehicle.

§3.24.20.    SEAT BELT REQUIRED
Except as provided in §3.25.20, the driver and all passengers in a motor vehicle shall wear a properly adjusted and fastened safety belt while the driver is in control of the vehicle.  This provision does not apply to operators or passengers in the following circumstances:
(a)    Riders in a motor vehicle manufactured before July 1, 1966;
(b)    Riders who possess a written verification from a licensed physician that the rider is unable to wear a safety belt for medical reasons;
(c)    Riders who are passengers in a vehicle if all seating positions with seat belts in the vehicle are occupied by other persons. The driver shall ensure that children sixteen (16) years of age and under have preference to seating positions with seat belts over persons more than 16 years of age; and,
(d)    Operators of taxicabs who possess valid taxicab license while picking up or transporting passengers for hire between the hours of 6:00 p.m. and 6:00 a.m.

§3.24.30.    LIABILITY
The driver of the vehicle shall be responsible for ensuring the passengers comply with this section.  Operators of passenger vehicles for hire are not responsible for ensuring passenger compliance with this section.

§3.24.40.    COMPLIANCE WITH STANDARDS
All seat belts or safety harnesses, including the installation and anchorages thereof, shall meet or exceed the standards and specifications published by the United States Department of Commerce and the Society of Automotive Engineers applicable to such equipment, installation, and anchorages current at the time such devices are installed and continuously maintained to conform to these standards.

§3.24.50.    VEHICLES FOR HIRE
All public vehicles for hire shall have operating seat belts for each passenger and display a sign which states the following: "District of Columbia law requires mandatory use of seat belts.  A fifty dollar ($50) fine applies for violations."

J.A. 281

§ 3.25   CHILD RESTRAINT

§3.25.10.   DEFINITIONS

The following definitions apply to the terms in this section only:

(a)   CHILD RESTRAINT SEAT:  any motor vehicle restraint system which has been designed to protect children and has been approved pursuant to all current and applicable federal safety standards.[11]

(b)   OPERATOR:  a person who drives or is in actual physical control of a vehicle.

(c)   PROPERLY RESTRAINED:

When used in reference to the use of a:

1.   SAFETY BELT means secured with the lap portion of a safety belt which is provided in a motor vehicle.

2.   CHILD RESTRAINT SEAT means secured in a child restraint seat which itself has been fastened to the motor vehicle by a safety belt and in which all securing straps are being used.

(d)   TRANSPORT:  to have a child of less than sixteen (16) years of age as a passenger in a motor vehicle while the operator is seated in the driver position and the motor vehicle is either parked or in motion.

(e)   MOTOR VEHICLE:  any device with more than three (3) wheels and a seating capacity of eight (8) or fewer passengers, exclusive of the operator, which is propelled by an internal-combustion engine, electricity or steam and which is designed used or maintained for passenger or recreational purposes, or which is designed, used, or maintained for transporting freight, merchandise or other commercial loads or property.  The term "motor vehicle" does not include any device used for livery, sightseeing, taxi, ambulance, funeral or farm purposes; or any device with more than three (3) wheels which is propelled by an internal-combustion engine, electricity or steam and which has a seating capacity of more than eight (8) passengers, exclusive of the operator.

§3.25.20.   REQUIREMENTS

(a)   CHILDREN UNDER THREE.  The operator of a motor vehicle may not transport any child of less than three (3) years of age unless the child is properly restrained in a child restraint seat.

(b)   CHILDREN UNDER SIXTEEN.  The operator of a motor vehicle shall not transport any child under sixteen (16) years of age unless the child is properly restrained in an approved child safety restraint system or restrained in a seat belt.  Children under eight (8) years of age shall be properly seated in an installed infant, convertible (toddler) or booster child safety

---

[11] See D.C. Code §50-1074.

seat, according to the manufacturer's instructions.  A booster
seat shall only be used with both a lap and shoulder belt.

(c)  EXCEPTION.  A parent or legal guardian may transport his or
her own child without restraint if that person is transporting a
number of his or her own children less than sixteen (16) years
of age which exceeds the number of passenger positions
equipped with safety belts in the motor vehicle.  However, an
unrestrained child may not be transported in the front seat of a
motor vehicle.

## § 3.26.  EXHAUST EMISSION SYSTEMS

§3.26.10.  GOOD WORKING ORDER

When any motor vehicle was originally equipped with an emission
control system, that system shall be maintained in good working order,
and no person shall disconnect any part of that system, except
temporarily in order to make repairs, replacements, or adjustments,
and no person shall modify or alter that system in its operation.

§3.26.20.  POLLUTION CONTROL SYSTEM

No person shall operate, and no owner shall cause or permit to be
operated, any motor vehicle originally equipped with a pollution
control system while any part of that system is disconnected or while
that system or its operation is modified or altered.

§3.26.30.  VISIBLE SMOKE AND FUMES

The engine, power, and exhaust mechanism of each motor vehicle
shall be equipped, adjusted, and operated to prevent the escape from
the vehicle of a trail of visible fumes or smoke for more than ten (10)
consecutive seconds.

J.A. 284

CHAPTER 4
# INSPECTION STICKER REQUIREMENTS

**§ 4.1.    GENERAL**

§4.1.10.    INSPECTION OF EQUIPMENT
Any police officer or other authorized agent of the Board may inspect and test the lights, brakes, steering assembly, tires, equipment horn, emission control equipment, exhaust emissions or other device at any time a vehicle is on Capitol Grounds.

**§ 4.2.    INSPECTION STICKERS**

§4.2.10.    DISTRICT OF COLUMBIA RESIDENTS
It shall be unlawful for any person to operate, park, or permit to be operated or parked any vehicle with current District of Columbia tags unless one of the following is displayed on the right side of the vehicle's windshield:

(a)    A current District of Columbia inspection sticker;

(b)    A temporary District of Columbia inspection sticker; or

(c)    When transferring ownership for registration purposes, a temporary registration certificate issued by a registered dealer or repair shop when transferring ownership for registration purposes.

§4.2.20.    NON-RESIDENTS
A vehicle owned by a non-resident and currently registered in another jurisdiction shall display the proper inspection sticker issued for the vehicle in accordance with the requirements of the issuing jurisdiction.

§4.2.30.    EXEMPTIONS
Vehicles bearing special bus identification, current dealer tags, transport tags, special use papers, vintage license tags or historic motor vehicle tags shall be exempt from the inspection sticker requirements in this section.

§ 4.3.   DETACHED AND CONDEMNED STICKERS

§4.3.10.   DETACHMENT MUTILATION AND LOSS

If an inspection sticker becomes wholly or partly detached from the place where it was attached or becomes mutilated or lost, the registrant or the person desiring registration (or their agent) shall present that motor vehicle or trailer to the inspection station where it was originally inspected within seventy-two (72) hours after the detachment, mutilation, or loss is discovered.

§4.3.20.   OPERATING WITH CONDEMNED STICKER

No person shall park, operate or permit to be operated any motor vehicle bearing a "condemned" sticker issued by any authorized agency from any jurisdiction on Capitol Grounds.

J.A. 286

CHAPTER 5
# IDENTIFICATION TAGS

§ 5.1.   PROPER DISPLAY OF TAGS

§5.1.10.   VEHICLES REGISTERED IN THE DISTRICT OF COLUMBIA
Whenever a District of Columbia registered motor vehicle or trailer is being operated or left standing on Capitol Grounds, such vehicle shall display two (2) current identification tags, with one (1) on the front and the other on the rear; except as follows:

(a)   Motor vehicles need only display a special use identification tag on the rear of the vehicle only; and

(b)   Motor vehicles may display a souvenir presidential inauguration tag on the front of the vehicle not more than sixty (60) days before and not more than sixty (60) days after inauguration day so long as a current identification tag is displayed on the rear.

§5.1.20.   MISCELLANEOUS VEHICLES
Motorized bicycles, motorcycles, trailers and vehicles identified by a dealer's tag or manufacturer's tag shall display only one (1) valid identification tag on the rear of the vehicle.

§5.1.30.   NON-RESIDENT TAGS
A vehicle owned by a non-resident and currently registered in another jurisdiction shall display the proper identification tag or tags issued for the vehicle in accordance with the requirements of the issuing jurisdiction provided they are displayed in accordance with §6.1.40, §6.1.50, §6.1.60, and §6.1.80.

§5.1.40.   SWINGING TAGS
Every owner shall securely fasten identification tags in a horizontal position to the vehicle for which they are issued at all times in order to prevent the tags from swinging.  Vehicle tags shall be secured in a place and a position so they are clearly visible and at a height of not less than twelve inches (12 in.) from the ground measuring from the bottom of the tags.

§5.1.50.   ILLEGIBLE TAGS
Every owner shall maintain identification tags so they are clearly legible and free from foreign materials.  Foreign materials include any:

(a)   Non-transparent materials placed on or over the tag(s);

(b)   Expired or unauthorized decals or stickers; or,

(c)   Markings or attachments of any kind, except as permitted by §5.1.60.

§5.1.60.    EMBLEMS
No sign or emblem measuring more than twenty-four square inches (24) in area shall be attached to any license tag bracket.  No sign or emblem of any size shall be placed in a way that obstructs any part of the identification tag from view.

§5.1.70.    VALIDATION STICKERS
Validation stickers issued by the District of Columbia that indicate the expiration of a motor vehicle's registration period are required to be displayed as follows:

(a)    For vehicles registered prior to April 22, 2002, and all motorized bicycles, motorcycles, and trailers, the stickers shall be affixed to the tags; the month sticker placed at the lower left corner and year sticker placed at the lower right corner; and

(b)    For vehicles not listed in (a), the sticker shall be affixed to the inside of the vehicle's windshield, on the driver's side.

§5.1.80.    TAG COVERINGS
No person shall operate a vehicle where the identifying numbers or letters on the identification tag are covered with glass, plastic, or any other type of material or substance.

## § 5.2.    LICENSING, REGISTRATION AND RECIPROCITY REQUIREMENTS

§5.2.10.    GENERAL
Any motor vehicle owner or operator on Capitol Grounds must comply with all applicable District of Columbia motor vehicle licensing and registration laws, regulations and rules.

## § 5.3.    FAILURE TO SURRENDER

§5.3.10.    IDENTIFICATION TAGS
A registrant who loses or disposes of his or her ownership of a vehicle for which valid registration is outstanding shall remove, or cause to be removed, the owner's identification tags from the vehicle.

§5.3.20.    SPECIAL LICENSE TAGS OR PARKING PERMIT
Whenever a special license tag or special parking permit issued by the District of Columbia is no longer needed by the applicant or the applicant is no longer eligible for those privileges set forth by the tag or permit, the applicant or the applicant's representative shall, within ten (10) days, notify and surrender the tags or permit to the District of Columbia.

## § 5.4.   IMPROPER USE OF TAGS

§5.4.10.   LENDING TAGS AND REGISTRATION

(a)   No person shall lend any temporary registration certificate, registration certificate, identification tag, or temporary identification tag issued to him or her to any to another person if that person would not be entitled to their use.

(b)   No person shall knowingly permit the use of any of these items by another person not entitled to them.

(c)   No person shall display on a vehicle any temporary registration certificate, identification tag, or temporary identification tag not issued for that vehicle or not otherwise lawfully used on the vehicle.

§5.4.20.   DEALER TAGS

Dealer identification tags issued to a registered dealer shall be used solely for the purpose of operating vehicles owned by the dealer, if directly in furtherance of the business of the dealer, and only by the following persons:

(a)   The dealer, provided they carry proof of dealer registration at the time of operation;

(b)   The dealer's salesperson, provided they carry their salesperson's license at the time of operation; or

(c)   The dealer's customer, provided:

1.   The customer is accompanied by the dealer or the dealer's salesperson and such person carries proof required by (a) or (b) at the time of operation; or

2.   The vehicle displays a temporary registration certificate issued to that customer.[12]

---

[12] *See* 18 DCMR § 503.8 for temporary registration certificate requirements.

J.A. 289

J.A. 290

# ARTICLE II:  MOTOR VEHICLES

J.A. 291

CHAPTER 6
# CRIMINAL DRIVING OFFENSES

**§6.1.   PENALTIES**
The provisions in this chapter are generated from the District of Columbia Traffic Act of 1925.  Under 2 U.S.C. §1969, the Capitol Police Board is authorized to proscribe the penalties set forth in that Act.  Therefore, the current penalties as set forth by the District of Columbia shall apply to the provisions in this chapter.[13]

**§ 6.2.   SPEEDING AND RECKLESS DRIVING**

§6.2.10.   RECKLESS DRIVING
A person shall be guilty of reckless driving if the person drives a vehicle upon a highway carelessly and heedlessly in willful or wanton disregard for the rights or safety of others, or without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger a person or property.

§6.2.20.   AGGRAVATED RECKLESS DRIVING
A person shall be guilty of aggravated reckless driving if the person violates §6.2.10 and the person does one or more of the following:

(a)   Operates the vehicle at a rate or speed at or greater than 30 miles per hour over the stated speed limit;

(b)   Causes bodily harm or permanent disability or disfigurement to another; or

(c)   Causes property damage in excess of $1,000.

**§ 6.3.   FLEEING FROM A LAW ENFORCEMENT OFFICER IN A MOTOR VEHICLE**

§6.3.10.   DEFINITIONS
The following definitions apply to the terms in this section only:

(a)   LAW ENFORCEMENT OFFICER.  A law enforcement officer means any sworn member of the United States Capitol Police or any other police force operating in DC.

(b)   SIGNAL.  A signal is any communication made by hand, voice or the use of emergency lights, sirens or other visual or aural devices.

§6.3.20.   FLEEING
No operator of a motor vehicle shall knowingly fail or refuse to bring the motor vehicle to an immediate stop, or flee or attempt to elude a law enforcement officer, following a law enforcement officer's signal to bring the motor vehicle to a stop.

---

[13] D.C. Code § 50-2201 et seq.

J.A. 293

§ 6.4.    LEAVING AFTER COLLIDING

Any person who operates or who is in physical control of a vehicle on Capitol Grounds who knows or has reason to believe that his or her vehicle has been in a collision shall immediately stop and:

(a)    INJURY TO PERSONS.  Where another person is injured, call or cause another to call 911 or call or cause another to call for an ambulance or other emergency assistance if necessary, remain on the scene until law enforcement arrives, and provide identifying information to law enforcement and to the injured person;

(b)    DAMAGE TO PROPERTY OR DOMESTIC ANIMAL.  Where real or personal property belonging to another is damaged or a domestic animal is injured, provide identifying information to the owner or operator of the property or the owner of the domestic animal or, where the owner or operator of the property or the owner of the domestic animal is not present, provide or cause another to provide identifying information and the location of the collision, to law enforcement or 911; or

(c)    RISK POSED TO OTHERS.  Where real or personal property or a wild or domestic animal, as a result of the collision, poses a risk to others, call or cause another to call 911 and provide identifying information, the location of the collision, and a description of the nature of the risk posed to others.

J.A. 294

**§ 6.5.   OBJECT FALLING OR FLYING FROM VEHICLE**
Any person who operates or who is in physical control of a vehicle within the District who knows or has reason to believe that an object likely to cause damage has detached from, fallen, or flown from his or her vehicle shall immediately stop and:

(a)   PERSONAL INJURY.  Where another person is injured, call or cause another to call 911 or call or cause another to call for an ambulance or other emergency assistance if necessary, remain on the scene until law enforcement arrives, and provide identifying information to law enforcement and to the injured person;

(b)   DAMAGE TO PROPERTY OR DOMESTIC ANIMAL.  Where real or personal property belonging to another is damaged or a domestic animal is injured, provide identifying information to the owner or operator of the property or the owner of the domestic animal or, where the owner or operator of the property or the owner of the domestic animal is not present, provide or cause another to provide identifying information and the location of the event, to law enforcement or 911; or

(c)   RISK POSED TO OTHERS.  Where real or personal property or a wild or domestic animal, as a result of the event, poses a risk to others, call or cause another to call 911 and provide identifying information, the location of the collision, and a description of the nature of the risk posed to others.

**§6.6.   NEGLIGENT HOMICIDE**

§6.6.10.   NEGLIGENT HOMICIDE
Any person who, by the operation of any vehicle in a careless, reckless, or negligent manner, but not wilfully or wantonly, shall cause the death of another, including a pedestrian in a marked crosswalk, or unmarked crosswalk at an intersection, shall be guilty of a felony and shall be punished by imprisonment for not more than the amount set by law.

§6.6.20.   NEGLIGENT HOMICIDE INCLUDED IN MANSLAUGHTER
The crime of negligent homicide defined in §6.6.10 shall be deemed to be included within every crime of manslaughter charged to have been committed in the operation of any vehicle, and in any case where a defendant is charged with manslaughter committed in the operation of any vehicle, if the jury shall find the defendant not guilty of the crime of manslaughter such jury may, in its discretion, render a verdict of guilty of negligent homicide.

§6.6.30.   IMMODERATE SPEED NOT DEPENDENT ON LEGAL RATE OF SPEED
In any prosecution under §6.6.10 or §6.6.20, whether the defendant was driving at an immoderate rate of speed shall not depend upon the rate of speed fixed by law for operating such vehicle.

J.A. 295

§6.7.    IMPAIRED OPERATING AND DRIVING

§6.7.10.    DRIVING UNDER THE INFLUENCE OF ALCOHOL OR A DRUG

No person shall operate or be in physical control of any vehicle in the District:

(a)    While the person is intoxicated; or

(b)    While the person is under the influence of alcohol or any drug or any combination thereof.

§6.7.20.    DRIVING UNDER THE INFLUENCE OF ALCOHOL OR A DRUG: COMMERCIAL VEHICLES

No person shall operate or be in physical control of any commercial vehicle in the District:

(a)    While the person is intoxicated; or

(b)    While the person is under the influence of alcohol or any drug or any combination thereof.

§6.7.30.    OPERATING A VEHICLE WHILE IMPAIRED

No person shall operate or be in physical control of any vehicle in the District while the person's ability to operate or be in physical control of a vehicle is impaired by the consumption of alcohol or any drug or any combination thereof.

§6.7.40.    OPERATING UNDER THE INFLUENCE OF ALCOHOL OR A DRUG: HORSE-DRAWN VEHICLE

No person shall operate or be in the physical control of any horse-drawn vehicle while under the influence of alcohol or any drug or any combination thereof.

§6.7.50.    ADDITIONAL PENALTIES

(a)    COMMERCIAL VEHICLES.  Any person violating §6.7.20 shall be subject to an additional 5 day mandatory minimum-term of incarceration.

(b)    DRIVING WITH A MINOR.  A person convicted of any offense under §6.7, who at the time of operation or physical control of the vehicle had a minor, other than him or herself in the vehicle, shall, in addition to any applicable penalty set forth by law, be:

1.    *Fine*.  Fined a minimum of $500 and not more than $1,000 per minor; and

2.    *Incarceration.*  Be incarcerated for a mandatory minimum term of incarceration  of:

i.    *If Restrained*.  5 days per minor if the minor or minors are restrained in or by an age-appropriate child passenger-safety restraint; or

ii.    *If Not Restrained*.  10 days per minor if the minor or minors are not restrained in, or by, an age-appropriate child passenger-safety restraint.

# CHAPTER 7
# MOVING INFRACTIONS

**§7.1.    GENERAL**

§7.1.10.    APPLICABILITY

The provisions of this chapter shall apply consistent with the provisions of these regulations.  The provisions of this chapter shall apply at all times unless otherwise indicated by an official traffic control device or police officer.

§7.1.20.    OPERATOR RESPONSIBILITIES

Every operator of a vehicle shall exercise due care to avoid colliding with any pedestrians or any person propelling a human powered vehicle and shall give an audible signal when necessary, and shall exercise proper precaution upon observing any child or any obviously confused, incapacitated, or intoxicated person.

(a)    DUE CARE.   Exercise due care to avoid colliding with any pedestrian upon any roadway;

(b)    WARNING SOUND.   Give warning by sounding the horn when necessary; and

(c)    CHILDREN AND INCAPACITATED PERSONS.   Exercise proper precaution upon observing any child or any confused or incapacitated person upon the roadway.

**§ 7.2.    SPEED RESTRICTIONS**

§7.2.10.    MAXIMUM LAWFUL SPEED ON STREETS AND HIGHWAYS

The maximum lawful speed limit on all streets and highways shall be twenty-five (25) miles per hour.  No person shall drive in excess of the maximum posted speed limit.

§7.2.20.    MAXIMUM LAWFUL SPEED IN DRIVEWAYS, GARAGES AND UNDER ARCHWAYS

The maximum lawful speed on all roadways leading to, going through or leaving from, any archway, driveway or parking garage is five (5) miles per hour.

§7.2.30.    REASONABLE SPEED FOR CONDITIONS

No person shall drive a vehicle on a street or highway at a speed greater than is reasonable and prudent under the conditions.

§7.2.40.   DUTY OF DUE CARE
Every operator shall control their speed at all times as is necessary to avoid colliding with any person, vehicle, or other conveyance on or entering the street or highway.

§7.2.50.   EXCESSIVE SPEEDING
Any individual convicted for driving a vehicle on a street or highway at a speed greater than thirty (30) miles per hour over the legal speed limit shall be fined not more than three hundred dollars ($300) or be imprisoned for not more than ninety (90) days.

## § 7.3.   MINIMUM SPEED RESTRICTIONS

§7.3.10.   REDUCED SPEED REQUIRED
The driver of every vehicle shall drive at an appropriate reduced speed when approaching and crossing an intersection or railway grade crossing; when approaching and going around a curve; when approaching a hill crest; when traveling upon any narrow or winding roadway; and when special hazard exists with respect to pedestrians or other traffic, or by reason of weather or highway conditions.

§7.3.20.   IMPEDING TRAFFIC
No person shall drive a motor vehicle at such a speed as to impede or block the normal and reasonable movement of traffic, except when reduced speed is necessary for safe operation or to be in compliance with the law.

**§ 7.4.**   **PROPER USE OF THE ROADWAYS**

§7.4.10.   DRIVE ON RIGHT SIDE OF THE ROAD

Upon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway, except:

(a)   When overtaking and passing another vehicle proceeding in the same direction under this section governing such movement;

(b)   When an obstruction exists making it necessary to drive to the left of the center of the roadway; any person so doing shall yield the right-of-way to all vehicles traveling in the proper direction upon the unobstructed portion of the roadway within such distance as to constitute an immediate hazard;

(c)   Upon a roadway designated and signed for one-way traffic; or

(d)   Upon a roadway divided into three (3) marked lanes for traffic.

§7.4.20.   SLOW-MOVING VEHICLES STAY TO THE RIGHT

Upon all roadways, any vehicle proceeding at less than the normal speed of traffic under the conditions then existing shall be driven in the right-hand plane then available for traffic, or as close as practicable to the right-hand curb or edge of the roadway, except when overtaking and passing another vehicle proceeding in the same direction or when preparing for a left turn at an intersection or into a private road, driveway or alley.

§7.4.30.   PASSING VEHICLES PROCEEDING IN OPPOSITE DIRECTIONS

Drivers of vehicles proceeding in opposite directions shall pass each other to the right, and upon roadways having width for not more than one lane of traffic in each direction, each driver shall give to the other at least one-half of the main-traveled portion of the roadway as nearly as possible.

§7.4.40.   FOLLOWING TOO CLOSE

The driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the roadway.

J.A. 299

§7.4.50.    SUFFICIENT SPACE BETWEEN VEHICLES
The driver of any motor vehicle drawing another vehicle when traveling upon a roadway which is following another motor vehicle drawing another vehicle shall, whenever conditions permit, leave sufficient space so that an overtaking vehicle may enter and occupy the space in front of the drawing vehicle without danger, except that this shall not prevent a truck or motor vehicle drawing another vehicle from overtaking and passing any like vehicle or other vehicle.

§7.4.60.    FAILURE TO CLEAR AN INTERSECTION
No driver shall enter an intersection or marked crosswalk, unless the movement can be made such that the vehicle can completely clear the intersection without obstructing the passage of other vehicles or pedestrians, notwithstanding any official traffic control device indication to proceed. A vehicle shall not enter an intersection to turn right or left unless there is sufficient space on the roadway being entered to accommodate the vehicle.

§ 7.5.    DESIGNATED ROADWAYS

§7.5.10.    ONE-WAY TRAFFIC
No person shall drive a vehicle in a direction other than the one indicated upon a roadway designated for one-way traffic.

§7.5.20.    MULTIPLE-LANE ROADWAYS
Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules shall apply:

(a)    STAY IN THE LANE.  A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that such movement can be made with safety.

(b)    THREE-LANE ROADWAYS.  Upon a roadway which is divided into three (3) lanes and which provides for two-way movement of traffic, a vehicle shall not be driven in the center lane except when:

1.    Overtaking and passing another vehicle traveling in the same direction when the center lane is clear of traffic within a safe distance;

2.    In preparation for making or completing a turn; or,

3.    Where the center lane is at the time allocated exclusively to traffic moving in the same direction than the vehicle is proceeding and the allocation is designated by official traffic control devices.

§7.5.30.    DIVIDED ROADWAYS
Every vehicle shall be driven upon the right-hand roadway whenever any highway is divided by a physical barrier, intervening space or as otherwise indicated to impede vehicular traffic.

§7.5.40.    DRIVING THROUGH MEDIAN PROHIBITED
No vehicle shall be driven over, across or within any dividing space, barrier or section, except through an opening in the physical barrier or dividing section or space or at a crossover or intersection or an unraised, paved dividing section with pavement markings only, unless otherwise directed by official traffic control devices.

## § 7.6.   OVERTAKING AND PASSING

§7.6.10.   APPLICATION

The rules set forth in this section shall govern the overtaking and passing of vehicles proceeding in the same direction.

§7.6.20.   OVERTAKING VEHICLE TO PASS ON LEFT

The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left of the vehicle at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle.

§7.6.30.   DRIVING ON LEFT SIDE OF ROADWAY

No vehicle shall at any time be driven to the left side of the roadway under the following conditions:

(a)   When approaching the crest of a grade or upon a curve in the highway where the driver's view is obstructed within such distance as to create a hazard if another vehicle approaches from the opposite direction;

(b)   When approaching within one hundred feet (100 ft.) of or while traversing any intersection or railroad grade crossing;

(c)   On the roadway of any bridge, viaduct, or tunnel; and

(d)   On the approach roadway within one hundred feet (100 ft.) of any bridge, viaduct, or tunnel.

The above-listed restrictions shall not apply to driving on a one-way roadway.

§7.6.40.   OVERTAKEN VEHICLE TO GIVE WAY

Except when overtaking and passing on the right is permitted, the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal and shall not increase the speed of his or her vehicle until completely passed by the overtaking vehicle.

§7.6.50.   PASSING ON THE RIGHT

The driver of a vehicle may overtake and pass upon the right of another vehicle only under the following conditions:

(a)   When the vehicle overtaken is making or about to make a left turn;

(b)   On a street or highway with unobstructed pavement not occupied by parked vehicles and of sufficient width for two (2) or more lines of moving vehicles in each direction; and

(c)   On a one-way street or upon any roadway upon which traffic is restricted to one direction of movement; where the roadway is free from obstructions and of sufficient width for two (2) or more lines of moving vehicles.

J.A. 302

§7.6.60.     UNSAFE PASSING ON THE RIGHT
             The driver of a vehicle may overtake and pass another vehicle on the
             right only under permitting such movement in safety.  In no event shall
             the passing movement be made by driving off the pavement or main-
             traveled portion of the roadway.

§7.6.70.     UNSAFE PASSING ON THE LEFT
             No vehicle shall be driven to the left side of the center of the roadway
             while overtaking and passing another vehicle unless the left side is
             clearly visible and is free of oncoming traffic for a sufficient distance
             ahead to permit the overtaking and passing to be completed without
             interfering with the safe operation of any vehicle approaching from the
             opposite direction or any vehicle overtaken.

§7.6.80.     RETURN AFTER OVERTAKING
             In every event, an overtaking vehicle must return to the right hand side
             of the roadway before coming within one hundred feet (100 ft.) of any
             vehicle approaching from the opposite direction.

§7.6.90.     OVERTAKING BICYCLES

             (a)   BICYCLE LANES.  On any street where official traffic control
                   devices have been erected giving notice that bicycles are
                   entitled to the use of the full right-hand lane then available for
                   moving traffic, the driver of a motor vehicle shall not drive
                   within that right hand lane while overtaking or passing a
                   bicycle being driven in that lane, and after overtaking or
                   passing, shall not drive into that right-hand lane until safely
                   clear of the overtaken bicycle.

             (b)   3 FOOT DISTANCE.  A person driving a motor vehicle shall
                   exercise due care by leaving a safe distance, but in no case less
                   than three (3) feet, when overtaking and passing a bicycle.

J.A. 303

## § 7.7. TURNING AT INTERSECTIONS

§7.7.10. APPLICATION

The driver of a vehicle intending to turn at an intersection shall abide by the provisions in this section unless otherwise indicated by a button, sign or marker, in which case the driver shall turn as indicated.

§7.7.20. RIGHT TURNS

The driver shall turn as close as practicable to the right-hand curb or edge of the roadway when approaching or making a right turn.

§7.7.30. LEFT TURN FROM A TWO-WAY STREET ONTO A TWO-WAY STREET

When making a left-turn from a two-way street into another two-way street, the driver shall approach the turn from the right half of the roadway nearest to the center line of that roadway. After entering the intersection, the driver shall turn into the lane nearest to the right center line of the roadway being entered.

§7.7.40. LEFT TURN FROM A TWO-WAY STREET ONTO A ONE-WAY STREET

When making a left turn from a two-way street into a one-way street, the driver shall approach from the right half of the roadway nearest the center line of the roadway. The driver shall stay to the right of the center line after entering the intersection.

§7.7.50. LEFT TURN FROM A ONE-WAY STREET ONTO A ONE-WAY STREET

When making a left turn from a one-way street into a two-way street, the driver shall approach from the portion of the roadway as close as practicable to the left-hand curb or edge of the roadway. After entering the intersection, the driver shall turn into the lane nearest to the right center line of the roadway being entered.

§7.7.60. LEFT TURN FROM A ONE-WAY STREET ONTO A ONE-WAY STREET

Where both streets and roadways are one-way, both the approach for a left turn and a left turn shall be made as close as practicable to the left-hand curb or edge of the roadway.

§7.7.70. CUT-OFF ROADWAYS

At intersections where "cut-off" roadways have been provided to facilitate a right turn, all vehicles emerging from such "cut-off" roadways shall turn to the right.

§7.7.80. UNBALANCED TRAFFIC LANES

The word "center line" shall mean the line between the two (2) directions of flow on streets during the hours designated for unbalanced traffic lanes.

§7.7.90. IMPROPER TURNING

No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway, as required in this section.

## § 7.8.  TURNING REQUIREMENTS AND RESTRICTIONS

§7.8.10.  TURNING AROUND BEFORE A CURVE OR CREST OF GRADE
No vehicle shall be turned so as to proceed in the opposite direction upon any curve, or upon the approach to or near the crest of a grade, where such vehicle cannot be seen by the driver of any other vehicle approaching from either direction within five hundred feet (500 ft.).

§7.8.20.  SAFE TURN REQUIRED
No person shall turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety.

§7.8.30.  PROPER TURN SIGNAL
No person shall turn any vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course or move right or left upon a roadway without giving an appropriate signal in the manner provided by these regulations if any other traffic may be affected by the movement.

§7.8.40.  INTENTION TO TURN
A signal of intention to turn right or left when required shall be given continuously during not less than the last one hundred feet (100 ft.) traveled by the vehicle before turning.

§7.8.50.  OBEDIENCE TO TRAFFIC MARKERS
When authorized markers, buttons, or other indications are placed within or between intersections indicating the course to be traveled by vehicles, no driver of a vehicle shall disobey the directions of the indications.

§7.8.60.  OBEDIENCE TO SIGNS
Whenever authorized signs are erected indicating that "NO RIGHT TURN" or "NO LEFT TURN" or "NO U-TURN" is permitted, no driver of a vehicle shall disobey the directions of any such sign.

§7.8.70.  U-TURN AT AN INTERSECTION
No vehicle shall make a U-turn so as to proceed in the opposite direction at any intersection controlled by traffic lights or police officer, or on a crosswalk adjacent to such an intersection.

§7.8.80.  TURNING IN OPPOSITE DIRECTION
The driver of any vehicle shall not turn a vehicle so as to proceed in the opposite direction unless such movement can be made in safety and without interfering with other traffic.

J.A. 305

## § 7.9.   PROPER SIGNALS FOR TURNING AND STOPPING

§7.9.10.   PROPER SIGNALS

Required stop or turn signals shall be given by using the hand and arm, by a signal lamp or lamps, or by means of a mechanical signal device, except as otherwise provided in this section.

§7.9.20.   SIGNAL EQUIPMENT REQUIRED

Any motor vehicle in use on a highway shall be equipped with signal lamp(s) or mechanical signal device when required by Chapter 4.[14]  If any motor vehicle is required to be equipped with a signal lamp(s) or mechanical signal devices, the required signal shall be given by means of lamps or devices.

§7.9.30.   SIGNAL FROM THE LEFT OF THE VEHICLE

All signals required by this chapter to be given by hand-and-arm shall be given from the left side of the vehicle in the following manner and the signals shall indicate as follows:

(a)   LEFT TURN:  Hand and arm extended horizontally;

(b)   RIGHT TURN:  Hand and arm extended upward; and,

(c)   STOP OR DECREASE SPEED:  Hand and arm extended downward.

## § 7.10.   STARTING, STOPPING AND BACKING

§7.10.10.   SAFE STARTING

No person shall start a vehicle which is stopped, standing, or parked unless and until the movement can be made with reasonable safety.

§7.10.20.   SUDDEN STOPS OR DECREASE OF SPEED

A person shall not stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal to the driver immediately to the rear.  The signal shall be given as soon as there is an opportunity and in accordance with the provisions of this chapter.

§7.10.30.   BACKING UP SAFELY

The driver of a vehicle shall not back the vehicle unless the backing movement can be made with reasonable safety and without interfering with other traffic.

---

[14] Chapter 3 ("Equipment").

J.A. 306

## § 7.11.   RIGHT-OF-WAY

§7.11.10.   DRIVER RESPONSIBILITY TO YIELD

(a)   EMERGING FROM A PRIVATE ROAD OR DRIVEWAY.  The driver of a vehicle emerging from an alley, building, private road or driveway shall stop the vehicle immediately prior to driving onto the sidewalk or sidewalk area.  If there is no sidewalk or sidewalk area, the driver shall stop at the point nearest to the street where the driver has a view of approaching traffic.

(b)   YIELD TO PEDESTRIANS ON SIDEWALK.  The driver of a vehicle crossing a sidewalk or sidewalk area shall yield the right-of-way to any pedestrian and all other traffic using the sidewalk or sidewalk area.

(c)   ENTERING OR CROSSING A ROADWAY.  The driver of a vehicle about to enter or cross a roadway from an alley or from any place other than another roadway shall yield the right-of-way to all vehicles approaching on the roadway to be entered or crossed.

§7.11.20.   INTERSECTIONS

(a)   VEHICLE TURNING LEFT.  The driver of a vehicle intending to leave a public roadway by turning left between intersections shall yield the right-of-way to any vehicle approaching from the opposite direction which is so close as to constitute an immediate hazard.

(b)   SAME-TIME APPROACH.  When two (2) vehicles approach or enter an intersection from different highways at approximately the same time, the driver of the vehicle on the left shall yield the right-of-way to the vehicle on the right.

(c)   APPROACHING FROM OPPOSITE DIRECTION.  The driver of a vehicle intending to turn to the left shall yield the right-of-way to any vehicle approaching from the opposite direction which is so close as to constitute an immediate hazard.

§7.11.30.   STOP AND YIELD SIGNS

(a)   APPROACHING A STOP SIGN.  Every driver of a vehicle approaching a "STOP" sign shall stop at a clearly marked stop line before entering the intersecting roadway; if there is no stop line, the driver shall stop before entering the nearest crosswalk; if there is no crosswalk, the driver shall stop at the point nearest the intersecting roadway where the driver has a view of approaching traffic on that roadway.

(b)   WHEN STOPPED AT A STOP SIGN.  After having stopped for a stop sign, the driver shall yield the right-of-way to any traffic in the intersection or approaching on another roadway so closely as to constitute an immediate hazard during the time when the driver is moving across or within the intersection or junction of roadways.  The driver shall yield the right-of-way to pedestrians.

J.A. 307

(c)    APPROACHING A YIELD SIGN.

    1.    The driver of a vehicle approaching a "YIELD" sign shall slow down to a speed reasonable for the existing conditions.

    2.    When required for safety, the driver shall stop at a clearly marked stop line; if there is no stop line, the driver shall stop before entering the nearest crosswalk; if there is no crosswalk, the driver shall stop at the point nearest the intersecting roadway where the driver has a view of approaching traffic on that roadway.

    3.    After slowing or stopping for a yield sign, the driver of a vehicle shall yield the right-of-way to any traffic in the intersection or approaching on another roadway so closely as to constitute an immediate hazard during the time the driver is moving across or within the intersection or junction of roadways.

    4.    The driver shall yield the right-of-way to pedestrians; if the driver is involved in a collision with a vehicle in the intersection or with a pedestrian, after driving past a "YIELD" sign without stopping, the collision shall be considered prima facie evidence of failure to yield the right-of-way.

J.A. 308

§7.11.40.   OTHER AREAS
   (a)   ENTERING A TRAFFIC CIRCLE.  The driver of a vehicle
          approaching a traffic circle shall yield the right-of-way to
          traffic already within the circle unless official traffic control
          devices indicate otherwise.
   (b)   ENTERING A FREEWAY.  The driver of a vehicle entering a
          freeway by way of an access ramp shall yield the right-of-way
          to traffic on the freeway.

§7.11.50.   PEDESTRIANS
   (a)   MARKED OR UNMARKED CROSSWALKS.  When official traffic-
          control signals are not in place or not in operation, the driver of
          a vehicle shall stop and give the right-of-way to a pedestrian
          crossing the roadway within any marked crosswalk or
          unmarked crosswalk at an intersection.
   (b)   CROSSING ON "WALK" SIGNAL.  A driver of any vehicle shall
          stop and give the right-of-way to a pedestrian who has begun
          crossing on the "WALK" signal to continue to the opposite
          sidewalk or safety island, whichever is nearest.

§7.11.60.   SCHOOL BUSES
   (a)   FLASHING WARNING LIGHT.  The driver of a vehicle
          approaching a school bus with the warning light flashing shall
          prepare to stop the vehicle and bring the vehicle to a complete
          stop not less than fifteen (15 ft.) from the school bus.  This
          applies to vehicles approaching from any direction with the
          exception of vehicles approaching from the opposite direction
          on a street with a median strip divider.
   (b)   WAIT TO PROCEED.  A driver who has stopped for a school bus,
          in accordance with this section, shall not proceed until the
          visual signals are no longer actuated.

**§ 7.12.**   EMERGENCY VEHICLES AND FIRE TRUCKS

§7.12.10.   MOVE-OVER LAW

Upon the immediate approach of an authorized emergency vehicle making use of audible and visual signals that meets the requirements of these regulations or of a police officer properly and lawfully making use of an audible signal only; the driver of every vehicle shall yield the right-of-way and immediately drive to a position parallel to and as close as possible to the right-hand edge or curb of the roadway, clear of any intersection.  That driver shall stop and remain in that position until the authorized emergency vehicle has passed.

§7.12.20.   DUTY OF CARE

This section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway.

§7.12.30.   FOLLOWING FIRE TRUCK

(a)   No driver of any vehicle shall follow any fire apparatus traveling in response to a fire alarm closer than five hundred (500) feet.

(b)   No driver shall drive into or park such vehicle within the block where fire apparatus has stopped in answer to a fire alarm.

§7.12.40.   DRIVING OVER FIRE HOSE

No vehicle shall be driven over any unprotected hose of a fire department when laid down on any street, private driveway, or streetcar track without the consent of a police or fire department official.

**§ 7.13.**   COASTING

§7.13.10.   MOTOR VEHICLES

No driver of any motor vehicle shall coast with the gears of the vehicle in neutral when traveling upon a down grade.

J.A. 310

## § 7.14.    OBSTRUCTION AND PASSENGER INTERFERENCE

§7.14.10.    LOADED VEHICLE

No person shall drive a vehicle when it is so loaded that:

(a)    The front or side view of the driver is obstructed; or,

(b)    There is interference with the driver's control over the driving mechanism of the vehicle.

§7.14.20.    EXCESS PASSENGER OBSTRUCTION

No person shall drive a vehicle with more than three (3) persons in the front seat if:

(a)    The front or side view of the driver is obstructed; or,

(b)    There is interference with the driver's control over the driving mechanism of the vehicle.

§7.14.30.    PASSENGER INTERFERENCE

No passenger in a vehicle or streetcar shall ride in a position that:

(a)    Obstructs the driver or operator's view ahead or to the sides; or,

(b)    Interferes with the driver or operator's control over the driving mechanism of the vehicle or streetcar.

§7.14.40.    FULL TIME AND ATTENTION

An operator shall give full time and attention to the operation of the vehicle while that vehicle is being operated.

§7.14.50.    RUNNING BOARDS

No person shall ride on the running board of a motor vehicle while that vehicle is in motion and no driver of a motor vehicle shall permit such standing.

§7.14.60.    DESIGNATED PASSENGER AREAS

No person shall ride on any portion of any vehicle which is not designed or intended for the use of passengers and no driver of a vehicle shall permit such riding.  This provision shall not apply to an employee engaged in the necessary discharge of his or her duty or to persons riding within truck bodies in space intended for materials.

§7.14.70.    SUSPENDED OBJECTS

No person shall operate any vehicle on Capitol Grounds that has an object:

(a)    Attached to or suspended from the rear view mirror or rear view mirror bracket;

(b)    Attached to or suspended from the windshield, rear window or any front side window; or

(c)    Attached to or suspended from the frame of the windshield, rear window or any front side window.

This section shall not be construed to prohibit the hanging of clothing or other objects from a hanger attached to either of the rear-side windows of a vehicle, nor shall it be construed to prohibit the display of a sticker authorized or required to be displayed by law.

## § 7.15.   OPEN DOORS AND BOARDING

§7.15.10.   BOARDING IN MOTION

No person shall board or alight from a vehicle while the vehicle is in motion nor shall any driver permit such action.

§7.15.20.   SWINGING DOORS

No motor vehicle shall be operated with the front door(s), side door(s), or rear door(s) tied open or swinging.

§7.15.30.   OPEN DOORS

(a)   No person shall open a vehicle door if it interferes with the safety of moving traffic, pedestrians or with the safety of any person in the vehicle.

(b)   No person shall leave a vehicle door open longer than is necessary to receive or discharge the passenger(s) entering or leaving the vehicle.

## § 7.16.   RIDING ON MOTORCYCLES

§7.16.10.   GENERAL

(a)   No person shall ride on a seat other than the permanent seat attached to the motorcycle.

(b)   No person other than the operator shall ride on a motorcycle that is only designed to carry one (1) nor shall the operator allow any additional person to ride on a motorcycle only designed to carry one (1) person.

§7.16.20.   PASSENGERS

If a motorcycle is equipped to carry more than one (1) person, the passenger may only ride upon:

(a)   The permanent seat attached to the motorcycle as long as that seat is designed for two (2) persons;

(b)   A seat that is firmly attached to the rear or side of the motorcycle and provided with foot rests and handgrips; or,

(c)   In a side car attached to the motorcycle.

§7.16.30.   PROTECTIVE HELMET REQUIRED

No person shall operate or ride upon a motorcycle unless wearing a protective helmet that meets current safety standards, in a manner for which the helmet was designed.

§7.16.40.   PROTECTIVE GEAR

(a)   No person shall operate a motorcycle unless they are wearing spectacles with safety glass lenses or a pair of goggles or a face shield.  All protective gear must meet current safety standards and worn or used in the manner for which they were designed.

(b)   If the operator is not wearing any protective eye wear, the motorcycle must be equipped with a wind screen or shield in accordance with Chapter 3.[15]

---

[15] Chapter 3 ("Equipment").

**§ 7.17.   RESTRICTED STREETS**

§7.17.10.       CLOSED STREETS

No person shall operate a vehicle on a street that has been closed to vehicular traffic except as specifically permitted by an official traffic control device.

§7.17.20.       DRIVING OVER BARRIERS

No person shall drive any vehicle across or over any public street at which there is any official barrier, sign, or authorized person indicating that the street is closed, except as otherwise provided.

§7.17.30.       BUS RESTRICTIONS

Whenever authorized signs are erected to restrict buses from any street or portion of a street, no person shall operate a bus upon such street or portion of the street at anytime unless otherwise excepted as stated on an official authorized sign.

**§ 7.18.   TRUCKS**

§7.18.10.       TRUCK INTERDICTION

Whenever authorized signs are erected indicating a truck restriction, no person shall operate the type of truck prohibited on the street, unless specifically authorized by the Board.[16]

---

[16] *See* Appendix E for "United States Capitol Police Board Regulations for the Truck Interdiction Program Providing for the Extended Capitol Police Jurisdiction Zone" (Nov. 12, 2003).

**§ 7.19.    SNOW EMERGENCY ROUTES**

§7.19.10.    EFFECTIVE TIRES

No person in charge of a motor vehicle operated on any street designated as a Snow Emergency Route shall allow the vehicle to become stalled on that street due to the fact that the driving wheels of the vehicle are not equipped with tire chains or effective snow tires. This provision is in effect whenever there is snow, sleet or freezing rain falling or covering the street.

§7.19.20.    PARKING PROHIBITION

Whenever there is a parking prohibition in effect on street designated as a Snow Emergency Route the following provisions shall apply:

(a)    NO FUEL.  No person in charge of a motor vehicle operated on any street designated as a Snow Emergency Route shall allow the vehicle to become stalled on that street due to the fact that the motor fuel supply of the vehicle is exhausted.

(b)    STALLED VEHICLE.  The person in charge of a stalled motor vehicle shall take action without delay to have the vehicle towed or pushed off the roadway.  This provision does not permit the violation of any other law or regulation and applies to any vehicle stalled for any reason.

(c)    ABANDONED VEHICLE.  No person shall abandon or leave a motor vehicle in the roadway of a Snow Emergency Route at any time when the parking of motor vehicles on that route has been prohibited.  A standing vehicle is not considered abandoned if (1) the operator leaves the vehicle for the purpose of securing assistance for a time necessary to secure such assistance and returns to and remains with the stalled vehicle until its removal and (2) the operator has placed on the windshield prior to leaving the vehicle stating the location where the person is seeking assistance and the approximate time of departure.

## § 7.20.   MISCELLANEOUS MOVING INFRACTIONS

§7.20.10.   UNNECESSARY NOISE

No vehicle shall be operated or used in such a manner as to cause unnecessary or disturbing noise.

§7.20.20.   PARALLEL PARKING

When the driver of a vehicle desires to park at the curb when there is room enough for only one (1) car between two (2) other cars, the driver shall drive forward until parallel to the car ahead of the space and back cautiously into the parking space.

§7.20.30.   DRIVING OVER SIDEWALKS

The driver of a vehicle shall not drive within or across any permanent sidewalk area except at a permanent or temporary driveway or as provided by these regulations.

§7.20.40.   FIXED OBJECTS

No vehicle shall be operated so that the vehicle or any load on it strikes any part of a building, landscape or architectural feature on Capitol Grounds.  This provision shall not apply to authorized vehicles working within the scope of official duty.

§7.20.50.   OVERTAKING A STOPPED VEHICLE

Whenever any vehicle is stopped at a marked crosswalk or at an unmarked crosswalk at any intersection to permit a pedestrian to cross the roadway, the driver of any vehicle approaching from the rear shall not overtake and pass the stopped vehicle.

§7.20.60.   LITTERING FROM VEHICLE

No person shall dispose or cause or allow the disposal of litter from a vehicle upon any public or private property.  Litter shall include all rubbish, waste matter, refuse, garbage, trash, debris, dead animals, or other discarded materials of every kind and description.

J.A. 315

§ **7.21.**   ALCOHOLIC BEVERAGES IN MOTOR VEHICLES

§7.21.10.   OPEN CONTAINER

No person shall operate or ride in a vehicle when any opened alcoholic beverage is in or on the vehicle.

§7.21.20.   TRUNK CARGO OR STORAGE AREA

An opened alcoholic beverage container may be carried in the trunk, cargo area, or storage compartment as long as the area is inaccessible from the passenger area.

§7.21.30.   CLOSED CONTAINERS

If the vehicle does not have a trunk, cargo area, or storage compartment that is inaccessible from the passenger area, an opened alcoholic beverage may be carried in the vehicle so long as the container has been capped, corked, or otherwise closed and the container is completely enclosed in a manner that does not allow a person to consume the alcoholic beverage.

§7.21.40.   DEFINITIONS

For purposes of this section, the term:

(a)   OPENED ALCOHOLIC BEVERAGE CONTAINER means an alcoholic beverage in a bottle, can, or other container which is open or from which the top, cap, cork, seal, or tab seal has at some time been removed; and,

(b)   ALCOHOLIC BEVERAGE means a liquid or solid, patented or not, containing alcohol capable of being consumed by a human being. The term "alcoholic beverage" shall not include a liquid or solid containing less than one-half of 1% of alcohol by volume.[17]

---

[17] As defined in § 3 of the District of Columbia Alcoholic Beverage Control Act, approved January 24, 1934 (48 Stat.319; D.C. Code § 25-101).

CHAPTER 8
# PARKING, STANDING AND STOPPING INFRACTIONS

**§8.1.    GENERAL REQUIREMENTS**

§8.1.10.    APPLICABILITY

(a)    TIME STATED.  The provisions of this chapter that prohibit the standing or parking of a vehicle shall apply at all times, at the times specified in each section or as indicated on official signs.

(b)    EXCEPTIONS.  The provisions of this chapter do not apply if it is necessary to stop a vehicle to avoid conflict with other traffic or if in compliance with the direction of a police officer or official traffic control device.  The provisions of this chapter do not apply to person issued Emergency Parking Permits in accordance with §8.13.[18]

(c)    MOST RESTRICTIVE PROVISIONS APPLY. The provisions of this chapter that impose a time limit on parking shall not relieve any person from the duty to observe other and more restrictive provisions that prohibit or limit stopping, standing or parking of vehicles in specified places or at specified times.

§8.1.20.    PRESUMPTION IN REFERENCE TO ILLEGAL PARKING
In any prosecution charging a violation of any regulation governing the standing or parking of a vehicle, proof that the particular vehicle described in the information was parked in violation of any such regulation, together with proof that the defendant named in the information was at the time of such parking the registered owner of such vehicle, shall constitute in evidence a prima facie presumption that the registered owner of such vehicle was the person who parked or placed such vehicle at the point where, and for the time during which such violation occurred.

---

[18] §8.14 ("Emergency Parking Permits").

## § 8.2.   PROPER PARKING

§8.2.10.   NO PARKING IN VIOLATION OF SIGNS

It shall be unlawful to park any unauthorized vehicle in violation of the parking restrictions stated on the sign wherever and whenever signs are erected that indicate parking is prohibited or restricted.

§8.2.20.   PARK IN THE DIRECTION OF TRAFFIC

No person shall stand or park a vehicle in a roadway other than parallel with the edge of the roadway headed in the direction of lawful traffic movement.

§8.2.30.   PARK WITHIN 12" OF CURB

(a)   TWO-WAY STREETS.  A person shall stand or park a vehicle on a two-way street with the right-hand wheels of the vehicle within twelve inches (12 in.) of the right curb or edge of the roadway.

(b)   ONE-WAY STREETS.  On a one-way street, a vehicle may be parked in the same manner as on a two-way street or may park with the left-hand wheels of the vehicle adjacent to and within twelve inches (12 in.) of the left-hand curb.

§8.2.40.   LEFT-SIDE PARKING PROHIBITED

If a highway includes two (2) or more separate roadways and traffic is restricted to one direction upon any such roadway, no person shall stand or park a vehicle upon the left-hand side of such one-way roadway unless signs are erected to permit such standing or parking.

§8.2.50.   MOTORCYCLE PARKING

A person may park a motorcycle or motorized bicycle in a direction other than parallel with the edge of the roadway, including perpendicular with the curb, if the motorcycle or motorized bicycle does not obstruct the flow of traffic.

J.A. 318

§ 8.3.    GENERAL PARKING

§8.3.10.    UNPAVED AREAS
No vehicle shall be parked or left standing on any part of Capitol Grounds that is not prepared for vehicular travel.

§8.3.20.    PARKING FOR PERMIT-HOLDERS ONLY
No vehicle shall park in any space where parking is limited to holders of official parking permits issued by the House or Senate Sergeant at Arms.

§8.3.30.    PARK BETWEEN THE LINES
A vehicle shall be parked between the markers or lines that designate the parking space.  Persons who park in such a way that cause another vehicle to be parked in violation of this subsection shall be held liable for violation of this subsection.

§8.3.40.    PARKING BETWEEN TWO VEHICLES
When the driver of a vehicle desires to park at the curb when there is room enough for only one car between two other cars, he shall drive up parallel with the car ahead of the space and back cautiously into the parking space.

§8.3.50.    RESERVED PARKING SPACES FOR DISABLED INDIVIDUALS
Parking for individuals with disabilities is permitted only for use of individuals with disabilities utilizing vehicles displaying special license tags or special permits issued pursuant valid federal or state law.

J.A. 319

**§ 8.4.**   <u>**NO SIGN REQUIRED:  STOPPING, STANDING AND PARKING**</u>

No person shall stop, stand, or park a motor vehicle or trailer, whether occupied or not, in any of the following places:

(a)     Within an intersection;

(b)     On a crosswalk;

(c)     Alongside or opposite any street excavation or obstruction when stopping, standing, or parking would obstruct traffic;

(d)     Upon any bridge, viaduct, or other elevated structure, freeway, highway tunnel, or ramps leading to or from such structures, or within a highway tunnel;

(e)     On any median, channelizing island, or safety zone, whether made of concrete, grass, or other material and with curbs or otherwise delineated by solid yellow or white lines;

(f)     In any driveway, alley entrance, or other way when stopping, standing or parking would obstruct the flow of pedestrians or other lawful traffic upon any sidewalk;

(g)     In a bicycle lane; or,

(h)     On the sidewalk.

Parking in the above-listed areas is only permissible when necessary to avoid conflict with other traffic, to be in compliance with the law or at the direction of a police officer, sign or traffic control device.

**§ 8.5.    <u>NO SIGN REQUIRED:  STANDING OR PARKING ONLY</u>**

No person shall stand or park a motor vehicle or trailer, whether occupied or not, in any of the following places:

(a)    In front of or within five feet (5 ft.) of an alley, public driveway, or private driveway;

(b)    Within ten feet (10 ft.) of a fire hydrant;

(c)    Within forty feet (40 ft.) of the intersection of curb lines of intersecting streets or within twenty-five feet (25 ft.) of the intersection of curb lines on the far (non-approach) side of a one-way street, *unless* the car has been issued a valid residential parking permit;[19]

(d)    Within twenty-five feet (25 ft.) of the approach side of any "STOP" or "YIELD" sign located at the side of the roadway;

(e)    Within fifty feet (50 ft.) of a railroad crossing;

(f)    Within twenty feet (20 ft.) of a fire station driveway entrance;

(g)    In or on any street or roadway when such parking will reduce the width of the open roadway to less than ten feet (10 ft.);

(h)    In front of any barricade or sign that has been placed for the purpose of closing the street; or,

(i)    In any fire lane located on public or private space.

Parking in the above-listed areas is only permissible when necessary to avoid conflict with other traffic, to be in compliance with the law or at the direction of a police officer, sign or traffic control device.  A vehicle may stop momentarily to pick up or discharge a passenger or multiple passengers.

---

[19] *See* §8.14 ("Residential Parking Permits").

**§ 8.6.**   <u>NO SIGN REQUIRED:  PARKING ONLY</u>

No person shall park a motor vehicle or trailer, whether occupied or not, in any of the following places:

(a)   On the public parking between the sidewalk space and the building line, except parking shall be permitted on public parking at those locations designated under this title and at locations authorized by permit and upon payment of rent;

(b)   Between a safety zone or channelizing island and the adjacent curb or within ninety feet (90 ft.) of points on the curb immediately opposite the ends of a safety zone or channelizing island unless otherwise indicated by official signs;

(c)   On the roadway side of any vehicle stopped or parked at the edge or curb of a street;

(d)   Within twenty-five feet (25 ft.) of either side of motorists' courtesy mail boxes;

(e)   In any public alley (with the exception of a permit or where designated by posted sign); or

(f)   In a manner to obstruct the entrance to any garage, parking lot or yard, door, or gate used for service purposes.

Temporary parking in these areas is only permissible for the purpose of and while actually engaged in loading or unloading of passengers.

**§ 8.7.**   <u>OVERSIZED VEHICLES</u>

Unless engaged in work for which a vehicle is reasonably necessary, no person shall park any of the following oversized vehicles on Capitol Grounds:

(a)   Any passenger vehicle with a seating capacity of more than fifteen (15) passengers;

(b)   A boat;

(c)   A trailer, whether loaded or unloaded;

(d)   Any vehicle longer than twenty-two feet (22 ft.) or wider than eight feet (8 ft.); or

(e)   Any vehicle that has been designed or modified to haul trash, junk, or debris.

## § 8.8.   LOADING AND UNLOADING:  VEHICLES

§8.8.10.    DISCHARGING PASSENGERS

If no curb space is available within a reasonable distance, a passenger vehicle may stand parallel and as near as practicable to other parked vehicles, only long enough to take on passengers who are actually waiting at the curb or to leave off passengers.

§8.8.20.    IMPEDING TRAFFIC

Unless prohibited by §8.11[20], a vehicle may stop parallel and as near as practicable to parked vehicles while loading; *provided*, that the vehicle while so parked will not unreasonably impede or interfere with orderly two-way traffic, or on a one-way street, that at least one lane is kept open for moving traffic.

§8.8.30.    MOMENTARY STOPPING PERMITTED

On any street, highway, or any portion of a street or highway, where parking is prohibited but stopping and standing are not prohibited, passenger vehicles may stop momentarily to load and unload passengers, and any vehicle may stop long enough to actually load and unload materials.

## § 8.9.   LOADING AND UNLOADING:  SCHOOL BUSES

§8.9.10.    DISCHARGING PASSENGERS

When stopping to load and unload school children along the roadway, a school bus driver shall pull as far to the right as is safe, at a place on the roadway where there is three hundred feet (300 ft.) or more of clear sight distance to the front and rear, and stop only for such time as is actually necessary to take on or discharge passengers.

§8.9.20.    FLASHING WHITE LIGHTS REQUIRED

Before making a stop to load or unload passengers, a school bus driver shall actuate the flashing white stroboscopic light not less than three hundred feet (300 ft.) distant from the stop, and allow the light to remain flashing until the bus resumes motion after the stop.

§8.9.30.    FLASHING RED STOP LIGHT REQUIRED

At each stop to pick up or discharge one or more school children, the school bus driver shall actuate the flashing red light during the time that the bus is stopped to pick up or discharge passengers, and shall turn off the light when the bus resumes motion.

---

[20] §8.10 ("Loading Zones").

J.A. 323

**§ 8.10. LOADING ZONES**

§8.10.10.    ESTABLISHMENT OF LOADING ZONES AND APPLICABILITY
The Board is authorized to determine the location of freight loading zones for use of commercial vehicles at the usual shipping and receiving entrances of any building on Capitol Grounds.  In doing so, the Board shall place and maintain the appropriate signage stating the hours that the provisions of this paragraph are applicable.  The provisions in this section shall also apply to those zones established by the District of Columbia.

§8.10.20.    LOADING RESTRICTED TO MARKED LOADING ZONES
The loading of materials shall be restricted to loading zones in each block where such zones have been designated by official signs except during hours when parking is prohibited in such area.

§8.10.30.    REASONABLE TIME LIMIT ON LOADING
Unless otherwise indicated by signage, loading zones shall be occupied only so long as is reasonable for loading or unloading, and only commercial vehicles loading materials in such zones shall be parked parallel and adjacent to the curb. Where signs are posted, designated loading zones may be occupied by a particular vehicle for up to a maximum of two (2) hours.

§8.10.40.    METER FARE REQUIRED
When parking in a multi-space parking meter loading zone, the operator of a motor vehicle shall, immediately after parking, pay for the amount of loading or unloading time desired. If a receipt is issued by the multi-space parking meter, the motor vehicle driver shall place the receipt face up on the passenger side of the dashboard of the vehicle so that it is clearly visible through the windshield of the vehicle. The vehicle may then occupy the space up to the time limit indicated on the receipt, but in no case for longer than two (2) hours.

J.A. 324

§8.10.50.  TIME LIMIT
No person shall park a motor vehicle in a multi-space parking meter loading zone longer than the time required to load or unload the vehicle.

§8.10.60.  EXPIRED METER
A vehicle shall be considered illegally parked if:

(a)  A multi-space parking meter indicates overtime parking with respect to the parking metered loading zone in which the vehicle is parked;

(b)  The expiration time indicated on the parking meter receipt displayed on the vehicle has lapsed;

(c)  The vehicle does not display a receipt in the manner required by §8.11.50; or

(d)  The vehicle does not display a receipt.

The above-listed sections (a) – (d) do not apply during times when parking in the metered loading zone is unrestricted.

§8.10.70.  PERMISSIBLE PARKING TIMES
Parking metered loading zones may be used without charge during times when the time for parking in the metered loading zone is unrestricted.

J.A. 325

## § 8.11. PARKING METERS AND PARKING METER ZONES

§8.11.10.   PARKING METER ZONE

A parking meter zone is designated as the space parallel to the curb extending from the center of the parking meter standard at the head of the space to the center of the parking meter standard or other marking at the rear of the space; except that if a parking meter zone is served by a multi-space parking meter, the parking meter zone may be designated by signs or pavement markings.

§8.11.20.   PARKING PROHIBITED

No vehicle shall park in a parking meter zone at any time when such parking is otherwise prohibited.

§8.11.30.   NO PARKING PAST METER LIMIT

No person shall park or cause, allow, permit, or suffer any vehicle registered in his or her name to be parked overtime or beyond the lawful period of time indicated on the meter.  This provision does not apply to spaces established for car-sharing programs. [21]

§8.11.40.   PARK WITHIN MARKED AREA

No person shall park or cause to be parked any vehicle so that the vehicle is not within the area between the designated standards or other marking(s) delimiting the parking space.

§8.11.50.   NO PARKING BEYOND ZONE

No person shall stop, stand, or park in a parking meter zone any vehicle which exceeds the designated length of the parking meter zone.

---

[21] *See* 18 DCMR § 2406.18.

§8.11.60.   DISPLAY OF RECEIPT
Immediately after parking a motor vehicle, the operator shall pay for the amount of parking time desired and, if a receipt is issued, place the receipt on the passenger side of the dashboard of the vehicle so that it is clearly visible through the windshield of the vehicle. The space may then be used by the vehicle during the parking limit indicated on the single-space or multi-space parking meter for that space or on the receipt issued, as is applicable, or for the amount of time that is confirmed through a pay-by-phone system.

§8.11.70.   PURCHASING BEYOND TIME LIMIT
No person shall purchase more time than allowed for parking in a parking meter zone as indicated by the signs in the zone and on the parking meter.

§8.11.80.   ILLEGAL PARKING
Except in zones where signs indicate payment is not needed[22] and in car-sharing spaces[23], a vehicle shall be considered illegally parked if:
(a)   The amount of time paid for at a single-space or multi-space parking meter has lapsed;
(b)   The expiration time indicated on the parking meter receipt displayed on the vehicle has lapsed;
(c)   The vehicle does not display a receipt in the manner required by §8.12.60; or
(d)   The amount of time paid for using the pay-by-phone system has lapsed.

§8.11.90.   NO CHARGE REQUIRED
Parking meter zones may be used without charge at times when the signs and meters in those zones indicate payment is not needed.

§8.11.100.   UNEXPIRED TIME IS TRANSFERRABLE
Except for parking meter zones served by parking meters that issue receipts, the unexpired time in a parking meter zone, which is unoccupied, may be used by another vehicle without depositing payment. A car displaying a receipt issued by a parking meter may park in any unoccupied parking meter zone that is served by a parking meter that issues receipts until the expiration time shown on the parking meter receipt has lapsed.

§8.11.110.   EXCEPTION FOR GOVERNMENT VEHICLES
Whenever a vehicle identified by license plates as being owned, rented, or leased by the federal or District government, is being used on official business and is parked in a parking meter zone, the operator of the vehicle is not required to deposit payment to park in the parking meter zone.

---

[22] *See* 18 DCMR § 2404.9.
[23] *See* 18 DCMR § 2406.18.

J.A. 327

§ **8.12.** **RESTRICTED USE OF VALET PARKING, VALET STAGING, BUS, TAXICAB AND SIGHTSEEING ZONES AND STANDS**

§8.12.10. GENERAL

(a) NO PARKING OR STANDING. No person shall stand or park a vehicle in a valet parking zone or valet staging zone unless authorized to do so; in a bus stand, stop, or zone, other than a bus authorized to use the bus stand, stop, or zone; in a taxicab stand, other than a taxicab authorized to use the taxicab stand; or in a sightseeing stand, other than a sightseeing vehicle authorized to use the sightseeing stand.

(b) DISCHARGE OF PASSENGERS PERMITTED. A driver of a passenger vehicle may stop momentarily in a stand, stop, or zone described in (a) for the purpose of and while actually picking up or discharging passengers, as long as such stopping does not interfere with any vehicle, bus, taxicab, or sightseeing vehicle about to enter the stand or zone designated for the use of such vehicle.

§8.12.20. DRIVER TO REMAIN NEAR VEHICLE

The driver of any vehicle parked in a bus, taxicab, or sightseeing stand in accordance with this section shall remain within five feet (5 ft.) of the vehicle at all times.

§8.12.30. BUS ZONE RESTRICTIONS

At locations where a bus stop is posted but bus zone or bus stand signs do not exist, there shall be no parking or standing by vehicles other than a bus within twenty feet (20 ft.) of the approach side of a bus stop sign. *However*, a vehicle may stop momentarily to pick up or discharge a passenger or passengers. Loading or unloading of materials is prohibited, and the posting of signs to indicate this restriction is not required.

§8.12.40. PARKING RESTRICTIONS EFFECTIVE AT ALL TIMES

The prohibition against parking or standing at such stands and zones shall be effective at all times, unless the restricted periods have been otherwise designated and signs posted accordingly.

J.A. 328

## § 8.13. EMERGENCY PARKING PERMITS

§8.13.10.   PERMISSIBLE PARKING

Holders of emergency parking permits issued by the Board may stand or park their vehicles in available parking space in the roadway at the following locations:

(a)   Entrances to office buildings, apartment buildings, hotels, nursing homes, and residences;

(b)   Loading zones;

(c)   Within spaces set aside for holders of official parking permits;

(d)   Within part or all of the twenty-five foot (25 ft.) space on the far or non-approach side of the intersection of a one-way street with another street, but not within ten feet (10 ft.) of the curb line of the intersecting street or within a marked crosswalk; and

(e)   Taxicab and sightseeing vehicle stands.

The holder of the permit must be parked in accordance with any other applicable section of these regulations.

§8.13.20.   PARKING FOR EMERGENCY PURPOSES ONLY

Emergency parking permits shall be used only while the holder is actually responding to an emergency believed to be one in which the life or death of any individual is dependent upon standing or parking by a physician in the places permitted in §8.14.10.

§8.13.30.   PERMIT MUST BE VISIBLE

While a vehicle for which a permit has been issued is parked in accordance with this section, the permit shall be displayed so that it is clearly visible through the windshield of the vehicle.

§8.13.40.   TRANSFER PROHIBITED

No person other than the permittee named on the permit shall use an emergency parking permit or display it on a vehicle operated or parked. Any such use or display by a person other than the permittee shall constitute a violation of these regulations by the permittee and by the person who so used or displayed it.

§8.13.50.   FAILURE TO SURRENDER

Failure to surrender a revoked emergency parking permit upon request shall constitute a violation of these regulations.

## § 8.14. RESIDENTIAL PERMIT PARKING

§8.14.10.   2 HOUR PARKING LIMIT

Parking a motor vehicle on a residential parking permit street within the same zone is limited and restricted beyond a consecutive two (2) hour period.  This restriction shall be in effect as posted.

§8.14.20.   PROPER AFFIXATION

While a vehicle for which a residential parking permit has been issued is parked in the residential permit parking zone, the permit shall be affixed by its own adhesive to the lower left (driver's) side of the windshield so that it is clearly visible through the windshield of the vehicle; *Provided*, that in the case of a motorcycle, motorized bicycle, or trailer, the permit shall be affixed to a mounting tab which shall be bolted to either corner of the identification tag. Expired permits shall not be left visible on a vehicle after affixing a new permit.

§8.14.30.   NO TIME LIMIT

Vehicles displaying a valid residential parking permit may park at all times, within a designated residential permit parking zone, twenty-five (25) feet or more from the intersection. The Director of the District Department of Transportation shall have the discretion to exempt intersections from the parking restriction moratorium established by this section that the Board determines would be inappropriate and unsafe with such parking.

§8.14.40.   VISIBILITY AND DISPLAY

(a)   VEHICLES.  While a vehicle for which a residential permit parking sticker has been issued is parked in the residential permit parking zone, the residential permit parking sticker shall be affixed by its own adhesive to the lower left (driver's) side of the windshield so that it is clearly visible through the windshield of the vehicle.

(b)   MOTORCYCLES.  Any motorcycle, motorized bicycle or trailer shall affix the residential permit parking sticker to a mounting tab bolted to either corner of the identification tab.

(c)   EXPIRED STICKERS.  Expired residential permit parking stickers shall not be left visible.

§8.14.50.   VALIDITY

A residential permit parking sticker shall be valid only when displayed in accordance with the standards under §8.15.40.

§8.14.60.   ONE PERMIT PER VEHICLE

Simultaneous display of current residential parking stickers for more than one (1) zone shall make all the residential permit parking stickers invalid and shall be prima facie evidence of misrepresentation on the residential permit parking sticker application.

§8.14.70.   PARKING OR STANDING PROHIBITED
A residential permit parking sticker shall not authorize the vehicle displaying the sticker to stand or park in any place or during any times when the stopping, standing, or parking of motor vehicles is prohibited or set aside for specific types of vehicles, nor provide an exemption from the observance of any traffic regulation other than the residential permit parking two (2) hour parking limit and the exemptions listed in §8.15.80.

§8.14.80.   PERMISSIBLE PARKING
Between the hours of 9:00 p.m. and 7:30 a.m., vehicles displaying a valid residential parking permit may park, within a designated residential permit parking zone, in the following manner:
(a)      In loading zones, except loading zones used by hotels; and
(b)      In entrances, except hospital entrances.

§8.14.90.   TRANSFER OF STICKERS PROHIBITED
No sticker or permit for residential permit parking shall be used or displayed on any vehicle other than the one (1) for which it was issued. Any sticker or permit so displayed shall be void, and any unauthorized display of stickers or permits shall constitute a violation of this section by the sticker holder and by the owner or the operator of the vehicle displaying the permit.

## § 8.15. VISITOR OR TEMPORARY PERMITS

§8.15.10.   REPLICATION UNLAWFUL
The forgery, counterfeiting or unauthorized use or replication of a visitor permit or temporary permit shall be punishable by a fine of $300.

## § 8.16. TEMPORARY AND EMERGENCY PARKING RESTRICTIONS

§8.16.10.    ASSEMBLIES

Whenever by reason of the scheduled assembly of a large number of persons at any public or semi-public building, embassy, legation, stadium, or other place of assembly, it is determined that the free flow of traffic upon the street or streets leading to or from the building, embassy, legation, stadium or other place of assembly, is or will be impeded by reason of the parking of vehicles, parking shall be prohibited (or restricted) on the street(s) during the hours that the free flow of traffic is or will be impeded by parking.

§8.16.20.    CONSTRUCTION

Whenever construction work upon or adjacent to any highway causes the width of the roadway to be reduced, parking shall be prohibited upon the roadway adjacent to and for a reasonable distance on either side of the construction work. If it is determined that the reduced roadway width will impede the flow of traffic except where the highway is physically divided into separate roadways carrying traffic in opposite directions, parking shall also be prohibited on the side of the roadway opposite to and for a reasonable distance on either side of the construction work.

§8.16.30.    PARADES

Parking shall be prohibited on streets for which parade permits have been issued by the Chief of the Metropolitan Police Department, including streets necessary for assembling and disbanding of parades, for a reasonable time prior to, during, and for a reasonable time after such parades.[24]

§8.16.40.    EMERGENCIES

When, as a result of the closing of any street to traffic by reason of a parade or emergency conditions, the flow of traffic on adjacent streets is or will be increased, or it is found that the free flow of traffic upon the adjacent streets is or will be impeded due to the parking of vehicles, parking shall be prohibited during such hours that it is found that the free flow of traffic is or will be impeded.

---

[24] Parades may be permitted on Louisiana Avenue.  *See* 40 U.S.C. § 5106(c) ("Suspension of Prohibitions").  *See* Appendix F.

J.A. 332

§8.16.50.    PROPER DISPLAY OF PARKING PERMIT PLACARDS

    (a)    PLACARD:  PROPER DISPLAY

Whenever a special events parking permit placard has been issued to allow parking in a specified restricted area or on a specified restricted street or portion thereof, the placard must be displayed on the left side of the dashboard of the vehicle so that it is clearly visible from the outside of the vehicle.

    (b)    STICKERS:  DISPLAY AND EXPIRATION

Whenever a special events parking permit sticker has been issued to allow parking in a specified restricted area or on a specified restricted street or portion of that street, to be valid the permit shall be affixed by its own adhesive to the lower left (driver's) side of the windshield so that it is clearly visible through the windshield of the vehicle. Expired permits shall not be left visible on a vehicle.

§8.16.60.    TAMPERING WITH SIGNS

    (a)    INSTALLATION AND REMOVAL.  No person, other than the United States Capitol Police, the Architect of the Capitol, the House Sergeant at Arms, the Senate Sergeant at Arms or any other entity with the authority to regulate traffic, shall remove or install a sign on public space that prohibits or reserves parking.

    (b)    VANDALIZING.  No person may vandalize or deface a sign in public space that prohibits or reserves parking. Any person violating this subsection shall be subject to a civil fine of $100 for the 1st violation, $200 for the 2nd violation, and $400 for the 3rd and subsequent violations.

    (c)    NO PARKING IN VIOLATION OF SIGNS.  Whenever a sign is erected indicating that parking is prohibited or reserved under this section, it shall be unlawful to park any unauthorized vehicle in violation of the parking restrictions stated on the sign.

§8.16.70.    ADVANCE NOTICE WAIVER

A sign prohibiting or reserving parking shall be erected at least twenty-four (24) hours in advance in a non-residentially zoned area. If a sign is erected in a residentially zoned area, the sign prohibiting or reserving parking shall be erected at least seventy-two (72) hours in advance. The Board for extraordinary circumstances shown may waive this required advance notice for good cause.

J.A. 333

### § 8.17. OFFICIAL GOVERNMENT PARKING

§8.17.10.     PROPER DISPLAY
Government officials parking in official parking areas shall display, in a conspicuous place behind the windshield of their vehicle, an "Official Parking Permit" which is issued by the Board.

### § 8.18. STREET CLEANING PARKING PROVISIONS

§8.18.10.     NO PARKING
No person shall park any vehicle or permit any vehicle to remain parked during the times and days indicated on a Street Cleaning Route.

### § 8.19. SNOW EMERGENCY PARKING REGULATIONS

§8.19.10.     SNOW EMERGENCY ROUTES
After the effective time of the prohibition, no person shall park any vehicle or permit any vehicle to remain parked on a Snow Emergency Route.  However, if a fall of snow, sleet or freezing rain occurs between 11:30 p.m. and 7:00 a.m. and the Director has not announced prior to 11:30 p.m. that parking on Snow Emergency Routes is prohibited after a specified time, a vehicle parked on a Snow Emergency Route may remain so parked until 7:00 a.m.

J.A. 334

## § 8.20. LITTERING AND DEBRIS

§8.20.10.   GLASS AND OTHER DEBRIS

No person shall throw or deposit upon any street, highway, sidewalk, or alley, any glass bottle, glass, nails, tacks, wire, cans, or any other substance likely to injure any person, animal, or vehicle upon the street, highway, sidewalk, or alleyway.

§8.20.20.   FAILURE TO REMOVE HARMFUL MATERIAL

Any person who drops, or permits to be dropped or thrown, upon any street, highway, sidewalk, or alley, any destructive or injurious material, shall immediately remove the same or cause it to be removed.

§8.20.30.   TOWING AND REMOVAL OF WRECKED VEHICLES

Any person removing a wrecked or damaged vehicle from a street, highway, sidewalk, or alley shall remove any glass or other injurious substance dropped upon the street, highway, sidewalk, or alley from the vehicle.

## § 8.21   ADVERTISING

§8.21.10.   GENERAL

No person shall drive or park any vehicle on any street or highway for the primary purpose of displaying advertising.

§8.21.20.   DE MINIMUS DISPLAY

No person shall drive or park on any street or highway within the Capitol Grounds any vehicle that by reasons of its special shape or design shall be construed as intended primarily for advertising purposes without a permit from the Capitol Police Board.

J.A. 335

## § 8.22. MISCELLANEOUS NON-MOVING VIOLATIONS

§8.22.10.   UNATTENDED VEHICLES

No persons driving or in charge of a motor vehicle shall permit it to stand unattended without first stopping the engine, locking the ignition, removing the key, and effectively setting the brake.

§8.22.20.   TURNING WHEELS TO CURB

In addition to the requirements of §8.22.10, whenever a motor vehicle is standing on a grade, the driver or person in charge of the vehicle shall not permit it to stand unattended without first turning the front wheels to the curb or side of the highway.

§8.22.30.   IDLE ENGINE

No person owning, operating, or having control over the engine of a gasoline or diesel powered motor vehicle on public or private space, including the engine of a public vehicles for hire, buses with a seating capacity of twelve (12) or more persons, and school buses or any vehicle transporting students, shall allow that engine to idle for more than three (3) minutes while the motor vehicle is parked, stopped, or standing, including for the purpose of operating air conditioning equipment in those vehicles, except as follows:

(a)   To operate private passenger vehicles;

(b)   To operate power takeoff equipment, including dumping, cement mixers, refrigeration systems, content delivery, winches, or shredders; or

(c)   To idle the engine for no more than five (5) minutes to operate heating equipment when the ambient air temperature is thirty-two degrees Fahrenheit (32° F) or below.

§8.22.40.   DISPLAY OF SALE AND REPAIR

No person shall park a vehicle upon any roadway for the principal purpose of doing either of the following:

(a)   Displaying the vehicle for sale; or

(b)   Greasing or repairing the vehicle, except minor repairs necessitated by an emergency.

CHAPTER 9
# TAXICABS AND VEHICLES FOR HIRE

**§ 9.1.** <u>APPLICABILITY</u>

This chapter shall apply to the operation of every public or private vehicle-for-hire that operates on Capitol Grounds or within the extended jurisdiction of the United States Capitol Police.

§9.1.10   <u>DEFINITIONS</u>

(a)   Limousine: a public vehicle-for-hire that operates exclusively through advanced registration, charges exclusively on the basis of time, and shall not accept street hails.

(b)   Private vehicle-for-hire: a class of transportation service by which a network of private vehicle-for-hire operators in the District of Columbia provides transportation to passengers to whom the private vehicle-for-hire operators are connected by digital dispatch.

(c)   Private vehicle-for-hire company: an organization, including a corporation, partnership, or sole proprietorship, operating in the District of Columbia that uses digital dispatch to connect passengers to a network of private vehicle-for-hire operators.

(d)   Private vehicle-for-hire operator: an individual who operates a personal motor vehicle-for-hire service in contract with a private vehicle-for-hire company.

(e)   Public vehicle-for-hire: a class of transportation service by motor vehicle for hire in the District of Columbia, including a taxicab or limousine, that provides for-hire service exclusively using drivers and vehicles licensed pursuant to District of Columbia law.

(f)   Taxicab: a class of public vehicle-for-hire that may be hired by dispatch, digital dispatch, or hailed on the street, and for which the fare charged is calculated by a District of Columbia Taxicab Commission-approved meter with uniform rates determined by the District of Columbia Taxicab Commission.

**§ 9.2.** <u>FAILURE TO GIVE RECEIPT UPON REQUEST</u>

A taxicab operator, when requested by a passenger or a person requesting messenger or parcel delivery service, shall give a receipt showing the following:

(a)   Operator's name;

(b)   Identification card number;

(c)   Vehicle tag number;

(d)   Time, date;

(e)   The amount of the fare; and

(f)   Commission's complaint phone number.

**§ 9.3.** <u>DISPLAY OF IDENTIFICATION FOR TAXICABS</u>

§9.3.10.   <u>FAILURE TO DISPLAY</u>

The vehicle identification card (DCTC license) issued under § 31(d) of the License Act (D.C. Official Code § 47-2829(d) (2001)) shall be displayed at all times in the taxicab for which it is issued.

§9.3.20.   FAILURE TO MAKE AVAILABLE FOR INSPECTION

The vehicle identification card shall be carried in the taxicab and made available for inspection upon the request of any hack inspector or law enforcement personnel.

§9.3.30.   IDENTIFICATION MUST BE VISIBLE TO PASSENGER

The operator identification card (face) issued to the driver pursuant to § 31(e) of the License Act (D.C. Official Code § 47-2829(e)(1) (2001)) shall be displayed in a bracket or receptacle of a type approved by the Commission and shall be firmly attached to the right sun visor so as to be visible to any passenger in the vehicle.

§9.3.40.   REMOVAL FROM UNATTENDED VEHICLES

At all times when the operator is not in the vicinity of the taxicab, the operator shall remove the identification card from the vehicle.  For the purposes of this section "vicinity" means not more than twenty-five feet (25 ft.) from the taxicab.

§9.3.50.   PASSENGER RIGHTS DISPLAY

There shall be displayed in a suitable frame on the right side of the back of the front seat of each taxicab, in a position clearly visible to passengers, the passenger rights which shall display the tag number, the company, association, fleet or owner's name, and the taxicab number.

**§ 9.4.     SOLICITING PASSENGERS**

§9.4.10.     SOLICITING PROHIBITED

No person shall solicit business for public or private vehicles-for-hire anywhere on Capitol Grounds. Private vehicles-for-hire are still prohibited under section 9.12.10 from making street hails anywhere in the District of Columbia.

§9.4.20.     LOITERING

No public or private vehicle-for-hire operator shall loiter with a public or private vehicle-for-hire around or in front of any hotel, theater, public building, or place of public gathering, except to take on or discharge a passenger.

§9.4.30.     REFUSAL TO HAUL

Public vehicle-for-hire operators shall, at all times when on duty and not engaged, furnish service on demand to any person, except as provided for in §9.4.40.

§9.4.40.     EXCEPTIONS

No public or private vehicle-for-hire operator shall refuse to transport a person while holding his or her vehicle for hire, unless:

(a)     Previously engaged;

(b)     Unable or forbidden by the provisions of this title to do so;

(c)     The operator has reason to believe the person is engaged in a violation of law; or

(d)     The operator has cause to fear injury to his or her person, property or vehicle.

§9.4.50.     HELD FOR HIRE

Any taxicab occupying a taxicab stand shall be considered to be held for hire.  Private vehicles-for-hire are prohibited from occupying a taxicab stand.

§9.4.60.     AVAILABILITY
Any taxicab being operated on the streets shall be considered held for hire when:

(a)     Not occupied by a passenger; or;

(b)     Not displaying an "ON CALL," "OFF DUTY," or "OUT OF SERVICE" sign as authorized by the Commission's rules and regulations.

§9.4.70.     REFUSAL OF SERVICE
Except in shared riding, the operator shall not ask the destination of the passenger until the passenger is in the public or private vehicle-for-hire. A dispatcher shall not ask the destination of a passenger. If the dispatcher learns the destination of a passenger, that dispatcher shall not then convey the destination when dispatching an operator to pick up the passenger unless requested to do so by the passenger or the passenger has an emergency.

J.A. 340

**§ 9.5.**   <u>ON-CALL AND OFF-DUTY SIGNS</u>

§9.5.10.   <u>"ON CALL" DISPLAY</u>
Whenever a taxicab is proceeding to take on a passenger in answer to a telephone call or previous appointment, or is engaged by the hour for the carriage of passengers or making an emergency delivery of a parcel or package, the operator shall display a sign reading "ON CALL."

§9.5.20.   <u>"OFF DUTY" DISPLAY</u>
Whenever a taxicab operator ceases to be for hire and is proceeding to a place without intending to take on passengers, the operator shall display a sign reading "OFF DUTY" or "OUT OF SERVICE," whichever is appropriate under these regulations, and turn off the cruising light. The operator shall enter on the manifest "OUT OF SERVICE" or "OFF DUTY," and the time and location.  The "OFF DUTY" sign shall not be displayed during rush hours between 7:00 a.m. and 9:30 a.m., and 4:00 p.m. and 6:30 p.m.

§9.5.30.   <u>PROPER PLACEMENT OF SIGNS</u>
All "ON CALL," "OFF DUTY," and "OUT OF SERVICE" signs shall be displayed at the bottom of the right half of the windshield so as not to obstruct the operator's vision. These signs shall be uniform in size and lettering, three inches by fifteen inches (3 in. x 15 in.) with letters two inches (2 in.) in height.  The signs may be of a manufactured type and lighted from within, and may be smaller in dimension than three inches by fifteen inches (3 in. x 15 in.), when they have been approved by the Commission.

§9.5.40.   <u>SIGNS MUST BE SECURED WHEN NOT IN USE</u>
"ON CALL," "OFF DUTY," and "OUT OF SERVICE" signs shall be placed and secured in the taxicab vehicle so they are not readily accessible to the operator while the taxicab vehicle is available for hire when not in use.

**§ 9.6.** <u>CRUISING LIGHTS</u>

§9.6.10. <u>CRUISING LIGHT REQUIRED</u>
Each taxicab licensed in the District shall be equipped with a permanently affixed cruising light to distinguish it from other vehicles. No cruising light shall be affixed by magnetic or other means so as to be easily removed.

§9.6.20. <u>CRUISING LIGHT MUST BE ILLUMINATED</u>
The cruising light of a taxicab shall be illuminated at all times when the taxicab is for hire during the hours when driving lights are required, and shall be turned off when the taxicab is not for hire.

§9.6.30. <u>LIGHTS ON "ON CALL"</u>
Whenever a taxicab is responding to a telephone call or previous engagement and is displaying the "ON CALL" sign as provided in the Commission's rules, the cruising light shall be turned off.

§9.6.40. <u>LIGHTS OFF "ON DUTY"</u>
Whenever a taxicab operator removes his or her vehicle from service and is proceeding to a place of his or her choosing without intending to take on passengers and is displaying the "OFF DUTY" sign, as provided in the Commission's rules, the cruising light shall be turned off.

§9.6.50. <u>PROPER WORKING CONDITION</u>
No taxicab shall be operated in the public service unless its cruising light is in proper working condition.

J.A. 342

**§ 9.7.**   <u>TAXICAB STANDS</u>

      §9.7.10.   <u>AVAILABLE FOR HIRE</u>
No taxicab shall be placed upon or occupy any taxicab stand except for the purpose of being held forth for hire. Taxicabs shall be placed on stands only from the rear and shall be moved forward and to the front of the stand immediately as space becomes available by the departure or movement of preceding taxicabs. It shall be within the passenger's discretion to determine which taxicab to engage on a taxi stand.

      **§**9.7.20.   <u>LOITERING</u>
When a taxicab stand is occupied to its full capacity, no taxicab shall loiter or wait nearby for the purpose of occupying space on the stand. The operator of every taxicab occupying a stand shall stay within five feet (5 ft.) of his or her taxicab at all times.

      §9.7.30.   <u>BLOCKING AT TAXICAB STANDS PROHIBITED</u>
In the event any taxicab on a taxicab stand attempts to leave, other taxicabs on the stand shall, if necessary, move so as to permit the taxicab to leave.

      §9.7.40.   <u>PARKING REGULATIONS APPLY TO STANDS</u>
No taxicab stand shall be occupied by a taxicab in violation of regulations prohibiting parking, stopping, or standing on the street on which it is located during the hours 7:00 a.m. to 9:30 a.m., and 4:00 p.m. to 6:30 p.m. or during the existence of any snow or other emergency declared.

      § 9.7.50.   <u>PRIVATE VEHICLES-FOR-HIRE AND LIMOUSINES PROHIBITED FROM TAXICAB STANDS</u>
Private vehicles-for-hire and limousines are prohibited from occupying taxicab stands.

J.A. 343

**§ 9.8.** OPERATION OF TAXICABS

§9.8.10.   HACK LICENSE AND PERMIT REQUIRED

No person shall drive or be in physical control of a taxicab unless they have in their possession a valid identification card or valid motor vehicle operator's permit issued to that individual.[25]

§9.8.20.   SAFE OPERATION AND OBEDIENCE TO LAWS

The operation of taxicabs shall be conducted in accordance with the laws of the District and with due regard for the safety, comfort and convenience of passengers, for the safe and careful transportation of property, and for the safety of the general public. All reasonable efforts shall be made to promote safety at all times and under all conditions.

§9.8.30.   NO LOADING IN A CROSSWALK

No taxicab operator shall stop to load or unload passengers on the traffic side of the street, while occupying any intersection or crosswalk, or in such a manner as to unduly interfere with the orderly flow of traffic. All taxicab drivers shall pull as close to the curb or edge of the roadway as possible to take on or discharge passengers.

§9.8.40.   PULLING TO CURB

No taxicab operator shall stop or park a taxicab adjacent to any curb except as follows:

(a)   While actually taking on or discharging passengers;

(b)   When occupying a designated public vehicle stand for taxicabs;

(c)   When answering a call or delivering a parcel; or

(d)   When not holding his or her vehicle for hire, in which event the identification card shall be removed from the taxicab and the driver shall be away from the taxicab on business of his or her own.

---

[25] A valid ID card is any card issued under D.C. Official Code § 47-2829(e) (2001).  An operator's permit is either a District of Columbia motor vehicle operator's permit or, for non-District residents or persons exempt from obtaining a District motor vehicle operator's permit, a valid motor vehicle operator's permit issued by a state that is a party to the Driver License Compact Act, D.C. Official Code § 50-1001 *et seq*. (2001).

J.A. 344

## § 9.9.   MANIFEST RECORD

§9.9.10.   MAINTENANCE

Every operator of a taxicab shall maintain, in ink, a manifest of all trips made by the taxicab while under his or her control, in a form approved by the Commission.[26]

§9.9.20.   CONTENTS

The manifest should contain, but not be limited to, the following:

(a)   The date, operator's identification card number, taxicab company, vehicle number, and license plate number;

(b)   The interstate mileage at the beginning and ending of an interstate trip;

(c)   The time and place of origin and time and place of destination of each trip;

(d)   The number of passengers and fare charged for each trip; and

(e)   The time and interstate mileage at the end of the workday.[27]

§9.9.30.   ACCURACY

A complete and accurate record of all information required on the manifest shall be kept, and each trip record shall be logged immediately following completion of the trip.

§9.9.40.   ALTERATION

Manifests are official documents of the Commission and shall not be altered. Evidence of alteration may be referred to the appropriate authority for enforcement action.

## § 9.10.   VEHICLES FOR HIRE AND SIGHTSEEING VEHICLES

§9.10.10.   IDENTIFICATION LICENSE

No person shall drive a public vehicle for hire in the District unless he or she has a valid identification license.[28]

§9.10.20.   OPERATOR LICENSE

No owner of a public or private vehicle-for-hire for hire shall operate or permit the vehicle to be operated without a valid operator license.[29]

§9.10.30.   SIGHTSEEING VEHICLES

No person shall operate or permit to be operated any vehicle used for sightseeing purposes unless a certificate permitting that use is issued by the Chairperson of the District of Columbia Taxicab Commission.

---

[26] A manifest is a daily log of trips.

[27] Form can be found in Appendix 8-3 under the District of Columbia Municipal Regulations.

[28] Identification Licenses are issued under the provisions of Chapter 31 of the District of Columbia Code of Municipal Regulations.

[29] Operator Licenses are issued under the provisions of Chapter 31 of the District of Columbia Code of Municipal Regulations.

J.A. 345

## § 9.11.    LIMOUSINES

§9.11.10.    LICENSE REQUIRED

Each limousine operator's license shall have marked on its face a statement indicating it is valid only for the type of vehicle operation for which it is issued and is nontransferable.

§9.11.20.    IDENTIFICATION REQUIREMENTS

Each license shall contain a number, photograph of the licensee, and any other information that the Commission considers appropriate.

## § 9.12.    PRIVATE VEHICLES FOR HIRE

§9.12.10    STREET HAILS PROHIBITED

Private vehicles-for-hire shall not solicit or accept street hails and may only be booked through a private vehicle-for-hire company.

§9.12.20    TRADE DRESS

All private vehicle-for-hire operators must display a private vehicle-for-hire company trade dress while operating their vehicle-for-hire. The trade dress must be distinctive and be displayed prominently on the exterior or on a window of the vehicle, provided the trade dress does not obstruct the driver's view. The trade dress must be on file and approved by the District of Columbia Taxicab Commission. The trade dress must be sufficiently large and color contrasted to be visible from a distance of 50ft, as well as be reflective, illuminated, or otherwise visible in darkness.

§9.12.30    OPERATION OF PRIVATE VEHICLES FOR HIRE

(a) No private vehicle-for-hire operator shall stop to load or unload passengers on the traffic side of the street, while occupying any intersection or crosswalk, or in such a manner as to unduly interfere with the orderly flow of traffic. All private vehicle-for-hire drivers shall pull as close to the curb or edge of the roadway as possible to take on or discharge passengers.

(b) No private vehicle-for-hire operator shall stop or park a private vehicle-for-hire adjacent to any curb except as follows: while actually taking on or discharging passengers; when occupying a designated passenger loading zone; when answering a call or delivering a parcel; or when not using his or her private vehicle as a private-vehicle-for hire, in which event the trade dress shall be removed from the vehicle and the driver shall be away from the vehicle on business of his or her own.

J.A. 346

J.A. 347

CHAPTER 10
# FUNERALS

**§ 10.1.    PERMIT REQUIRED**

§10.1.10.    NO FUNERAL PROCESSIONS THROUGH CAPITOL SQUARE
No funeral procession shall be driven over any street or roadway in the area known as Capitol Square unless specifically permitted to do so by the Congress.

**§ 10.2.    RESPONSIBILITIES OF FUNERAL PROCESSION MEMBERS**

§10.2.10.    STAY TO THE RIGHT
Each driver in a funeral or other procession shall drive as near to the right-hand edge of the roadway as practicable and shall follow the vehicle ahead as close as is practicable and safe.

§10.2.20.    PROCEEDING THROUGH AN INTERSECTION
The leading vehicle in a funeral procession shall stop at any intersection where the traffic control device requires such a stop, but after the leading vehicle has entered the intersection, all vehicles in the funeral procession shall continue their passage except in the instance there is a funeral escort officer preceding the funeral procession.

§10.2.30.    HEADLIGHT DISPLAY
A funeral composed of a procession of vehicles in order to be recognized as such, shall display on each vehicle two (2) illuminated headlights.

§10.2.40    DISPLAY OF HEADLIGHTS ON RETURN
The vehicles in a procession returning from a funeral shall not display headlights, except during the hours when lights are required to be displayed on all motor vehicles.

**§ 10.3.    DRIVER RESPONSIBILITIES**

§10.3.10.    DRIVING THROUGH A FUNERAL PROCESSION
No driver of a vehicle shall drive between the vehicles comprising a funeral or other authorized procession while they are in motion.  The provision shall not apply at intersections where traffic is controlled by traffic control signals or police officers unless provided in this chapter.

J.A. 348

J.A. 349

ARTICLE III:  PEDESTRIANS, BICYCLES AND OTHER TRAFFIC

# CHAPTER 11
# PEDESTRIAN INFRACTIONS

§ 11.1.   GENERAL

§11.1.10.   PEDESTRIANS SUBJECT TO TRAFFIC REGULATIONS
Pedestrians shall be subject to traffic control signals as provided Chapter 2.[30]   At all other places, pedestrians shall be accorded the privileges and shall be subject to the restrictions stated in this chapter.

§11.1.20.   PEDESTRIAN IDENTIFICATION

(a)   IDENTIFICATION FOR INFRACTION ONLY.  A pedestrian who is stopped by a police officer or other authorized official after the pedestrian has committed an infraction of these regulations shall be required to inform the officer or other official of his or her true name and address for the purpose of including that information on a notice of infraction; provided, that no pedestrian shall be required to possess or display any documentary proof of his or her name or address in order to comply with the requirements of this section.

(b)   PENALTY.  A pedestrian who refuses to provide his or her name and address to a police officer upon request after having been stopped for committing an infraction of these regulations shall, upon conviction, be fined not less than $100 nor more than $250.

---

[30] Chapter 2 ("Traffic Signs, Signals, Symbols and Devices").

J.A. 351

**§ 11.2.    RIGHT-OF-WAY IN CROSSWALKS**

§11.2.10.       APPLICATION
                No pedestrian shall suddenly leave a curb, safety platform, safety
                zone, loading platform, or other designated place of safety and walk or
                turn into the path of a vehicle which is so close that it is impossible for
                the driver to yield.

§11.2.20.       JAYWALKING
                No pedestrian shall cross a roadway intersection diagonally unless
                authorized by official traffic control devices.

§11.2.30.       OBEDIENCE TO SIGNALS
                When authorized to cross diagonally, pedestrians shall cross only in
                accordance with the official traffic control devices pertaining to such
                crossing movements.

**§ 11.3.    NON-CROSSWALK CROSSING**

§11.3.10.       APPLICATION
                Between adjacent intersections controlled by traffic control signal
                devices or by police officers, pedestrians shall not cross the roadway at
                any place except in a crosswalk.

§11.3.20.       YIELD TO VEHICULAR TRAFFIC
                Each pedestrian crossing a roadway at any point other than within a
                marked crosswalk, or within an unmarked crosswalk at an intersection,
                shall yield the right-of-way to all vehicles upon the roadway.

§11.3.30.       PROPER CROSSING
                No pedestrian shall cross a roadway at any place other than by a route
                at right angles to the curb or by the shortest route to the opposite curb,
                except in a crosswalk.

**§ 11.4.    SIDEWALKS AND ROADWAYS**

§11.4.10.    STAY TO THE RIGHT

Whenever possible, pedestrians shall walk on the right half of the crosswalk.

§11.4.20.    MUST USE SIDEWALKS

Where sidewalks are provided, it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway.

§11.4.30.    STAY TO LEFT OF ROADWAY

Where sidewalks are not provided, any pedestrian walking along and upon a street or highway shall, when practicable, walk only on the left side of the roadway or its shoulder-facing traffic, which may approach from the opposite direction.

§11.4.40.    HITCHHIKING

No person shall stand in a roadway for the purpose of soliciting a ride from the driver of any vehicle.

§11.4.50.    MOVE-OVER LAW

Upon the approach of an authorized emergency vehicle, pedestrians shall yield right-of-way and immediately proceed to the nearest point of safety.

J.A. 353

J.A. 354

CHAPTER 12

# DEMONSTRATIONS AND SPECIAL EVENTS

**§ 12.1.   DEMONSTRATION ACTIVITY**

§12.1.10.   DEFINITION

Demonstration activity is defined as any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution.

§12.1.20.   APPLICABILITY

The provisions of this chapter shall be applicable to any one (1) person or group of persons engaged in demonstration activity on Capitol Grounds.  The provisions of this chapter shall apply equally to all demonstrators, regardless of viewpoint.

§12.1.30.   SPECIAL EVENTS

Certain events on Capitol Grounds are not considered "demonstrations" for the purposes of this chapter.  They are authorized as follows:

(a)   BAND CONCERTS.  Concerts performed by bands that are in the service of the federal government, at times which will not interfere with Congress, as authorized by the Architect of the Capitol.[31]

(b)   LOUISIANA AVENUE.  Parades, processions or assemblages on that part of Louisiana Avenue located within Capitol Grounds.  The Capitol Police Board grants the Mayor of the District of Columbia the authority to permit the use of Louisiana Avenue for these events.[32]

(c)   TOUR GROUPS.  A group organized for the purpose of sightseeing and visiting the Capitol.

(d)   CEREMONIAL EVENTS AND ENTERTAINMENT.  Any small-scale event such as a school band, musical presentation or military reenlistment ceremony.  Any group wishing to engage in this type of activity must apply for and receive prior written approval from the Board.  These events shall only be conducted in assigned areas and must comply with all restrictions, limitations and conditions as determined by the Board.

**§ 12.2.   GENERAL REQUIREMENTS**

§12.2.10.   PERMISSIBLE DEMONSTRATION AREAS

---

[31] 40 U.S.C. § 5107 ("Concerts on Grounds").  *See* Appendix F.

[32] 40 U.S.C. § 5106(c) ("Authority of Mayor to Permit Use of Louisiana Avenue").  *See* Appendix F.

J.A. 355

Demonstration activity is allowed in designated areas as indicated on the "United States Capitol Grounds Demonstration Areas Map," as amended.[33]

§12.2.20.   PROHIBITED DEMONSTRATION AREAS

No person or group of any size may engage in demonstration activity on the steps of the United States Capitol, on the steps of any building on Capitol Grounds or in any area otherwise closed or restricted for official use. In addition, projecting of images on any building on Capitol Grounds shall not be permitted. Demonstration activity by Members of Congress is exempt from this section if:

a.   it is being done in his or her official capacity as a Member;

b.   it is being organized or sponsored by a Member of Congress; and

c.   the Member(s) is personally in attendance at the demonstration activity at all times.

The exemption will no longer apply to others at the demonstration activity if the organizing or sponsoring Member(s) departs the activity. The exemption will not apply when a Member of Congress merely advocates for demonstration activity organized or sponsored by others.

## § 12.3.   GROUPS OF THIRTY OR LESS

§12.3.10.   NO PERMIT REQUIRED

No person or group of thirty (30) or less persons shall be required to obtain a permit.

§12.3.20.   AVAILABILITY

Space for one (1) person or group of thirty (30) persons or less is available on a first-come, first-served basis, subject to the provisions of this chapter.

§12.3.30.   PERMIT ENCOURAGED

One (1) person or group of thirty (30) persons or less that desires to secure a specific demonstration area is encouraged to file an application for a permit.  A permit holder will be given priority over any person or group occupying a demonstration area not in possession of a permit.  The Board may remove or relocate any person or group of thirty (30) persons or less not in possession of a permit to accommodate permitted demonstration activity or special event as authorized by §12.1.30.

---

[33] *See* Appendix G.  Approved December 5, 2012.

J.A. 356

§12.3.40.   PROHIBITIONS
A person or group of thirty (30) persons or less shall not engage in the following:

(a)   SEGMENTING FROM THE GROUP.  A person or group of thirty (30) persons or less may engage in demonstration activity without a permit provided that the demonstration activity is not merely a segment of the same group whose complement would consist of over (30) persons.

(b)   INTERFERENCE.  No person or group of thirty (30) persons or less shall engage in demonstration activity that audibly or physically interferes with the demonstration activity of another person or group.

(c)   DENSITY.  No person or group of thirty (30) persons or less shall occupy an area in which the density exceeds 4.95 square feet per person, including props and equipment.[34]  In no instance shall the per person density of any area exceed that set by the Federal Emergency Management Agency.

(d)   SEVEN DAY LIMITATION.  No person or group of thirty (30) persons or less shall engage in demonstration activity for a period that exceeds more than seven (7) consecutive days.

(e)   CONTINUOUS DAILY DEMONSTRATION.  No person or group of thirty (30) persons or less shall engage in demonstration activity having a duration of more than twenty-four (24) consecutive hours, including clean-up and the set-up and take down of props and equipment.[35]

§12.3.50.   APPLICABILITY OF OTHER SECTIONS.
With the exception of §12.4, any person or group of thirty (30) persons or less is required to adhere to the provisions of this chapter.

---

[34] "Special Events Contingency Planning," Federal Emergency Management Agency (Mar. 2005).

[35] *Community for Creative Non-Violence v. Carvino, et al.,* 660 F. Supp 744 (D.D.C. 1987); *Community for Creative Non-Violence v. Kerrigan, et.al.,* 865 F.2d 382 (D.C. App. 1989).  *See* Appendix H for all related case law.

J.A. 357

**§ 12.4.    GROUPS OVER THIRTY**

§12.4.10.    PERMIT REQUIRED FOR GROUPS OF OVER THIRTY

No group of over thirty (30) persons shall engage in demonstration activity on Capitol Grounds except pursuant to the terms of a permit issued by the Capitol Police Board.

§12.4.20.    PERMIT APPLICATIONS

(a)    ADVANCE NOTICE.  All applications for permits shall be submitted in writing to the Capitol Police Board.[36]  An application shall be submitted in writing so as to be received by the Capitol Police Board at least five (5) business days in advance of the proposed demonstration activity.

(b)    CONTENTS.  Permit applicants shall provide the following:

1.    Requested area of Capitol Grounds;

2.    Date, time, duration, and nature of the demonstration activity;

3.    Estimated number of participants;

4.    Sponsoring person or organization;

5.    Requested props and equipment;  and,

6.    Name, address, telephone number and signature of applicant.

(c)    WAIVER.  The Board may waive notice or reduce the number of days of advance notice if it determines that unforeseen or exceptional circumstances exist.

---

[36] The Special Events Division of the United States Capitol Police has been designated to receive and process applications.  Applications can be obtained by calling (202) 224-8891 or visiting www.uscapitolpolice.gov.

§12.4.30.    PROCESSING APPLICATIONS AND ISSUANCE OF PERMITS

(a)    APPROVAL.  The Capitol Police Board shall process applications in order of their receipt.  Properly completed applications will be given priority over applications that are defective.

(b)    ISSUANCE.  The Board shall issue a permit authorizing peaceable and orderly demonstration activity upon proper and timely application.

(c)    CONTENTS.  Each permit shall clearly identify:

1.    The sponsoring person and organization;

2.    The area on Capitol Grounds where the permitted demonstration activity is to take place;

3.    The date, time and duration of the demonstration activity;

4.    The nature of the event and detailed description of the activity; and,

5.    The number of participants.

(d)    TACIT APPROVAL.  Should the Board fail to act on a properly completed and timely filed application within twenty-four (24) hours prior to the date of the proposed demonstration activity, such application shall be deemed approved by the Board.

§12.4.40.    TERMS AND CONDITIONS

In addition to any additional terms as set forth in the permit, no permit shall be issued that authorizes the following:

(a)    AREA.  No permit shall authorize a group to demonstrate in more than one (1) area per event simultaneously.

(b)    DENSITY.  No permit shall be issued that would exceed a density of five (5) square feet per person in the requested demonstration area, including props and equipment.

(c)    SEVEN DAY LIMITATION.  No permit shall be issued for a period of more than seven (7) consecutive days.

(d)    CONTINUOUS DAILY DEMONSTRATION PROHIBITED.  No permit shall authorize demonstration activity having a duration of more than twenty-four (24) consecutive hours, including clean-up and the set up and take down of props and equipment.[37]

---

[37] *Community for Creative Non-Violence v. Kerrigan, et.al.*, 660 F. Supp 744 (D.D.C. 1987); 865 F.2d 382 (D.C. App. 1989).  *See* Appendix H for all related case law.

§12.4.50.   GROUPS TO REMAIN IN ASSIGNED AREAS
All groups are required to remain in their assigned demonstration areas throughout the course of the demonstration activity.  The same group may not hold a permit to more than one demonstration area at the same time.

§12.4.60.   REVOCATION FOR NON-COMPLIANCE OR FOR CAUSE.
In any case in which the terms of the permit are violated, such permit may be revoked by the Capitol Police Board.  The Board is authorized to revoke a permit if it determines that continuation of demonstration activity is likely to result in bodily harm or death to an individual, damage to or destruction of any real or personal property or that a breach of the peace is imminent and good order cannot otherwise be maintained.

## § 12.5.   PROPS AND EQUIPMENT

The following provisions apply to all persons or groups of persons bringing props and equipment onto Capitol Grounds.

§12.5.10.   GENERAL

(a)   DEFINITION.  Props and equipment include items such as stands, lecterns, sound amplification equipment, chairs, tables, portable sanitary facilities, press and news facilities or other similar items that are reasonably necessary as an integral part of demonstration activity.

(b)   HEIGHT RESTRICTION.  No single prop, piece of equipment or combination thereof may exceed fifteen (15) feet in height.

(c)   STAGES, RISERS AND PLATFORMS.  No stage, riser or platform may exceed two (2) feet in height.

(d)   UNATTENDED PROPS AND EQUIPMENT.  No prop or piece of equipment shall be left unattended while on Capitol Grounds.

(e)   REMOVAL.  All props and equipment must be capable of immediate removal.

(f)   TWENTY FOUR HOUR LIMITATION.  Props and equipment must be removed from Capitol Grounds at least once every consecutive twenty-four (24) hour period.[38]

(g)   CONCLUSION.  Demonstration activity is not considered concluded until all props and equipment are removed from Capitol Grounds within the permitted time.

---

[38] *Id.*

§12.5.20.    ADDITIONAL REQUIREMENTS FOR PERMIT APPLICANTS
(a)    All permit applicants are required to list props and equipment in their application.
(b)    Permit applicants must provide a description and the intended use of each such item in the permit application.
(c)    Any stage, riser or platform must be clearly identified in the permit application and receive Board authorization prior to use.
(d)    Permit holders are subject to any additional requirements pertaining to props and equipment as determined by the Board and set forth in the permit.

§ 12.6.    SIGNS, BANNERS AND PLACARDS
Signs, banners and placards are permissible on Capitol Grounds provided the supports for these items have dull ends, do not exceed ¾ of an inch at their widest point and cannot in any way be construed as a weapon.  No nails, screws or bolt-type fastening devices may be protruding from the supports.

§ 12.7.    TEMPORARY STRUCTURES
No temporary structure of any kind may be erected on Capitol Grounds.  Tents, cabanas, canopies and all other types of covered or enclosed structures are expressly prohibited.[39]  No object shall be tied, fastened or suspended to any tree, pole or other landscape or architectural feature on Capitol Grounds.

§ 12.8.    AMPLIFICATION AND OTHER NOISE DISTURBANCES
§12.8.10.    AMPLIFICATION EQUIPMENT
Amplification equipment is not permitted on the Lower West Front Terrace or any other location on Capitol Grounds as determined by the Board.
§12.8.20.    SOUND PROJECTION
All sound amplification equipment must be projected away from the Capitol and all other Congressional office buildings.
§12.8.30.    UNAMPLIFIED DISTURBANCES
No individual may utter loud, threatening or abusive language or engage in disorderly or disruptive conduct at any place on Capitol Grounds that interferes with any business being conducted in the Capitol or in any of the office building on Capitol Grounds at any time, including during periods of recess.

---

[39] See also §16.6 ("Camping").

**§ 12.9.**   <u>ROAD RACES</u>

§12.9.10.   <u>DEFINITION</u>
A road race is any type of sponsored running or cycling event, such as a marathon or triathlon.

§12.9.20.   <u>PERMIT REQUIRED FROM NEIGHBORING AGENCY</u>
No road race will be allowed to traverse Capitol Grounds when the route includes District of Columbia or National Park Service land unless a permit from the Metropolitan Police and National Park Service has been issued.

§12.9.30.   <u>SUNDAYS</u>
Road races are permitted on Sundays only.

§12.9.40.   <u>NO RE-TRACING ON CAPITOL GROUNDS</u>
Road races shall only pass through Capitol Grounds once; there will be no re-tracing of the route on Capitol Grounds.

§12.9.50.   <u>CAPITOL SQUARE</u>
A road race may not occupy more than two (2) streets that comprise Capitol Square.

§12.9.60.   <u>AUTHORIZED ROUTE</u>
Race coordinators must submit documentation that lays out the route of the race.  Race participants must remain on the authorized route throughout the course of the race.

**§ 12.10.**   <u>MARCHES</u>

§12.10.10.   <u>PRIOR PERMIT REQUIRED</u>
No march will be authorized without an existing permit from both the Metropolitan Police Department and the National Park Service.

§12.10.20.   <u>AUTHORIZED ROUTE</u>
Participants must submit documentation that lays out the route and remain on the authorized route throughout the march.  Unless otherwise authorized by the Board, all marchers are to remain on sidewalks.

J.A. 362

**§ 12.11.   DAMAGE TO CAPITOL GROUNDS**

§12.11.10.   RESTORATION OF GROUNDS

Any person or group of persons that engages in demonstration activity on Capitol Grounds shall restore the grounds to same condition that existed prior to that demonstration activity.

**§ 12.12.   PERSONAL ACTIVITIES**

Wedding ceremonies, graduation ceremonies and other events of a personal nature are not permitted on Capitol Grounds.

**§ 12.13.   ADDITIONAL CONDITIONS**

The Board reserves the right to impose additional reasonable time, place and manner restrictions on any demonstration activity consistent with this chapter in the interest of safety and in order to minimize the obstruction or impediment of vehicular and pedestrian traffic through or within the Capitol Grounds.

J.A. 363

J.A. 364

CHAPTER 13

# BICYCLES

## § 13.1. GENERAL PROVISIONS

§13.1.10.    APPLICATION

This chapter shall apply to any bicycle that is parked or being operated on Capitol Grounds.

§13.1.20.    BICYCLE DEFINED

A bicycle is a device which is propelled solely by human power; which is designed to be ridden by one (1) or more persons; which has a saddle or seat for each person that the device is designed and equipped to carry; which has a tandem arrangement of two (2) wheels (or is a device generally recognized as a bicycle though equipped with two front or rear wheels); and which has either one wheel at least twenty inches (20 in.) in diameter or is designed to be ridden on a roadway. This *shall not* include any device equipped with a motor or engine capable of propelling such device either exclusively or in combination with human power, whether or not such motor or engine is in actual operation.

## § 13.2. HIGHWAYS AND SIDEWALKS

§13.2.10.    RIDING ON SIDEWALKS

There shall be no prohibition against any person riding a bicycle on a sidewalk so long as that person does not create a hazard.

§13.2.20.    OBEDIENCE TO TRAFFIC CONTROL DEVICES

No person shall operate a bicycle except in obedience to the instructions of official traffic control signals, signs, and other control devices applicable to vehicles, unless otherwise directed by a police officer or other person authorized to control and direct traffic.

§13.2.30.    DUTIES OF BICYCLE OPERATORS

Every person who rides a bicycle on a highway shall have the same duties as any other vehicle operator under these regulations, except as otherwise expressly provided in this chapter, and except for those duties imposed by these regulations which, by their nature or wording, can have no reasonable application to a bicycle operator.

## § 13.3.   SAFE RIDING

§13.3.10.   SAFE OPERATION

A person shall operate a bicycle in a safe and non-hazardous manner so as not to endanger himself or herself or any other person.

§13.3.20   SEAT REQUIRED

No person shall operate or ride a bicycle other than upon or astride a regular seat attached to the bicycle.

§13.3.30   EXTRA RIDERS

No person shall operate or ride a bicycle with more persons on it at any one time than the bicycle is equipped to carry.

§13.3.40.   CARRYING ARTICLES

No person shall operate or ride a bicycle while carrying any package, bundle, or article which prevents the operator from keeping at least one hand on the handle bars.

§13.3.50.   WARNING DEVICE

No person operating a bicycle shall sound any warning device at any intersection so as to interfere with the obedience to the instructions of official traffic control signals or to the directions of a police officer.

§13.3.60.   NO CLINGING

No person riding upon a bicycle shall attach himself, herself or the device upon which he or she is riding, to another bicycle, Segway, play vehicle or any other vehicle.

§13.3.70.   RIDING ABREAST

Persons riding upon a roadway shall not ride more than two abreast except on paths or part of roadways set aside for the exclusive use of bicycles.  Persons riding two abreast shall not impeded the normal and reasonable movement of traffic and, on a lane roadway, shall ride within a single lane.

§13.3.80.   OVERTAKING AND PASSING

(a)   A person operating a bicycle may overtake and pass another vehicle only under conditions which permit the movement to be made with safety.

(b)   A person operating a bicycle may overtake and pass other vehicles on the left or right side, staying in the same lane as the overtaken vehicle, or changing to a different lane, or riding off the roadway, as necessary to pass with safety.

(c)   If a lane is partially occupied by vehicles that are stopped, standing, or parked in that lane, a person operating a bicycle may ride in that or in the next adjacent lane used by vehicles proceeding in the same direction.

§13.3.90.   RIDING INTO PATH OF VEHICLE

No bicyclist shall suddenly leave a sidewalk and ride into the path of a vehicle which is so close that it is impossible for the driver to yield.

J.A. 366

## § 13.4.    RIGHT-OF-WAY

§13.4.10.    YIELD TO PEDESTRIANS ON SIDEWALK

Any person propelling a bicycle upon a sidewalk shall yield the right-of-way to pedestrians and shall travel at a speed no greater than the posted speed limit of the adjacent roadway provided that such speed is safe for the conditions then existing on the sidewalk.

§13.4.20.    YIELD TO PEDESTRIANS IN CROSSWALK

A person propelling a bicycle while crossing a roadway in a crosswalk shall have all the rights and duties applicable to a pedestrian under the same circumstances, except that the bicyclist must yield to pedestrians on the sidewalk or crosswalk.

§13.4.30.    EMERGING AND ENTERING

The operator of a bicycle emerging from or entering an alley, driveway, or building shall yield the right-of-way to all pedestrians upon approach to the sidewalk or the sidewalk area extending across any alleyway.  Upon entering the roadway, the bicyclist shall yield the right-of-way to all vehicles approaching on said roadway to the extent necessary to safely enter the flow of traffic.

## § 13.5.    BICYCLE SAFETY EQUIPMENT

§13.5.10.    BICYCLE BRAKE

Each bicycle shall be equipped with a brake which enables the operator to cause the braked wheels to skid on dry, level, clean pavement.  A fixed gear bicycle is not required to have a separate brake, but an operator of a fixed gear bicycle shall be able to stop the bicycle using the pedals.

§13.5.20.    FRONT LAMP ON BICYCLE

Each bicycle, when in use at night, shall be equipped with a lamp on the front which shall emit a steady or flashing white light visible from a distance of at least five hundred feet (500 ft.) to the front and with a red reflector on the rear which shall be visible from all distances from fifty feet (50 ft.) to three hundred feet (300 ft.) to the rear when directly in front of upper beams of head lamps on a motor vehicle.

§13.5.30.    REAR LAMP ON BICYCLE

A lamp emitting a steady or flashing red light visible from a distance of five hundred feet (500 ft.) to the rear may be used in lieu of the red reflector.

§13.5.40.    BODY LAMP ON BICYCLE OPERATORS
In place of the requirements of §13.5.20, a lamp may be worn on the body of an operator; it may be readily seen from the distances set forth in that subsection.

§13.5.60.    PROHIBITION ON SIRENS
A bicycle shall not be equipped with, nor shall any bicycle rider use, a siren of any kind.

## § 13.6.   PARKING AND SECURING BICYCLES

§13.6.10.    PERMISSIBLE BICYCLE PARKING
No person shall park his bicycle on Capitol Grounds in any place other than a bicycle rack or other area designated specifically for the parking of bicycles.

§13.6.20.    PARKED BICYCLES
Any bicycle parked in a parking garage or secured designated staff parking lot must have a valid permit issued by the Senate Committee on Rules and Administration or the Committee on House Administration. Any bicycle parked in any other public parking area, including a bicycle rack, does not need to have a permit.

§13.6.30.    TWENTY-FOUR HOUR TIME LIMITATION
A person may secure a bicycle in accordance with the provisions of this chapter for a period of not more than twenty-four (24) consecutive hours, by means of a lock or similar device, in accordance with the requirements of this chapter.  Any bicycle secured in excess of twenty-four (24) consecutive hours may be seized by the U.S. Capitol Police.

§13.6.40.    SECURED BICYCLE CANNOT IMPEDE TRAFFIC
A person may secure a bicycle in accordance with the provisions of this chapter by means of a lock or similar device as long as securing the bicycle does not obstruct or unduly impede traffic or pedestrian movement and as long as securing bicycles has not been forbidden by any signage or notice.

J.A. 368

§13.6.50.   SECURING BICYCLES PROHIBITED IN CERTAIN AREAS
No person shall secure a bicycle to any of the following publicly-owned facilities:

(a)   Fire hydrants;
(b)   Police and fire call boxes;
(c)   Electric traffic signal poles;
(d)   Fences;
(e)   Stanchion, bollard or any publicly-owned pole or post used as support;
(f)   Tree, shrub or plant;
(g)   Bench, fountain, fixture or object temporarily or permanently attached or appended to any structure or building;

§13.6.60.   BUILDINGS AND IMPROVED AREAS
No person shall park a bicycle:

(a)   Upon a highway other than the roadway against the curb; or
(b)   Upon a sidewalk, against a building or any other fixture or improved area not specifically designated by this chapter.

§13.6.70.   TAMPERING PROHIBITED
No person shall tamper with any bicycle that has been locked, placed in a bicycle rack or otherwise secured.

J.A. 369

J.A. 370

CHAPTER 14
# PEDICABS

## § 14.1.   GENERAL PROVISIONS

§14.1.10.   APPLICATION

This chapter shall apply to any pedicab that is parked, standing or being operated on Capitol Grounds.

§14.1.20.   PEDICAB DEFINED

A bicycle with two (2) rear wheels and one (1) front wheel that is designed to be ridden by one (1) or more persons, that transports, or is capable of transporting, passengers on seats attached to the bicycle, and that is used for transporting passengers for hire.

## § 14.2.   HIGHWAYS AND SIDEWALKS

§14.2.20.   PUBLIC ROADS

Pedicabs shall only be operated only on public streets.

§14.2.20.   OBEDIENCE TO TRAFFIC CONTROL DEVICES

Unless otherwise directed by a police officer, no person shall operate a pedicab except in obedience to the instructions of official traffic control signals, signs, and other control devices applicable to vehicles.

§14.2.30.   DUTIES OF PEDICAB OPERATORS

Every person who rides a pedicab on a highway shall have the same duties as any other vehicle operator under these regulations, except as otherwise expressly provided in this chapter, and except for those duties imposed by these regulations which, by their nature or wording, can have no reasonable application to a pedicab operator.

## § 14.3. SAFE RIDING

§14.3.10.  APPLICABILITY OF BICYCLE REGULATIONS

Pedicabs shall be operated in accordance with the general safety requirements set forth in §13.3 and §13.4.40.[40]

§14.3.20.  SAFE OPERATION

Each pedicab shall be operated in accordance with the following provisions:

(a)  PASSENGER LIMIT.  The maximum number of passengers a pedicab may transport shall not exceed the number of available seats.

(b)  PASSENGERS MUST BE SEATED.  All passengers shall be seated while the pedicab is in motion.

(c)  SEATBELTS.  All passengers shall have a seatbelt securely fastened while the pedicab is in motion.

(d)  30 MPH SPEED LIMIT.  A pedicab shall not be operated on a roadway with a posted speed limit of more than thirty miles per hour (30 mph).

(e)  SIDEWALKS.  A pedicab may not be operated or parked on a sidewalk.

(f)  LOADING.  Pedicab passengers shall be loaded and off-loaded while the pedicab is stopped.

(g)  LOADING.  No pedicab operator shall stop to load or unload passengers on the traffic side of the street, while occupying any intersection or crosswalk, or in such a manner as to unduly interfere with the orderly flow of traffic.  All pedicab operators shall pull as close to the curb or edge of the roadway as possible to take on or discharge passengers.

(h)  PARKING.  A pedicab shall not be parked in any restricted zones identified for other vehicles, including, but not limited to, parking meter zones, residential permit parking zones, valet parking zones, bus zones, taxicab zones, and sightseeing zones.

(i)  SECURING.  A pedicab shall not be tied, cabled, or otherwise attached to a parking meter, street light pole, or other public space asset.

---

[40] §13.3: ("Safe Riding"); §13.4.40 ("Emerging and Entering").

(j)    HEADLAMPS.  At any time from one half (1/2) hour after sunset to one-half (1/2) hour before sunrise, and at any other time when, due to insufficient light or unfavorable atmospheric conditions, persons and vehicles on the highway are not clearly discernible at a distance of five hundred feet (500 ft.) ahead, a pedicab shall be operated with a headlamp of sufficient intensity to reveal a person or a vehicle three hundred feet (300 ft.).

(k)    TAIL LAMPS.  At any time from one half (1/2) hour after sunset to one-half (1/2) hour before sunrise, and at any other time when, due to insufficient light or unfavorable atmospheric conditions, persons and vehicles on the highway are not clearly discernible at a distance of five hundred feet (500 ft.) ahead, a pedicab shall be operated with tail lamps capable of being seen from a distance of five hundred feet (500 ft.).

§14.3.30.    DRIVING WHILE IMPAIRED

No one shall operate or be in control of a pedicab while the person's alcohol concentration is eight hundredths of a gram (0.08 g.) or more either per one hundred milliliters (100 ml.) of blood or per two hundred and ten liters (210 L.) of breath or is one tenth of a gram (0.10 g.) or more per one hundred milliliters (100 ml) of urine, or while under the influence of intoxicating liquor or any drug or any combination thereof, or while the ability to operate a vehicle is impaired by the consumption of intoxicating liquor.

J.A. 373

**§ 14.4.   SAFETY EQUIPMENT**

§14.4.10.   SAFETY REQUIREMENTS

Each pedicab shall meet the following safety requirements:

(a)   WIDTH.  The maximum width of the pedicab shall be fifty-five inches (55 in.);

(b)   LENGTH.  The maximum length of the pedicab shall be ten feet (10 ft.);

(c)   EQUIPMENT.  The pedicab shall be equipped with:

   1.   *Seatbelts.*  Passenger seat belts for no more than three (3) passengers (either one (1) seat belt for each passenger or one (1) seat belt that covers all passengers);

   2.   *Brakes.*  Hydraulic or mechanical disc or drum brakes, which shall be unaffected by rain or wet conditions;

   3.   *Head Lamps.*  At least one (1) and no more than two (2) battery-operated head lamps capable of projecting a beam of white light for a distance of three hundred feet (300 ft.) in front of the pedicab, under normal atmospheric conditions at the times that use of the head lamp is required;

   4.   *Tail Lamps.*  Battery-operated tail lamps mounted on the rear of the pedicab, which, when operated, shall emit a red beam of light visible from a distance of five hundred feet (500 ft.) to the rear, under normal atmospheric conditions at the times that use of the head lamp is required;

   5.   *Turning Lights.*  Turn lights;

   6.   *Audible Signal.*  A bell or other device capable of giving a signal audible for a distance of at least one hundred feet (100 ft.); and,

   7.   *Reflectors*.  Reflectors on the spokes of the wheels of the pedicab.

(d)   REFLEXIVE TAPE.  Reflective tape that meets the following requirements shall be affixed on the side and back of the pedicab:

   1.   The tape shall be at least two inches (2 in.) wide;

   2.   The tape shall be at least twelve inches (12 in.) long; and

   3.   There shall be at least two (2) pieces of tape on each side and on the back of the pedicab.

J.A. 374

CHAPTER 15
# LOW-SPEED VEHICLES

**§ 15.1.    GENERAL PROVISIONS**

§15.1.10.      APPLICATION

This chapter shall apply to any low-speed vehicle that is parked or being operated on Capitol Grounds.

§15.1.20.      LOW-SPEED VEHICLE DEFINED

Low-speed vehicles consist of, but are not limited to, the following:

(a)    MOTORIZED BICYCLE:  Any motor vehicle having either a tandem arrangement of two wheels equipped with tires which are sixteen inches (16 in.) or more in diameter or a tricyclic arrangement of three (3) wheels equipped with tires which are sixteen inches (16 in.) or more in diameter, having a seat or saddle for the use of the operator, having an automatic transmission, and having a motor or engine which produces not more than one and one-half (1.5) brake horsepower (S.A.E. rating), has a piston displacement of not more than fifty cubic centimeters (50 cc), and is capable of moving the vehicle at a maximum speed of not more than thirty-five miles per hour (35 mph) on level ground when propelled exclusively by such motor or engine.

(b)    MOPED:  A motorcycle or motorized bicycle equipped with functional pedals.

(c)    MOTOR-DRIVEN CYCLE:  Any motorcycle having a motor or engine which produces five (5.0) brake horsepower (S.A.E. rating) or less.

(d)    PERSONAL MOBILITY DEVICE: A motorized propulsion device, designed to transport only one person or a self-balancing, two non-tandem wheeled device, designed to transport only one person with an electric propulsion system, but excluding a battery-operated wheelchair or any "power driven mobility device."[41]

(e)    SEGWAY:  A Personal Mobility Device.

(f)    SIMILAR MOTORIZED DEVICES.  Any other vehicle similar to those listed above that does not otherwise fall within Chapter 13 or Chapter 14.[42]

§15.1.40      TAMPERING PROHIBITED

No person shall tamper with any low-speed vehicle that has been locked, placed in a bicycle rack or otherwise secured.

---

[41] As defined by 28 C.F.R. § 35.104 (2011).

[42] Chapter 13 ("Bicycles"); Chapter 14 ("Pedicabs").

J.A. 375

## § 15.2.    GENERAL SAFETY REQUIREMENTS

§15.2.10.    REASONABLE AND PRUDENT SPEED

No rider shall ride a low-speed vehicle at a speed in excess of any posted limited or at a speed which is greater than is reasonable and prudent under conditions then existing.

§15.2.20.    SAFE OPERATION

A person shall operate a low-speed vehicle in a safe and non-hazardous manner so as not to endanger himself or herself or any other person.

§13.2.30.    OBEDIENCE TO TRAFFIC CONTROL DEVICES

No person shall operate a low-speed vehicle except in obedience to the instructions of official traffic control signals, signs, and other control devices applicable to vehicles, unless otherwise directed by a police officer or other person authorized to control and direct traffic.

§15.2.40.    DUTIES OF LOW-SPEED VEHICLE OPERATORS

Every person who propels a low-speed vehicle on highway shall have the same duties as any other vehicle operator under these regulations, except as otherwise expressly provided in this chapter, and except for those duties imposed by these regulations which, by their nature or wording, can have no reasonable application to an operator of a low-speed vehicle.

## § 15.3.    SEGWAYS

§15.3.10.    REGISTRATION

No Segway shall be operated on Capitol Grounds unless it has been validly registered in the District or other jurisdiction and bears readily visible evidence of being registered.[43]

§15.3.20.    AGE

No person shall operate a Segway if they are under sixteen (16) years of age.

§15.3.30.    MAXIMUM SPEED LIMIT

Notwithstanding the limitations set forth in §15.3.10, no person shall operate a Segway at a speed in excess of ten (10) miles per hour.

§15.3.40.    PACKAGES

No person shall operate a Segway if they are carrying a package, bundle or other article that hinders the person from keeping both hands on the handlebars.

§15.3.50.    HEADPHONES

No person shall operate a Segway on Capitol Grounds while the person is wearing a headset, headphone or earphone, unless the device is being uses to improve the hearing of a person with a hearing impairment or covers or is inserted in one ear only.

---

[43] Operator permits are not required for Segways.  *See* 18 DCMR § 1200.4

§15.3.70.    RIDING ON SIDEWALKS
There shall be no prohibition against any person riding a Segway on a sidewalk, so long as the rider does not create a hazard.

§15.3.80.    YIELD TO PEDESTRIANS ON SIDEWALK
Any person riding a Segway upon a sidewalk shall yield the right-of-way to pedestrians and shall travel at a speed no greater than the posted speed limit of the adjacent roadway provided that such speed is safe for the conditions then existing on the sidewalk.

§15.3.90.    YIELD TO PEDESTRIANS IN CROSSWALK
A person operating Segway while crossing a roadway in a crosswalk shall have all the rights and duties applicable to a pedestrian under the same circumstances, except that the Segway operator must yield to pedestrians on the sidewalk or crosswalk.

§15.3.100.    EMERGING AND ENTERING
The operator of a Segway emerging from or entering an alley, driveway, or building shall yield the right-of-way to all pedestrians upon approach to the sidewalk or the sidewalk area extending across any alleyway.  Upon entering the roadway, the Segway operator shall yield the right-of-way to all vehicles approaching on said roadway to the extent necessary to safely enter the flow of traffic.

## § 15.4.    MOTORIZED BICYCLES

§15.4.10.    MINIMUM AGE
No motorized bicycle shall be operated upon any public space on Capitol Grounds by any person who is less than sixteen (16) years old.

§15.4.20.    SIDEWALKS
No person shall operate a motorized bicycle on any sidewalk, path or bicycle route on Capitol Grounds.

§15.4.30.    ROADWAY
A motorized bicycle may be operated on any part of a roadway designated for the use of bicycles.

§15.4.40.    SEAT REQUIRED
No person shall operate or ride a motorized bicycle other than upon or astride a regular seat attached to the motorized bicycle.

§15.4.50.    EXTRA RIDERS
No person shall operate or ride a motorized bicycle with more persons on it at any one time than the motorized bicycle is equipped to carry.

§15.4.60.    CARRYING ARTICLES
No person shall operate or ride a motorized bicycle while carrying any package, bundle, or article which prevents the operator from keeping at least one hand on the handle bars.

§15.4.70.  WARNING DEVICE
No person operating a motorized bicycle shall sound any warning device at any intersection so as to interfere with the obedience to the instructions of official traffic control signals or to the directions of a police officer.

§15.4.80.  NO CLINGING
No person riding upon a motorized bicycle shall attach himself, herself or the device upon which he or she is riding, to another bicycle, low-speed vehicle or play vehicle or any other vehicle.

§15.4.90.  RIDING ABREAST
Persons riding upon a roadway shall not ride more than two abreast except on paths or part of roadways set aside for the exclusive use of bicycles.  Persons riding two abreast shall not impede the normal and reasonable movement of traffic and, on a lane roadway, shall ride within a single lane.

§15.4.100.  YIELD TO PEDESTRIANS IN CROSSWALK
A person operating a motorized bicycle while crossing a roadway in a crosswalk shall have all the rights and duties applicable to a pedestrian under the same circumstances, except that they must yield to pedestrians on the sidewalk or crosswalk.

§15.4.120.  EMERGING AND ENTERING
The operator of a motorized bicycle emerging from or entering an alley, driveway, or building shall yield the right-of-way to all pedestrians upon approach to the sidewalk or the sidewalk area extending across any alleyway.  Upon entering the roadway, the operator shall yield the right-of-way to all vehicles approaching on said roadway to the extent necessary to safely enter the flow of traffic.

§15.4.130.  OVERTAKING AND PASSING
(a)  A person operating a motorized bicycle may overtake and pass another vehicle only under conditions which permit the movement to be made with safety.

(b)  A person operating a motorized bicycle may overtake and pass other vehicles on the left or right side, staying in the same lane as the overtaken vehicle, or changing to a different lane, or riding off the roadway, as necessary to pass with safety.

(c)  If a lane is partially occupied by vehicles that are stopped, standing, or parked in that lane, a person operating a motorized bicycle may ride in that or in the next adjacent lane used by vehicles proceeding in the same direction.

J.A. 378

**§ 15.5.   ALL-TERRAIN VEHICLES AND DIRTBIKES**

§15.5.10.   PROHIBITED
No person shall operate an all-terrain vehicle or dirt bike on Capitol Grounds at any time.

§15.5.20.   PENALTIES
Any individual violating this section shall upon conviction be fined not more than $1,000 or imprisoned not more than 30 days, or both.[44]

**§ 15.6   PARKING AND SECURING LOW-SPEED VEHICLE ON PUBLIC SPACE**

§15.6.10.   BUILDINGS AND IMPROVED AREAS
No person shall park a low-speed vehicle:

(a)   Upon a highway other than the roadway against the curb; or

(b)   Upon a sidewalk, against a building or any other fixture or improved area not specifically designated by these regulations.

---

[44] This offense is prosecuted in the Superior Court of the District of Columbia.

J.A. 380

CHAPTER 16
# RECREATIONAL ACTIVITIES AND SPECIAL RESTRICTIONS WITHIN CAPITOL GROUNDS

**§ 16.1.   LEGAL DEFINITION OF CAPITOL GROUNDS**
The boundaries of Capitol Grounds are set forth in 40 USC § 5102.[45]

**§ 16.2.   PUBLIC USE AND RECREATION**

§16.2.10.   RESTRICTION ON PUBLIC USE
Public travel in and occupancy of Capitol Grounds is restricted to the roads, walks and places specifically prepared for that purpose.[46]

§16.2.20.   PROPERTY DAMAGE
No person shall use any portion of the Capitol Grounds as a playground or in any manner that may potentially cause destruction or injury to persons or property.[47]

§16.2.30.   CLIMBING AND SWINGING
Climbing, jumping, hanging or swinging onto or into any landscape or architectural feature on Capitol Grounds is prohibited.[48]

§16.2.40.   STANDING ON SKYLIGHTS AND ENTRY INTO WORK AREAS
Standing on or entrance onto any skylight, air grate, generator, light pole, elevator tower or any other such object or area is prohibited.[49]

§16.2.50.   SWIMMING AND ENTRY INTO POOLS
No person shall swim, wade or enter into any fountain, pool, or other body of water on Capitol Grounds.

---

[45] *See* Appendix I.

[46] *See also* 40 U.S.C. § 5103.  Restrictions on public use of Unites States Capitol Grounds:
"Public travel in, and occupancy of, the Unites States Capitol Grounds is restricted to the roads, walks, and places prepared for that purpose."  *See* Appendix F.

[47] *See also* 2 U.S.C. § 1963:
"It shall be the duty of the Capitol police on and after April 29, 1876, to prevent any portion of the Capitol Grounds and terraces from being used as playgrounds or otherwise, so far as may be necessary to protect the public property, turf and grass from destruction or injury."

[48] *See also* 2 USC § 5104(d):
"A person may not step in or climb on, remove, or in any way injure any statute, seat, wall, fountain, or other erection or architectural feature, or any tree, shrub, plant or turf in the Grounds." *See* Appendix F.

[49] As added by Board Order 08.03 "Concerning the Reopening of the East Front and Amendments to the Traffic and Motor Vehicle Regulations for the United States Capitol Grounds." November 21, 2008.

J.A. 381

§16.2.60.  SKATING AND PLAY VEHICLES
No person shall skate-board, roller-skate, roller-blade or ice-skate on Capitol Grounds.  The use of scooters, kiddie cars, tricycles, wagons or any similar device is prohibited on Capitol Grounds.

§16.2.70.  GAME-PLAYING
No person shall kick, toss, throw or strike any ball, disc or object of any material, shape or size onto or into any area within Capitol Grounds.

§16.2.80.  KITE-FLYING
Kite-flying is prohibited on Capitol Grounds.

§16.2.90.  MODEL ROCKETS AND BOATS
The use of model rockets, remote or manually-controlled model gliders, model airplanes or unmanned aircrafts, model boats and model cars is prohibited on Capitol Grounds.

## §16.3.  CROWD CONTROL

§16.3.10.  ESTABLISHING A POLICE LINE
When fires, accidents, wrecks, explosions, parades or other occasion causes or may cause persons to collect on any street, roadway, pathway on Capitol Grounds, the Board may establish an area or zone necessary for the purpose of affording clearing for the following:

(a)  Operation of fireman or policeman,

(b)  The passage of a parade,

(c)  The movement of traffic,

(d)  The exclusion of the public from the vicinity of a riot, disorderly gathering, accident, wreck, explosion or other emergency; and

(e)  The protection of persons and property.

§16.3.20.  OBEY AN ORDER
Each person present at the scene of an emergency occasion shall comply with any necessary order or instruction of any police officer.

§16.3.30.  UNAUTHORIZED ENTRY
No person shall enter the emergency area or zone unless duly authorized by the person in command of the emergency occasion.

§16.3.40.  BLOCKING AND OBSTRUCTING ROADWAYS
It is forbidden to occupy the roads on Capitol Grounds in a manner that obstructs or hinders their proper use.[50]

---

[50] *See also* 40 U.S.C. § 5104(b) ("Obstruction of Roads").  *See* Appendix F.

**§ 16.4.**   <u>SLEEPING OR LYING DOWN</u>

§16.4.10.   <u>PAVED OR IMPROVED AREAS</u>
No person shall sleep or lie down on the paved or improved portions of Capitol Buildings and Grounds (such as streets, roads, sidewalks, walkways, steps, curbs, gutters, doorways, alcoves, walls or benches) at any time.

§16.4.20.   <u>UNPAVED AND GRASSY AREAS</u>
No person shall sleep or lie down on any unpaved or unimproved grassy portion of the Grounds from one-half (1/2) hour after sunset to one-half (1/2) hour before sunrise.

**§ 16.5.**   <u>WINTER ACTIVITIES</u>

§16.5.10.   <u>SNOWMOBILING</u>
Except in the case of a street closed by the Capitol Police Board to motor vehicular traffic due to conditions of ice or snow, no person shall drive or ride on a snowmobile on any such area within Capitol Grounds.

§16.5.20.   <u>SLEDDING</u>
No person shall coast or slide a sled within Capitol Grounds.

§16.5.30.   <u>SKIING</u>
With the exception of the use of cross-country skis or snowshoes as a means for transportation, no person shall ski on any area within Capitol Grounds.

J.A. 383

**§16.6.**    <u>CAMPING</u>

§16.6.10.    CAMPING DEFINED
Any activity such as sleeping, making preparations to sleep, cooking or the making of any fire, digging, earth-breaking or any other activity that reasonably appears, in light of all circumstances, that the participants are using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging, including demonstration activity. [51]

§16.6.20.    CAMPING PROHIBITED
No person shall use or occupy any part of Capitol Grounds for camping or for living accommodations.

§16.6.30.    STORAGE OF PERSONAL BELONGINGS
No person shall set up, place or store any type of tent, sleeping bag, bedroll, bedding, equipment or shelter of any kind at any time for any purpose on Capitol Grounds.

**§ 16.7.**    DRIVING INTO RESTRICTED AREAS

§16.7.10.    SIDEWALK AND NON-ROADWAY AREAS
The driver of a vehicle shall not drive within or across any sidewalk area, except at a permanent or temporary driveway.  No vehicle shall be operated on or across any part of the Capitol Grounds not prepared and designated for vehicular traffic.

§16.7.20.    EAST FRONT PLAZA
The center section of the East Front Plaza shall be a non-roadway restricted to emergency or authorized official government vehicles. [52]

---

[51] *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984). *See* Appendix H for all related case law.

[52] As added by Board Order 08.05 "Amendments to the Traffic and Motor Vehicle Regulations for the East Front Plaza of the United States Capitol Grounds" (December 5th 2008).

**§ 16.8.**   ANIMALS WITHIN CAPITOL GROUNDS

§16.8.10.   NON-DOMESTICATED ANIMALS
No person shall drive, lead, herd, ride, release or conduct any sheep, swine, cattle, horse, mule, goat, elephant, duck, goose, fowl or any other non-domesticated animal on Capitol Grounds.  This section does not apply to authorized law enforcement or military horses or during an official function of the U.S. Congress.

§16.8.20.   LEASH LAW
No person shall bring a domesticated animal onto Capitol Grounds unless the animal is firmly secured by a leash not exceeding four (4) feet in length.

**§ 16.9.**   METAL DETECTORS

With the exception of equipment officially authorized by the Board, no person may use or possess a mineral or metal detector, magnetometer or other metal detecting device on Capitol Grounds.

**§ 16.10.**   OPEN FLAMES, GAS GENERATORS AND OTHER INCENDIARY DEVICES

§16.10.10.   OPEN FLAMES
Unless exempted by the Board, no person shall use or display any open flame; all candles, torches, lanterns, lamps or other similar items are prohibited.

§16.10.20.   INCENDIARY DEVICE
With the exception of household lighters and ordinary matches, no item, substance or material capable of igniting another material is permitted on Capitol Grounds.[53]

§16.10.30.   GAS GENERATORS
Gas generators are only permitted in areas as specified by the Board; all generators must be fueled and refueled off of Capitol Grounds.

---

[53] *See* Appendix J for the *Police Board Regulations Pertaining to Firearms, Explosives, Incendiary Devices and Other Dangerous Weapons* (October 31, 1967); 40 U.S.C. § 5104(e).

## § 16.11.   RESTRICTED VEHICLES

§16.11.10.   COMMERCIAL AND AGRICULTURAL VEHICLES

No person shall operate any commercial, recreational, agricultural, construction vehicle or truck on any street, highway, or driveway within Capitol Grounds, except while actually transacting business at the Capitol Buildings, provided that the vehicle is essential to the transaction.  That transaction must involve an administrative, housekeeping or support function or duty necessary to the maintenance of the Capitol Buildings or an official function of the United States Congress.  All such vehicles must be security screened through the United States Capitol Police Off-Site Delivery Center, or such other screening security as determined by the Board.[54]

§16.11.20.   ANIMAL-DRAWN VEHICLES

No person shall operate any animal-drawn vehicle on any street, highway, or driveway in the area bounded by First Street on the west, Constitution Avenue on the north, Independence Avenue on the south, and First Street on the east.

## § 16.12.   SALE OF GOODS, COMMERCIAL ACTIVITY AND SOLICITATION

§16.12.10.   CONVEYANCE OF GOODS AND MERCHANDISE

It is unlawful to use any road on Capitol Grounds to convey goods or merchandise except as officially authorized..[55]

§16.12.20.   VENDING

No person shall offer or expose any article for sale unless officially authorized to do so. [56]

§16.12.30.   COMMERCIAL ADVERTISING

No person shall display, place or maintain a sign, placard, or other form of advertisement unless officially authorized to do so. [57]

§16.12.40.   SOLICITATION

No person shall solicit fares, alms, subscriptions, or contributions unless officially authorized to do so.[58]

---

[54] As added and amended by the Board pursuant to "Amendment to the Traffic and Motor Vehicle Regulations for United States Capitol Grounds" (February 8, 2002).

[55] *See also* 40 U.S.C. § 5104(b) ("Obstruction of Roads").  *See* Appendix F.

[56] *See also* 40 U.S.C. § 5104(c) ("Sale of Articles, Display of Signs and Solicitations").  *See* Appendix F.

[57] *Id.*

[58] *Id.*

### § 16.13.   TRIPODS AND PHOTOGRAPHY EQUIPMENT

The use of tripods or other film or photography enhancement equipment is limited to grassy areas where pedestrian or vehicular traffic will not be impeded.  Tripods may not be used for commercial photography unless officially authorized by the Board.[59] Any tripod that does not conform to this regulation is subject to removal or relocation to another area on Capitol Grounds.

### § 16.14.   TEMPORARY CLOSING OR CORDONING OFF OF CAPITOL GROUNDS

The Board is authorized to issue an order temporarily closing or cordoning off any area or any part of Capitol Grounds at any time if a determination is made that doing so is necessary for the safety, convenience or protection of pedestrian, vehicular or any other type of traffic on Capitol Grounds.

### § 16.15.   CLOSED OR CORDONED OFF AREAS ON CAPITOL GROUNDS

No unauthorized person shall enter any closed or cordoned off areas on Capitol Grounds.

### § 16.16.   PROHIBITED ITEMS ON CAPITOL GROUNDS.

**§ 16.16.10** Pursuant to 40 U.S.C. Section 5104(e)(1), firearms, dangerous weapons, explosives, or incendiary devices are prohibited on Capitol Grounds.

**§16.16.20** At the direction of the Chief of Police, the United States Capitol Police may search packages, backpacks, and other containers in the immediate possession of individuals who enter and are within the United States Capitol Grounds for the purpose of detecting prohibited items.

---

[59] Currently the Board issues permits on a case-by-case basis for commercial filming on Union Square.  Legislation is pending at the time of printing.

J.A. 387

Chapter 17

# Union Square

**§ 17.1**    **General Prohibition of Commercial Activity**
All activity on Capitol Grounds is regulated by and subject to all Capitol Police Board regulations.  However, certain commercial activity described below is allowed at the parcel of land known as Union Square to the extent that it was allowable on or before December 23, 2011. (P.L. 113-76.)

All other commercial activity that is generally prohibited on Capitol Grounds, and not specifically allowed pursuant to this Chapter, remains prohibited within Union Square.

**§ 17.2**    **Union Square**
Union Square is described as the property which is bounded on the north by Pennsylvania Avenue Northwest, on the east by First Street Northwest and First Street Southwest, on the south by Maryland Avenue Southwest, and on the west by Third Street Southwest and Third Street Northwest.  This comprises the area transferred to the Architect of the Capitol under Section 1202 of the Legislative Branch Appropriations Act, 2012.

**§ 17.3**    **Authority of the United States Capitol Police Board**
Pursuant to Public Law 113-76, the Capitol Police Board may promulgate regulations (in consultation with the Committee on House Administration and the Committee on Rules and Administration of the Senate) regarding the use of Union Square pursuant to the Capitol Police Board's authority under Section 14 of the Act of July 31, 1946 (2 U.S.C. § 1969).

**§ 17.4**    **Commercial Activity**

§ 17.4.1    Definition – The only commercial Activities permitted on Union Square are  the taking of photographs, filming, and sales of articles and printed material (only books, newspapers, leaflets, pamphlets, buttons and bumper stickers) associated with the permitted activity. The sale of food, food items, or other perishable items shall not be permitted.

§ 17.4.2    Definition – "Person", as used in these regulations, includes any individual, company, or other entity, whether public or private, for profit or not for profit.

**§ 17.5**    **Permits**

Prior to engaging in commercial activity within Union Square a person shall obtain a permit from the United States Capitol Police.  In order to request a permit, an application shall be filed with the United States Capitol Police Special Events

J.A. 388

Section, and may be subject to a security assessment by the Chief of the United States Capitol Police ("Chief") or designee.

All applications for commercial activity permits must be submitted in writing to the United States Capitol Police Special Events Section at least ten (10) business days in advance of the proposed commercial activity.

Should the Chief fail to act on a properly completed and timely filed application within forty-eight (48) hours prior to the date of the proposed commercial activity, such application shall be deemed denied.

No permit, other than still photography permits, shall be issued for more than 7 consecutive days nor may permits be issued for consecutive 7 day periods to the same applicant.

No permitted activity shall be for more than 23 consecutive hours unless good cause is shown on the permit application and a waiver is granted by the Capitol Police Board.

§ 17.6    **Prohibited Items and Activities**
The following items/activities are prohibited within Union Square:

    a.  Firearms
    b.  Replica firearms
    c.  Knives
    d.  Mace or pepper spray
    e.  Ammunition
    f.  Explosives and fireworks
    g.  Open flame
    h.  Alcohol
    i.  Commercial Advertisement not associated with permitted activity
    j.  Sale of food and beverages
    k.  Climbing, jumping, hanging, or swinging onto or into any landscaping or architectural feature
    l.  Swimming, wading, or entering the Reflecting Pool
    m.  The use of model rockets, remote or manually-controlled model gliders, model airplanes or unmanned aircrafts, model boats, and model cars

§ 17.7    **Security Assessments**
    § 17.7.1 Security Assessment – The Chief or designee may require a security assessment of any activity or items included in a permit application.

J.A. 389

§ 17.7.2   <u>Inspections</u> All items and vehicles transporting items to be used at Union Square shall be subject to inspection at a time and place determined by the United States Capitol Police.

**§ 17.8   <u>Permit Fees</u>**

§ 17.8.1   <u>Permit Fees</u> - The terms and conditions of a permit issued by the Chief will require the person to whom the permit is issued to pay a fee to cover any costs incurred by the Architect of the Capitol as a result of the issuance of the permit.  The United States Capitol Police shall collect the fee on behalf of the Architect of the Capitol upon the issuance of a permit in such a manner as determined by the United States Capitol Police in consultation with the Architect of the Capitol.

§ 17.8.2   <u>Approval of the Fee Structure</u> – The Capitol Police Board shall approve the fee structure for permits.

§ 17.8.3   <u>Review of the Fee Structure</u> – The Capitol Police Board shall review the permit fee structure annually.  Any proposed changes to the fee structure shall be approved in writing by the Capitol Police Board.

§ 17.8.4   <u>Capitol Trust Account</u> – Any permit fee that is collected by the United States Capitol Police on behalf of the Architect of the Capitol shall be transferred to the "Capitol Trust Account" established in the Treasury of the United States.

§ 17.8.5   <u>Use of Funds</u> – Amounts in the Capitol Trust Account shall be available without fiscal year limitation for such maintenance, improvements, and projects with respect to Union Square as the Architect of the Capitol considers appropriate, subject to the approval of the Committees on Appropriations of the United States House of Representatives and Senate.

§ 17.8.6   <u>Publication of Fees</u> – The Chief, upon the approval of the Capitol Police Board, may amend the fees on 30 days published notice.  Any permit issued prior to such notice shall not be subject to the amended fees.

**§ 17.9   <u>Fee Schedule and Other Requirements</u>**

§ 17.9.1   <u>Still Photography Fees</u> – The following shall be the per day fee for an application to photograph at Union Square and the Grant Statue consistent with the fees that had previously been collected by the National Park Service:

| | |
|---|---|
| 1-10 people photographed | $50 per day |
| 11-30 people photographed: | $150 per day |
| Over 30 people photographed: | $250 per day |

J.A. 390

Still photography permits shall only be valid for 30 days from the date of issuance.  No bond shall be required when the activity relates solely to still photography at the Grant Statute.

§ 17.9.1.1 <u>Still Photography Fees: School Photography Companies</u>– The following shall be the annual fee for a permit to take still photographs at Union Square and the Grant Memorial for companies whose principal commercial work is to photograph school groups: $10,000 annual fee which permits 200 days per calendar year of photography. Each company shall pay a pro rata share of the fee monthly and submit at that time the days on which they wish to take photographs.  Any company that exceeds 200 days photographing at Union Square and/or the Grant Memorial shall be charged the current daily fees set forth in § 17.9.1 above. No bond shall be required when the activity relates to still photography by companies whose principal commercial work is to photograph school groups at Union Square and the Grant Memorial.

§ 17.9.2    <u>Filming Fees</u> – The following shall be the per day fee for an application to film at Union Square and the Grant Statue consistent with the fees that had previously been collected by the National Park Service:

| | |
|---|---|
| 1-10 people on set: | $150 per day |
| 11-30 people on set: | $250 per day |
| 31-49 people  on set: | $500 per day |
| Over 50 people on set: | $750 per day |

§ 17.9.3    <u>Bond</u> – At the discretion of the Chief, in consultation with the Architect of the Capitol, a bond may be required as a condition of a permit issued for commercial use of Union Square except as stated herein.  Such bond shall be based on the cost estimate by the Architect of the Capitol.  Such estimate shall be based on current estimates of labor and overtime rates plus materials needed to support the permitted activity and to restore the property to its condition prior to the permitted activity.

§ 17.9.4    <u>Insurance</u> – The Chief of the United States Capitol Police in consultation with the Architect of the Capitol may require proof of liability insurance (naming the United States as an additional insured) as a condition of a permit being issued for the commercial use of Union Square.

**§ 17.10     Denial of Permit Application**

§ 17.10.1    <u>Denial of Permit Application</u> – A permit application may be denied after a security assessment if it is determined that the commercial activity or any items associated with the activity pose a risk to the safety and security of the United States Capitol complex, Members of Congress, staff, or visitors; or if it is determined that the requested activity would create an unreasonable risk of damage to Capitol Grounds which could not be repaired or adequately covered by a bond; or if Union Square is

otherwise unavailable on the date(s)/time(s) requested.  A permit may also be denied if the permit application does not contain sufficient information for a determination to be made as to whether a permit should be issued or if the required fees are not submitted in full with the permit application.

The Chief or designee shall notify the permit applicant, in writing (where time allows), of the reason for the denial of the permit application. (Email communication may also be used.)

§ 17.10.2   <u>Resubmission</u> – A permit applicant may resubmit a commercial activity  application that has been denied if the application has been cured of all identified deficiencies and all security/safety or architectural concerns have been resolved.

§ 17.10.3   <u>Appeal</u> – A permit applicant may submit a written appeal of the denial of a permit (including permits denied through inaction under §14.5) to the Capitol Police Board within 10 days of receipt of the denial of the permit application or within 10 days of the denial of a permit by inaction.  The appeal must include a copy of the written denial (if there is one), state the reasons why the permit should be issued, and include any additional factors that the applicant would like the Capitol Police Board to consider.  The Capitol Police Board shall issue a written decision (email may also be used) on the appeal within 10 business days after the appeal is received.  All decisions of the Capitol Police Board are final.  However, an applicant whose appeal has been denied may resubmit a permit application curing all deficiencies contained in the original application or curing all issues/concerns identified in the security assessment.

J.A. 392

# EXHIBIT F



UNITED STATES CAPITOL GROUNDS
DEMONSTRATION AREAS MAP

NOVEMBER 2012

J.A. 394

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **REVEREND PATRICK J. MAHONEY,** | |
| *Plaintiff,* | **Civil Action No. 21-2314 (JEB)** |
| **v.** | |
| **KAREN H. GIBSON, in her Official Capacity as U.S. Senate Sergeant at Arms and Doorkeeper and Chair, United States Capitol Police Board; WILLIAM P. MCFARLAND, in his Official Capacity as U.S. House of Representatives Sergeant at Arms and Member, United States Capitol Police Board; CHERE REXROAT, in her Official Capacity as Acting Architect of the Capitol and Member, United States Capitol Police Board; and J. THOMAS MANGER, in his Official Capacity as Chief of Police, United States Capitol Police and Ex-Officio Member, United States Capitol Police Board,** | **STIPULATIONS OF FACT** |
| *Defendants.* | |

Plaintiff and Defendants hereby acknowledge stipulate to the following set of facts and documents to govern the Court's adjudication of Plaintiff's claim that the Traffic Regulations' "no-demonstration zone" around the Capitol building is unconstitutional:

### THE UNITED STATES CAPITOL GROUNDS

1.      The United States Capitol Grounds ("Capitol Grounds") are defined in 40 U.S.C. § 5102, and include, *inter alia,* from Union Station in the North to Virginia Avenue in the South, and from Second Street Northeast to Third Streets North- and Southwest, encompassing the Capitol building itself ("Capitol") as well as House and Senate office buildings, National Garden of the United States Botanic Garden, Library of Congress Buildings and Grounds, a power plant, press areas, and public open space and all additions added by law after June 25, 1946.

2.     Within the Capitol Grounds, and immediately surrounding the Capitol, there is a 58-acre park with grassy areas, trees, sidewalks, and several paved plazas. This park, which was designed by Frederick Law Olmstead in the 1870s, is part of, and commonly referred to, as Capitol Square, and is bounded by Constitution Avenue NW and NE to the north, First Street NE and SE to the east, Independence Avenue SW and SE to the south and First Street NW and SW to the South.

3.     The United States Capitol Police ("USCP") is exclusively authorized to police the Capitol Grounds and Buildings under the direction of the United States Capitol Police Board ("Board") per 2 U.S.C. § 1967, and to protect Members of Congress and officers of Congress, in any area in the United States, per 2 U.S.C. § 1966. The USCP is headed by the Chief of Police.

4.      The Board consists of Members (Senate Sergeant at Arms and Doorkeeper, House Sergeant at Arms, Architect of the Capitol) and an Ex-Officio Member (Chief of Police). These individuals are Defendants in this matter in their official capacities.

5.     The Board has "exclusive charge and control of the regulation and movement of all vehicular and other traffic" on the Capitol Grounds. 2 U.S.C. § 1969(a). Pursuant to that authority, the Board has installed barricades preventing automobiles from entering Capitol Square except through designated entry points.

6.     Pedestrians have regular access to Capitol Square, unless the area is restricted by imposing barriers to restrict foot traffic based on, but not limited to, security concerns, turf restoration, and special events. As a result, members of the public—whether alone or in groups— use the area extensively, commuting to work, sightseeing, posing for pictures, exercising, and walking dogs.

**THE EAST FRONT PLAZA**

7.      The area to the east of the Capitol is commonly referred to as the East Front Plaza. The East Front Plaza contains two grassy areas near the Capitol, an area covered in pavers, two reflecting skylights, and raised sidewalks that traverse almost the entirety of the eastern side of Capitol.

8.      The United States Capitol Visitor Center ("Visitor Center") is located beneath the East Front Plaza. Tourists generally enter the Capitol through the Visitor Center.

9.      The eastern side of the Capitol has three sets of steps leading from the East Front Plaza into the building. The Eastern Senate steps lead to the Senate at the northeast side of the building, the Eastern Capitol steps lead into the due-east side of the building, and the Eastern House steps lead to the House of Representatives at the southeast side of the building.

10.     The photograph attached as Exhibit 1[1] is an accurate overhead view of the Capitol, the Eastern Senate steps, the Eastern Capitol steps, the Eastern House steps (collectively, "Eastern Steps"), and the East Front Plaza. The photograph attached as Exhibit 2 is an accurate view of this same area from the northeast.

11.     The Visitor Center was built in 2008, but the construction of the Visitor Center did not materially alter the Eastern Steps or the areas immediately surrounding them. Instead, for all relevant purposes, those areas look today just as they did prior to 2000. The image attached as Exhibit 3 is an accurate overhead view of the Capitol, the Eastern Steps, and the East Front Plaza on or about March 31, 1999.

---

[1] The Exhibits hereto are submitted by Plaintiff, and the use of the Exhibits in this matter is not objected to by Defendants.

## THE EASTERN STEPS AND SURROUNDING AREAS

### The Eastern Senate Steps and Surrounding Sidewalks

12.     The granite base of the Eastern Senate steps is three-sided, with the granite steps facing North, East, and South. The base is 99 feet and 1 inch (East facing) by 37 feet and 7 inches (North and South facing), with 6 ¼ inch ascending steps approximately every 1.33 feet or 16 inches. The eighth step is a small landing. The tenth step above this landing is also a small landing.

13.     There is a 51 feet and 7 inches long divider (metal posts with a chain) between the large stone blocks preventing passage on and above the second landing. Above the barricade, there are 27 steps to the landing where the entrance to the Senate Chamber is located.

14.     A 118 feet and 3 inches (East facing) by 24 feet and 2 inches (North and South facing) sidewalk at the base of the Eastern Senate steps borders the steps on all three sides.

15.     The photographs attached as Exhibits 4–6 accurately depict the Eastern Senate steps and surrounding sidewalks.

### The Eastern Capitol Steps and Surrounding Areas

16.     The granite base of the Eastern Capitol steps is three-sided, with the granite steps facing North, East, and South. The base is 65 feet and 7 inches (East facing) by 12 feet and 2 inches (North and South facing), with 7 inch ascending steps approximately every 1.3 feet or 15 ½ inches. The seventh step has a small landing. At the landing, there are no more steps facing North and South—only East—and the steps become bordered on the North and South by large stone blocks.

17.     There is a 51 feet and 10 inches foot-long divider (metal posts with a chain) between the large stone blocks preventing passage on and above the landing. Above the barricade, there are approximately 28 steps to the landing where the entrance to the Capitol Building is located.

4

18.     The flat paved area at the base of the Eastern Capitol steps borders the steps on all three sides. From the base, it is approximately 50 feet and 3 inches to the sidewalks traversing North/South.

19.     The photographs attached as Exhibits 7–9 accurately depict the Eastern Capitol steps and surrounding area.

**The Eastern House Steps and Surrounding Sidewalks**

20.     The granite base of the Eastern House steps is three-sided, with the granite steps facing North, East, and South. The base is 99 feet and 1 inch (East facing) by 37 feet and 7 inches (North and Southfacing), with 6 ¼ inches ascending steps approximately every 1.33 feet or 16 inches. The eighth step is a small landing. The tenth step above this landing is also a small landing.

21.     There is a 51 feet and 6 inches foot-long divider (metal posts with a chain) between the large stone blocks preventing passage on and above the second landing. Above the barricade, there are approximately 28 steps to the landing where the entrance to the House Chamber is located.

22.     A 118 feet and 6 inches (East facing) by 24 feet and 3 inches (North and South facing) sidewalk at the base of the Eastern Senate steps borders the steps on all three sides.

23.     The photographs attached as Exhibits 10–12 accurately depict the Eastern House steps and surrounding sidewalks.

**THE TRAFFIC REGULATIONS**

24.     The Board promulgated the TRAFFIC REGULATIONS FOR THE UNITED STATES CAPITOL GROUNDS, as amended February 17, 2019 (the "Traffic Regulations"). A true and correct copy of the Traffic Regulations is attached hereto as Exhibit 13. Article III,

Chapter 12 of the Traffic Regulations regulates "Demonstrations and Special Events" on the Capitol Grounds. *Id.* § 12.

     25.    Under the Traffic Regulations, "[d]emonstration activity is allowed in designated areas as indicated on the 'United States Capitol Grounds Demonstration Area Map,' as amended." (the "Demonstration Area Map"). *Id.* § 12.2.10 and Appx. G. "Demonstration activity is defined as any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution." *Id.* § 12.1.10.

     26.    The Demonstration Area Map is as follows:



(*Id.* Appx. G.). The Demonstration Area Map is oriented with the east at the top.

     27.    Under the Demonstration Area Map, green designates "Demonstration Permit Area." *Id.* Demonstration activity is allowed in green areas for (a) individuals and groups of up to

thirty people without a permit and (b) groups of more than thirty people with a permit.[2] Areas in yellow are designated "Pedestrian Walkway – must not be impeded at any time." *Id.* Demonstration activity is allowed in yellow areas for individuals and groups up to thirty people without a permit, subject to the requirement that such activity may not impede the flow of pedestrian or other traffic, *i.e.*, there must be ingress and egress at all times. Areas in red are designated as "No Demonstration Permitted" areas. *Id.* No demonstration activity may occur in red areas, even if being undertaken by a single person.

28.     The sidewalk immediately to the east of the Eastern Senate steps is designated yellow. The Eastern Senate steps themselves and other sidewalks around them are designated red.

29.     Both the Eastern Capitol steps themselves and the paved areas immediately around them are designated red.

30.     The sidewalk immediately to the east of the Eastern House steps is designated yellow. The Eastern House steps themselves and the other sidewalks around them are designated red.

31.     The USCP is authorized to enforce the law of the District of Columbia on the Capitol Grounds. *See* 2 U.S.C. § 1967(a). District of Columbia Code § 22-1307 provides, among other things, that "[i]t is unlawful for a person, alone or in concert with others, to engage in a demonstration in an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a demonstration." D.C. Code § 22-1307(b)(1). For purposes of this provision, "demonstration means marching, congregating, standing, sitting, lying down, parading, demonstrating, or

---

[2] The current version of the Traffic Regulations provides that permits are required for groups of twenty people or more who are engaging in demonstration activity. Traffic Regulations § 12.4, *et seq.* On January 1, 2024, this number will raise to over thirty.

patrolling by one or more persons, with or without signs, for the purpose of persuading one or more individuals, or the public, or to protest some action, attitude, or belief." D.C. Code § 22-1307(b)(2).

## REV. MAHONEY'S PROPOSED DEMONSTRATION ACTIVITY[3]

32.     Rev. Mahoney is an ordained Presbyterian Minister. He is the Director of the Christian Defense Coalition, an unincorporated association based in Washington, D.C. The Christian Defense Coalition is a faith-based human-rights and social-justice organization that challenges Christians to live out their faith in the public square through Biblical expressions of love, mercy, and justice. Rev. Mahoney is not a Member of Congress and never has been, nor has any Member of Congress ever interceded on his behalf to allow him to conduct demonstration activity on the Eastern Steps.

33.     Rev. Mahoney is a peaceful man of God. He sincerely believes that Jesus Christ is Lord and Savior, that it is necessary for Christians to pray out loud and in the public square, that such prayer is a communal event, creating a body of believers in union with Christ, and that public prayer is necessary to remind Americans and their leaders, including members of Congress, that the solutions for America's challenges must involve God.

34.     Since the late 1980s, Rev. Mahoney has regularly engaged in demonstration activity on the Capitol Grounds, both alone and with groups of others, in the form of prayer vigils, protests, marches, rallies, and other forms of demonstration activity, including demonstration activity involving holding signs containing religious, political, or social ideas, views, or concerns. Rev. Mahoney engages in demonstration activity in one form or another on the Capitol Grounds no less

---

[3] In this section of stipulations, Rev. Mahoney characterizes himself, his association, his proposed activities, *etc.* Defendants take no position on—but do not dispute—these characterizations.

than twice a month. Prior to September 11, 2001, Rev. Mahoney engaged in permitted demonstration and prayer activity on the Eastern Senate, Capitol, and House steps and areas immediately surrounding them.

35.   Rev. Mahoney desires to engage in demonstration activity—in the form of events that will involve praying, gathering, assembly, and protest involving holding signs that contain religious, political, or social ideas, views, or concerns on them that are protected by the First Amendment to the United States Constitution—with his wife and a small group of other people (2-4 others) on the Eastern Steps (below the dividers) and the areas at the base of the steps immediately around them. For ease of reference, Rev. Mahoney's proposed demonstration activity will be referred to as the "Proposed Demonstration Activity."

36.   At the Proposed Demonstration Activity, Rev. Mahoney and those who are with him would pray out loud with one another, asking for God's intervention in the problems that face America today, and otherwise express religious, political, or social ideas, views, or concerns together that are protected by the First Amendment, including but not limited to the idea, view, or concern that the solutions for the challenges facing America must involve God and that abortion is morally wrong, should not be supported by federal funds, and should be prohibited by law in all forms. The Proposed Demonstration Activity would last approximately one hour to one hour and a half. Rev. Mahoney would videorecord some or all of the Proposed Demonstration Activity and broadcast it on his X (formerly Twitter) account for his followers and others who use the X platform to see. Rev. Mahoney wants to engage in the Proposed Demonstration Activity for the purposes of seeking God's intervention in the crises facing America, seeking to educate his fellow Americans, and seeking to persuade his fellow Americans to adopt his views.

37.     There are certain days of the year on which Rev. Mahoney always engages in demonstration activity on the Capitol Grounds, including Good Friday, the National Day of Prayer, September 11 (or another day close in time), Thanksgiving (or another day close in time), and Christmas (or another day close in time). Rev. Mahoney specifically desires to engage in his Proposed Demonstration Activity on each of these days in 2024 and on each of these days of every subsequent year for the foreseeable future. If Rev. Mahoney were allowed to conduct his Proposed Demonstration Activity, the first event he would conduct would be on the Eastern House steps and sidewalks immediately surrounding them,[4] the second event he would conduct would be on the Eastern Senate steps and sidewalks immediately surrounding them,[5] and the third event he would conduct would be on the Eastern Capitol steps and areas immediately surrounding them,[6] after which Rev. Mahoney would start again at the House.

38.     Rev. Mahoney's Proposed Demonstration Activity is prohibited under the Traffic Regulations because he proposes to conduct it on the Eastern House steps and sidewalks around them to the North and South, the Eastern Capitol steps and paved areas immediately surrounding them, and the Eastern Senate steps and sidewalks around them to the North and South.

---

[4] Demonstration activity is currently allowed on the sidewalk immediately to the East of the Eastern House steps if it does not impede pedestrian access. Demonstration activity is not allowed on the sidewalks immediately to the North and South of the Eastern House steps, nor is it allowed on the Eastern House steps themselves. Rev. Mahoney wishes to conduct his Proposed Demonstration Activity in these prohibited areas.

[5] Demonstration activity is currently allowed on the sidewalk immediately to the East of the Eastern Senate steps if it does not impede pedestrian access. Demonstration activity is not allowed on the sidewalks immediately to the North and South of the Eastern Senate steps, nor is it allowed on the Eastern Senate steps themselves. Rev. Mahoney wishes to conduct his Proposed Demonstration Activity in these prohibited areas.

[6] Demonstration activity is not allowed on the Eastern Capitol Steps or the paved areas immediately surrounding them. Rev. Mahoney wishes to conduct his Proposed Demonstration Activity in these prohibited areas.

39.     On or about August 12, 2021, Rev. Mahoney was engaged in demonstration activity on the Eastern House steps (below the second landing) that was materially indistinguishable from the Proposed Demonstration Activity. During that demonstration activity, the USCP directed Rev. Mahoney to cease, informed him that he would be arrested if he did not comply, arrested him when he did not comply, and charged him with violating § 22-1307(b)(1). (Those charges are no longer pending.) The USCP's enforcement of § 22-1307(b)(1) has not changed since August 2021. The photographs attached hereto as Exhibits 14–16 accurately depict Rev. Mahoney's demonstration activity and arrest on or about August 12, 2021.

40.     Rev. Mahoney fears that he will be arrested for violating § 22-1307(b)(1) if he engages in the Proposed Demonstration Activity. Based on that fear, Rev. Mahoney will self-censor and will not engage in the Proposed Demonstration Activity. If Rev. Mahoney were to engage in his Proposed Demonstration Activity, the USCP would instruct him to cease, he would refuse, and he would be arrested.

## HISTORICAL INSTANCES OF DEMONSTRATION ACTIVITY ON THE EASTERN STEPS

41.     The Board originally enacted the Traffic Regulations—then called the Traffic and Motor Vehicle Regulations for the United States Capitol Grounds—in 1976. The Traffic Regulations have been amended over the years.

42.     Prior to the enactment of the Traffic Regulations, members of the public were generally prohibited from engaging in demonstration activity on the Capitol Grounds. Members of Congress were generally allowed to engage in demonstration activity on the Capitol Grounds, and Members of Congress could—and did—grant authority to non-Members to engage in demonstration activity on the Capitol Grounds—including the Eastern Steps—pursuant to an unwritten "'permit' system." *See Dellums v. Powell*, 566 F.2d 167, 179–83 (D.C. Cir. 1977); *see*

*also United States v. Nicholson*, Nos. 20210-69A *et al.*, at (5) (D.C. Ct. of Gen. Sess. June 19, 1969), *aff'd*, 263 A.2d 56 (D.C. App. 1970), attached as Appendix to *Dellums*, 566 F.2d at 196–205.

43.    After the Traffic Regulations were enacted, and prior to the terrorist attacks on September 11, 2001, members of the public were able to engage in lawful demonstration activity on the Eastern Steps on certain terms and conditions that changed throughout the years. Without attempting to set forth the terms and conditions under which such demonstration activity was allowed or to catalogue each instance of such demonstration activity prior to September 11, 2001, the parties identify the following examples.

44.    Beginning in 1979, Rita Warren—known as "the Jesus Lady"—was allowed to place a six-foot tall mannequin of Jesus of Nazareth on the Eastern Steps on an almost weekly basis. During Easter week, Ms. Warren's display was more elaborate, and included the mannequin and a flower arrangement in the form of a cross. The photograph attached hereto as Exhibit 17 accurately depicts one of Ms. Warren's Easter week displays.[7]

45.    On or about June 16, 1988, a group called The Washington Office on Africa was allowed to hold demonstration activity on the Eastern House steps. At the event, speakers voiced their opposition to the increasing militarization and oppression in South Africa. The event drew scores of participants and lasted approximately two hours. A true and correct video of this event is available online at https://www.c-span.org/video/?2991-1/apartheid-africa (last visited October 1, 2023). This event was referred to a "press conference" and "rally" and at least one Member of Congress spoke at the event.

---

[7] *See also* https://rollcall.com/2020/09/08/capitol-hills-stalwart-jesus-lady-dies-at-92/.

46.     Rev. Mahoney was allowed to engage in regular demonstration activity on the Eastern Steps from the late 1980s until approximately September 11, 2001. Over this time period, Rev. Mahoney engaged in demonstration activity on the Eastern Steps—alone, in small groups, and in groups of twenty or more people (for which a permit was required and issued by the Board)—on no fewer than forty occasions. The demonstration activity that Rev. Mahoney engaged in over this time period was similar to the demonstration activity Rev. Mahoney conducted on August 12, 2021, with some activity involving fewer people and some involving more. The photographs attached hereto as Exhibits 18 and 19 accurately depict two of these events, the first from May 1999 and the second from December 31, 1999. In addition, on occasion, Rev. Mahoney would join Ms. Warren in her demonstration activity.

47.     After September 11, 2001, and in response to the events of that day, the Board and the USCP began prohibiting demonstration activity on the Eastern Steps by members of the public.

48.     In protecting the Capitol, the Board and the USCP also take into account the events of January 6, 2021[8] and the current threat environment to Members of Congress.[9]

## MORE RECENT EXAMPLES REGARDING THE EASTERN STEPS

49.     Historically, the Board and the USCP have interpreted the Traffic Regulations' provisions governing demonstration activity on the Capitol Grounds to exempt Members of Congress. The current conditions that trigger this exemption are set forth in Paragraph 69 below.

50.     More recently, Members of Congress have been allowed to hold press conferences, ceremonials, and constituent events (such as tours and photographs) on the Eastern Steps and the

---

[8] *See also* https://www.justice.gov/usao-dc/33-months-jan-6-attack-capitol-0.

[9] *See also* https://rollcall.com/2023/09/21/capitol-police-agents-strained-to-probe-increasing-threats-against-lawmakers/.

13
J.A. 407

areas immediately surrounding them. In some instances, Members of Congress have been allowed to conduct demonstration activity on the Eastern Steps and the areas immediately surrounding them, including conducting demonstration activity with non-Members.

51.     Without attempting to catalogue each instance over the past three years, the parties identify the following examples.

52.     On January 19, 2021, then-House Speaker Nancy Pelosi (D-CA), Majority Leader Steny Hoyer (D-MD), Assistant Majority Leader Katherine Clark (D-MA), and Democratic Caucus Vice Chair Pete Aguilar (D-CA) held a "moment of silence" to honor the victims of COVID-19 on the Eastern House steps. The moment of silence lasted approximately five minutes. A true and correct video of this event is available online at https://www.c-span.org/video/?508097-1/moment-silence-victims-covid-19 (last visited October 1, 2023).

53.     After Congress adjourned for its August 2021 recess, House Representative Cori Bush (D–MO) organized demonstration activity on the Eastern House steps and areas at the base of the steps immediately surrounding them from approximately July 30–August 3, 2021.[10] The purpose of this demonstration activity was to seek to convince the Biden Administration to issue an executive order continuing the residential eviction moratorium first implemented in the wake of COVID-19.

54.     Rep. Bush and the other attendees at her demonstration activity congregated on the Eastern House steps up to the barricades located at the second landing and the sidewalks around the Eastern House steps. The photographs attached hereto as Exhibits 20–29 accurately depict Rep. Bush's demonstration activity.

---

[10]  *See also*  https://www.nbcnews.com/politics/politics-news/u-s-rep-cori-bush-spends-night-outside-capitol-protest-n1275606.

55.     Rep. Bush's demonstration activity attracted scores of attendees, continuing through the day and night, during the time it was being held. Attendance at the demonstration activity was not limited to Members of Congress, and most of the attendees were not Members of Congress.

56.     Most of the attendees at Rep. Bush's event did not receive a special invitation to attend. Instead, most of the attendees were individuals who simply "showed up" to support Rep. Bush and her cause. Most of the attendees were not known to Rep. Bush, any other member of Congress, the USCP, or the Board. Neither the Board nor the USCP required attendees to register in advance or otherwise make their identity known.

57.     On September 13, 2021, approximately fifty members of Congress held an event on the Eastern House steps in remembrance of September 11, 2001. The event involved prayer by a religious leader, singing by a United States military band, and statements by several members of Congress regarding the events of September 11, 2001. The event lasted approximately thirty minutes. A true and correct video of this event is available online at https://www.c-span.org/video/?514576-1/congressional-leaders-hold-september-11-remembrance-ceremony (last visited October 1, 2023).

58.     On January 6, 2022, approximately seventy-five members of Congress held an event on the Eastern House steps that involved prayer by a religious leader, singing by a United States military band, a statement by Rep. Pelosi, and a moment of silence in remembrance of the events of January 6, 2021. The event lasted approximately ten minutes. A true and correct video of this event is available online at https://www.c-span.org/video/?517013-1/congressional-vigil-january-6-anniversary (last visited October 1, 2023).

59.    On May 12, 2022, approximately thirty members of Congress held an event on the Eastern House steps involving prayer by a religious leader, singing by a United States military band, and a "moment of silence" to honor the victims of COVID-19. The event lasted approximately ten minutes. A true and correct video of this event is available online at https://www.c-span.org/video/?520225-1/lawmakers-mark-million-american-covid-19-deaths (last visited October 1, 2023).

60.    On January 6, 2023, over 100 members of Congress held an event on the Eastern House steps involving prayer by a religious leader, singing, statements by members of Congress in remembrance of the events of January 6, 2021, recitations by family members of deceased police officers, and a moment of silence. The event lasted approximately twenty minutes. A true and correct video of this event is available online at https://www.c-span.org/video/?525199-1/house-minority-leader-jeffries-marks-january-6-anniversary (last visited October 1, 2023).

61.    On or about July 25, 2023, Representative Greg Casar (D–TX) organized demonstration activity on the Eastern House steps and areas at the base of the steps immediately surrounding them that lasted approximately eight hours. The purpose of this demonstration activity was to protest a new Texas law blocking local ordinances that mandate water breaks for workers.[11]

62.    Rep. Casar and the other attendees at his demonstration activity congregated on the Eastern House steps up to the barricades located at the second landing and the sidewalks around the Eastern House steps. The photographs attached hereto as Exhibits 30–34 accurately depict Rep. Casar's demonstration activity.

---

[11]  *See also*  https://rollcall.com/2023/07/25/no-water-on-the-capitol-steps-rep-greg-casar-stages-thirst-strike/.

63.     Rep. Casar's demonstration activity attracted scores of attendees during the time it was being held. Attendance at the demonstration activity was not limited to Members of Congress, and most of the attendees were not Members of Congress.

64.     Most of the attendees at Rep. Casar's event did not receive a special invitation to attend. Instead, most of the attendees were individuals who simply "showed up" to support Rep. Casar and his cause. Most of the attendees were not known to Rep. Casar, any other member of Congress, the USCP, or the Board. Neither the Board nor the USCP required attendees to register in advance or otherwise make their identity known.

65.     Members of Congress also regularly hold press conferences on the Eastern Steps and areas at the base of the steps immediately surrounding them. These press conferences are on a wide array of topics and, over the past sixteen months, have involved topics like abortion, gun control, the debt ceiling, disaster relief, coronavirus response, energy policy, economic policy, immigration, and police reform. As with demonstration activity conducted by Members of Congress, the Board and the USCP allow members of the press and the public to attend these press conferences and neither the Board nor the USCP requires attendees to register in advance or otherwise make their identity known.

66.     Without attempting to catalogue each instance of such demonstration activity over the past sixteen months, the photographs attached hereto as Exhibits 35–39 accurately depict several of these press conferences that have occurred in the past approximately 16 months, which were held on or about May 3, 2022, June 24, 2022, September 29, 2022, January 18, 2023, and March 29, 2023, respectively.

67.     When not otherwise prohibited by security restrictions or special events (like the State of the Union), members of the public, including tourists and others taking group photographs,

may sit, stand or congregate on the Eastern Steps (up to the dividers) and areas at the base of the steps immediately surrounding them, as long as they do not engage in demonstration activity, impede ingress or egress, or otherwise pose a security issue. The photographs attached hereto at Exhibits 40–42 are an accurate representation of the type of activity in which individuals are allowed to engage on the Eastern Steps and areas at the base of the steps immediately surrounding them.

68.     While the Eastern Steps can be used for ingress and egress to the Capitol by Members of Congress and Congressional staff, for the most part, those who work in the Capitol typically enter the building by way of other entrances. The Eastern Steps are regularly demarcated by dividers as depicted in Exhibits 4–12 and 40–42.

## DEMONSTRATION ACTIVITY STANDARD REGARDING THE EASTERN STEPS AS OF JANUARY 1, 2024

69.     In light of concerns raised by D.C. Circuit Judge Millett and D.C. District Judge Boasberg, Defendants will, as of January 1, 2024, implement the following standard for Member events in the revised Traffic Regulations: Members of Congress are exempt from Section 12 of the Traffic Regulations, but only for demonstration activity conducted by them that meets all three of the following requirements: (a) the demonstration activity is activity in which the Member is engaging in his or her official capacity; (b) the demonstration activity is activity that the Member has organized[12] or sponsored[13]; and (c) if persons other than the organizing or sponsoring Member(s) are participating in the demonstration activity, the Member(s) must personally be in

---

[12] In this context, "organize" means that the Member him- or herself is coordinating the activity.

[13] In this context, "sponsor" means that the Member is supporting the activity of another who is organizing the activity, including the activity of a non-Member.

attendance at the demonstration activity at all times for the exemption to last.  If the organizing or sponsoring Member(s) departs, the demonstration activity will immediately be subject to Section 12 of the Traffic Regulations. This provision specifically precludes an exemption when a Member of Congress merely advocates for demonstration activity organized or sponsored by others.[14]

[SIGNATURE PAGES FOLLOW]

---

[14] Prior to January 1, 2024, the Board and the USCP construed the Traffic Regulations' exemption for Members of Congress to apply to demonstration activity that was organized, sponsored, or advocated for by a Member of Congress.

**WE SO STIPULATE**

January 17, 2024

                                     *By:/s/Joshua Wallace Dixon*
                                     Joshua Wallace Dixon*
                                     Eric Sell
                                     (D.C. Bar ID: 1742565)
                                   CENTER FOR AMERICAN LIBERTY
                                   1311 S. Main Street, Suite 207
                                   Mount Airy, MD 21771
                                   (703) 687-6200

                                   Harmeet K. Dhillon
                                   (D.C. Bar ID: CA00078)
                                   DHILLON LAW GROUP INC.
                                   177 Post Street, Suite 700
                                   San Francisco, CA 94108
                                   (415) 433-1700

                                   *Counsel for Plaintiff Patrick J. Mahoney*
                                   *Admitted pro hac vice*

                                   MATTHEW M. GRAVES, D.C. Bar #418052
                                   United States Attorney

                                   BRIAN P. HUDAK
                                   Chief, Civil Division

                                   /s/ *Kenneth Adebonojo*
                                   KENNETH ADEBONOJO
                                   Assistant United States Attorney
                                   United States Attorney's Office
                                   District of Columbia, Civil Division
                                   601 D Street, N.W.
                                   Washington, D.C.  20530
                                   Telephone: (202) 252-2562
                                   kenneth.adebonojo@usdoj.gov

                                   *Counsel for the Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PATRICK J. MAHONEY,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 21-2314 (JEB)** |
| **UNITED STATES CAPITOL POLICE BOARD,** *et al.***,** | |
| **Defendants.** | |

## <u>ORDER</u>

For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

1. Plaintiff's [97] Motion for Summary Judgment is GRANTED;

2. Defendants' [102] Cross-Motion for Summary Judgment is DENIED; and

3. Judgment is ENTERED in favor of Plaintiff as follows:

    a. Defendants' prohibition on non-Member-sponsored speech on the bottommost

    steps of the Eastern Steps of the Capitol Grounds is DECLARED unconstitutional

    under the First Amendment; and

    b. Defendants are permanently ENJOINED from enforcing such prohibition as to

    that portion of the Eastern Steps.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  May 17, 2024

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PATRICK J. MAHONEY,

     Plaintiff,

        v.

UNITED STATES CAPITOL POLICE
BOARD, *et al.*,

     Defendants.

Civil Action No. 21-2314 (JEB)

## <u>MEMORANDUM OPINION</u>

For many years, Plaintiff Patrick J. Mahoney has sought to invalidate demonstration restrictions on federal property here in Washington. A clergyman, he has invoked the First Amendment for both its religion and speech protections throughout his challenges. Back when he filed this lawsuit in 2021 against the U.S. Capitol Police Board and its individual members, Mahoney was seeking to invalidate a number of Board limitations on demonstration activity all over the Capitol Grounds. Little of that case remains.

As things currently stand, the only matter still in need of resolution is Mahoney's speech-based challenge to the Board's near-total prohibition on expressive activities on the lower sets of steps leading to the eastern entrances of the Capitol building. He now moves for summary judgment, seeking a declaration that this regulation is unconstitutional and a permanent injunction preventing the Board from enforcing it. Defendants cross-move for summary judgment, contending that the Board's regulation is constitutionally valid. Believing that Plaintiff ultimately has the better of the argument, the Court will grant his Motion and enter a permanent injunction.

1

J.A. 416

## I.    Background

The Court begins with a brief overview of the applicable regulations governing demonstrations on the portion of the Capitol Grounds relevant to this dispute, then proceeds to the factual and procedural history that has led us here.  Those interested in the extended version of Mahoney's crusade against the Board's regulatory scheme can refer to the Court's previous opinions.  See Mahoney v. U.S. Capitol Police Bd., 566 F. Supp. 3d 1 (D.D.C. 2022) (Mahoney I); Mahoney v. U.S. Capitol Police Bd., 2022 WL 1014791 (D.D.C. Apr. 5, 2022) (Mahoney II); Mahoney v. U.S. Capitol Police Bd., 566 F. Supp. 3d 22 (D.D.C. 2022) (Mahoney III); ECF No. 80 (Op.) (D.D.C. Apr. 4, 2023) (Mahoney IV).

### A.  Legal Background

The Board regulates traffic, both vehicular and pedestrian, within the Capitol Grounds. See ECF No. 98-5 (Traffic Regulations) at 3.  Pursuant to its statutory authority, it has promulgated a set of regulations — the Traffic Regulations — that governs, among other things, "demonstration activity" on those Grounds.  Id. § 12.1.  Demonstration activity is "any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment."  Id. § 12.1.10.

Such activity is permitted on some parts of the Capitol Grounds and prohibited on others. The Regulations reference the U.S. Capitol Grounds Demonstration Areas Map, which is reproduced below, to differentiate among those areas.  Id. § 12.2.10.

2

J.A. 417



UNITED STATES CAPITOL GROUNDS
DEMONSTRATION AREAS MAP

ECF No. 99-1 (Stipulation of Facts), ¶ 26 (citation omitted; circles added).

Demonstration activity is barred in areas designated "No Demonstration Permitted" — the darkest zones in the map above — including a 250-foot buffer zone around the Capitol building.  Id., ¶ 27.  Most importantly for present purposes, the "No Demonstration Permitted" areas include the three sets of steps on the eastern side of the Capitol and "the paved areas immediately around them."  Id., ¶ 29.  Those three sets — which the Court collectively calls the Eastern Steps — comprise the Eastern Senate, House, and Capitol steps.

The Eastern Senate steps, which lie between the Capitol and area 9 (marked above in a yellow circle), consist of a base that is slightly elevated above the adjoining sidewalk and a total of 37 steps leading to an entrance to the Senate chamber.  Id., ¶¶ 12–13.  The topmost 27 steps, which are cordoned off by bike racks and a chain, are currently off-limits to the public.  Id., ¶ 13; see also ECF No. 95-5 (Senate Steps Photograph).  These steps are depicted below.

3

J.A. 418



The Eastern House steps, which are near area 10 on the Traffic Regulations map (marked by a green circle), are nearly identical to their Senate counterparts, with the topmost 28 steps similarly closed off to the public.  See Stip., ¶¶ 20–22.  These steps (depicted below), as their name suggests, lead to an entrance to the House chamber.  Id., ¶ 21; ECF No. 95-11 (House Steps Photograph).

4



The Eastern Capitol steps, which sit in between the Senate and House steps (marked by a red circle on the demonstration map), differ slightly from the other two. They do not have an elevated base, meaning that it is less clear where the nearby sidewalk ends and the base of these steps begins. See Stip., ¶ 18. The Capitol steps (depicted below) are otherwise very similar to the Senate and House steps, and their upper steps are similarly closed to the public. Id., ¶¶ 16–17. These, too, lead to an entrance, this time to the Capitol rotunda. Id., ¶ 17; ECF No. 95-8 (Capitol Steps Photograph). Mahoney wishes to conduct his activities on the bottommost portion of all three sets of steps, and the analysis below does not distinguish among them.

5



While previous iterations of the Traffic Regulations allowed members of the public to engage in demonstration activity on the Eastern Steps, see Stip., ¶¶ 43–46 (citing examples), the Board has prohibited such conduct since the September 11, 2001, terrorist attacks. Id., ¶ 47.

This proscription is not absolute, however. Based on a longstanding (but implicit) interpretation of its prior regulations, the Board (now explicitly) permits members of Congress and their invitees to engage in demonstration activity on the Eastern Steps. See Traffic Regs. § 12.2.20. A Member-led event qualifies for this exemption as long as: "(a) it is being done" in the Member's "official capacity"; "(b) it is being organized or sponsored" by the Member; and "(c) the Member[] is personally in attendance at the demonstration activity at all times." Id. Should the sponsoring Member leave the event at any time, the exemption will cease to apply. Id.

6

The Regulations do not contain criminal-enforcement provisions. The U.S. Capitol Police, however, is authorized to enforce federal and D.C. law on the Capitol Grounds — including, for example, 40 U.S.C. § 5104(f)(a)'s ban on "parad[ing]" on the Grounds, violation of which may be punishable by a fine and imprisonment. See 2 U.S.C. § 1967(a)(4), (b)(1); Stip., ¶ 31. D.C. law, moreover, makes the Regulations indirectly enforceable by rendering it unlawful to "engage in a demonstration in an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a demonstration." D.C. Code § 22-1307(b)(1). Violation of that provision is similarly punishable by a fine and imprisonment. Id. § 22-1307(c); Stip., ¶ 31; see also Stip., ¶¶ 39–40.

B. Factual and Procedural Background

With this statutory and regulatory backdrop in mind, the Court proceeds to the facts, as reflected in the parties' stipulation. Mahoney is a Presbyterian minister who has brought myriad suits over the decades seeking to conduct demonstrations on federal property. See, e.g., Mahoney v. Babbitt, 105 F.3d 1452 (D.C. Cir. 1997). This time around, he has been battling the Board since 2021 over his desire to hold prayer vigils and other demonstrations on the Capitol Grounds that run afoul of the latter's regulations. See Stip., ¶¶ 35–40; ECF No. 1 (Compl.).

The history of this years-long dispute has wound a tortuous path. See Mahoney IV, ECF No. 80 at 5–11 (recounting said history); Mahoney I, 566 F. Supp. 3d at 7–8 (same). Suffice it to say that after, inter alia, numerous preliminary-relief requests, two motions to dismiss, a motion for reconsideration, a trip to the Circuit, see Mahoney v. U.S. Capitol Police Bd., 2022 WL 1177313 (D.C. Cir. Apr. 15, 2022), and various revisions to the Traffic Regulations, the parties have finally narrowed their disagreements to one: Plaintiff's proposed demonstration activity on

7

J.A. 422

the bottommost portion of the Eastern Steps — *i.e.*, below the barriers currently blocking off

access to the public.  Specifically, Mahoney wishes to put on events "that will involve praying,

gathering, assembly, and protest" on these steps and the adjoining sidewalks, and he expects that

his wife and another few individuals will join him.  See Stip., ¶ 35.  As before, he wants to

engage in these activities on specific days such as Good Friday, Thanksgiving, and Christmas

and plans to do so not just this year but "every subsequent year for the foreseeable future."  Id.,

¶ 37.

Because these proposed vigils and protests, which would not be sponsored by a Member

of Congress, would violate the prohibition on demonstration activity in this area, Mahoney seeks

the Court's intervention.  He contends that the Board's designation of the Eastern Steps as a "No

Demonstration Permitted" area violates both the First Amendment on its face and the Fifth

Amendment's equal-protection guarantee.  See ECF No. 69 (3d Am. Compl.), ¶¶ 97–98, 160–63.

He asks the Court to enter a permanent injunction to prevent the Board from enforcing this

portion of the regulations.  Id. at 45–46.  The parties have now cross-moved for summary

judgment.  See ECF Nos. 97 (Pl. MSJ); 102-1 (Defs. MSJ).

## II.    **Legal Standard**

Summary judgment must be granted if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at

895.  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550

8

U.S. 372, 380 (2007); <u>Holcomb</u>, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Liberty Lobby</u>, 477 U.S. at 255; <u>see also</u> <u>Mastro v. PEPCO</u>, 447 F.3d 843, 850 (D.C. Cir. 2006); <u>Aka v. Washington Hospital Center</u>, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (<i>en banc</i>).  The Court must "eschew making credibility determinations or weighing the evidence."  <u>Czekalski v. Peters</u>, 475 F.3d 360, 363 (D.C. Cir. 2007).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  <u>See</u> Fed. R. Civ. P. 56(e); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor.  <u>See</u> <u>Laningham v. U.S. Navy</u>, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

## III. Analysis

Like ships passing in the night, the parties open with two completely different doctrinal frameworks for resolving this case.  Plaintiff believes that a straightforward application of First Amendment forum analysis shows why he is entitled to summary judgment and a permanent injunction against the Traffic Regulations.  Defendants, meanwhile, insist that a forum analysis would be improper because the First Amendment does not apply at all.  That is so, they posit, because the regulatory scheme at issue limits only <u>government</u> speech.  The Court will take these

in the reverse order, beginning with government speech and then turning to forum analysis. Given the resolution in Plaintiff's favor on the First Amendment question, it need not consider his Fifth Amendment claim.

A.  Government Speech

There is no dispute that Mahoney's proposed activities constitute speech covered by the First Amendment.  See Stip., ¶ 35.  While that Amendment typically does not permit discrimination based on the content or viewpoint of the speech, when the Government is the one speaking — which it does, at times, through private individuals — it is allowed to so discriminate in determining what messages it wishes to disseminate or sponsor.  See Walker v. Texas Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); Raven v. Sajet, 334 F. Supp. 3d 22, 32 (D.D.C. 2018) ("Even political discrimination is allowed when the government chooses to sponsor speech."); Nat'l Endow. for Arts v. Finley, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view[.]").  "Indeed, it is not easy to imagine how government could function if it lacked this freedom."  Pleasant Grove City v. Summum, 555 U.S. 460, 468 (2009).  Because this doctrine is one "susceptible to dangerous misuse," however, courts must "exercise great caution before" declaring a particular activity government speech.  Matal v. Tam, 582 U.S. 218, 235 (2017).

Defendants here appear to contend that all speech on the Eastern Steps is government speech.  In other words, as the events are organized or sponsored by Members, any expression constitutes government speech.  See Defs. MSJ at 6–11; see also ECF No. 108 (Defs. Reply) at 10 ("[S]peech by Members of Congress during Member events on the East Front Steps

10

J.A. 425

constitutes government speech[.]").  Mahoney believes that even this is a contestable proposition, as a Member may do no more than sponsor an event and attend as a mere bystander. See ECF No. 105 (Pl. Reply) at 18–20 (citing examples).  He conceivably has a point.  Cf. Shurtleff v. City of Bos., Massachusetts, 596 U.S. 243, 252 (2022) ("The boundary between government speech and private expression can blur when, as here, a government invites the people to participate in a program.").  But that is neither here nor there.  The more significant weakness in the Government's position is that the presence of government speech in a public forum (which the Court below concludes this is) does not exempt from First Amendment scrutiny its restrictions on other speakers.

The circumstances here, in fact, are indistinguishable from those in ANSWER Coalition v. Jewell, 153 F. Supp. 3d 395 (D.D.C. 2016).  The challenged regulations there, much like the ones here, reserved certain areas along the presidential inaugural parade route for the exclusive use of the Presidential Inaugural Committee, a private organization controlled by the President-Elect and tasked with organizing inauguration-related events.  Id. at 401–04.  The court concluded that the Committee's speech within the reserved areas was government speech, id. at 412–13, but nevertheless analyzed whether the exclusion of other speakers from those areas was permissible under the First Amendment.  Id. at 413–14.  While "[the Committee's] speech itself is not subject to First Amendment scrutiny," the court explained, "the restriction of the expressive activities of [the plaintiff] and all other private persons and entities to limited portions of the parade route . . . is."  Id. at 414.  So it is here.  The Court thus rejects the Board's halfhearted effort to take the First Amendment out of the equation altogether.

11

B. Forum Analysis

With the Government's top-line argument dispensed, the Court now turns to the meat of the parties' disagreement: should the Eastern Steps be classified as a public or non-public forum? Plaintiff advocates for the former, while Defendants push for the latter. See Pl. MSJ at 23; Defs. MSJ at 11–12. As the Court cannot determine the correct standard of scrutiny that applies to the restrictions until it answers this question, it will begin there. In addition, since Mahoney wishes to engage in demonstration activity only on the steps below the dividers, the Court's conclusions will be cabined to those lower areas of the three sets of steps. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 801 (1985) (in defining forum, courts should "focus[] on the access sought by the speaker").

1. *Designation of Forum*

When the Government restricts speech on its own property — as it does here — the Court's review under the First Amendment initially inquires into the nature of the forum. See Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth., 901 F.3d 356, 364 (D.C. Cir. 2018). Such property may be classified, for example, as a "traditional" or "designated" public forum — a space that the state has opened to the public for expressive activity either as a matter of longstanding tradition (*e.g.*, sidewalks and parks) or by fiat. Id. (citing Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45–46 (1983)). Alternatively, the property may be one that "is not by tradition or designation a forum" for public speech — in which case, the forum is "non-public." Perry Educ. Ass'n, 460 U.S. at 46, 53. The Government can also create a kind of in-between forum, known as a "limited public forum," which is open to discussion only on some specific topics or to some groups, such as public-university facilities. See Price v. Garland, 45 F.4th 1059, 1068 (D.C. Cir. 2022); Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S.

12

J.A. 427

819 (1995).  In classifying public property, courts must "take[] into account the nature and traditional uses of the particular" property involved.  Boardley v. U.S. Dep't of Interior, 615 F.3d 508, 515 (D.C. Cir. 2010) (citation omitted).

a.  Public Forum

While no case has squarely addressed the forum designation of the portion of the Eastern Steps at issue here, the Court is hardly writing on a blank slate.  On various occasions, as Plaintiff correctly points out, our Circuit and other courts in this district have held that various portions of the Capitol Grounds are traditional public fora.  See Pl. MSJ at 24–26.  Start with Jeannette Rankin Brigade v. Chief of Capitol Police, 342 F. Supp. 575 (D.D.C. 1972), where a three-judge court here held that the Grounds "have traditionally been open to the public."  Id. at 584.  The court noted that the Grounds received thousands of visitors per year and that the main purpose of the Capitol building (i.e., making laws) was compatible "with the existence of all parades, assemblages, or processions which may take place on the grounds."  Id.  Notably, the court's holding did not draw any distinction between the precise area where the plaintiffs there wanted to protest — the east front plaza near the east Capitol steps — and the rest of the Grounds, but instead announced that as a whole they are a traditional public forum.  Id.  Since the Supreme Court summarily affirmed the district court's decision in Jeannette Rankin, this decision is now "binding precedent."  Lederman v. United States, 291 F.3d 36, 41 (D.C. Cir. 2002); see also Cmty. for Creative Non-Violence v. Kerrigan, 865 F.2d 382, 387 (D.C. Cir. 1989) ("There is no doubt that the Capitol Grounds are a public forum.").

Thirty years later, the D.C. Circuit held that the sidewalks at the bases of the Eastern Senate and House steps were traditional public fora.  See Lederman, 291 F.3d at 44.  The court there focused on the sidewalks and declined to "consider the public forum status of 'no-

13

demonstration zones' other than" those.  Id. at 41.  It stated that, since "the Capitol Grounds as a whole meet the definition of a traditional public forum," the burden was on the Government to show that the sidewalks were used for a special purpose.  Id. at 41–42 (emphasis added).  In attempting to do so, the defendants there pointed to three differences: 1) the sidewalks (like the steps here) abut the Capitol Building, 2) the eastern-front sidewalks were never open for public expression, even if they were generally open to the public, and 3) the sidewalks were primarily used for ingress and egress by members of Congress.  Id. at 42–44.

The Lederman court was unconvinced.  As to the Government's first distinction, it breezily noted that it was unavailing because "the entire Capitol Grounds are a public forum," so the fact that the sidewalks were near the Capitol building did not by itself make them non-public.  Id. at 42.  The court was equally dismissive of the second, as the sidewalks were only unavailable for public expression because "such expression was prohibited anywhere on the Capitol Grounds by the very statute declared unconstitutional in Jeannette Rankin."  Id. at 43.  Last, the court found that the use of the sidewalks by Congressmembers did not alter its conclusion because members already had to avoid "tourists, joggers, dogs, and strollers," so there was no reason to assume "they are [not] also capable of circumnavigating the occasional protester."  Id.

Fast forward another 20+ years to the Circuit's recent opinion in United States v. Nassif, 97 F.4th 968 (D.C. Cir. 2024).  In concluding that the interior of the Capitol building is a non-public forum, the court there highlighted that it has "long recognized" the exterior Capitol Grounds as a traditional public forum, thus distinguishing the former from the latter.  Id. at 975.  In support of its conclusion as to the interior, the Circuit also suggested that the "physical threshold separating" the Grounds from the interior was the doorway.  Id.  This, it reasoned, was

14

J.A. 429

"a familiar signal that the building's interior differs from the remainder of the public Grounds in ways that make it uniquely nonpublic." Id. (cleaned up).

What is more, our Circuit has held that Vietnam-war protesters arrested on the very Capitol steps that Mahoney now wishes to demonstrate on could bring a First Amendment Bivens claim against Capitol police. See Dellums v. Powell, 566 F.2d 167, 173, 194–96 (D.C. Cir. 1977); see also Hartley v. Wilfert, 918 F. Supp. 2d 45, 50 (D.D.C. 2013). While the court's opinion did not engage in any forum analysis as such, it described the plaintiff's demonstrations on the steps as the exercise of "basic constitutional rights in their most pristine and classic form." Id. at 194-95 (citation omitted). It further reasoned that a cause of action for damages was necessary to prevent the "loss of an opportunity to express to Congress one's dissatisfaction" in a location likely to attract "the attention of a mass audience." Id. at 195.

Stepping back from the Capitol and looking at legislatures more generally, courts in the District of Columbia are hardly alone in thinking that legislative buildings — and the steps that lead to them — "occupy a special place in our First Amendment tradition." Hulbert v. Pope, 70 F.4th 726, 738 (4th Cir. 2023); Occupy Columbia v. Haley, 738 F.3d 107, 121 (4th Cir. 2013) (entire state-house grounds are traditional public forum); Wells v. City & County of Denver, 257 F.3d 1132, 1146 (10th Cir. 2001) (steps leading to county building are public forum); Pouillon v. City of Owosso, 206 F.3d 711, 716–17 (6th Cir. 2000) (steps leading to city hall are traditional public forum as they are "in the highest degree linked, traditionally, with the expression of opinion"); see also Watters v. Otter, 986 F. Supp. 2d 1162, 1173 (D. Idaho 2013) (state house and surrounding area are traditional public forum because "expressing grievances at the site of the State Government is the most pristine and classic form" of First Amendment speech) (cleaned up); Kanelos v. County of Mohave, 893 F. Supp. 2d 1001, 1012 (D. Ariz. 2012) ("Where a

15

J.A. 430

government building houses legislative activities, courts have typically held that the building's grounds are a traditional public forum.") (collecting cases).

Nor should this come as a surprise. Throughout this country's history, legislative grounds have been the stage for movements seeking to voice their displeasure with official policy. Many protests during the civil-rights movement, for instance, took place at or near state legislative buildings. See, e.g., Cox v. Louisiana, 379 U.S. 536, 539, 545–46 (1965) (college students gathered "at the site of the old State Capitol Building" before marching to courthouse to protest segregation); Edwards v. South Carolina, 372 U.S. 229, 235 (1963) (describing anti-segregation demonstration on statehouse grounds as "pristine and classic form" of First Amendment activity); Henry v. City of Rock Hill, 376 U.S. 776, 777 (1964) (similar). The same was true of demonstrations against the United States' involvement in Vietnam; indeed, many anti-war protests took place on the Capitol Grounds themselves, as described above. See Jeannette Rankin, 342 F. Supp. at 578 (anti-war protest at east front plaza); Dellums, 566 F.2d at 173 (anti-war protest at Eastern Capitol Steps). In fact, the parties agree that the Eastern Steps themselves were the site of protests and other demonstrations prior to 9/11, including "no fewer than forty" events in which Mahoney participated. See Stip., ¶¶ 43–46.

In light of all this, the Court ultimately agrees with Plaintiff that at least the lower portion of the Eastern Steps on which he wishes to demonstrate are the kind of public property that has been "historically associated with the exercise of First Amendment rights." Pl. MSJ at 23 (citation omitted). Like the sidewalks immediately next to them, the steps are "continually open, often uncongested, and . . . a place where people may enjoy the open air or the company of friends and neighbors." Lederman, 291 F.3d at 44 (citation omitted). More importantly, these steps and others like them have historically "been used for purposes of assembly . . . and

16

discussing public questions." Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939). The nature of the steps and the function they have played thus support their designation as a traditional public forum. Perry Educ. Ass'n, 460 U.S. at 45.

b. Defense Counterarguments

All is not necessarily lost for Defendants, however, as they could rebut the "working presumption" that these steps are a public forum by establishing that they are reserved for a unique use that "outweigh[s] the attributes that would otherwise mark them as public forums." Henderson v. Lujan, 964 F.2d 1179, 1182 (D.C. Cir. 1992). In attempting to do so, Defendants offer three principal arguments for why the Eastern Steps are distinguishable from the rest of the Capitol Grounds, which the Court reorders for ease of analysis. First, they stress that the Eastern Steps have now been a "No Demonstration Zone" in the two decades following 9/11 and that the Capitol Grounds were "informally" closed to public demonstrations even before then. See Defs. MSJ at 11. Second, they argue that the Board was entitled to close the steps in light of security threats like 9/11 and the events of January 6, 2021. See Defs. Reply at 3. Third, they contend that the steps are "part of the Capitol Building itself" and serve as a secure entryway for Members and staff, rendering them structurally distinct from the adjoining sidewalks and used for a different purpose. See Defs. MSJ at 13; Defs. Reply at 2–4.

The Board's initial point fails to move the needle. The Government cannot turn a traditional public forum into a non-public one by its own say so. See U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 133 (1981) (Government "may not by its own *ipse dixit* destroy the 'public forum' status of" locations "which have historically been public for[a]"). Nor can the "unconstitutional restrictions" that informally closed off the steps until the court's decision in Jeannette Rankin, "by their mere existence, bootstrap subsequent

17

J.A. 432

restrictions into validity." Lederman, 291 F.3d at 43.  This argument, it turns out, is simply a recapitulation of one of the arguments the court in Lederman considered and rejected.  See id. at 43 (dismissing argument that east-front sidewalks are non-public because they "ha[d] never been available to the public for expressive activity").  Indeed, it is a weaker version of it, as the regulations here have been in place for only two decades, as compared to the "century" of regulation deemed irrelevant in Lederman.  Id.

Defendants' second argument founders for the same reason.  The Court is certainly mindful of the security concerns that animate the Board's restrictions here and has acknowledged them previously.  See Mahoney I, 566 F. Supp. 3d at 10 ("Well before [January 6, 2021], the events of September 11, 2001 — the very event that Mahoney sought to commemorate in his vigil — dramatically changed the security landscape on the Capitol Grounds.").  Serious as these are, however, they do not lead to the conclusion that the Eastern Steps were designed for a use that is incompatible with their status as a traditional public forum — unlike sidewalks within a military base, for example, which are.  See Greer v. Spock, 424 U.S. 828, 838 (1976).  Of course, these interests are weighty and will be considered when the Court turns to the validity of the regulations being challenged, but they do not suffice to turn an otherwise public forum into a non-public one.

This leaves Defendants' contention that the steps are specialized because they are part of the Capitol building itself and were designed "only to provide access to non-public entrances to the Capitol Building."  Defs. Reply at 2.  They accordingly analogize the steps, not to the sidewalks next to them, but to interior post-office sidewalks and the staircase leading to the plaza in front of the Supreme Court, both of which were previously declared non-public by our Circuit. Id. at 2, 5; Initiative & Referendum Inst. v. U.S. Postal Serv., 685 F.3d 1066 (D.C. Cir. 2012)

18

(interior post-office sidewalks); Hodge v. Talkin, 799 F.3d 1145 (D.C. Cir. 2015) (Supreme Court plaza and staircase).

The Court remains unconvinced, although this is Defendants' strongest argument and the only one that directly addresses the issue here: whether the Eastern Steps are designed for a specialized use that is incompatible with their being a traditional public forum. For one, the record here belies any notion that these steps exist only to serve as an entryway for Members and their staff. It indicates that the public can and does access the steps for "sightseeing, posing for pictures, . . . and walking dogs." Stip., ¶ 6; see also id., ¶ 67 (noting that anyone can "sit, stand[,] or congregate on the Eastern Steps (up to the dividers)" absent special events like State of the Union). In addition, Members and their staff typically use other entrances to enter the Capitol building. Id., ¶ 68.

The Eastern Steps are therefore readily distinguishable from Defendants' first analogue, an interior post-office sidewalk. See Initiative & Referendum Inst., 685 F.3d at 1070. The Circuit determined that the latter was a non-public forum because it was "typically used only by customers and employees of the post office" and was "built solely to provide efficient access to the post office." Id. at 1071 (emphasis added). Nor, the court continued, was there a tradition of using these sidewalks — which typically ran from the parking lot directly to the front door of the post-office building — for "expressive activities." Id. at 1071–72. Here, by contrast, the steps are not used solely for access and typically are not even put to that use by the individuals who work in the Capitol building. And, as discussed above, these steps were frequently used for private expressive activities before 9/11 and are still used for that purpose by Members and their non-member, non-staff invitees. See, e.g., Stip, ¶¶ 52 (moment of silence to honor COVID-19

victims led by House Speaker), 53 (protest against end of executive eviction moratorium led by Rep. Cori Bush), 61 (protest against state law led by Rep. Greg Casar).

The second example on offer, the Supreme Court plaza, is closer to the mark. After all, the Circuit found the entire plaza (staircase included) to be non-public in part because its "architectural integration" with the Court's building elevated it, both literally and figuratively, to the status of a "special type of enclave." Hodge, 799 F.3d at 1158–59 (quoting United States v. Grace, 461 U.S. 171, 180 (1983)); see id. at 1158 ("The plaza is elevated from the sidewalk by a set of marble steps."). Since the Eastern Steps could be said to be part of the Capitol building, and since the base of the House and Senate Steps are slightly elevated from the east-front sidewalk, Defendants suppose that the public would be aware that they have "entered some special type of enclave" upon ascending these steps. See Defs. Reply at 2.

Even assuming that the Eastern Steps bear a resemblance to the Supreme Court plaza, as Defendants say, this does not affect the Court's conclusion. In fact, the Circuit's opinion in Hodge only serves to reinforce it. After the court there determined that the Supreme Court's plaza was distinct from the perimeter sidewalks, it went on to explain that courthouse grounds have historically "not been considered a forum for demonstrations and protests." Hodge, 799 F.3d at 1159 (citing Cox, 379 U.S. at 560, 562). These grounds were no different, it continued, as Congress had heavily restricted demonstrations on the plaza, and the Supreme Court police had strictly enforced these regulations. Id. at 1161–62. More to the point, the Circuit underscored its conclusion by contrasting the Supreme Court's grounds with the Capitol Grounds, which "are a public forum by requirement of the First Amendment." Id. at 1661. While the "fundamental function of a legislature in a democratic society" invites expressions of

20

public opinion, the "judiciary does not decide cases by reference to popular opinion." Id. at 1159 (quoting Jeannette Rankin, 342 F. Supp. at 584).

Simply put, just as "[j]udges are not politicians," courthouses are not legislative buildings. Williams-Yulee v. Fla. Bar, 575 U.S. 433, 437 (2015); Hodge, 799 F.3d at 1161 ("[P]oliticians are expected to be appropriately responsive to the preferences of the public[;] . . . the same is not true of judges.") (cleaned up). Demonstrations and other First Amendment activities are perfectly compatible with the nature and purpose of the latter, as explained above, but not necessarily the former. So, even if the Eastern Steps are architecturally similar to the Supreme Court plaza, the First Amendment rightly treats them as fundamentally different because responsiveness to public clamor is a virtue in elected officials, and only these officials should expect frequent "public expression" around their workplaces. Hodge, 799 F.3d at 1161.

*    *    *

To recap: the Court here need not determine the forum status of every single tread and riser within the Eastern Steps or of the upper landing areas that they lead to. Nor does it need to demarcate once and for all where the eastern portion of the Capitol Grounds ends and the Capitol building begins. All it decides is that the real property on which Mahoney wishes to demonstrate — viz., the steps below the dividers on the three sets of steps near the east front plaza — are a traditional public forum.

### 2. Application of Scrutiny

Having classified the relevant portion of the Eastern Steps as a traditional public forum, the Court can now assess the appropriate level of scrutiny to apply to the Board's Traffic Regulations. The Government's regulatory authority is at its lowest ebb in a forum like this one, as it "must respect the open character of these for[a]." Oberwetter v. Hilliard, 639 F.3d 545, 551

(D.C. Cir. 2011); <u>Grace</u>, 461 U.S. at 177 (in traditional public forum, "the government's ability to permissibly restrict expressive conduct is very limited"). Content-based restrictions on expressive activities in such fora must pass strict scrutiny — *i.e.*, "the restriction must be narrowly tailored to serve a compelling government interest." <u>Pleasant Grove City</u>, 555 U.S. at 469. On the other hand, even in a public forum the Government has a freer hand to impose <u>content-neutral</u> time, place, and manner restrictions. <u>See Mahoney I</u>, 566 F. Supp. 3d at 9. Such regulations need only satisfy intermediate scrutiny, meaning they must be "narrowly tailored to serve a significant government interest" and must "leave open ample alternative channels of communication." <u>Mahoney v. Doe</u>, 642 F.3d 1112, 1117 (D.C. Cir. 2011) (citation omitted).

Given that the level of scrutiny hinges on whether the Traffic Regulations target speech based on its content, the parties vigorously dispute whether these do. <u>See</u> Pl. MSJ at 31–32 (arguing affirmatively); Defs. MSJ at 17–18 (arguing negatively). Interesting though it may be, the Court will not settle this disagreement one way or another. That is because the near-total ban on expression here would fail under either standard because it is not narrowly tailored. <u>Lederman</u>, 291 F.3d at 44; <u>cf. Nassif</u>, 97 F.4th at 980 ("A categorical prohibition on all expressive activity <u>within</u> Capitol Buildings would likely not pass constitutional muster even under the relaxed standard applicable to a nonpublic forum.") (emphasis added). That is so even if Defendants unquestionably have a "compelling interest in the security of the Capitol Building." <u>Mahoney</u>, 2022 WL 1177313, at *3 (Millett, J., concurring).

To begin, the Board's ban on expressive activities on the eastern steps is troublingly overinclusive. <u>See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.</u>, 502 U.S. 105, 121–23 (1991) (law that is "significantly overinclusive" is not narrowly tailored). While the Court is well aware of the "significant security concerns presented when groups are in

22

J.A. 437

close proximity to the Capitol" following January 6, see Defs. MSJ at 18, the applicable portion of the Traffic Regulations prevents even a single person from holding a quiet vigil on the bottom House or Senate steps.  See Traffic Regs. §§ 12.1.10 (defining demonstration activity to include a "vigil"); 12.1.20 (prohibition applies to "any one . . . person or group of persons").  It would also seem to cover a pair of individuals gathering on the Eastern Steps to oppose or support the latest editorial in the *New York Times*.  Id. § 12.1.10 (prohibiting "gathering . . . for the purpose of expressing political, social, religious[,] or other similar ideas").  In short, it beggars belief that "all listed demonstration activities could reasonably be expected to interfere with" Defendants' security priorities.  Lederman, 291 F.3d at 45; cf. Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc., 482 U.S. 569, 574–75 (1987) (ban on "all First Amendment activities" not narrowly tailored as "no conceivable governmental interest would justify such an absolute prohibition on speech") (cleaned up).

These regulations, moreover, suffer from the opposite problem, too — they are seriously underinclusive.  See Brown v. Ent. Merchs. Ass'n, 564 U.S. 786, 802 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.").  Neither these regulations nor any others stop members of the public from merely "sitt[ing], stand[ing] or congregat[ing] on the Eastern Steps."  Stip., ¶ 67.  In large enough groups, these people could presumably pose a serious threat to the Capitol building and Grounds.  Yet "the Board has made no effort to keep any of these . . . individuals away from the Capitol."  Lederman, 291 F.3d at 45.

Worse still, the Traffic Regulations allow Members to invite an untold number of private individuals to join in expressive activities without undergoing any security vetting by them or the Board.  See Stip., ¶¶ 56, 64 (highlighting how attendees of two Member-organized events

23

J.A. 438

"simply showed up" and were not even known to organizing Member). The only explicit limits on this set-aside are that the sponsoring Member must be acting in her official capacity and must be present at all times. See Traffic Regs. § 12.2.20. The Traffic Regulations thus seem to permit a large and temporally interminable protest on the Eastern Steps — regardless of the dangerousness or size of the crowd — so long as a Member sponsors the demonstration and stands nearby, all while preventing a lone individual from sharing his views on the controversy *du jour* with passersby. This comes nowhere close to narrow tailoring.

What ultimately seals this prohibition's fate, however, is the availability of less restrictive alternatives to promote Defendants' crucial security objectives. Granted, a regulation "'need not be the least restrictive or least intrusive means of' serving the government's interests." McCullen v. Coakley, 573 U.S. 464, 468 (2014) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989)). But the number of alternative regulatory options at the Board's disposal is so vast as to confirm what the under- and over- inclusiveness intimated: that Defendants are "sacrificing speech" by burdening "substantially more [of it] than necessary" in pursuit of their admittedly noble goals. Id. at 486, 490 (cleaned up); Lederman, 291 F.3d at 45 ("Perhaps the most troubling aspects of the Board's virtually per se ban on expressive activity on the East Front sidewalk [abutting Eastern Steps] is the ready availability of 'substantially less restrictive' alternatives[.]").

Defendants, for example, could limit the number of people who can demonstrate on the Eastern Steps at one time, or they could require individuals like Plaintiff to obtain a permit, as they already do for groups wishing to demonstrate on different areas of the Capitol Grounds. See Traffic Regs. §§ 12.3.10 (allowing groups under thirty to demonstrate in most of Grounds without permit); 12.4.20 (laying out permit-application requirements for groups over thirty); Mahoney I, 566 F. Supp. 3d at 10–11 (holding more restrictive size and permit restrictions are

24

narrowly tailored).  They could also ban the use of props, see Cmty. for Creative Non-Violence, 865 F.2d at 383 (upholding 24-hour limit on use of props on Capitol Grounds), ban expressive activities at certain times of the day, or force prospective demonstrators to submit to police screening.  Indeed, they could also strictly enforce the federal law that prohibits engaging in "disorderly or disruptive conduct . . . with the intent to impede" congressional proceedings, "imped[ing] passage through" the Capitol Grounds, and "engag[ing] in an act of physical violence in the Grounds."  40 U.S.C. § 5104(e)(2)(D), (E), (F).  What they cannot do is ban nearly all expressive conduct on the Eastern Steps in the name of security while looking the other way as to non-expressive or Member-sponsored activities that may present as great a threat to the Capitol and its Grounds.  Defendants, moreover, offer no explanation whatsoever for why these alternatives would be unworkable.

In sum, assuming *arguendo* that the Traffic Regulations are content neutral, and acknowledging that Defendants' interests here are about as weighty as they come, the Court nevertheless concludes that the ban on all non-sponsored speech on the Eastern Steps is not narrowly tailored and thus would not survive intermediate (let alone strict) scrutiny.  It is, in a word, unconstitutional.

C.  Remedies

With the finish line finally in sight, the Court turns to Mahoney's request for remedies. Having determined that Defendants' prohibition violates the First Amendment, the Court will grant his demand for declaratory relief.

He also seeks a permanent injunction preventing the Board from enforcing its ban on expressive activities on the bottommost Eastern Steps.  A permanent injunction is an "exceptional form of relief" that should not be awarded lightly.  Salazar by Salazar v. Dist. of

25

J.A. 440

Columbia, 896 F.3d 489, 497 (D.C. Cir. 2018).  To obtain such remedy, Plaintiff must show that:
(1) he "suffered an irreparable injury"; (2) "remedies available at law, such as monetary
damages, are inadequate to compensate for that injury"; (3) the "balance of hardships" shakes
out in his favor; and (4) "the public interest would not be disserved by a permanent injunction."
Conservation Law Found. v. Ross, 422 F. Supp. 3d 12, 31 (D.D.C. 2019) (quoting Monsanto Co.
v. Geertson Seed Farms, 561 U.S. 139, 156–57 (2010)).  While the irreparable-harm requirement
is recited in the past tense, it is clear that future harm may qualify.  See, e.g., Loving v. IRS., 917
F. Supp. 2d 67, 81 (D.D.C. 2013).

 The Court's analysis in the previous Section all but decides this in Plaintiff's favor;
Defendants, in fact, do not address the propriety of injunctive relief either in their Motion or their
Reply, thereby forfeiting any objections they may have had.  Id. at 80; see Defs. MSJ at 2–15
(arguing only that Traffic Regulations do not violate First Amendment); Defs. Reply at 6–22
(same).  In any event, the Court believes that this remedy is called for here.

 Beginning with the first factor, it is black-letter law that the impairment of First
Amendment rights, "for even minimal periods of time, unquestionably constitutes irreparable
injury."  Mills v. Dist. of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting Elrod v.
Burns, 472 U.S. 347, 373 (1976).  As Mahoney has succeeded on his First Amendment claim, he
has thus established that he was and continues to be irreparably injured by the challenged Board
regulations.

 The second factor is more of a mixed bag.  On the one hand, Plaintiff incorrectly assumes
that he would not have a cause of action for damages under Bivens in relation to his 2021 arrest,
see Stip., ¶ 39, which ignores binding Circuit precedent to the contrary.  See Dellums, 566 F.2d at
194–96 (holding that demonstrators arrested on steps of Capitol could bring First Amendment

<div align="center">26</div>

<div align="center">J.A. 441</div>

<u>Bivens</u> claim). To be sure, the Supreme Court may decide that the Circuit's decision in <u>Dellums</u> is no longer good law in light of more recent precedent on <u>Bivens</u>, <u>see, e.g.</u>, <u>Hernandez v. Mesa</u>, 589 U.S. 93 (2020), but that is that Court's decision to make, not this one's. <u>See</u> <u>Hartley</u>, 918 F. Supp. 2d at 52 ("Even if Defendants are correct in predicting the Supreme Court's response to questions not yet before it, this Court cannot accept its invitation to depart from this Circuit's binding precedent.").

On the other hand, it is unclear that Plaintiff has suffered any economic damages resulting from the constitutional violation at hand. <u>See</u> <u>Zukerman v. U.S. Postal Serv.</u>, 567 F. Supp. 3d 161, 177 (D.D.C. 2021) (suit for damages not adequate when plaintiff "suffered no economic damages"). Nor is a declaratory judgment an adequate alternative <u>at law</u>, as "this brand of relief is itself more equitable than legal in nature." <u>Nat'l Mining Ass'n v. U.S. Army Corps of Engineers</u>, 145 F.3d 1399, 1409 (D.C. Cir. 1998). All in all, then, this factor slightly favors Mahoney, too.

The last two factors — which merge when the Government is the defendant, <u>see</u> <u>Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.</u>, 64 F.4th 1354, 1364 (D.C. Cir. 2023) — take Plaintiff all the way home. The Court agrees with him that Defendants have no interest "in enforcing an unconstitutional regulation." Pl. MSJ at 44; <u>see</u> <u>Kiakombua v. Wolf</u>, 498 F. Supp. 3d 1, 57–58 (D.D.C. 2020) ("[T]he government cannot suffer harm from an injunction that merely ends an unlawful practice.") (cleaned up). There is thus no valid hardship on the Government side of the ledger against which to balance Plaintiff's harms. And the public would be served by the kind of relief Mahoney seeks, since "enforcement of an unconstitutional law is always contrary to the public interest." <u>Gordon v. Holder</u>, 721 F.3d 638, 653 (D.C. Cir. 2013). With all of the factors pointing in the same direction, the Court accordingly concludes

27

that a permanent injunction preventing the Board from enforcing its prohibition on the portion of

the Eastern Steps on which Mahoney wishes to demonstrate is also an appropriate remedy here.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Plaintiff's Motion for Summary Judgment,

deny Defendants', and enter a permanent injunction barring Defendants from enforcing their

prohibition on non-Member-sponsored speech on the bottommost portion of the Eastern Steps.  A

separate Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  May 17, 2024

28

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PATRICK J. MAHONEY,

      **Plaintiff,**

        **v.**

                            Civil Action No. 21-2314 (JEB)

UNITED STATES CAPITOL POLICE
BOARD, *et al.*,

      **Defendants.**

## <u>MEMORANDUM OPINION</u>

For many years, Plaintiff Patrick J. Mahoney has sought to invalidate demonstration

restrictions on federal property here in Washington. A clergyman, he has invoked the First

Amendment for both its religion and speech protections throughout his challenges. Back when

he filed this lawsuit in 2021 against the U.S. Capitol Police Board and its individual members,

Mahoney was seeking to invalidate a number of Board limitations on demonstration activity all

over the Capitol Grounds. Little of that case remains.

As things currently stand, the only matter still in need of resolution is Mahoney's speech-

based challenge to the Board's near-total prohibition on expressive activities on the lower sets of

steps leading to the eastern entrances of the Capitol building. He now moves for summary

judgment, seeking a declaration that this regulation is unconstitutional and a permanent

injunction preventing the Board from enforcing it. Defendants cross-move for summary

judgment, contending that the Board's regulation is constitutionally valid. Believing that

Plaintiff ultimately has the better of the argument, the Court will grant his Motion and enter a

permanent injunction.

<div align="center">1</div>

## I.   Background

The Court begins with a brief overview of the applicable regulations governing

demonstrations on the portion of the Capitol Grounds relevant to this dispute, then proceeds to

the factual and procedural history that has led us here.  Those interested in the extended version

of Mahoney's crusade against the Board's regulatory scheme can refer to the Court's previous

opinions.  See Mahoney v. U.S. Capitol Police Bd., 566 F. Supp. 3d 1 (D.D.C. 2022) (Mahoney

I); Mahoney v. U.S. Capitol Police Bd., 2022 WL 1014791 (D.D.C. Apr. 5, 2022) (Mahoney II);

Mahoney v. U.S. Capitol Police Bd., 566 F. Supp. 3d 22 (D.D.C. 2022) (Mahoney III); ECF No.

80 (Op.) (D.D.C. Apr. 4, 2023) (Mahoney IV).

### A.  Legal Background

The Board regulates traffic, both vehicular and pedestrian, within the Capitol Grounds.

See ECF No. 98-5 (Traffic Regulations) at 3.  Pursuant to its statutory authority, it has

promulgated a set of regulations — the Traffic Regulations — that governs, among other things,

"demonstration activity" on those Grounds.  Id. § 12.1.  Demonstration activity is "any protest,

rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for

the purpose of expressing political, social, religious or other similar ideas, views or concerns

protected by the First Amendment."  Id. § 12.1.10.

Such activity is permitted on some parts of the Capitol Grounds and prohibited on others.

The Regulations reference the U.S. Capitol Grounds Demonstration Areas Map, which is

reproduced below, to differentiate among those areas.  Id. § 12.2.10.

2

J.A. 445



ECF No. 99-1 (Stipulation of Facts), ¶ 26 (citation omitted; circles added).

Demonstration activity is barred in areas designated "No Demonstration Permitted" — the darkest zones in the map above — including a 250-foot buffer zone around the Capitol building.  Id., ¶ 27.  Most importantly for present purposes, the "No Demonstration Permitted" areas include the three sets of steps on the eastern side of the Capitol and "the paved areas immediately around them."  Id., ¶ 29.  Those three sets — which the Court collectively calls the Eastern Steps — comprise the Eastern Senate, House, and Capitol steps.

The Eastern Senate steps, which lie between the Capitol and area 9 (marked above in a yellow circle), consist of a base that is slightly elevated above the adjoining sidewalk and a total of 45 steps leading to an entrance to the Senate chamber.  Id., ¶¶ 12–13.  The topmost 27 steps, which are cordoned off by bike racks and a chain, are currently off-limits to the public.  Id., ¶ 13; see also ECF No. 95-5 (Senate Steps Photograph).  These steps are depicted below.

3

J.A. 446



The Eastern House steps, which are near area 10 on the Traffic Regulations map (marked by a green circle), are nearly identical to their Senate counterparts, with the topmost 28 steps similarly closed off to the public.  See Stip., ¶¶ 20–22.  These steps (depicted below), as their name suggests, lead to an entrance to the House chamber.  Id., ¶ 21; ECF No. 95-11 (House Steps Photograph).



The Eastern Capitol steps, which sit in between the Senate and House steps (marked by a red circle on the demonstration map), differ slightly from the other two.  They do not have an elevated base, meaning that it is less clear where the nearby sidewalk ends and the base of these steps begins.  See Stip., ¶ 18.  The Capitol steps (depicted below) are otherwise very similar to the Senate and House steps, and their upper steps are similarly closed to the public.  Id., ¶¶ 16–17.  These, too, lead to an entrance, this time to the Capitol rotunda.  Id., ¶ 17; ECF No. 95-8 (Capitol Steps Photograph).  Mahoney wishes to conduct his activities on the bottommost portion of all three sets of steps, and the analysis below does not distinguish among them.

5



While previous iterations of the Traffic Regulations allowed members of the public to engage in demonstration activity on the Eastern Steps, <u>see</u> Stip., ¶¶ 43–46 (citing examples), the Board has prohibited such conduct since the September 11, 2001, terrorist attacks. <u>Id.</u>, ¶ 47.

This proscription is not absolute, however. Based on a longstanding (but implicit) interpretation of its prior regulations, the Board (now explicitly) permits members of Congress and their invitees to engage in demonstration activity on the Eastern Steps. <u>See</u> Traffic Regs. § 12.2.20. A Member-led event qualifies for this exemption as long as: "(a) it is being done" in the Member's "official capacity"; "(b) it is being organized or sponsored" by the Member; and "(c) the Member[] is personally in attendance at the demonstration activity at all times." <u>Id.</u> Should the sponsoring Member leave the event at any time, the exemption will cease to apply. <u>Id.</u>

J.A. 449

The Regulations do not contain criminal-enforcement provisions.  The U.S. Capitol Police, however, is authorized to enforce federal and D.C. law on the Capitol Grounds — including, for example, 40 U.S.C. § 5104(f)(a)'s ban on "parad[ing]" on the Grounds, violation of which may be punishable by a fine and imprisonment.  See 2 U.S.C. § 1967(a)(4), (b)(1); Stip., ¶ 31.  D.C. law, moreover, makes the Regulations indirectly enforceable by rendering it unlawful to "engage in a demonstration in an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a demonstration."  D.C. Code § 22-1307(b)(1).  Violation of that provision is similarly punishable by a fine and imprisonment.  Id. § 22-1307(c); Stip., ¶ 31; see also Stip., ¶¶ 39–40.

### B.  Factual and Procedural Background

With this statutory and regulatory backdrop in mind, the Court proceeds to the facts, as reflected in the parties' stipulation.  Mahoney is a Presbyterian minister who has brought myriad suits over the decades seeking to conduct demonstrations on federal property.  See, e.g., Mahoney v. Babbitt, 105 F.3d 1452 (D.C. Cir. 1997).  This time around, he has been battling the Board since 2021 over his desire to hold prayer vigils and other demonstrations on the Capitol Grounds that run afoul of the latter's regulations.  See Stip., ¶¶ 35–40; ECF No. 1 (Compl.).

The history of this years-long dispute has wound a tortuous path.  See Mahoney IV, ECF No. 80 at 5–11 (recounting said history); Mahoney I, 566 F. Supp. 3d at 7–8 (same).  Suffice it to say that after, inter alia, numerous preliminary-relief requests, two motions to dismiss, a motion for reconsideration, a trip to the Circuit, see Mahoney v. U.S. Capitol Police Bd., 2022 WL 1177313 (D.C. Cir. Apr. 15, 2022), and various revisions to the Traffic Regulations, the parties have finally narrowed their disagreements to one: Plaintiff's proposed demonstration activity on

the bottommost portion of the Eastern Steps — *i.e.*, below the barriers currently blocking off access to the public.  Specifically, Mahoney wishes to put on events "that will involve praying, gathering, assembly, and protest" on these steps and the adjoining sidewalks, and he expects that his wife and another few individuals will join him.  See Stip., ¶ 35.  As before, he wants to engage in these activities on specific days such as Good Friday, Thanksgiving, and Christmas and plans to do so not just this year but "every subsequent year for the foreseeable future."  Id., ¶ 37.

Because these proposed vigils and protests, which would not be sponsored by a Member of Congress, would violate the prohibition on demonstration activity in this area, Mahoney seeks the Court's intervention.  He contends that the Board's designation of the Eastern Steps as a "No Demonstration Permitted" area violates both the First Amendment on its face and the Fifth Amendment's equal-protection guarantee.  See ECF No. 69 (3d Am. Compl.), ¶¶ 97–98, 160–63.  He asks the Court to enter a permanent injunction to prevent the Board from enforcing this portion of the regulations.  Id. at 45–46.  The parties have now cross-moved for summary judgment.  See ECF Nos. 97 (Pl. MSJ); 102-1 (Defs. MSJ).

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550

8

J.A. 451

U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). The Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor. See Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

## III.   Analysis

Like ships passing in the night, the parties open with two completely different doctrinal frameworks for resolving this case. Plaintiff believes that a straightforward application of First Amendment forum analysis shows why he is entitled to summary judgment and a permanent injunction against the Traffic Regulations. Defendants, meanwhile, insist that a forum analysis would be improper because the First Amendment does not apply at all. That is so, they posit, because the regulatory scheme at issue limits only government speech. The Court will take these

in the reverse order, beginning with government speech and then turning to forum analysis. Given the resolution in Plaintiff's favor on the First Amendment question, it need not consider his Fifth Amendment claim.

A. <u>Government Speech</u>

There is no dispute that Mahoney's proposed activities constitute speech covered by the First Amendment. <u>See</u> Stip., ¶ 35.  While that Amendment typically does not permit discrimination based on the content or viewpoint of the speech, when the Government is the one speaking — which it does, at times, through private individuals — it is allowed to so discriminate in determining what messages it wishes to disseminate or sponsor. <u>See</u> <u>Walker v. Texas Div., Sons of Confederate Veterans, Inc.</u>, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); <u>Raven v. Sajet</u>, 334 F. Supp. 3d 22, 32 (D.D.C. 2018) ("Even political discrimination is allowed when the government chooses to sponsor speech."); <u>Nat'l Endow. for Arts v. Finley</u>, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view[.]").  "Indeed, it is not easy to imagine how government could function if it lacked this freedom." <u>Pleasant Grove City v. Summum</u>, 555 U.S. 460, 468 (2009).  Because this doctrine is one "susceptible to dangerous misuse," however, courts must "exercise great caution before" declaring a particular activity government speech. <u>Matal v. Tam</u>, 582 U.S. 218, 235 (2017).

Defendants here appear to contend that all speech on the Eastern Steps is government speech.  In other words, as the events are organized or sponsored by Members, any expression constitutes government speech. <u>See</u> Defs. MSJ at 6–11; <u>see also</u> ECF No. 108 (Defs. Reply) at 10 ("[S]peech by Members of Congress during Member events on the East Front Steps

J.A. 453

constitutes government speech[.]").  Mahoney believes that even this is a contestable proposition, as a Member may do no more than sponsor an event and attend as a mere bystander. See ECF No. 105 (Pl. Reply) at 18–20 (citing examples).  He conceivably has a point.  Cf. Shurtleff v. City of Bos., Massachusetts, 596 U.S. 243, 252 (2022) ("The boundary between government speech and private expression can blur when, as here, a government invites the people to participate in a program.").  But that is neither here nor there.  The more significant weakness in the Government's position is that the presence of government speech in a public forum (which the Court below concludes this is) does not exempt from First Amendment scrutiny its restrictions on other speakers.

The circumstances here, in fact, are indistinguishable from those in ANSWER Coalition v. Jewell, 153 F. Supp. 3d 395 (D.D.C. 2016).  The challenged regulations there, much like the ones here, reserved certain areas along the presidential inaugural parade route for the exclusive use of the Presidential Inaugural Committee, a private organization controlled by the President-Elect and tasked with organizing inauguration-related events.  Id. at 401–04.  The court concluded that the Committee's speech within the reserved areas was government speech, id. at 412–13, but nevertheless analyzed whether the exclusion of other speakers from those areas was permissible under the First Amendment.  Id. at 413–14.  While "[the Committee's] speech itself is not subject to First Amendment scrutiny," the court explained, "the restriction of the expressive activities of [the plaintiff] and all other private persons and entities to limited portions of the parade route . . . is."  Id. at 414.  So it is here.  The Court thus rejects the Board's halfhearted effort to take the First Amendment out of the equation altogether.

B. <u>Forum Analysis</u>

With the Government's top-line argument dispensed, the Court now turns to the meat of the parties' disagreement: should the Eastern Steps be classified as a public or non-public forum? Plaintiff advocates for the former, while Defendants push for the latter.  <u>See</u> Pl. MSJ at 23; Defs. MSJ at 11–12.  As the Court cannot determine the correct standard of scrutiny that applies to the restrictions until it answers this question, it will begin there.  In addition, since Mahoney wishes to engage in demonstration activity only on the steps below the dividers, the Court's conclusions will be cabined to those lower areas of the three sets of steps.  <u>See</u> <u>Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.</u>, 473 U.S. 788, 801 (1985) (in defining forum, courts should "focus[] on the access sought by the speaker").

1. *Designation of Forum*

When the Government restricts speech on its own property — as it does here — the Court's review under the First Amendment initially inquires into the nature of the forum.  <u>See Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.</u>, 901 F.3d 356, 364 (D.C. Cir. 2018).  Such property may be classified, for example, as a "traditional" or "designated" public forum — a space that the state has opened to the public for expressive activity either as a matter of longstanding tradition (*e.g.*, sidewalks and parks) or by fiat.  <u>Id.</u> (citing <u>Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n</u>, 460 U.S. 37, 45–46 (1983)).  Alternatively, the property may be one that "is not by tradition or designation a forum" for public speech — in which case, the forum is "non-public."  <u>Perry Educ. Ass'n</u>, 460 U.S. at 46, 53.  The Government can also create a kind of in-between forum, known as a "limited public forum," which is open to discussion only on some specific topics or to some groups, such as public-university facilities.  <u>See</u> <u>Price v. Garland</u>, 45 F.4th 1059, 1068 (D.C. Cir. 2022); <u>Rosenberger v. Rector and Visitors of Univ. of Va.</u>, 515 U.S.

J.A. 455

819 (1995).  In classifying public property, courts must "take[] into account the nature and

traditional uses of the particular" property involved.  Boardley v. U.S. Dep't of Interior, 615 F.3d

508, 515 (D.C. Cir. 2010) (citation omitted).

<div style="text-align:center">a.   Public Forum</div>

While no case has squarely addressed the forum designation of the portion of the Eastern

Steps at issue here, the Court is hardly writing on a blank slate.  On various occasions, as

Plaintiff correctly points out, our Circuit and other courts in this district have held that various

portions of the Capitol Grounds are traditional public fora.  See Pl. MSJ at 24–26.  Start with

Jeannette Rankin Brigade v. Chief of Capitol Police, 342 F. Supp. 575 (D.D.C. 1972), where a

three-judge court here held that the Grounds "have traditionally been open to the public."  Id. at

584.  The court noted that the Grounds received thousands of visitors per year and that the main

purpose of the Capitol building (i.e., making laws) was compatible "with the existence of all

parades, assemblages, or processions which may take place on the grounds."  Id.  Notably, the

court's holding did not draw any distinction between the precise area where the plaintiffs there

wanted to protest — the east front plaza near the east Capitol steps — and the rest of the

Grounds, but instead announced that as a whole they are a traditional public forum.  Id.  Since

the Supreme Court summarily affirmed the district court's decision in Jeannette Rankin, this

decision is now "binding precedent."  Lederman v. United States, 291 F.3d 36, 41 (D.C. Cir.

2002); see also Cmty. for Creative Non-Violence v. Kerrigan, 865 F.2d 382, 387 (D.C. Cir. 1989)

("There is no doubt that the Capitol Grounds are a public forum.").

Thirty years later, the D.C. Circuit held that the sidewalks at the bases of the Eastern

Senate and House steps were traditional public fora.  See Lederman, 291 F.3d at 44.  The court

there focused on the sidewalks and declined to "consider the public forum status of 'no-

<div style="text-align:center">13</div>

demonstration zones' other than" those.  Id. at 41.  It stated that, since "the Capitol Grounds as a whole meet the definition of a traditional public forum," the burden was on the Government to show that the sidewalks were used for a special purpose.  Id. at 41–42 (emphasis added).  In attempting to do so, the defendants there pointed to three differences: 1) the sidewalks (like the steps here) abut the Capitol Building, 2) the eastern-front sidewalks were never open for public expression, even if they were generally open to the public, and 3) the sidewalks were primarily used for ingress and egress by members of Congress.  Id. at 42–44.

The Lederman court was unconvinced.  As to the Government's first distinction, it breezily noted that it was unavailing because "the entire Capitol Grounds are a public forum," so the fact that the sidewalks were near the Capitol building did not by itself make them non-public.  Id. at 42.  The court was equally dismissive of the second, as the sidewalks were only unavailable for public expression because "such expression was prohibited anywhere on the Capitol Grounds by the very statute declared unconstitutional in Jeannette Rankin."  Id. at 43.  Last, the court found that the use of the sidewalks by Congressmembers did not alter its conclusion because members already had to avoid "tourists, joggers, dogs, and strollers," so there was no reason to assume "they are [not] also capable of circumnavigating the occasional protester."  Id.

Fast forward another 20+ years to the Circuit's recent opinion in United States v. Nassif, 97 F.4th 968 (D.C. Cir. 2024).  In concluding that the interior of the Capitol building is a non-public forum, the court there highlighted that it has "long recognized" the exterior Capitol Grounds as a traditional public forum, thus distinguishing the former from the latter.  Id. at 975.  In support of its conclusion as to the interior, the Circuit also suggested that the "physical threshold separating" the Grounds from the interior was the doorway.  Id.  This, it reasoned, was

14

J.A. 457

"a familiar signal that the building's interior differs from the remainder of the public Grounds in ways that make it uniquely nonpublic." Id. (cleaned up).

What is more, our Circuit has held that Vietnam-war protesters arrested on the very Capitol steps that Mahoney now wishes to demonstrate on could bring a First Amendment Bivens claim against Capitol police. See Dellums v. Powell, 566 F.2d 167, 173, 194–96 (D.C. Cir. 1977); see also Hartley v. Wilfert, 918 F. Supp. 2d 45, 50 (D.D.C. 2013). While the court's opinion did not engage in any forum analysis as such, it described the plaintiff's demonstrations on the steps as the exercise of "basic constitutional rights in their most pristine and classic form." Id. at 194-95 (citation omitted). It further reasoned that a cause of action for damages was necessary to prevent the "loss of an opportunity to express to Congress one's dissatisfaction" in a location likely to attract "the attention of a mass audience." Id. at 195.

Stepping back from the Capitol and looking at legislatures more generally, courts in the District of Columbia are hardly alone in thinking that legislative buildings — and the steps that lead to them — "occupy a special place in our First Amendment tradition." Hulbert v. Pope, 70 F.4th 726, 738 (4th Cir. 2023); Occupy Columbia v. Haley, 738 F.3d 107, 121 (4th Cir. 2013) (entire state-house grounds are traditional public forum); Wells v. City & County of Denver, 257 F.3d 1132, 1146 (10th Cir. 2001) (steps leading to county building are public forum); Pouillon v. City of Owosso, 206 F.3d 711, 716–17 (6th Cir. 2000) (steps leading to city hall are traditional public forum as they are "in the highest degree linked, traditionally, with the expression of opinion"); see also Watters v. Otter, 986 F. Supp. 2d 1162, 1173 (D. Idaho 2013) (state house and surrounding area are traditional public forum because "expressing grievances at the site of the State Government is the most pristine and classic form" of First Amendment speech) (cleaned up); Kanelos v. County of Mohave, 893 F. Supp. 2d 1001, 1012 (D. Ariz. 2012) ("Where a

15

government building houses legislative activities, courts have typically held that the building's grounds are a traditional public forum.") (collecting cases).

Nor should this come as a surprise. Throughout this country's history, legislative grounds have been the stage for movements seeking to voice their displeasure with official policy. Many protests during the civil-rights movement, for instance, took place at or near state legislative buildings. See, e.g., Cox v. Louisiana, 379 U.S. 536, 539, 545–46 (1965) (college students gathered "at the site of the old State Capitol Building" before marching to courthouse to protest segregation); Edwards v. South Carolina, 372 U.S. 229, 235 (1963) (describing anti-segregation demonstration on statehouse grounds as "pristine and classic form" of First Amendment activity); Henry v. City of Rock Hill, 376 U.S. 776, 777 (1964) (similar). The same was true of demonstrations against the United States' involvement in Vietnam; indeed, many anti-war protests took place on the Capitol Grounds themselves, as described above. See Jeannette Rankin, 342 F. Supp. at 578 (anti-war protest at east front plaza); Dellums, 566 F.2d at 173 (anti-war protest at Eastern Capitol Steps). In fact, the parties agree that the Eastern Steps themselves were the site of protests and other demonstrations prior to 9/11, including "no fewer than forty" events in which Mahoney participated. See Stip., ¶¶ 43–46.

In light of all this, the Court ultimately agrees with Plaintiff that at least the lower portion of the Eastern Steps on which he wishes to demonstrate are the kind of public property that has been "historically associated with the exercise of First Amendment rights." Pl. MSJ at 23 (citation omitted). Like the sidewalks immediately next to them, the steps are "continually open, often uncongested, and . . . a place where people may enjoy the open air or the company of friends and neighbors." Lederman, 291 F.3d at 44 (citation omitted). More importantly, these steps and others like them have historically "been used for purposes of assembly . . . and

16

discussing public questions." Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939).  The

nature of the steps and the function they have played thus support their designation as a

traditional public forum.  Perry Educ. Ass'n, 460 U.S. at 45.

           b.   Defense Counterarguments

        All is not necessarily lost for Defendants, however, as they could rebut the "working

presumption" that these steps are a public forum by establishing that they are reserved for a

unique use that "outweigh[s] the attributes that would otherwise mark them as public forums."

Henderson v. Lujan, 964 F.2d 1179, 1182 (D.C. Cir. 1992).  In attempting to do so, Defendants

offer three principal arguments for why the Eastern Steps are distinguishable from the rest of the

Capitol Grounds, which the Court reorders for ease of analysis.  First, they stress that the Eastern

Steps have now been a "No Demonstration Zone" in the two decades following 9/11 and that the

Capitol Grounds were "informally" closed to public demonstrations even before then.  See Defs.

MSJ at 11.  Second, they argue that the Board was entitled to close the steps in light of security

threats like 9/11 and the events of January 6, 2021.  See Defs. Reply at 3.  Third, they contend

that the steps are "part of the Capitol Building itself" and serve as a secure entryway for

Members and staff, rendering them structurally distinct from the adjoining sidewalks and used

for a different purpose.  See Defs. MSJ at 13; Defs. Reply at 2–4.

        The Board's initial point fails to move the needle.  The Government cannot turn a

traditional public forum into a non-public one by its own say so.  See U.S. Postal Serv. v.

Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 133 (1981) (Government "may not by its

own ipse dixit destroy the 'public forum' status of" locations "which have historically been

public for[a]").  Nor can the "unconstitutional restrictions" that informally closed off the steps

until the court's decision in Jeannette Rankin, "by their mere existence, bootstrap subsequent

restrictions into validity." Lederman, 291 F.3d at 43.  This argument, it turns out, is simply a recapitulation of one of the arguments the court in Lederman considered and rejected.  See id. at 43 (dismissing argument that east-front sidewalks are non-public because they "ha[d] never been available to the public for expressive activity").  Indeed, it is a weaker version of it, as the regulations here have been in place for only two decades, as compared to the "century" of regulation deemed irrelevant in Lederman.  Id.

Defendants' second argument founders for the same reason.  The Court is certainly mindful of the security concerns that animate the Board's restrictions here and has acknowledged them previously.  See Mahoney I, 566 F. Supp. 3d at 10 ("Well before [January 6, 2021], the events of September 11, 2001 — the very event that Mahoney sought to commemorate in his vigil — dramatically changed the security landscape on the Capitol Grounds.").  Serious as these are, however, they do not lead to the conclusion that the Eastern Steps were designed for a use that is incompatible with their status as a traditional public forum — unlike sidewalks within a military base, for example, which are.  See Greer v. Spock, 424 U.S. 828, 838 (1976).  Of course, these interests are weighty and will be considered when the Court turns to the validity of the regulations being challenged, but they do not suffice to turn an otherwise public forum into a non-public one.

This leaves Defendants' contention that the steps are specialized because they are part of the Capitol building itself and were designed "only to provide access to non-public entrances to the Capitol Building."  Defs. Reply at 2.  They accordingly analogize the steps, not to the sidewalks next to them, but to interior post-office sidewalks and the staircase leading to the plaza in front of the Supreme Court, both of which were previously declared non-public by our Circuit. Id. at 2, 5; Initiative & Referendum Inst. v. U.S. Postal Serv., 685 F.3d 1066 (D.C. Cir. 2012)

(interior post-office sidewalks); <u>Hodge v. Talkin</u>, 799 F.3d 1145 (D.C. Cir. 2015) (Supreme Court plaza and staircase).

The Court remains unconvinced, although this is Defendants' strongest argument and the only one that directly addresses the issue here: whether the Eastern Steps are designed for a specialized use that is incompatible with their being a traditional public forum. For one, the record here belies any notion that these steps exist only to serve as an entryway for Members and their staff. It indicates that the public can and does access the steps for "sightseeing, posing for pictures, . . . and walking dogs." Stip., ¶ 6; <u>see also id.</u>, ¶ 67 (noting that anyone can "sit, stand[,] or congregate on the Eastern Steps (up to the dividers)" absent special events like State of the Union). In addition, Members and their staff typically use other entrances to enter the Capitol building. <u>Id.</u>, ¶ 68.

The Eastern Steps are therefore readily distinguishable from Defendants' first analogue, an interior post-office sidewalk. <u>See</u> <u>Initiative & Referendum Inst.</u>, 685 F.3d at 1070. The Circuit determined that the latter was a non-public forum because it was "typically used <u>only</u> by customers and employees of the post office" and was "built solely to provide efficient access to the post office." <u>Id.</u> at 1071 (emphasis added). Nor, the court continued, was there a tradition of using these sidewalks — which typically ran from the parking lot directly to the front door of the post-office building — for "expressive activities." <u>Id.</u> at 1071–72. Here, by contrast, the steps are not used solely for access and typically are not even put to that use by the individuals who work in the Capitol building. And, as discussed above, these steps were frequently used for private expressive activities before 9/11 and are still used for that purpose by Members and their non-member, non-staff invitees. <u>See, e.g.</u>, Stip, ¶¶ 52 (moment of silence to honor COVID-19

19

victims led by House Speaker), 53 (protest against end of executive eviction moratorium led by Rep. Cori Bush), 61 (protest against state law led by Rep. Greg Casar).

The second example on offer, the Supreme Court plaza, is closer to the mark. After all, the Circuit found the entire plaza (staircase included) to be non-public in part because its "architectural integration" with the Court's building elevated it, both literally and figuratively, to the status of a "special type of enclave." Hodge, 799 F.3d at 1158–59 (quoting United States v. Grace, 461 U.S. 171, 180 (1983)); see id. at 1158 ("The plaza is elevated from the sidewalk by a set of marble steps."). Since the Eastern Steps could be said to be part of the Capitol building, and since the base of the House and Senate Steps are slightly elevated from the east-front sidewalk, Defendants suppose that the public would be aware that they have "entered some special type of enclave" upon ascending these steps. See Defs. Reply at 2.

Even assuming that the Eastern Steps bear a resemblance to the Supreme Court plaza, as Defendants say, this does not affect the Court's conclusion. In fact, the Circuit's opinion in Hodge only serves to reinforce it. After the court there determined that the Supreme Court's plaza was distinct from the perimeter sidewalks, it went on to explain that courthouse grounds have historically "not been considered a forum for demonstrations and protests." Hodge, 799 F.3d at 1159 (citing Cox, 379 U.S. at 560, 562). These grounds were no different, it continued, as Congress had heavily restricted demonstrations on the plaza, and the Supreme Court police had strictly enforced these regulations. Id. at 1161–62. More to the point, the Circuit underscored its conclusion by contrasting the Supreme Court's grounds with the Capitol Grounds, which "are a public forum by requirement of the First Amendment." Id. at 1661. While the "fundamental function of a legislature in a democratic society" invites expressions of

public opinion, the "judiciary does not decide cases by reference to popular opinion." Id. at 1159

(quoting Jeannette Rankin, 342 F. Supp. at 584).

Simply put, just as "[j]udges are not politicians," courthouses are not legislative

buildings. Williams-Yulee v. Fla. Bar, 575 U.S. 433, 437 (2015); Hodge, 799 F.3d at 1161

("[P]oliticians are expected to be appropriately responsive to the preferences of the public[;] . . .

the same is not true of judges.") (cleaned up).  Demonstrations and other First Amendment

activities are perfectly compatible with the nature and purpose of the latter, as explained above,

but not necessarily the former.  So, even if the Eastern Steps are architecturally similar to the

Supreme Court plaza, the First Amendment rightly treats them as fundamentally different

because responsiveness to public clamor is a virtue in elected officials, and only these officials

should expect frequent "public expression" around their workplaces.  Hodge, 799 F.3d at 1161.

*     *     *

To recap: the Court here need not determine the forum status of every single tread and

riser within the Eastern Steps or of the upper landing areas that they lead to.  Nor does it need to

demarcate once and for all where the eastern portion of the Capitol Grounds ends and the Capitol

building begins.  All it decides is that the real property on which Mahoney wishes to demonstrate

— viz., the steps below the dividers on the three sets of steps near the east front plaza — are a

traditional public forum.

### 2. *Application of Scrutiny*

Having classified the relevant portion of the Eastern Steps as a traditional public forum,

the Court can now assess the appropriate level of scrutiny to apply to the Board's Traffic

Regulations.  The Government's regulatory authority is at its lowest ebb in a forum like this one,

as it "must respect the open character of these for[a]."  Oberwetter v. Hilliard, 639 F.3d 545, 551

(D.C. Cir. 2011); <u>Grace</u>, 461 U.S. at 177 (in traditional public forum, "the government's ability to permissibly restrict expressive conduct is very limited").  Content-based restrictions on expressive activities in such fora must pass strict scrutiny — *i.e.*, "the restriction must be narrowly tailored to serve a compelling government interest." <u>Pleasant Grove City</u>, 555 U.S. at 469.  On the other hand, even in a public forum the Government has a freer hand to impose <u>content-neutral</u> time, place, and manner restrictions.  <u>See</u> <u>Mahoney I</u>, 566 F. Supp. 3d at 9.  Such regulations need only satisfy intermediate scrutiny, meaning they must be "narrowly tailored to serve a significant government interest" and must "leave open ample alternative channels of communication." <u>Mahoney v. Doe</u>, 642 F.3d 1112, 1117 (D.C. Cir. 2011) (citation omitted).

Given that the level of scrutiny hinges on whether the Traffic Regulations target speech based on its content, the parties vigorously dispute whether these do.  <u>See</u> Pl. MSJ at 31–32 (arguing affirmatively); Defs. MSJ at 17–18 (arguing negatively).  Interesting though it may be, the Court will not settle this disagreement one way or another.  That is because the near-total ban on expression here would fail under either standard because it is not narrowly tailored. <u>Lederman</u>, 291 F.3d at 44; <u>cf.</u> <u>Nassif</u>, 97 F.4th at 980 ("A categorical prohibition on all expressive activity <u>within</u> Capitol Buildings would likely not pass constitutional muster even under the relaxed standard applicable to a nonpublic forum.") (emphasis added).  That is so even if Defendants unquestionably have a "compelling interest in the security of the Capitol Building." <u>Mahoney</u>, 2022 WL 1177313, at *3 (Millett, J., concurring).

To begin, the Board's ban on expressive activities on the eastern steps is troublingly overinclusive.  <u>See</u> <u>Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.</u>, 502 U.S. 105, 121–23 (1991) (law that is "significantly overinclusive" is not narrowly tailored).  While the Court is well aware of the "significant security concerns presented when groups are in

close proximity to the Capitol" following January 6, see Defs. MSJ at 18, the applicable portion

of the Traffic Regulations prevents even a single person from holding a quiet vigil on the bottom

House or Senate steps.  See Traffic Regs. §§ 12.1.10 (defining demonstration activity to include

a "vigil"); 12.1.20 (prohibition applies to "any one . . . person or group of persons").  It would

also seem to cover a pair of individuals gathering on the Eastern Steps to oppose or support the

latest editorial in the *New York Times*.  Id. § 12.1.10 (prohibiting "gathering . . . for the purpose

of expressing political, social, religious[,] or other similar ideas").  In short, it beggars belief that

"all listed demonstration activities could reasonably be expected to interfere with" Defendants'

security priorities.  Lederman, 291 F.3d at 45; cf. Bd. of Airport Comm'rs of L.A. v. Jews for

Jesus, Inc., 482 U.S. 569, 574–75 (1987) (ban on "all First Amendment activities" not narrowly

tailored as "no conceivable governmental interest would justify such an absolute prohibition on

speech") (cleaned up).

        These regulations, moreover, suffer from the opposite problem, too — they are seriously

underinclusive.  See Brown v. Ent. Merchs. Ass'n, 564 U.S. 786, 802 (2011)

("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the

interest it invokes, rather than disfavoring a particular speaker or viewpoint.").  Neither these

regulations nor any others stop members of the public from merely "sitt[ing], stand[ing] or

congregat[ing] on the Eastern Steps."  Stip., ¶ 67.  In large enough groups, these people could

presumably pose a serious threat to the Capitol building and Grounds.  Yet "the Board has made

no effort to keep any of these . . . individuals away from the Capitol."  Lederman, 291 F.3d at 45.

        Worse still, the Traffic Regulations allow Members to invite an untold number of private

individuals to join in expressive activities without undergoing any security vetting by them or the

Board.  See Stip., ¶¶ 56, 64 (highlighting how attendees of two Member-organized events

"simply showed up" and were not even known to organizing Member).  The only explicit limits on this set-aside are that the sponsoring Member must be acting in her official capacity and must be present at all times.  See Traffic Regs. § 12.2.20.  The Traffic Regulations thus seem to permit a large and temporally interminable protest on the Eastern Steps — regardless of the dangerousness or size of the crowd — so long as a Member sponsors the demonstration and stands nearby, all while preventing a lone individual from sharing his views on the controversy *du jour* with passersby.  This comes nowhere close to narrow tailoring.

What ultimately seals this prohibition's fate, however, is the availability of less restrictive alternatives to promote Defendants' crucial security objectives.  Granted, a regulation "'need not be the least restrictive or least intrusive means of' serving the government's interests."  McCullen v. Coakley, 573 U.S. 464, 468 (2014) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989)).  But the number of alternative regulatory options at the Board's disposal is so vast as to confirm what the under- and over- inclusiveness intimated: that Defendants are "sacrificing speech" by burdening "substantially more [of it] than necessary" in pursuit of their admittedly noble goals.  Id. at 486, 490 (cleaned up); Lederman, 291 F.3d at 45 ("Perhaps the most troubling aspects of the Board's virtually per se ban on expressive activity on the East Front sidewalk [abutting Eastern Steps] is the ready availability of 'substantially less restrictive' alternatives[.]").

Defendants, for example, could limit the number of people who can demonstrate on the Eastern Steps at one time, or they could require individuals like Plaintiff to obtain a permit, as they already do for groups wishing to demonstrate on different areas of the Capitol Grounds.  See Traffic Regs. §§ 12.3.10 (allowing groups under thirty to demonstrate in most of Grounds without permit); 12.4.20 (laying out permit-application requirements for groups over thirty); Mahoney I, 566 F. Supp. 3d at 10–11 (holding more restrictive size and permit restrictions are

narrowly tailored).  They could also ban the use of props, see Cmty. for Creative Non-Violence,

865 F.2d at 383 (upholding 24-hour limit on use of props on Capitol Grounds), ban expressive

activities at certain times of the day, or force prospective demonstrators to submit to police

screening.  Indeed, they could also strictly enforce the federal law that prohibits engaging in

"disorderly or disruptive conduct . . . with the intent to impede" congressional proceedings,

"imped[ing] passage through" the Capitol Grounds, and "engag[ing] in an act of physical

violence in the Grounds."  40 U.S.C. § 5104(e)(2)(D), (E), (F).  What they cannot do is ban

nearly all expressive conduct on the Eastern Steps in the name of security while looking the other

way as to non-expressive or Member-sponsored activities that may present as great a threat to the

Capitol and its Grounds.  Defendants, moreover, offer no explanation whatsoever for why these

alternatives would be unworkable.

In sum, assuming *arguendo* that the Traffic Regulations are content neutral, and

acknowledging that Defendants' interests here are about as weighty as they come, the Court

nevertheless concludes that the ban on all non-sponsored speech on the Eastern Steps is not

narrowly tailored and thus would not survive intermediate (let alone strict) scrutiny.  It is, in a

word, unconstitutional.

C.  Remedies

With the finish line finally in sight, the Court turns to Mahoney's request for remedies.

Having determined that Defendants' prohibition violates the First Amendment, the Court will

grant his demand for declaratory relief.

He also seeks a permanent injunction preventing the Board from enforcing its ban on

expressive activities on the bottommost Eastern Steps.  A permanent injunction is an

"exceptional form of relief" that should not be awarded lightly.  Salazar by Salazar v. Dist. of

Columbia, 896 F.3d 489, 497 (D.C. Cir. 2018).  To obtain such remedy, Plaintiff must show that:
(1) he "suffered an irreparable injury"; (2) "remedies available at law, such as monetary
damages, are inadequate to compensate for that injury"; (3) the "balance of hardships" shakes
out in his favor; and (4) "the public interest would not be disserved by a permanent injunction."
Conservation Law Found. v. Ross, 422 F. Supp. 3d 12, 31 (D.D.C. 2019) (quoting Monsanto Co.
v. Geertson Seed Farms, 561 U.S. 139, 156–57 (2010)).  While the irreparable-harm requirement
is recited in the past tense, it is clear that future harm may qualify.  See, e.g., Loving v. IRS., 917
F. Supp. 2d 67, 81 (D.D.C. 2013).

The Court's analysis in the previous Section all but decides this in Plaintiff's favor;
Defendants, in fact, do not address the propriety of injunctive relief either in their Motion or their
Reply, thereby forfeiting any objections they may have had.  Id. at 80; see Defs. MSJ at 2–15
(arguing only that Traffic Regulations do not violate First Amendment); Defs. Reply at 6–22
(same).  In any event, the Court believes that this remedy is called for here.

Beginning with the first factor, it is black-letter law that the impairment of First
Amendment rights, "for even minimal periods of time, unquestionably constitutes irreparable
injury."  Mills v. Dist. of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting Elrod v.
Burns, 472 U.S. 347, 373 (1976).  As Mahoney has succeeded on his First Amendment claim, he
has thus established that he was and continues to be irreparably injured by the challenged Board
regulations.

The second factor is more of a mixed bag.  On the one hand, Plaintiff incorrectly assumes
that he would not have a cause of action for damages under Bivens in relation to his 2021 arrest,
see Stip., ¶ 39, which ignores binding Circuit precedent to the contrary.  See Dellums, 566 F.2d at
194–96 (holding that demonstrators arrested on steps of Capitol could bring First Amendment

J.A. 469

<u>Bivens</u> claim).  To be sure, the Supreme Court may decide that the Circuit's decision in <u>Dellums</u> is no longer good law in light of more recent precedent on <u>Bivens</u>, <u>see, e.g.</u>, <u>Hernandez v. Mesa</u>, 589 U.S. 93 (2020), but that is that Court's decision to make, not this one's.  <u>See</u> <u>Hartley</u>, 918 F. Supp. 2d at 52 ("Even if Defendants are correct in predicting the Supreme Court's response to questions not yet before it, this Court cannot accept its invitation to depart from this Circuit's binding precedent.").

On the other hand, it is unclear that Plaintiff has suffered any economic damages resulting from the constitutional violation at hand.  <u>See</u> <u>Zukerman v. U.S. Postal Serv.</u>, 567 F. Supp. 3d 161, 177 (D.D.C. 2021) (suit for damages not adequate when plaintiff "suffered no economic damages").  Nor is a declaratory judgment an adequate alternative <u>at law</u>, as "this brand of relief is itself more equitable than legal in nature."  <u>Nat'l Mining Ass'n v. U.S. Army Corps of Engineers</u>, 145 F.3d 1399, 1409 (D.C. Cir. 1998).  All in all, then, this factor slightly favors Mahoney, too.

The last two factors — which merge when the Government is the defendant, <u>see</u> <u>Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.</u>, 64 F.4th 1354, 1364 (D.C. Cir. 2023) — take Plaintiff all the way home.  The Court agrees with him that Defendants have no interest "in enforcing an unconstitutional regulation."  Pl. MSJ at 44; <u>see</u> <u>Kiakombua v. Wolf</u>, 498 F. Supp. 3d 1, 57–58 (D.D.C. 2020) ("[T]he government cannot suffer harm from an injunction that merely ends an unlawful practice.") (cleaned up).  There is thus no valid hardship on the Government side of the ledger against which to balance Plaintiff's harms.  And the public would be served by the kind of relief Mahoney seeks, since "enforcement of an unconstitutional law is always contrary to the public interest."  <u>Gordon v. Holder</u>, 721 F.3d 638, 653 (D.C. Cir. 2013).  With all of the factors pointing in the same direction, the Court accordingly concludes

J.A. 470

that a permanent injunction preventing the Board from enforcing its prohibition on the portion of the Eastern Steps on which Mahoney wishes to demonstrate is also an appropriate remedy here.

## IV.   Conclusion

For the foregoing reasons, the Court will grant Plaintiff's Motion for Summary Judgment, deny Defendants', and enter a permanent injunction barring Defendants from enforcing their prohibition on non-Member-sponsored speech on the bottommost portion of the Eastern Steps.  A separate Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  May 28, 2024

28

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK J. MAHONEY,

        *Plaintiff*,

    **v.**

KAREN H. GIBSON, in her Official
Capacity as U.S. Senate Sergeant at Arms
and Doorkeeper and Chair, United States
Capitol Police Board; WILLIAM J.
WALKER, in his Official Capacity as U.S.
House of Representatives Sergeant at Arms
and Member, United States Capitol Police
Board; J. BRETT BLANTON, in his Official
Capacity and Member, United States Capitol
Police Board; and J. THOMAS MANGER,
in his Official Capacity as Chief of Police,
United States Capitol Police and Ex-Officio
Member, United States Capitol Police Board,

        *Defendants*.

Civil Action No. 21-2314 (JEB)

SETTLEMENT TERM SHEET

On September 20, 2023, the parties, before Magistrate Judge Moxila Upadhyaya, reached a partial settlement of this matter, in principle, subject to the condition precedent set forth below. The material terms of the conditional settlement are as follows:

1.      Defendants agree that the United States Capitol Police Board (the "Board") will, no later than December 31, 2023, amend the Traffic Regulations as follows:

    a.   To provide that members of Congress are exempt from Section 12 of the Traffic Regulations, but only for demonstration activity conducted by them that meets all three of the following requirements: (a) the demonstration activity is activity in which the member is engaging in his or her official capacity; (b) the demonstration activity is activity that the member has organized or sponsored;

and (c) if persons other than the organizing or sponsoring member(s) are participating in the demonstration activity, the member(s) must personally be in attendance at the demonstration activity at all times for the exemption to last. If the organizing or sponsoring member(s) departs, the demonstration activity will immediately be subject to Section 12 of the Traffic Regulations. This provision specifically precludes an exemption when a member of Congress merely advocates for demonstration activity organized or sponsored by others.

b.  To change the size of the group allowed to engage in demonstration activity without a permit from 19 people to 30 people (Section 12.3, *et seq.*). This change authorizes demonstration activity without a permit in groups of 30 or fewer people in areas designated Green and / or Yellow on the United States Capitol Demonstration Areas Map (Appendix G to the Traffic Regulations) (the "Demonstration Map").

c.  To change (a) the minimum time period between permit application and proposed demonstration activity from 10 business days to 5 business days (Section 12.4.20) and (b) the "deemed approved" period to 24 hours prior to the proposed demonstration activity (Section 12.4.30.d).

d.  To remove all references to 40 U.S.C. Section 5104(f) or the concepts contained in its provisions (including but not limited to Section 12.1.30.a and fn. 31).

2.   Rev. Mahoney agrees to consent to dismissal of the Third Amended Complaint, with prejudice, with the caveat that that following claims will not be dismissed or otherwise precluded by the dismissal: (1) Rev. Mahoney's claim that allowing the Board to regulate speech on the Capitol Grounds by way of restrictions, including but not limited to Board Orders, that are

2

not published or otherwise made known to the general public violates the Due Process Clause (this claim is alleged in Count III of Rev. Mahoney's Third Amended Complaint), and (2) Rev. Mahoney's claim that the approximately 250-foot "no-demonstration zone" around the Capitol Building as set forth in the Demonstration Map is unconstitutional under the First Amendment and Due Process / Equal Protection Clause (this claim is alleged in Counts I, II, and IV).

    a.   With respect to the first of these two reserved claims, the district court has previously dismissed this claim, and Rev. Mahony will not attempt to revive it in the district court. Rather, Rev. Mahoney reserves the right to challenge the dismissal of this claim on appeal upon entry of a final judgment.

    b.   With respect to the second of these two reserved claims, the parties agree that Rev. Mahoney is challenging, in the district court—and may challenge, in the district court—three specific areas of the "no demonstration zone" only: (1) the sidewalks at the base of the Eastern Senate steps and the Eastern Senate steps themselves up to the second landing where the barricades are presently located; (2) the sidewalks at the base of the Eastern House steps and the Eastern House steps themselves up to the second landing where the barricades are presently located; and (3) the sidewalks at the base of the Eastern Capitol (center) steps and the Eastern Capitol (center) steps themselves up to the first landing where the barricades are presently located.

    c.   Defendants agree that the agreement set forth in Paragraph 1 above shall not prejudice or affect in any way Rev. Mahoney' argument in support of these preserved claims, including but not limited to Rev. Mahoney's argument that the fact the Board allows members of Congress to conduct demonstration

3

activity in the "no demonstration zone"—whether alone, with other members of Congress, or with non-members of Congress—undermines any assertion by Defendants that allowing demonstration activity in the "no demonstration zone" presents a security threat or is otherwise not feasible.

d.   Defendants agree that the dismissal does not preclude Rev. Mahoney from asserting claims in the future that are not actually alleged in the Third Amended Complaint, including but not limited to denials of future permit applications. Further, because the Third Amended Complaint does not contain a challenge the Board's temporary 250-person crowd-size limitation in Area 1 / 150-person crowd-size limitation in Areas 8-11 that are now in place, Rev. Mahoney may challenge those temporary restrictions in the future. Rev. Mahoney represents and warrants that he does not presently have the intent to challenge those temporary restrictions in the future.

3.     The parties agree that they shall not be authorized to take discovery from one another in connection with the second of the two reserved claims. Instead, the parties agree to work together in good faith and with due diligence to agree upon a stipulated set of facts that will govern the adjudication of that claim, after which the parties will file cross-motions for summary judgment according to a schedule set by the district court. The categories of information that are relevant to the stipulated set of facts are: (1) the demonstration activity Rev. Mahoney wishes to conduct in the three areas in question; (2) the demonstration activity that Representative Cori Bush conducted on and around the Eastern House steps in the Summer of 2021; (3) other demonstration activity that has previously taken place on and around the Eastern steps of the House, Senate, and Capitol including but not limited to demonstration activity previously conducted by Rita Warren and Rev.

Mahoney; (4) the activity that is currently allowed and that takes place in the "no demonstration zone"; (5) the physical characteristics of the three areas in question; (6) photographs relevant to topics (1)–(5); and (7) any other topic mutually agreed upon by the parties. Other than this stipulated set of facts, the parties may not introduce any evidence other than material that is the subject of judicial notice. Rev. Mahoney and Defendants each have the separate authority, in their sole discretion, to determine whether the stipulated set of facts is adequate to present the issues to the district court, and mutual agreement to the stipulated set of facts shall be a condition precedent to settlement.

4.      Rev. Mahoney acknowledges that the Board retains the flexibility to revisit the revisions to the Traffic Regulations contemplated in Paragraph 1 if required by security concerns created by a change in circumstances, whether through a formal revision to the Traffic Regulations, Board Orders, or other Board action. If any of the revisions contemplated in Paragraph 1 are not made due to such security concerns, or the Traffic Regulations are further amended after the revisions are made due to such security concerns, Rev. Mahoney is not precluded by the dismissal from challenging, in this lawsuit or otherwise, the provision(s) of the Traffic Regulations that deviate from the revisions contemplated in Paragraph 1.

5.      The parties agree to formalize their agreement in a consent decree. In addition to containing the terms of their agreement, the Board will agree in the consent decree to enforce 40 U.S.C. § 5104(f) in a manner that is consistent with the United Sates Constitution and operative precedent, including but not limited to *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 583–84 (D.D.C. 1982), *aff'd* 409 U.S. 92 (1972).

We consent:

/s/Joshua Wallace Dixon
Joshua Wallace Dixon, SC Bar #75815
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771
(703) 687-6200
jdixon@libertycenter.org

*Counsel for Plaintiff Patrick J. Mahoney*


MATTHEW M. GRAVES, D.C. Bar #418052
United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

/s/ Kenneth Adebonojo
KENNETH ADEBONOJO, N.J. Bar #00676-2001
Assistant United States Attorney
Civil Division
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C.  20530
Telephone: (202) 252-2562
kenneth.adebonojo@usdoj.gov

*Counsel for Defendants*

September 22, 2023

6

## SETTLEMENT AGREEMENT

This settlement agreement ("Settlement Agreement") in *Mahoney v. Gibson et al.*, Civil Action No. 21-2314 (JEB), is made and entered into as of the last date in the signature blocks below, by and between Plaintiff REVEREND PATRICK J. MAHONEY ("Rev. Mahoney"), on the one hand, and Defendants KAREN H. GIBSON, in her Official Capacity as U.S. Senate Sergeant at Arms and Doorkeeper and Chair of the United States Capitol Police Board (the "Board"), WILLIAM P. MCFARLAND, in his Official Capacity as U.S. House of Representatives Sergeant at Arms and Member of the Board, CHERE REXROAT, in her Official Capacity as Acting Architect of the Capitol and Member of the Board, and J. THOMAS MANGER, in his Official Capacity as Chief of Police, United States Capitol Police and Ex-Officio Member of the Board (collectively "Defendants"), on the other hand. Rev. Mahoney and Defendants are collectively referred to herein as the "Parties."

WHEREAS, on August 31, 2021, Rev. Mahoney filed this action (the "Lawsuit") alleging, among other things, that the Traffic Regulations for the United States Capitol Grounds, Amended February 17, 2019 (the "Traffic Regulations") violated the First and Fifth Amendments to the United States Constitution in several respects as set forth in Rev. Mahoney's Complaint and subsequent amendments thereto, culminating in the Third Amended Complaint (Dkt. 69);

WHEREAS, on April 4, 2023, the District Court partially granted Defendants' Motion to Dismiss, dismissing, among other things, Rev. Mahoney's claim that allowing the Board to regulate speech on the Capitol Grounds by way of temporary restrictions, including but not limited

to Board Orders, that are not published or otherwise made known to the general public violates the Due Process Clause of the Fifth Amendment (the "Board Order Due Process Claim");[1]

WHEREAS, on July 27, 2023 and September 20, 2023, the Parties mediated this dispute before Magistrate Judge Moxila A. Upadhyaya, where they reached a partial settlement of the Lawsuit in principle, which partial settlement was conditioned upon the Parties arriving at a stipulated set of facts to govern Rev. Mahoney's unsettled claim that the "no-demonstration zone" around the Capitol Building violates the First, Fifth, and Fourteenth Amendments (the "'No Demonstration Zone' Claim");[2] and

WHEREAS, the Parties have now agreed to a stipulated set of facts, which are attached hereto as Exhibit A.

NOW THEREFORE, in consideration of the mutual covenants and promises set forth herein, the adequacy and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Defendants agree that the Board will, no later than December 31, 2023, amend the Traffic Regulations as follows (however, Rev. Mahoney acknowledges the Board can still impose temporary security restrictions consistent with the First Amendment):

a.   To provide that Members of Congress are exempt from Section 12 of the Traffic Regulations, but only for demonstration activity conducted by them that meets all three of the following requirements: (a) the demonstration activity is activity in which the Member is engaging in his or her official capacity; (b) the

_____

[1] This claim is alleged in Count III of the Third Amended Complaint. Count III also contains other claims that are resolved by this Settlement Agreement.

[2] This claim is alleged in Counts I, II, and IV of the Third Amended Complaint. Counts I, II, and IV also contain other claims that are resolved by this Settlement Agreement.

demonstration activity is activity that the Member has organized or sponsored; and (c) if persons other than the organizing or sponsoring Member(s) are participating in the demonstration activity, the Member(s) must personally be in attendance at the demonstration activity at all times for the exemption to last. If the organizing or sponsoring Member(s) departs, the demonstration activity will immediately be subject to Section 12 of the Traffic Regulations. This provision specifically precludes an exemption when a Member of Congress merely advocates for demonstration activity organized or sponsored by others.

b.  To change the size of the group allowed to engage in demonstration activity without a permit from 19 people to 30 people (Traffic Regulations § 12.3, *et seq.*). This change authorizes demonstration activity without a permit in groups of 30 or fewer people in areas designated Green and / or Yellow on the United States Capitol Demonstration Areas Map (Traffic Regulations Appendix G) (the "Demonstration Map").

c.  To change (a) the minimum time period between permit application and proposed demonstration activity from 10 business days to 5 business days (Traffic Regulations §12.4.20) and (b) the "deemed approved" period from 48 hours to 24 hours prior to the proposed demonstration activity (Traffic Regulations § 12.4.30.d).

d.  To remove all references to 40 U.S.C. § 5104(f) or the concepts contained in its provisions (including but not limited to Traffic Regulations § 12.1.30.a and fn. 31).

2.      Rev. Mahoney agrees that, within three business days of being provided copies of Defendants' signatures on this Settlement Agreement, he will file a motion seeking dismissal of the Third Amended Complaint, with *prejudice*, to the following extent and on the following terms:

a.   Rev. Mahoney's "No Demonstration Zone" Claim is not dismissed. By that claim, Rev. Mahoney is challenging—and may challenge—the constitutionality, facially and as applied, of three specific areas of the "no demonstration zone" only: (1) the sidewalks at the base of the Eastern Senate steps and the Eastern Senate steps themselves up to the second landing where divider is presently located; (2) the sidewalks at the base of the Eastern House steps and the Eastern House steps themselves up to the second landing where the divider is presently located; and (3) the paved area at the base of the Eastern Capitol (center) steps and the Eastern Capitol (center) steps themselves up to the first landing where the divider is presently located. While Rev. Mahoney seeks relief as to these three areas only, he may argue, in support of that relief, that the entire "no demonstration zone" is unconstitutional.

b.   Rev. Mahoney may not attempt to revive, in this Court, the Board Order Due Process Claim, which was previously dismissed, but Rev. Mahoney is not precluded from appealing the dismissal of this claim upon entry of a final judgment in the Lawsuit or from pursuing that claim in this Court if the dismissal is vacated or reversed by the Court of Appeals. Rev. Mahoney may not attempt to revive any other claims that were previously dismissed, nor may he seek to appeal the dismissal of any other previously dismissed claims.

c.  Defendants agree that the agreement set forth in Paragraph 1 above shall not prejudice or affect in any way Rev. Mahoney' argument in support of these preserved claims, including but not limited to Rev. Mahoney's argument that the fact the Board allows members of Congress to organize or sponsor demonstration activity in the "no demonstration zone"—whether alone, with other members of Congress, or with non-members of Congress—undermines any assertion by Defendants that allowing demonstration activity in the "no demonstration zone" presents a security threat or is otherwise not feasible.

d.  Other than Rev. Mahoney's "No-Demonstration Zone" Claim, the other remaining claims in the Third Amended Complaint are dismissed, *with prejudice*, but Rev. Mahoney shall be precluded only from again bringing the claims that are actually alleged in the Third Amended Complaint. Rev. Mahoney is not precluded from, among other things, bringing future claims arising from future denials of Rev. Mahoney's future permit applications to conduct future demonstration activity on the Capitol Grounds or claims arising out of the Board's temporary 250-person crowd-size limitation in Area 1 and 150-person crowd-size limitation in Areas 8-11 that are now in place.

e.  If any of the revisions to the Traffic Regulations contemplated in Paragraph 1 are not made, if the Traffic Regulations are further amended after the revisions contemplated in Paragraph 1 are made due to security or other concerns, or if the revisions contemplated in Paragraph 1 are otherwise rendered ineffective, temporarily or permanently, because of a contradictory or conflicting Board Order, other Board action, or Act of Congress, Rev. Mahoney is not precluded

5

J.A. 482

from challenging, in the Lawsuit or otherwise, the failure to make the revision

or the provision that deviates from the revision contemplated in Paragraph 1.

The proposed Motion seeking entry of the proposed Consent Decree and Order of Partial Dismissal

is attached hereto as Exhibit B. The proposed Consent Decree and Order of Partial Dismissal is

attached hereto as Exhibit C. The Settlement Agreement is conditioned upon the District Court

entering the proposed Consent Decree and Order of Partial Dismissal without material change.

     3.     The Parties agree that they shall not be authorized to take discovery from one

another in connection with Rev. Mahoney's "No-Demonstration Zone" Claim. Instead, the Parties

have agreed upon a stipulated set of facts that will govern the adjudication of that claim (Exhibit

A). Other than the stipulated set of facts, the forthcoming amendments to the Traffic Regulations,

and material that is the proper subject of judicial notice, the parties may not introduce any evidence

in connection with Rev. Mahoney's "No-Demonstration Zone" Claim; provided, however, that

Rev. Mahoney may introduce a supplemental declaration if his standing becomes an issue. The

Parties will work together to propose a schedule to file cross-motions for summary judgment on

the "No Demonstration Zone" Claim and include it in Exhibit C.

     4.     Rev. Mahoney acknowledges that the Board retains the flexibility to revisit or

amend the revisions to the Traffic Regulations contemplated in Paragraph 1 if required by security

concerns created by a change in circumstances, whether through a formal revision to the Traffic

Regulations, Board Orders, or other Board action. If any of the revisions contemplated in

Paragraph 1 are not made, or the Traffic Regulations are further amended after the revisions are

made or the revisions are otherwise rendered ineffective, Rev. Mahoney is not precluded by this

Settlement Agreement or the Consent Decree and Order of Partial Dismissal from challenging, in

the Lawsuit or otherwise, the provision(s) of the Traffic Regulations that deviate from the revisions contemplated in Paragraph 1.

5.      The Board agrees to enforce 40 U.S.C. § 5104(f) in a manner that is consistent with the United Sates Constitution and operative precedent, including but not limited to *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 583–84 (D.D.C. 1972), *aff'd* 409 U.S. 92 (1972).

6.      The Parties represent and warrant that no other person or entity currently has or has ever had any actionable interest in the claims, demands, obligations, or causes of action that are the subject of this Settlement Agreement and that they have full power and authority to enter into this Settlement Agreement and to perform all actions or transactions contemplated herein.

7.      This Settlement Agreement contains the entire agreement between the Parties with regard to the matters set forth herein and shall be binding upon and inure to the benefit of the executors, administrators, personal representatives, heirs, successors and assigns of each. This Settlement Agreement shall not be altered, amended, modified, or rescinded, except by an instrument in writing signed by each of the Parties, specifically referencing this Settlement Agreement. The Court shall be informed of any material changes to this Settlement Agreement.

8.      This Settlement Agreement shall be construed and interpreted in accordance with the laws of the United States and, as applicable therethrough, the District of Columbia. Jurisdiction and venue to enforce this Settlement Agreement shall remain vested exclusively with the United States District Court for the District of Columbia.

9.      The Parties will cooperate fully with one another and execute any and all supplementary documents and take all additional actions to give full force and effect to this Settlement Agreement.

10.     This Settlement Agreement may be signed in counterparts, which, together, comprise a single binding Settlement Agreement.

11.     The terms, provisions, and conditions of this Settlement Agreement are the result of negotiations in good faith and at arm's length between Rev. Mahoney and Defendants, each of whom has been represented by legal counsel. Accordingly, the terms, provisions and conditions of this Settlement Agreement shall be interpreted and construed in accordance with their usual and customary meanings, without application of any rule of interpretation or construction providing that ambiguous or conflicting terms, conditions, or provisions shall be interpreted or construed against the Party whose legal counsel prepared the executed version or any prior drafts of the Settlement Agreement.

12.     The provisions and sub-provisions of this Settlement Agreement are not severable from the whole. If any provision or sub-provision of this Settlement Agreement is deemed invalid, the Parties shall attempt to come to a new agreement that best approximates the agreements herein.

13.     A waiver of any breach of this Settlement Agreement by any Party shall not constitute a continuing waiver or a waiver of any subsequent breach of the same or any other provision of this Settlement Agreement.

14.     The Parties will bear their own fees and costs with respect to the claims previously dismissed or dismissed by the Consent Decree and Order of Partial Dismissal.

IN WITNESS WHEREOF, the Parties hereby execute this Settlement Agreement.


Rev. Patrick J. Mahoney

Date: 12.27.2023

8

Karen H.
Gibson

Digitally signed by Karen
H. Gibson
Date: 2023.12.23
19:59:34 -05'00'

Karen H. Gibson
U.S. Senate Sergeant at Arms and Doorkeeper
Chair, United States Capitol Police Board

Date: December 23, 2023

William P.
McFarland

Digitally signed by William
P. McFarland
Date: 2023.12.22
16:55:22 -05'00'

William P. McFarland
U.S. House of Representatives Sergeant at Arms
Member, United States Capitol Police Board

Date: December 22, 2023

Chere Rexroat
Acting Architect of the Capitol
Member, United States Capitol Police Board

Date: December 22, 2023

J. Thomas Manger
Chief of Police, United States Capitol Police
Ex-Officio Member, United States Capitol Police Board

Date: 12/23/23

9

USCA Case #24-5207      Document #2104065      Filed: 03/05/2025      Page 311 of 363

Enter keywords



# UNITED STATES CAPITOL POLICE
### ESTABLISHED 1828

**Home**

# Arrest Summary Report

**United States Capitol Police Arrest Summary Report**
***To request a public document, contact the USCP Reports Processing Section at (202) 228-4585.***

**USCP Report Request Form 2019.pdf**

Displaying 1 - 2 of 2

**Filter by CFN#**

Criminal File Number

**Filter by Crime Date**

06/17/2024

Use the date picker popup to choose a date or to clear out your previous selection.

**Filter by Crime Summary**

Filter by any word of the crime summary.

**Filter by Crime Type**

demonstrating

Filter by any word or phrase of crime type.

Apply

| Arrest Charge | Date | Time | CFN# | Crime Summary |
|---|---|---|---|---|
| UNLAWFUL DEMONSTRATING | 05/21/2024 | 16:11:00 | 240521001284 | R/O observed multiple individuals actively demonstrating by preaching loudly and handing out pamphlets on the Rotunda Steps of the U.S. Capitol Building. R/O advised the Suspects that the |

## Media Center

**Press Releases**

**USCP Arrests**

**USCP FAST FACTS**

## Glossary

- R/O = Reporting/Responding Officer
- SFST = Standardized Field Sobriety Test
- W = Witness

(Page 311 of Total)

J.A. 487

| | | | | | |
|---|---|---|---|---|---|
| | | | | area was a restricted, non-demonstration zone. The Suspects were given multiple warnings to cease their demonstration activity but failed to do so. The Suspects were placed under arrest, and transported to Headquarters for processing. | • S = Suspect<br>• SA = Special Agent<br>• CIS = Criminal Investigations Section<br>• CSS = Crime Scene Search<br>• C = Complainant<br>• LPR = License Plate Number<br>• CFN = Capitol File Number<br>• Unless otherwise noted, Defendants placed under arrest are transported to USCP Headquarters, 119 D Street, NE, for processing. |
| DEMONSTRATING WITHIN A US CAP BLDG/DC 10-03.16(b)7 | 02/28/2023 | 19:26:00 | 230228000348 | R/O-1 and A/O-1 observed the Suspects displaying signs and yelling during a committee hearing in the Cannon House Office Building. The Suspects were warned to cease and desist their demonstration activity but they refused to do so. The Suspects were placed under arrest and transported to Headquarters for processing. | |

**United States Capitol Police**
119 D Street, NE
Washington, DC 20510
USCapitolPolice@uscp.gov

**Accessibility**   **Copyright**   **Privacy**   **House.gov**

J.A. 488

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**PATRICK J. MAHONEY,**

     **Plaintiff,**

       **v.**                                                    **Civil Action No. 21-2314 (JEB)**

**UNITED STATES CAPITOL POLICE**
**BOARD,** *et al.*,

     **Defendants.**

---

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

1. Defendants' [116] Motion for Reconsideration is DENIED;

2. Plaintiff's [118] Motion for Sanctions is GRANTED IN PART and DENIED IN

   PART; and

3. The [116-2] Declaration of Sean P. Gallagher is STRICKEN.


                    /s/ *James E. Boasberg*
                    JAMES E. BOASBERG
                    Chief Judge

Date:  July 31, 2024

1

J.A. 489

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PATRICK J. MAHONEY,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 21-2314 (JEB)** |
| **UNITED STATES CAPITOL POLICE BOARD,** *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Patrick J. Mahoney recently prevailed on his First Amendment challenge to the U.S. Capitol Police Board's near-total prohibition on expressive activities that take place on the lower steps leading to the eastern entrances of the Capitol building. Relying on a stipulated set of facts that the parties had agreed to as part of a partial settlement, this Court granted summary judgment in his favor. It further entered a permanent injunction prohibiting any and all enforcement of the Board's regulation at the base of the Eastern Steps.

Defendants, the U.S. Capitol Police Board's individual members, who did not address the propriety of injunctive relief during summary-judgment briefing (let alone its proper scope), now move for reconsideration of that injunction. Specifically, they contend that its breadth exceeds the Court's authority, poses security problems amounting to manifest injustice, and contravenes equitable principles. Believing that this phase of the litigation is no longer subject to the parties' agreement on the use of stipulated facts, moreover, the Board presents a new factual declaration supporting its position on the remedial question. Mahoney not only opposes these efforts to reopen the matter, but he also cross-moves for sanctions related to the new factual declaration.

1

J.A. 490

As the Board does not establish a lack of jurisdiction or a need to prevent manifest injustice or correct a clear error in the prior Opinion's equitable analysis, the Court will deny its Motion. Agreeing that the new declaration is improperly filed, moreover, it grants Plaintiff's Motion for Sanctions insofar as it will strike that pleading.

## I.    **Background**

Fans of this multi-installment franchise looking for a director's cut of its legal and factual background may reference the Court's aforementioned Opinion granting summary judgment to Mahoney.  See Mahoney v. U.S. Capitol Police Bd., 2024 WL 2252178 (D.D.C. May 17, 2024) (Mahoney V).  Here, we need only review the basics of that Opinion and a few other points of procedural history.

The impetus for this suit was Mahoney's desire to hold prayer vigils and other demonstrations on the Capitol Grounds that run afoul of the Capitol Police Board's regulations. See ECF No. 99-1 (Stip.), ¶¶ 35–40; ECF No. 1 (Compl.).  Following years of litigation, the parties embarked on settlement negotiations that yielded partial fruit — viz., a settlement and consent decree providing for revisions to the Board's Traffic Regulations, voluntary dismissal of several of Mahoney's claims, and an agreement to skip over discovery and brief summary judgment on the sole remaining claim on the basis of stipulated facts.  See ECF No. 92 (Consent Decree), ¶¶ 4–7.  The parties so proceeded with those understandings.  See Stip.

The only regulation at issue following the Consent Decree was the Board's designation of the bottommost portion of the Capitol's Eastern Steps as a "No Demonstration Zone."  See Consent Decree, ¶¶ 6–7; ECF No. 69 (3d Am. Compl.), ¶¶ 97, 160.  In moving for summary judgment, Mahoney contended that this blanket prohibition violated the First Amendment on its face and as applied, as well as the Fifth Amendment's equal-protection guarantee.  See ECF No.

2

97-1 (Pl. MSJ) at 20, 43.  As for how those constitutional violations affected him, he asserted a

wish to put on events "involv[ing] praying, gathering, assembly, and protest" on the Eastern

Steps and the adjoining sidewalks, in which he expected that his wife and a few other individuals

would join.  See Stip., ¶ 35.  He thus asked the Court to enter a permanent injunction to prevent

the Board from enforcing this portion of the regulations "insofar as it prohibits demonstration

activity on the Eastern Steps."  Pl. MSJ at 44.  Defendants countered Plaintiff's Motion on the

merits, but had nothing to say on the topic of relief.  See ECF No. 102-1 (Defs. MSJ).

The Court concluded that Mahoney had gotten the law right.  Reaching only the First

Amendment facial challenge, it held that the Eastern Steps were a public forum and that the near-

total demonstration ban failed the narrow-tailoring requirement attendant to both intermediate

and strict scrutiny.  Mahoney V, 2024 WL 2252178, at *9–11.  It was, "in a word,

unconstitutional."  Id. at *11.  Although noting that Defendants had not weighed in on the proper

remedy, the Court went on to consider whether a permanent injunction of the sort requested by

Mahoney was justified.  Id.  It found that the equitable factors guiding such analysis uniformly

weighed in favor of an injunction and thus granted Plaintiff's requested relief.  Id. at *11–12; see

also ECF No. 111 (Order) ("Defendants are permanently ENJOINED from enforcing [the]

prohibitions as to [the bottommost] portion of the Eastern Steps.").

Although that would have been a natural conclusion to the whole affair, Defendants now

tack on a coda.  They move for reconsideration in hopes that the Court will narrow the scope of

its injunction to Plaintiff alone.  See ECF No. 116 (Mot. for Recon.).  As support for that request,

they offer a declaration from the Assistant Chief for Uniformed Operations for the U.S. Capitol

Police.  See ECF No. 116-2 (Decl. of Sean P. Gallagher).  That declaration primarily avers that

the injunction currently in place jeopardizes law-enforcement operations and national security, as

J.A. 492

the "use of no demonstration zones" on the Eastern Steps "has been a fundamental part of the

USCP's plan to defend the Capitol Building for decades."  Id., ¶ 6.  "Prior to the injunction," it

relays, that area "was [a] buffer zone [between demonstrators and places of concern,] and it

provided an elevated platform from which to take defensive action essential to the defense of the

Capitol."  Id.  Plaintiff opposes the Motion for Reconsideration as unfounded, see ECF No. 117

(Opp. to Recon.), and separately seeks sanctions for Defendants' use of the Gallagher

Declaration, which he contends was filed in "blatant disregard of both the terms of the settlement

agreement and the Consent Decree."  ECF No. 118 (Mot. for Sanctions) at 2.  Both Motions are

now ripe.

## II.    Legal Standard

Federal Rule of Civil Procedure 59(e) permits the filing of a motion to alter or amend a

judgment when such motion is filed within 28 days after the judgment's entry.  The Court must

apply a "stringent" standard when evaluating Rule 59(e) motions.  See Ciralsky v. CIA, 355 F.3d

661, 673 (D.C. Cir. 2004).  "A Rule 59(e) motion is discretionary and need not be granted unless

the district court finds that there is an intervening change of controlling law, the availability of

new evidence, or the need to correct a clear error or prevent manifest injustice."  Firestone v.

Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (internal quotation marks and citation omitted).

Critically, Rule 59(e) "is not a vehicle to present a new legal theory that was available prior to

judgment," Patton Boggs LLP v. Chevron Corp., 683 F.3d 397, 403 (D.C. Cir. 2012), or "to

relitigate old matters."  Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008) (citation

omitted); see also New LifeCare Hosps. of N. Carolina LLC v. Azar, 466 F. Supp. 3d 124, 129

(D.D.C. 2020).  "The strictness with which [Rule 59(e)] motions are viewed is justified by the

need to protect both the integrity of the adversarial process in which parties are expected to bring

4

J.A. 493

all arguments before the court, and the ability of the parties and others to rely on the finality of

judgments."  Mohammadi v. Islamic Republic of Iran, 947 F. Supp. 2d 48, 77 (D.D.C. 2013)

(quoting CFTC v. McGraw-Hill Cos., 403 F. Supp. 2d 34, 36 (D.D.C. 2005)), aff'd, 782 F.3d 9

(D.C. Cir. 2015).

Defendants also invoke Federal Rule of Procedure 60(b)(6), see ECF No. 119 (Recon.

Reply) at 2, which allows a court to relieve a party or its legal representative from a final

judgment, order, or proceeding for any "reason that justifies relief."  Because it moved within 28

days of the Court's entering judgment, the Board's reliance on Rule 60(b) is not necessary.  See

Banister v. Davis, 590 U.S. 504, 520 n.9 (2020) ("[C]ourts of appeals have long treated Rule

60(b) motions filed within 28 days as . . . Rule 59(e) motions.").  In addition, that rule is more

demanding than the Rule 59(e) standard; courts have typically interpreted it to apply only to

"'extraordinary' situations" and note that it "should be only sparingly used."  Twelve John Does

v. District of Columbia, 841 F.2d 1133, 1140 (D.C. Cir. 1988) (quoting Ackermann v. United

States, 340 U.S. 193, 202 (1950), and Good Luck Nursing Home, Inc. v. Harris, 636 F.2d 572,

577 (D.C. Cir. 1980)).  The Court will thus proceed by analyzing the Motion for Reconsideration

under Rule 59(e) alone.

## III.   Analysis

Defendants advance three reasons why the Court should revisit its entry of a permanent,

universal injunction: 1) the security concerns posed by such injunction constitute a manifest

injustice; 2) issuance of a universal injunction in a case involving only one person's imminent

injury exceeds the bounds of Article III judicial power; and 3) the Court's grant of a universal

injunction stands in tension with equitable principles.  Because it appears to be jurisdictional in

nature, the Court addresses the second of these arguments at the top.  After assuring itself of

5

jurisdiction, it turns to the remaining bases for reconsideration.

    A.  <u>Article III Jurisdiction</u>

Apparently drawing on principles of Article III standing, Defendants believe that jurisdiction is lacking to enjoin all enforcement of the Traffic Regulation "because Plaintiff's asserted injury in fact in this case has consistently focused on harms to himself alone."  Mot. for Recon. at 12.  Because "a party must assert its own legal rights," they maintain, Mahoney's personal injury "suffice[s] to support his standing to bring an as-applied First Amendment claim and to seek a corresponding injunction of the No Demonstration Zone as applied to him."  <u>Id.</u> at 14.  But, they say, no others may benefit via facial relief.

The debate over judicial authority to issue universal injunctions (sometimes referred to as nationwide injunctions) has raged intensely in recent years, with an array of scholars voicing their takes, both for and against.  <u>See, e.g.</u>, Samuel L. Bray, <u>Multiple Chancellors: Reforming the National Injunction</u>, 131 Harv. L. Rev. 417, 420–21 (2017) (arguing in favor of rule — "rooted in the authority of the federal courts" — that "[n]o matter how important the question and no matter how important the value of uniformity, a federal court should not award a national injunction"); Amanda Frost, <u>In Defense of Nationwide Injunctions</u>, 93 N.Y.U. L. Rev. 1065, 1069 (2018) ("Nothing in the Constitution's text or structure bars federal courts from issuing a remedy that extends beyond the parties[.]"); Mila Sohoni, <u>The Lost History of the "Universal" Injunction</u>, 133 Harv. L. Rev. 920, 927 (2020) (contending that "it would be a sharp departure from precedent and practice to treat Article III as" prohibiting such injunctions); Spencer E. Amdur & David Hausman, Response, <u>Nationwide Injunctions and Nationwide Harm</u>, 131 Harv. L. Rev. F. 49, 50 (2017) (advocating middle ground "allow[ing] broad injunctions when necessary to prevent real-world injuries, but . . . otherwise preserv[ing] opportunities for percolation across

<div align="center">6</div>

<div align="center">J.A. 495</div>

multiple" judicial bodies).  Fascinating as it may be, this discourse is not law; at most, it has

made its way into a few Supreme Court concurrences as a topic for further consideration.  See,

e.g., Trump v. Hawaii, 585 U.S. 667, 713 (2018) ("I am skeptical that district courts have the

authority to enter universal injunctions.") (Thomas, J., concurring).  In reality, all the hand-

wringing surrounding this topic aside, binding authority makes clear that the judicial power

extends to broadly enjoining facially invalid laws in cases brought by individual plaintiffs.

Begin with a few decisive Supreme Court statements on the matter.  In Whole Woman's

Health v. Hellerstedt, 579 U.S. 582 (2016) — a case brought by "a group," but not a class, "of

Texas abortion providers," id. at 591 — the Court stated that "[n]othing prevents this Court from

awarding facial relief as the appropriate remedy for . . . as-applied claims."  Id. at 604.  That is so

because "if the arguments and evidence show that a statutory provision is unconstitutional on its

face, an injunction prohibiting its enforcement is proper."  Id. at 603 (cleaned up).  Put

differently, the breadth of the relief follows from the nature of the constitutional defect.  To

similar effect, in Citizens United v. FEC, 558 U.S. 310 (2010), the Court explained that "the

distinction between facial and as-applied challenges" principally "goes to the breadth of the

remedy employed by the Court," indicating that when a court finds a law facially invalid, the

corresponding remedy should be a universal injunction barring its enforcement as a whole.  See

id. at 331.  In that case, a single nonprofit had challenged a Bipartisan Campaign Reform Act

limit on campaign contributions, yet the Court determined that facial invalidation was the only

appropriate outcome.  See id. at 319–20, 331; cf. also NFIB v. Sibelius, 567 U.S. 519, 540, 588

(2012) (concluding in case brought by 26 states, several individuals, and an association of small

businesses that Medicaid-expansion portion of Affordable Care Act exceeded Congress's power

under Spending Clause, and stating that "[t]he remedy for that constitutional violation is to

preclude the Federal Government from imposing such a sanction").

These decisions are hardly outliers; the Supreme Court and our Circuit have blessed district courts' granting of universal injunctions with some frequency. One prominent example is Trump v. International Refugee Assistance Project, 582 U.S. 571 (2017), in which the Supreme Court narrowed but left in place an injunction invalidating an executive order banning entry by travelers from certain Muslim countries. It explicitly allowed that remedy to "remain in place . . . with respect to parties similarly situated to" the named plaintiffs, but who were not parties to the case. Id. at 582. Other instances abound. See, e.g., Ashcroft v. ACLU, 542 U.S. 656 (2004) (approving injunction originally issued in ACLU v. Reno, 31 F. Supp. 2d 473, 499 (1999), which prohibited Attorney General from "enforcing or prosecuting matters premised upon [statute] at any time for any conduct"); Brown v. Ent. Merchants Ass'n, 564 U.S. 786 (2011) (affirming Video Software Dealers Ass'n v. Schwarzenegger, 2007 WL 2261546, at *12 (N.D. Cal. Aug. 6, 2007), which "permanently enjoin[ed] the defendants from enforcing" California statute violative of First Amendment); FEC v. Cruz, 596 U.S. 289, 295, 301 (2022) (affirming in First Amendment case where plaintiff candidate sought and received from lower court "an order enjoining the Government from taking any action to enforce the loan-repayment limitation" of BCRA. Indeed, our Circuit in Lederman v. United States, 291 F.3d 36 (D.C. Cir. 2002), remanded "for entry of an injunction barring enforcement of" the portion of the very same USCP Traffic Regulations at issue here after concluding that the regulation was not narrowly tailored. Id. at 46, 48.

As the Supreme Court has made clear, the practice of granting facial relief for facial problems is particularly appropriate in the First Amendment context. In Ashcroft, for example, it affirmed a universal preliminary injunction of a speech restriction that was not narrowly tailored,

just as this Court ruled was the case at summary judgment here.  See 542 U.S. at 666 (identifying a "number of plausible, less restrictive alternatives to the statute"); see also Mahoney V, 2024 WL 2252178, at *10–11.  In justifying the universal injunction, Ashcroft referred to the chill on speech that would follow absent such remedial action.  See 542 U.S. at 670–71 ("Where a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial."); see also Citizens United, 558 U.S. at 336 ("The ongoing chill upon speech that is beyond all doubt protected makes it necessary in this case to invoke the earlier precedents that a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated.").

As another data point, Mahoney correctly notes that judicial authority to issue universal remedies is also on full display in the context of Administrative Procedure Act litigation.  See Opp. to Recon. at 16–17.  In National Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399 (D.C. Cir. 1998), for example, the D.C. Circuit explained that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated — not that their application to the individual petitioners is proscribed."  Id. at 1409 (alteration in original) (quoting Harmon v. Thornburgh, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).  That is, upon demonstrating the illegality of an agency action of general applicability, "a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court."  Id. (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting)).  With these principles in mind, the D.C. Circuit affirmed the district court's universal injunction and rejected the agencies' argument that the injunctive relief should have extended only to the named plaintiffs.  Id. at 1408–10; see also Planned Parenthood Fed'n of Am., Inc. v. Heckler, 712 F.2d 650, 651 (D.C. Cir. 1983) (affirming injunction

prohibiting enforcement of federal regulations); <u>Wirtz v. Baldor Elec. Co.</u>, 337 F.2d 518, 534–36 (D.C. Cir. 1963) (same).  If Article III allows a court to universally enjoin a regulation as violative of the APA, it likewise empowers a court to prohibit any and all enforcement of the Traffic Regulations at issue here on constitutional grounds.  <u>Contra</u> Recon. Reply at 12–13.

The Board's citations to the contrary do not hold up.  To start, it repeatedly relies on <u>Warth v. Seldin</u>, 422 U.S. 490 (1975), and its proclamation that the "judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."  <u>Id.</u> at 499; <u>see also</u> Mot. for Recon. at 12, 14.  The Court sees no conflict between this statement and the existence of Article III jurisdiction to enter a universal injunction; in fact, <u>Warth</u> seems to agree.  As long as a plaintiff has her own injury to rely on and the relief sought redresses that injury, an incidental benefit to others does not pose jurisdictional problems.

Nor does the line of cases limiting when a plaintiff may assert third-party injury — in the absence of her own injury — cast this idea into doubt.  <u>See, e.g.</u>, <u>Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 474 (1982) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (cleaned up); <u>United States v. Hansen</u>, 599 U.S. 762, 769 (2023) ("[L]itigants typically lack standing to assert the constitutional rights of third parties.").  Mahoney does not rely on any third-party injury; he merely seeks relief proportional to the constitutional flaw in the statute causing <u>him</u> injury.

The Board is no more successful in pointing to the statement in <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332 (2006), that any remedy "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."  <u>Id.</u> at 353 (cleaned up).  That case

<div align="center">10</div>

<div align="center">J.A. 499</div>

stands for the rule that a plaintiff must establish standing for each claim she brings — that is, "standing is not dispensed in gross." Id. (cleaned up). Mahoney does not seek relief for a problem that he does not face in addition to the one he does, as would be prohibited by this rule. Put differently, DaimlerChrysler would prevent Mahoney from asserting, say, a claim that the Board's regulations limiting the size of demonstrations elsewhere on Capitol grounds also violate the First Amendment, even though he only plans on demonstrating on the lower Eastern Steps. But it does not prevent him from seeking a species of relief — facial invalidation — that remediates his own injury as well as injuries of the same variety to others.

It is somewhat harder to parse how an older case that Defendants rely on — Doran v. Salem Inn, Inc., 422 U.S. 922 (1975) — fits into the doctrinal landscape. There, the Court held that Younger abstention (which prohibits federal courts from enjoining ongoing state criminal proceedings) did not prevent individuals from bringing a First Amendment challenge to preliminarily enjoin a local ordinance that they were likely to be prosecuted under as long as they were not yet being prosecuted. Id. at 930–31. In so holding, the Court observed that this ruling would not unduly impinge on state authority because "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." Id. at 931.

At first blush, Doran's language seems to support the Board's theory that injunctions must be limited in scope to the plaintiff alone. But how, then, can it be reconciled with the Supreme Court's later pronouncements and actions to the contrary? The key is to recognize that Doran's statement of law cannot be so cleanly excised from its context. It is best understood not as a pronouncement about the operation of all injunctions, but as a rule deployed to ensure that a subset of injunctions do not flout the ironclad principle underlying Younger — i.e., that "a

<div align="center">11</div>

<div align="center">J.A. 500</div>

federal court should, in all but the most exceptional circumstances, refuse to interfere with an ongoing state criminal proceeding."  Id.; see also Mass. Delivery Ass'n v. Coakley, 671 F.3d 33, 46 (1st Cir. 2012) (citing Doran for proposition that "where 'neither declaratory nor injunctive relief can directly interfere' with the ongoing state proceedings, there is no basis for Younger abstention") (quoting Doran, 422 U.S. at 931).  That concern is not present here, where state actors are nowhere to be found; as such, Doran is of no help to the Board.

Next, attempting to work around inconvenient aspects of the doctrine, Defendants propose that a First Amendment overbreadth challenge — where the unlawful applications of a speech prohibition are substantial in relation to its legitimate sweep, United States v. Stevens, 559 U.S. 460, 473 (2010) — would be exempt from the jurisdictional limitation they otherwise espouse, but that Mahoney did not make this claim.  See Mot. for Recon. at 15.  This bit of contortionism reveals the foibles of Defendants' position.  No doubt, showing that a law is overbroad "suffices to invalidate all enforcement of that law."  Virginia v. Hicks, 539 U.S. 113, 119 (2003).  But it does not follow from that fact that Mahoney's challenge is insufficient to beget a universal injunction.  After all, a typical facial challenge (such as the one Mahoney brought) goes much further than an overbreadth claim — it asserts that the law has not one legitimate application.  See Edwards v. Dist. of Columbia, 755 F.3d 996, 1001 (D.C. Cir. 2014).  It would be nonsensical to conclude that universal injunctions are inappropriate only when a speech restriction has fewer constitutionally acceptable applications.  Overbreadth doctrine is animated by a "concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech."  Hicks, 539 U.S. at 119.  Because leaving a statute with no

legitimate application on the books would surely create an even more intolerable chill on expression, Defendants' backwards logic is wanting.

Finally, the Board faults the Court for reaching Mahoney's facial challenge at all since he brought an as-applied challenge as well.  See Mot. for Recon. at 15.  But Citizens United indicates that the Board has it exactly backwards.  There, the plaintiff originally brought both facial and as-applied challenges, but then voluntarily dismissed the former.  See 558 U.S. at 329. The Court ultimately determined that even that did not preclude it from considering the law's facial constitutionality because not doing so would chill speech.  Id. at 329–331.  To reiterate, "if the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is proper."  Hellerstedt, 579 U.S. at 603.  The Court's injunction was therefore entirely acceptable as a matter of Article III jurisdiction.

B. Reconsideration

With the jurisdictional worry out of the way, the Court turns its focus to the remaining merits analysis.  Defendants have not sought to vacate the judgment in light of an "intervening change of controlling law" or the "availability of new evidence."  Firestone, 76 F.3d at 1208. Instead, the Board chiefly asserts that the Court must reverse course to "prevent manifest injustice."  Id.; see also Mot. for Recon. at 9.  It also argues that "extending injunctive relief to non-parties where such relief is unnecessary to redress a plaintiff's injury is inappropriate" as a matter of equitable principles, see Mot. for Recon. at 16, seemingly invoking "the need to correct a clear error" in the Court's equitable analysis.  Firestone, 76 F.3d at 1208.

Both arguments must clear a high hurdle.  See Leidos, Inc. v. Hellenic Republic, 881 F.3d 213, 217 (D.C. Cir. 2018) (describing Rule 59(e) grant as "an extraordinary measure").  Manifest injustice is an "exceptionally narrow concept."  Slate v. Am. Broad. Cos., Inc., 12 F. Supp. 3d 30,

13

J.A. 502

35 (D.D.C. 2013). It "does not result merely because a harm may go unremedied." Id.

Similarly, granting a Rule 59(e) motion for clear error requires the Court to conclude that the

"final judgment [was] 'dead wrong.'" Mohammadi, 947 F. Supp. 2d at 78 (quoting Lardner v.

FBI, 875 F. Supp. 2d 49, 53 (D.D.C. 2012)). The Court first determines whether it can consult

the Gallagher Declaration in assessing Defendants' reconsideration contentions. It then tackles

them in sequence.

### 1. *Gallagher Declaration*

Does the Board's filing of the Gallagher Declaration violate the parties' settlement

agreement such that it should be stricken? See Mot. for Sanctions at 2. While Defendants

"acknowledge the parties' prior agreement that their cross-motions for summary judgment would

be decided based on the Stipulations of Fact," Mot. for Recon. at 9, they believe that their filing

is nonetheless permissible.

The Board first argues that submission of the Declaration is entirely consistent with the

parties' agreement. In so contending, it stresses that it "did not attempt to introduce the

declaration during summary judgment proceedings on the merits" of Mahoney's "No

Demonstration Claim." ECF No. 120 (Opp. to Sanctions) at 4–5. So what? The agreement, as

reflected in the Consent Decree, was not nearly so narrow. The parties there "agreed upon a

stipulated set of facts that [would] govern the adjudication of [Mahoney's 'No-Demonstration

Zone'] claim." See Consent Decree, ¶ 6. That is precisely what the Board asks to be

reconsidered. In fact, the Consent Decree prohibited the parties from "introduc[ing] any

evidence in connection with Rev. Mahoney's 'No-Demonstration Zone' Claim" other than "the

stipulated set of facts and material that is the proper subject of judicial notice." Id. (emphasis

J.A. 503

added).  Since determining the correct remedy is part and parcel of adjudicating a claim, nothing

in the agreement indicated that the stipulated facts would not govern remedial questions.

Undeterred, Defendants also maintain that the very security problems discussed in the

Gallagher Declaration justify its consideration even if the agreement does not contemplate

anything of the sort.  See Mot. for Recon. at 9; Recon. Reply at 8.  The Board raises no doctrine

of contract interpretation that allows a signatory to override the parties' agreement in light of

such concerns.  Parties may account for such issues while drafting the contract, but they did not

do so here.  Defendants' reliance on National Parks Conservation Ass'n v. Semonite, 422 F.

Supp. 3d 92 (D.D.C. 2019), which refers to the magnitude of the interests at stake as a basis for

overlooking forfeiture, is misplaced.  See id. at 95–96.  The issue here is not forfeiture, but the

Board's affirmative commitment to litigating this claim using agreed-upon facts.  The security

concerns cited are thus irrelevant.

Finally, Defendants posit that "Plaintiff is not prejudiced by the Court's consideration of

the USCP's concerns relating to demonstrations in which Plaintiff has no involvement."  Mot. for

Recon. at 10.  This contention is misguided for the reasons already discussed *supra* regarding

Mahoney's ability to seek facial invalidation of this regulation.  In any event, the prejudice

wrought by the Board's late-breaking maneuver is plain.  Plaintiff convincingly lays out the

manner in which the Gallagher Declaration seems to contradict aspects of the stipulated facts.

See Recon. Opp. at 14–15.  There is no need to determine whether and to what extent

inconsistencies between the two sets of facts exist because such possibility is enough to show

that Mahoney's litigation prospects are hampered.  He is, for instance, left without the ability to

conduct discovery to counter Gallagher's assertions.  This is prejudice in the most classic sense.

Hudson v. Am. Fed'n of Gov't Emps., 2019 WL 3533602, at *8 (D.D.C. Aug. 2, 2019) ("The

denial of the opportunity to present facts or evidence which would have been offered had the amendment been timely is the paradigmatic form of prejudice.") (cleaned up).

With each of the Board's rationales for why the Declaration was legitimately filed rejected, the question becomes one of consequences.  Whether as an exercise of its authority to enforce the consent decree or as a sanction pursuant to Federal Rule of Civil Procedure 16(f), the Court may strike the Declaration.  Pigford v. Perdue, 330 F. Supp. 3d 1, 10 (D.D.C. 2018) ("[A] district court may interpret and enforce a consent decree to the extent authorized either by the decree itself or by a related order."); Consent Decree, ¶ 10 ("The Court shall retain jurisdiction of this matter for the purposes of construction, modification, and enforcement of this Consent Decree and Order . . . ."); Fed. R. Civ. Pro. 16(f) ("[T]he court may issue any just orders  . . . if a party . . . fails to obey a scheduling or other pretrial order.").  Having found that the Declaration seriously prejudices Mahoney, the Court will strike it.  It declines Plaintiff's invitation to impose additional sanctions by awarding attorney fees.  See Mot. for Sanctions at 6.  The harm to Mahoney is largely accounted for by striking the Gallagher Declaration, and Defendants' single erroneous action does not evince the kind of bad faith meriting monetary sanctions.

The Court will grant the Motion for Sanctions in part by striking the Declaration.  It accordingly does not consider Gallagher's statements in the remaining analysis.

2. *Manifest Injustice*

On to manifest injustice.  That standard is met here, Defendants say, because "extending the injunction to others beyond Plaintiff poses unique national security risks."  Mot. for Recon. at 10.  Without the benefit of the Gallagher Declaration, however, Defendants' unsupported assertion of manifest injustice amounts merely to a relitigation of whether USCP's security concerns were so pressing as to justify its near-total ban on expressive activity in the first place.

16

J.A. 505

If Defendants' security rationale failed to persuade on first consideration, it certainly falls short of the high bar set by Rule 59(e).  As even Defendants note, while the stipulated facts "did recognize USCP's security concerns," they "did not describe those concerns in any detail and did not specifically address the USCP's concerns regarding demonstrations that differ from Plaintiff's proposed activity."  Mot. for Recon. at 9.  Indeed, in rejecting the Board's original contention that security concerns justified the restriction, the Court's prior decision noted that "the number of alternative regulatory options at the Board's disposal is so vast as to confirm . . . that Defendants are 'sacrificing speech' by burdening 'substantially more [of it] than necessary' in pursuit of their admittedly noble goals."  Mahoney V, 2024 WL 2252178, at *10 (quoting McCullen v. Coakley, 573 U.S. 464, 486, 490 (2014)).  The stipulated facts were likewise not enough to convince the Court that any public interest weighed against granting an injunction.  Id. at *12 ("Defendants have no interest in enforcing an unconstitutional regulation.") (cleaned up).  With the Gallagher Declaration cast aside, the Court will leave its original conclusions on these points intact.

### 3.  *Equitable Principles*

That brings us at last to Defendants' suggestion that the Court clearly erred in weighing the equities of a universal injunction.  According to the Board, "Equitable principles . . . favor a narrowing of the Court's injunction to Plaintiff."  Mot. for Recon. at 16.  As an initial matter, Mahoney argues that Defendants have forfeited any legal argument about the scope of injunctive relief.  That is so, he insists, because the Board neglected to raise any such argument in its summary-judgment briefing although it was available at the time.  See Opp. at 10–11 (citing Sarfati v. Antigua and Barbuda, 2013 WL 12313323, at *2 (D.D.C. May 16, 2013) (stating that

such omission "alone bars reconsideration")).  Defendants also did not include a request for limited injunctive relief in their Answer (indeed, they filed no Answer at all).  Id. at 12.

The Court is not convinced that any of this calls for immediate rejection of Defendants' position.  After all, the Board is correct that summary-judgment briefing often gives short shrift to remedial concerns and that its omission is thus less problematic than the typical failure to preserve positions.  See Recon. Reply at 3–4; see also Nat'l Parks Conservation Ass'n, 422 F. Supp. 3d at 95 (finding no forfeiture on remand when party left out remedy argument in its appellate brief in line with "standard practice" on appeal).  The pleadings issue is no more persuasive.  The only authority Plaintiff cites for the rule that objections to the scope of injunctive relief must be pled in an answer is hardly decisive.  See Opp. to Recon. at 12 (citing United States v. Cole, 2014 WL 1303143, at *2, *6 (D. Or. Mar. 31, 2014) (denying motion to strike affirmative defense relating to scope of injunction under Federal Rule of Civil Procedure 12(f) as "insufficient defense or . . . redundant, immaterial, impertinent, or scandalous matter")).  It is one thing to say that a defendant may include an objection to the breadth of an injunction in an answer without it being considered immaterial or legally erroneous, but quite another to require its inclusion.  The Court will thus consider the Board's equity-based objection to the injunction, although it does so under the strict Rule 59(e) standard.

Defendants do not quarrel with any of the Court's reasoning about the propriety of an injunction here; rather, they harp on several variations of the theme that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  Califano v. Yamasaki, 442 U.S. 682, 702 (1979); see also Mot. for Recon. at 16–19.  In light of the many cases discussed *supra* affirming facial injunctions, this old chestnut and its progeny do not render the relief entered here "dead wrong," as it must be to warrant

J.A. 507

reconsideration.  Mohammadi, 947 F. Supp. 2d at 78 (cleaned up).  It cannot be the case that

every injunction granting facial relief for a facial constitutional violation is *per se* overbroad.

Even Califano recognized that the "scope of injunctive relief is dictated by the extent of the

violation established."  442 U.S. at 702.  Here, the facial infirmity in the at-issue regulation

warranted the relief given.

Sidestepping the obvious congruence between the facial problem with the Traffic

Regulation and the Court's injunction, Defendants point to First Amendment cases where courts

found as-applied violations because it was possible that different challengers would have had less

success.  See Mot. for Recon. at 17–18.  In United States v. National Treasury Emps. Union

(NTEU), 513 U.S. 454 (1995), the Supreme Court confronted a ban on federal employees'

receiving honoraria for speaking or writing engagements.  After affirming the court of appeals'

decision that the ban was not narrowly tailored, the Court addressed whether an injunction

barring all enforcement of the law was overbroad.  Id. at 477–78.  It stated that "although the

occasional case requires us to entertain a facial challenge in order to vindicate a party's right not

to be bound by an unconstitutional statute," this was not such a case.  Id.  Specifically, because

certain "high-level employees" were not similarly situated to the plaintiffs and because "the

Government conceivably might advance a different justification for an honoraria ban limited to

more senior officials, thus presenting a different constitutional question than the one we decide

today," the Court limited the injunction to the parties in the case.  Id. at 478.

Similarly, in Picard v. Magliano, 42 F.4th 89 (2d Cir. 2022), the Second Circuit

considered an attack on a statute prohibiting certain picketing within 200 feet of a courthouse.

The court concluded that "it cannot be said that there is no set of circumstances in which the

application of [the law] would be constitutional" and thus rejected the view that the law was not

narrowly tailored.  Id. at 104.  It further observed that the individual plaintiff's speech —

advocacy for "the correct principles of the legal system, unconnected to any specific trial" —

was not the law's stated target: "raucous demonstrations demanding particular decisions by

judges and jurors in a pending proceeding."  Id. at 106.  It thus narrowed the district court's

injunction to the plaintiff alone.  Id.

      NTEU and Picard are nonetheless not instructive on the scope of relief in this case.  It is

simply not true that this Court could have reached a different outcome on the merits had the

challenger been some other, more disruptive would-be demonstrator.  The analysis would have

proceeded exactly as it actually did; the Traffic Regulation, in banning nearly all demonstration

in the relevant area, was not narrowly tailored and thus required retooling to have any valid

application to any protester.  See Mahoney V, 2024 WL 2252178 at *9–11.  NTEU and Picard,

by contrast, both reasoned that the merits outcome might differ depending on the plaintiff.  It is

also worth noting that NTEU did not have to deal with the question of whether to allow an

injunction affecting truly similarly situated nonparties because the plaintiff union in that case

represented all employees junior enough to count as similarly situated.  See 513 U.S. at 478.

      Nor is Defendants' resort to United States v. Mendoza, 464 U.S. 154 (1984), a winner.

Mendoza held that the government should not be subjected to nonmutual offensive collateral

estoppel because the "economy interests underlying a broad application of nonmutual collateral

estoppel are outweighed by the constraints which peculiarly affect the government."  Id. at 162–

63.  By the Board's lights, entry of universal injunctions "undermine[s] [this] rule" by giving

nonparties the right to enforce an injunction they did not win against the government.  See Mot.

<div align="center">20</div>

<div align="center">J.A. 509</div>

for Recon. at 17.  As at least one circuit has pointed out, however, universal injunctions are less

taxing on government litigants than the breed of estoppel at issue in <u>Mendoza</u>:

> [U]nlike the collateral estoppel context, the universal injunction by
> its nature will concern an issue that is common to all parties bound
> by it who will be similarly-situated, will involve an issue of obvious
> and significant impact (thus not presenting the government with the
> need to appeal every adverse legal decision in even minor cases),
> and will not interfere with the ability of future Administrations to
> change policies (because the impact of the universal injunction will
> be felt in one ongoing case that would be appealed, not in unlimited,
> unforeseeable cases in the future).

<u>City of Chicago v. Barr</u>, 961 F.3d 882, 915 (7th Cir. 2020) (concluding that <u>Mendoza</u> did not

preclude use of universal injunctions).  Because the burdens imposed by universal injunctions are

lighter in significant respects than nonmutual collateral estoppel, <u>Mendoza</u>'s logic does not

convince the Court that its injunction contravenes binding Supreme Court authority.

What is more, at least some of the typical criticisms levied against universal injunctions

in the cases cited by Defendants — including <u>Mendoza</u> — do not carry weight here.  Take, in

particular, the fear that such injunctions "deprive other lower courts of the chance to weigh in on

important questions" and "encourage parties to engage in forum shopping."  <u>United States v.</u>

<u>Texas</u>, 599 U.S. 670, 694 (2023) (Gorsuch, J., concurring in the judgment); <u>see also</u> <u>Mendoza</u>,

464 U.S. at 160 (espousing virtues of percolation).  It is difficult to imagine this case — with its

Washington-based defendant and its effects geographically limited to Washington — finding

jurisdiction and proper venue anywhere aside from this district.  Limited percolation is thus

endemic to the challenge, and forum shopping is impossible.  Even the most forceful

J.A. 510

explanations of why universal injunctions are often inequitable therefore have less power in this context.

The Court acknowledges that, as a matter of equity, there are instances in which a broad injunction like the one issued in this case will be inappropriate.  Given the demanding standard applied on a motion for reconsideration and the facial nature of the constitutional invalidity here, however, it is not convinced that any adjustment is needed.

## IV. Conclusion

For the foregoing reasons, the Court will deny Defendants' Motion for Reconsideration and grant in part Plaintiff's Motion for Sanctions.  A separate Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  July 31, 2024

22

J.A. 511

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PATRICK J. MAHONEY,

    *Plaintiff*,

    v.

UNITED STATES CAPITOL POLICE
    BOARD et al.,

    *Defendants*.
    .

**Civil Action No. 1:21-cv-2314 (JEB)**

## <u>DEFENDANTS' NOTICE OF APPEAL</u>

NOTICE is hereby given that Defendants the United States Capitol Police Board; Karen H. Gibson, in her Official Capacity as U.S. Senate Sergeant at Arms and Doorkeeper and Member, Capitol Police Board; William P. McFarland, in his Official Capacity as U.S. House of Representatives Sergeant at Arms and Chair, Capitol Police Board; Thomas E. Austin, in his Official Capacity as Architect of the Capitol and Member, Capitol Police Board; and J. Thomas Manger, in  his Official Capacity as Chief of Police, Capitol Police, and Ex-Officio Member, Capitol Police Board appeal to the United States Court of Appeals for the D.C. Circuit from the Court's Order and Opinion of May 17, 2024, and Amended Opinion of May 28, 2024, granting Plaintiff's motion for summary judgment and denying Defendants' cross-motion for summary judgment (Dkt. Nos. 111, 112, 114), and from the Court's Order and Opinion of July 31, 2024, denying Defendants' motion for reconsideration (Dkt. Nos. 122, 123).

September 5, 2024

MATTHEW M. GRAVES, D.C. Bar #418052
United States Attorney

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

J.A. 512

BRIAN P. HUDAK
Chief, Civil Division

KENNETH ADEBONOJO
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-2562
kenneth.adebonojo@usdoj.gov

LESLEY R. FARBY
Assistant Director, Federal Programs Branch

*/s/ Kathryn L. Wyer*
KATHRYN L. WYER (DC Bar# 90023642)
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Washington, DC  20005
Tel. (202) 616-8475
kathryn.wyer@usdoj.gov

*Attorneys for the United States*

2

J.A. 513

Page 338 of 363

Filed: 03/05/2025

Document #2104065

USCA Case #24-5207

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PATRICK J. MAHONEY,

*Plaintiff,*

v.

UNITED STATES CAPITOL POLICE
BOARD et al.,

*Defendants.*

Civil Action No. 1:21-cv-2314 (JEB)

### DECLARATION OF SEAN P. GALLAGHER

I, Sean P. Gallagher, have personal knowledge of the following facts and will testify to them, if called to do so:

1. I am currently the Assistant Chief for Uniformed Operations with the United States Capitol Police ("USCP" or "Department"). I began my career with the USCP in 2001 as a recruit officer and have been promoted through the ranks of Sergeant, Lieutenant, Captain, Inspector, and Deputy Chief to attain my current position of Assistant Chief. In my current role, I oversee and am responsible for all operational facets of three bureaus: Uniformed Services, Operational Services, and Command and Coordination. Uniformed Operations represents the largest percentage of the Department's sworn workforce; it comprises approximately 1,291 officers out of a total of 2,091. The Capitol Division is one of the divisions within the Uniformed Services Bureau, and therefore, the protection of the U.S. Capitol Building is under my command.

(Page 338 of Total)

Page 339 of 363

Filed: 03/05/2025

Document #2104065

USCA Case #24-5207

*Capitol Square and the Eastern Steps*

2. The grounds surrounding the U.S. Capitol Building covers an area of 58.8 acres. Its boundaries are Independence Avenue on the south, Constitution Avenue on the north, First Street NE/SE on the east, and First Street NW/SW on the west ("Capitol Square").

3. The U.S. Capitol and the surrounding grounds are often the site of demonstrations and other forms of public expression on matters of great public interest and controversy, particularly given the fact that the U.S. Supreme Court is adjacent to the Capitol Square. Demonstrations at the U.S. Capitol are subject to restrictions, including limiting such activity to designated areas on U.S. Capitol Grounds.

4. The U.S. Capitol houses both the U.S. House of Representatives and the U.S. Senate. Due to the vital role that the U.S. Capitol plays in the functioning of the United States Government, the security of both the building and its occupants is a matter of national security.

5. The eastern side of the U.S. Capitol has three sets of steps along the front face of the U.S. Capitol building leading from the East Front Plaza into the building ("Eastern Steps"). These sets of steps constitute the main paths of ingress and egress for Members of Congress, their staff, and visitors. The Eastern Senate steps lead to the Senate at the northeast side of the building, the Eastern Capitol Steps lead into the due-east side of the building, and the Eastern House steps lead to the House of Representatives at the southeast side of the building. Stip. ¶ 9, pg. 3. On the East Front Plaza level there are entrances to the Capitol between the Eastern House steps and the Eastern Capitol Steps, and between the Eastern

(Page 339 of Total)

Senate steps and the Eastern Capitol Steps.  These entrances are commonly referred to as the Carriage doors or entrance.[1]  The USCP Dignitary Protection Division motorcades use the Carriage doors to drop off and pick up visiting Dignitaries.

6.   Prior to this Court's recent injunction, the Eastern Steps, as well as the entrances to the Carriage doors, were designated as no demonstration zones due to security concerns.  The use of no demonstration zones for these areas has been a fundamental part of the USCP's plan to defend the Capitol Building for decades. In order to control any group of demonstrators, it is a critical police tactic to create enough space, i.e., buffer zone, between demonstrators and places of concern.  Prior to the injunction, the space between the base of the steps and the building was the buffer zone and it provided an elevated platform from which to take defensive action essential to the defense of the Capitol.  This buffer zone enabled the Department to establish areas of last resort denial using less than lethal resources (or lethal if warranted) and provided room to establish civil disturbance unit formations. These formations could then be used to push a surging crowd back from the entrances.  Unlike other government locations, such as the White House or a military base, there is no permanent fence surrounding the Capitol, so maintaining the ability for officers to form a "human fence" close to the building is critical.  Allowing demonstrators behind that "human fence" is a crucial breach of that security posture.

7.   Under this Court's injunction, a demonstration on the lower steps of the Eastern

---

[1] https://www.senate.gov/general/resources/pdf/Capitol_Door_Map_Hours.pdf

J.A. 516

Steps, which are cordoned off from the upper level of steps by barriers, would be closer to the Capitol than any other demonstration area on the Capitol Grounds. This situation poses a pressing new security risk to the safety of Members of Congress and the security of the Capitol Building, particularly at a time when there are heightened threats to lawmakers, and the Capitol is preparing for a series of important events, including the certification of the electoral votes on January 6, 2025.

*Increased Security Risk on the Eastern Steps*

8.   The Eastern Steps span the entire front face of the U.S. Capitol Building and could conceivably allow hundreds of demonstrators to mass together in areas where this activity was previously prohibited for security reasons.

9.   In my experience, the potential for security risks increases in direct proportion to the number of demonstrators that are allowed to gather on or around the U.S. Capitol Building, as well as the proximity in which they are allowed to stage.  The distance from the dividing barrier on the House Steps to the House Chamber is less than 123 feet; and the distance from the dividing barrier of the Senate Steps to the Senate Chambers is less than 139 feet.  Thus, if a large number of demonstrators in such close proximity to the Chambers becomes unruly and violent, like on January 6, 2021, it would present a significant threat to the safety of Members, employees, and visitors, and require a swift augmentation of USCP officers.

10.  Many demonstrations take place on the Capitol Grounds peacefully and without

J.A. 517

Page 342 of 363

Filed: 03/05/2025

Document #2104065

USCA Case #24-5207

incident. However, anyone may enter the Capitol Grounds, and it is often not possible to predict in advance whether a demonstration will pose a security threat. A small demonstration that begins peacefully may become larger and more violent, and the circumstances that may cause this to occur are not always known. USCP's job is to monitor for potential threats, and to be prepared to respond in the event a security concern arises.

11. Because of the unique security concerns regarding the Eastern Steps and the crucial tactical importance of the Eastern Steps to maintaining the defense of the Capitol in a worst case scenario, USCP would need to plan accordingly if unknown groups of demonstrators gather on the Eastern Steps. Even with a group of 30 demonstrators on one of the set of steps—the current maximum for demonstrations without a permit in other areas of the Capitol Grounds—the Department would need to have a greater number of officers, likely in excess of 50, in positions on the steps in order to be sufficiently prepared to respond if too many people start to join the demonstration on the steps or if the demonstration turns violent. This is especially true given the operational and logistical difficulties that officers face defending non-level surfaces, such as the steps, which can create jarring and unpredictable results in violent crowd control situations.

12. Since the events of January 6, 2021, USCP has made great strides in rebuilding police force numbers, but there remains a continuing need to build up the force to ensure the security of the Capitol and the safety of Members, staff, and visitors. Quite simply, the force mobilization that will be required for steps demonstrations

(Page 342 of Total)

Page 343 of 363

Filed: 03/05/2025

Document #2104065

USCA Case #24-5207

will be a huge resource re-allocation, requiring USCP to pull resources from other posts throughout the Capitol Building and Grounds, or other Congressional Buildings. This new security obligation will have a material impact on policing around the Capitol and the surrounding grounds ("Capitol Complex"), as it will pull officers from other crucial postings to defend the Capitol against demonstrations that could turn violent on the very steps of the Capitol.  I note that the court has suggested that the USCP could address the new security concerns by instituting limits on the number of demonstrators, requiring permits, banning the use of props, or limiting expressive activities to certain times of day.  First and foremost, USCP officers must focus on security concerns rather than counting the number of demonstrators at any given moment.  Furthermore, requiring permits, banning props and implementing time restrictions do not eliminate the logistical, operational and tactical issues described herein.  Finally, it is unclear how the USCP would be able to set up security screening without permanent fencing around the expansive East Front Plaza.

13. The challenge of resource allocation and the need to have time and space to respond to unexpected conditions that arise, such as demonstrations that become acts of civil disobedience or deteriorate and turn violent, were on full display with respect to the following:

    a. January 6, 2021:  the USCP did not anticipate that thousands of protesters would storm the U.S. Capitol Building and the steps, breaking windows and doors, and attacking the U.S. Capitol Police officers guarding the campus and Capitol Building.  Protesters were

(Page 343 of Total)

Page 344 of 363

Filed: 03/05/2025

Document #2104065

USCA Case #24-5207

armed with weapons that included bricks, baseball bats, hockey sticks, construction tools, and flag poles, and the violence escalated quickly and overwhelmed the USCP.  If this attack had begun on the bottommost steps of the Eastern Steps, where demonstrations are now allowed, the results could have been far worse.  As it was, over 140 officers were injured and a USCP officer lost his life.  According to the Department of Justice, as of May 3, 2024, over 1424 protesters have been charged with having participated in the attack.[2]

b. April 11, 2016:  Over 400 participants led by a group called Democracy Spring attempted to stage a demonstration on the lower steps of the Eastern Steps, which were part of the no demonstration zone prior to the Court's injunction.  Prior to the demonstration, the USCP had no way of knowing exactly how many people would participate or whether the situation was likely to deteriorate into violence.  During the demonstration, in order to ensure the safety of the U.S. Capitol, the USCP blockaded the staircase with a physical chain and a line of officers.  They were quickly overwhelmed by the sheer number of demonstrators that were intent on being arrested for civil disobedience.  Fortunately, the demonstrators did not turn violent; otherwise, the situation could have been much worse.  On that particular day, over 400 demonstrators were arrested.

The Democracy Springs event is an example of how some demonstrators that

---

[2] https://www.justice.gov/usao-dc/39-months-since-the-jan-6-attack-on-the-capitol

(Page 344 of Total)

come to the Capitol Grounds do so in order to draw attention or publicity to themselves and their cause.  The demonstrators at this event used the common tactic of risking or inviting arrest by demonstrating in an area where demonstrations are not allowed.  By now allowing demonstrations on the lower steps of the Eastern Steps, a natural transition for civil disobedience is that groups will try to demonstrate on the upper level of steps of the Eastern Steps, an area not affected by this Court's injunction, but an area that poses a substantially greater security risk to Members of Congress given the proximity to the Chambers.

14. These concerns about mass demonstrations on the lower steps of the Eastern Steps and the potential for violence threatening the security of the Capitol are wholly different from the daily situations in and around the Eastern Steps. On a normal day, USCP can easily monitor tourists or visitors who might temporarily walk on the steps for short periods of time to take pictures or meet briefly with a Member of Congress.  However, the strategies and tactics for regular, routine matters such as monitoring tourists and visitors do not present the logistical, operational, and protection issues posed by demonstrations that can be for sustained periods of time, may involve a growing group of unknown people, and are unpredictable in how they may evolve over the course of one or more hours. In those situations, the USCP must be prepared to react quickly, especially if the demonstration devolves into violence or an attempt to breach the Capitol via the steps, as happened on January 6, 2021.

15. A similar comparison can be made regarding Members and/or staff that occasionally stage demonstrations on the Eastern Steps.  While the USCP's

Page 346 of 363

Filed: 03/05/2025

Document #2104065

USCA Case #24-5207

permission is not sought, the USCP is typically given advance notice of the intention of the planned activities of the Members and/or staff, allowing for consideration and planning for any security concerns.  The USCP is unaware of a Member-led event on the steps that devolved into violence or presented the type of operational and logistical concerns that are presented by random, spontaneous or even planned events involving demonstrators who may mass upon the lower steps of the Eastern Steps and then decide to breach the barriers leading to the upper-level steps or the Capitol Building.

16. Even Plaintiff in this case, who has a long history of demonstrating on Capitol Grounds, is a known quantity to the USCP, and has described during the litigation the types of demonstrations he wishes to hold, such that the USCP can anticipate any security concerns with respect to his demonstrations.  The same cannot be said about other demonstrations by unknown persons or groups that will now be conducted on the lower steps of the Eastern Steps.  My understanding is that the Court's injunction currently allows demonstrations on the steps not only by Plaintiff, but also by other individuals or groups, known or unknown to the USCP.

*Other Concerns Regarding Demonstrations on the Lower Steps of the Eastern Steps*

17. Allowing demonstrations on the lower steps of the Eastern Steps could also impede an emergency evacuation of the building, creating a life safety issue. There are a limited number of ways to exit or evacuate the Capitol Building, and potentially having an unknown contingent of people demonstrating on the lower steps of the Eastern Steps is certainly an additional concern that is particularly

9

J.A. 522

(Page 346 of Total)

Page 347 of 363

Filed: 03/05/2025

Document #2104065

USCA Case #24-5207

challenging to handle.  For risks coming from inside the Capitol, such as fire or chemical hazards, exiting out of the Capitol doors, the House doors or Senate doors may be the most efficient evacuation route. Allowing demonstrations to block these potential evacuation routes is a critical security risk.

18. The USCP tracks threats against Members of Congress.  Over the course of the past seven years, these threats have increased significantly:

- 3,939 in 2017,
- 5,206 in 2018,
- 6,955 in 2019,
- 8,613 in 2020,
- 9,625 in 2021,
- 7,501 in 2022, and
- 8,008 in 2023.[3]

My expectation, based on the number of threats received to date, is the number of threats in 2024 could well exceed 10,000.

19. In the last few years, the USCP has seen an increase in the number of demonstrations and acts of civil disobedience at the U.S. Capitol, as well as the surrounding Capitol Grounds.  Based on internal USCP statistics, unpermitted events accounted for the majority of demonstrations that resulted in arrests in 2022 and 2023, and the number of USCP demonstration arrests increased by approximately 98% between 2022 and 2023.

20. "No demonstration zones" have also proven to be an extremely effective tool in

---

[3] https://www.uscp.gov/media-center/press-releases/uscp-threat-assessment-cases-2023

(Page 347 of Total)

J.A. 523

Page 348 of 363

Filed: 03/05/2025

Document #2104065

USCA Case #24-5207

reducing the potential for suspicious packages.  In the past two years, on the grounds surrounding the exterior of the U.S. Capitol, the number of suspicious packages found in areas where demonstrations were allowed were double the number of those found in areas where demonstrations were not allowed. Therefore, as a result of lifting the no demonstration zone, I anticipate an increase in suspicious packages in the area around the lower steps of the Eastern Steps. Proximity remains a significant concern in this regard as well – the closer a suspicious package is to the Capitol Building itself, the more damage could be done should it contain an explosive device.

21. The next seven months, in particular, will present significant security challenges for the USCP at the Capitol Complex. A divisive national election season, followed by the opening of a new Congress, the certification of the Electoral ballots on January 6, 2025, and the presidential inauguration on January 20, 2025, create the potential for highly volatile public demonstrations that will strain the USCP's resources, as well as the law enforcement agencies that partner with the USCP to protect the Capitol Complex.

22. Finally, it is worth noting that Members of Congress are not the only ones being protected by a safe and secure U.S. Capitol Building.  High-level Executive Branch Members and other government officials and personnel routinely visit the Capitol.  For instance, the Carriage entrance is used for the arrivals and departures of dignitary motorcades.  Allowing demonstrators on both the sidewalk and the lower steps of the Eastern Steps could result in that entrance being blocked.  By putting the seat of government at heightened security risk through the allowance

J.A. 524

(Page 348 of Total)

USCA Case #24-5207        Document #2104065        Filed: 03/05/2025        Page 349 of 363

of demonstrations on the lower steps of the Eastern Steps that may turn violent,

there is a substantial risk of disruption of legislative business, and disruption of

the government as a whole.

J.A. 525

(Page 349 of Total)

Page 350 of 363

Filed: 03/05/2025

Document #2104065

USCA Case #24-5207

(Page 350 of Total)

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 14th day of June 2024.

Sean P. Gallagher

J.A. 526

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK J. MAHONEY,

         *Plaintiff*,

    v.

KAREN H. GIBSON, in her Official
Capacity as U.S. Senate Sergeant at Arms
and Doorkeeper and Chair, United States
Capitol Police Board; WILLIAM P.
MCFARLAND, in his Official Capacity as
U.S. House of Representatives Sergeant at
Arms and Member, United States Capitol
Police Board; CHERE REXROAT, in her
Official Capacity as Acting Architect of the
Capitol and Member, United States Capitol
Police Board; and J. THOMAS MANGER,
in his Official Capacity as Chief of Police,
United States Capitol Police and Ex-Officio
Member, United States Capitol Police Board,

         *Defendants*.

Civil Action No. 21-2314 (JEB)

DECLARATION OF PATRICK J.
MAHONEY IN SUPPORT OF
OPPOSTION TO DEFENDANTS'
MOTION FOR STAY PENDING APPEAL

I, Patrick J. Mahoney, hereby declare:

    1.    I am the plaintiff in the above-entitled matter.  I am over the age of 18, and I make this declaration from my own personal knowledge.  If called upon to testify to the contents below, I could and would do so competently.

    2.    On January 6, 2023, I went to Capitol Square around noon to pray for national healing in light of the events there two years prior. When I arrived on the eastern side of the Capitol, I saw that Capitol Square had been surrounded by barricades. I spoke with a Capitol Police Officer who informed me Capitol Square was closed to the public. I do not know why Capitol Square was closed, but I presume the United States Capitol Police Board (the "Board") closed it due to a perceived security threat.

J.A. 528

3.      Since the Court entered its injunction in this case, I have conducted demonstration activity on the lower Eastern Steps approximately 6–7 times. On most of these occasions, I prayed alone or with my wife on the lower Eastern House Steps.

4.      Since the Court entered its injunction in this case, I have spoken with Capitol Police Officers regarding how the Board is interpreting the Traffic Regulations in the wake of the Court's injunction. The Capitol Police Officers informed me that the Board is now interpreting the Traffic Regulations to (1) allow demonstration activity on the lower Eastern Steps in groups of thirty people or fewer and (2) prohibit demonstration activity on the lower Eastern Steps in groups of more than thirty people.

5.      To the best of my knowledge, since the Court entered its injunction in this case, the Board has not revised the Traffic Regulations to impose additional restrictions on demonstration activity on the lower Eastern Steps, entered a Board Order setting forth additional restrictions on demonstration activity on the lower Eastern Steps greater than those imposed under the Traffic Regulations, or otherwise imposed additional restrictions on demonstration activity on the lower Eastern Steps greater than those imposed under the Traffic Regulations.

6.      To the best of my knowledge, since the Court entered its injunction in this case, and based on my observations during my demonstration activity and otherwise while on the Capitol Grounds, the Board has not: created a permit requirement for demonstration activity on the lower Eastern Steps; imposed a more stringent cap on demonstration activity crowd size on the lower Eastern Steps than the Traffic Regulations' background thirty-person limit; banned demonstration activity at certain times on the lower Eastern Steps; more strictly enforced existing laws regulating activity on the Capitol Grounds on the lower Eastern Steps; or required prospective demonstrators to submit to police screening before demonstrating on the lower Eastern Steps.

7.      In my many years of conducting demonstration activity on the Capitol Grounds, I have obtained many permits for demonstration activity. The permit application process requires close coordination between a representative of the group seeking the permit and the Capitol Police regarding such topics as the date of the proposed demonstration activity, the location of the proposed demonstration activity, the proposed size of the group that will be demonstrating, the proposed start and stop time of the demonstration activity, whether any props or equipment are requested for the proposed demonstration activity, and other logistical matters regarding the proposed demonstration activity. In my experience, the Capitol Police will not issue a permit without engaging in this dialogue with a representative of the group seeking the permit.

8.      In my many years of conducting demonstration activity on the Capitol Grounds, I have observed that it is exceedingly rare for Members of Congress to participate in demonstration activity conducted by ordinary members of the public.

9.      On June 23, 2024, I gathered with approximately twenty-nine other people on the lower Eastern House Steps to engage in demonstration activity in the form of prayer and songs. The demonstration activity lasted approximately one hour. At the time we began, there were approximately 7–8 Capitol Police Officers in the vicinity. The Officers did not subject us to any additional security measures, like searching us for contraband. By the time we finished, there was only one Capitol Police Officer in the vicinity. That Officer was standing at the top of the Eastern House Steps.

10.     I intend to continue conducting demonstration activity on the lower Eastern Steps to the full extent allowed by the Traffic Regulations so long as I am allowed to do so.

11.     I am a peaceful man of God. My demonstration activity will not cause a threat to the security of the Capitol Building, the Capitol Grounds, any member of Congress, or anything else in which the Board has a legitimate interest.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of September, 2024

Rev. Patrick J. Mahoney

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**PATRICK J. MAHONEY,**

     **Plaintiff,**

       v.

**UNITED STATES CAPITOL POLICE
BOARD,** *et al.*,

     **Defendants.**

Civil Action No. 21-2314 (JEB)

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, the Court hereby

ORDERS that:

1.  Defendants' Motion to Stay is GRANTED;

2.  The injunction is MODIFIED to apply only to Plaintiff and up to four others

    demonstrating with him.

          */s/ James E. Boasberg*
          JAMES E. BOASBERG
          Chief Judge

Date: October 16, 2024

1

J.A. 532

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**PATRICK J. MAHONEY,**

      **Plaintiff,**

      **v.**

**UNITED STATES CAPITOL POLICE
BOARD,** *et al.*,

      **Defendants.**

**Civil Action No. 21-2314 (JEB)**

## <u>MEMORANDUM OPINION</u>

Plaintiff Patrick J. Mahoney brought this First Amendment challenge to the U.S. Capitol Police Board's near-total prohibition on expressive activities that take place on the lower Eastern Steps of the Capitol building. He has since prevailed two times over: once when the Court granted summary judgment in his favor, entering a permanent injunction prohibiting any and all enforcement of the Board's regulation at the base of the Eastern Steps, and again when the Court denied Defendants' Motion for Reconsideration. Undeterred, Defendants — the U.S. Capitol Police Board's individual members — now seek a partial stay of that injunction as to people other than Mahoney pending their noticed appeal to the D.C. Circuit. The third time is the charm, as the Court sides with the Board members and finds that the relevant factors weigh in favor of a partial stay. It will, accordingly, grant Defendants' Motion.

## I.    Background

To avoid spilling yet more ink, the Court will not again rehash the legal and factual background of this litigation. For those interested in its circuitous journey, the full saga is

recounted in the Court's previous Opinions.  See, e.g., Mahoney v. U.S. Capitol Police Bd.

(Mahoney V), 2024 WL 2252178 (D.D.C. May 17, 2024).  Here, the Court sets out only a few

basic points of procedural history.

     Mahoney, a clergyman who seeks to hold prayer vigils and other demonstrations on the

grounds of the United States Capitol, filed this lawsuit to challenge Capitol Police Board

regulations forbidding such activity.  See ECF No. 99-1 (Stip.), ¶¶ 35–40; ECF No. 1 (Compl.).

Following years of litigation — including a settlement and consent decree as well as voluntary

dismissal of several of Mahoney's claims — the parties agreed to skip over discovery and brief

summary judgment on the basis of stipulated facts.  See ECF No. 92 (Consent Decree), ¶¶ 4–7.

On summary judgment, the only regulation at issue was the Board's designation of the

bottommost portion of the Capitol's Eastern Steps as a "No Demonstration Zone."  See Consent

Decree, ¶¶ 4–7; ECF No. 69 (3d Am. Compl.), ¶¶ 97, 160.  Plaintiff contended that this blanket

prohibition violated the First Amendment.  See ECF No. 97-1 (Pl. MSJ) at 19–43.  He thus asked

the Court to enter a permanent injunction to prevent the Board from enforcing this portion of the

regulations "insofar as it prohibits demonstration activity on the Eastern Steps."  Pl. MSJ at 44.

     The Court agreed with Mahoney.  It held that the Eastern Steps were a public forum and

that the near-total demonstration ban was unconstitutional.  Mahoney V, 2024 WL 2252178, at

*9–11.  The Court then found that the equitable factors guiding the permanent-injunction

analysis uniformly weighed in favor of an injunction.  Id. at *11–12; see also ECF No. 111

(Order) ("Defendants are permanently ENJOINED from enforcing [the] prohibition as to [the

bottommost] portion of the Eastern Steps.").

     Dissatisfied, the Board members moved for reconsideration and asked the Court to

narrow the scope of its injunction to Plaintiff alone.  See ECF No. 116 (Mot. for Recon.).  The

Court denied that Motion, holding that it possessed jurisdiction to enter the permanent injunction

and that Defendants (then lacking an admissible declaration) had failed to establish a need to

prevent manifest injustice or correct a clear error. Mahoney v. U.S. Capitol Police Bd., 2024 WL

4235429 (D.D.C. July 31, 2024). About a month later, on September 5, 2024, Defendants filed

their Notice of Appeal. See ECF No. 127 (Notice of Appeal). The same day, they filed the

instant Motion asking the Court to partially stay its Order pending appellate review. See ECF

No. 128 (Mot. for Stay). Defendants seek a stay only as to nonparties and only until the

Inauguration of the President in January 2025. Id. at 1. Under Defendants' proposed stay,

Mahoney would be permitted "to engage in his desired demonstration activities that formed the

basis for this lawsuit." Id. at 2. In other words, Mahoney could still demonstrate on the lower

Eastern Steps with two to four other people, but the Board could enforce its regulations against

all other demonstrations.

## II.    Legal Standard

The party seeking a stay pending appeal bears the burden of justifying it based upon the

following factors: "(1) the likelihood that the party seeking the stay will prevail on the merits of

the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3)

the prospect that others will be harmed if the court grants the stay; and (4) the public interest in

granting the stay." Cuomo v. U.S. Nuclear Regul. Comm'n, 772 F.2d 972, 974, 978 (D.C. Cir.

1985). This familiar test is "'essentially the same' as the test for a preliminary injunction,

'although courts often recast the likelihood of success factor as requiring only that the movant

demonstrate a serious legal question on appeal where the balance of harms favors a stay.'"

Citizens for Resp. & Ethics in Wash. v. Off. of Admin., 565 F. Supp. 2d 23, 25 n.1 (D.D.C.

2008) (quoting Al-Anazi v. Bush, 370 F. Supp. 2d 188, 193 & n.5 (D.D.C. 2005)). In assessing

the propriety of a stay, the Court bears in mind that it is an "extraordinary remedy," Cuomo, 772

F.2d at 978, that is "not a matter of right, even if irreparable injury might otherwise result" to the

movant. Nken v. Holder, 556 U.S. 418, 427 (2009) (internal quotation marks and citation

omitted). Instead, a stay is "an exercise of judicial discretion" that turns upon the particular

circumstances of each case. Id. at 433 (citation omitted).

### III. Analysis

#### A. Success on Merits

In considering the four factors, the Court begins with the likelihood of Defendants'

success on appeal. As the Board members diplomatically acknowledge, the Court has already

rejected their position twice. See Mot. for Stay at 5. While the Court remains convinced that its

previous Opinions correctly resolved the issues, Defendants need not persuade it that it erred and

will likely be reversed — an acknowledgment one would expect few courts to make. Instead, so

long as the other factors strongly favor a stay, such remedy is appropriate if "a serious legal

question is presented." Loving v. IRS, 920 F. Supp. 2d 108, 110 (D.D.C. 2013) (quoting

Citizens for Resp. & Ethics in Wash. v. Off. of Admin., 593 F. Supp. 2d 156, 160 (D.D.C.

2009)); see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843–

44 (D.C. Cir. 1977). The Court concedes that such a question is presented here. "If the other

factors tip in favor of a stay, therefore, this factor will not preclude one." Loving, 920 F. Supp.

2d at 110.

#### B. Irreparable Harm

To establish the existence of the second factor, the movant must demonstrate that the

injury is "of such imminence that there is a 'clear and present' need for equitable relief to

prevent irreparable harm." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297

(D.C. Cir. 2006) (quoting Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).  The

injury must also be "both certain and great; it must be actual and not theoretical." Id. (quoting

Wisconsin Gas, 758 F.2d at 674).  Finally, the injury must be "beyond remediation." Id.

   Defendants, citing the events of January 6, 2021, argue that the Court's injunction —

which would allow demonstrators to congregate steps from the House and Senate Chambers —

could threaten the safety of legislators and other Capitol employees. See Mot. for Stay at 2–5.

In particular, the Board members explain (now with an admissible declaration) that the

injunction will allow demonstrators closer access to the Capitol Building, thus undermining the

ability of Capitol Police to respond to an unpredictable crisis, both on the date of certification

and throughout this "divisive national election season." Id. at 4 (quoting ECF No. 128-1 (Decl.

of Sean P. Gallagher)).  As both this Court and a judge on the D.C. Circuit have noted,

"Defendants unquestionably have a 'compelling interest in the security of the Capitol Building.'"

Mahoney V, 2024 WL 2252178, at *9 (quoting Mahoney v. U.S. Capitol Police Bd., 2022 WL

1177313, at *3 (D.C. Cir. Apr. 15, 2022) (Millett, J., concurring)).  The Court, accordingly, does

not take Defendants' warnings lightly and credits their assertions that the injunction creates a

substantial risk of serious harm to the Capitol and those who work inside it.

   To be sure, Defendants have not shown that such harm is absolutely certain to occur,

particularly between now and the election.  They have, however, shown that the risk of injury is

significant between the election and the Inauguration and that the consequences would be severe.

And because the harm to Mahoney is so minimal, as will be explained below, the Court will not

demand an airtight showing of irreparable injury.  The Board members have therefore

sufficiently shown that they face irreparable harm if the Court's injunction remains in place.

C.  Harm to Others

The Court now considers the "prospect that others [involved in the litigation] will be harmed if the court grants the stay." Cuomo, 772 F.2d at 974.  Mahoney advances two reasons he believes show that he will be harmed by a stay, neither of which the Court finds convincing.

Plaintiff first objects on the ground that, under Defendants' proposed stay, he would not be permitted to demonstrate with large groups — that is, groups of up to thirty people — on the lower Eastern Steps.  See ECF No. 130 (Opp.) at 16–17.  But Plaintiff is entitled only to relief that would remedy the injuries forming the basis of his lawsuit.  Throughout this litigation, and particularly in his stipulated facts, Mahoney has asserted that his principal aim for the lower Eastern Steps is to hold small vigils.  See, e.g., 3d Am. Compl., ¶ 81 ("Rev. Mahoney desires to engage in a prayer vigil alone and/or with his wife on the Eastern Plaza immediately in front of the steps to the Senate and the House of Representatives . . . ."); Stip., ¶ 35 ("Rev. Mahoney desires to engage in demonstration activity . . . with his wife and a small group of other people (2–4 others) on the Eastern Steps (below the dividers) and the areas at the base of the steps immediately around them.").  Mahoney cannot now raise a new request for relief and claim injury from being denied that relief.  The Court is therefore unpersuaded that a stay will injure Mahoney by preventing him from demonstrating with large groups.

Plaintiff next argues that he will be harmed by a stay because the Capitol Police may ask him to identify himself when conducting his demonstrations.  See Opp. at 17.  Mahoney, however, doth protest too much.  The harm associated with proving his identity is negligible, and a *de minimis* harm to the non-movant does not pose an obstacle to granting a stay when there are strong interests weighing in the movant's favor.  See Lair v. Bullock, 697 F.3d 1200, 1215 (9th Cir. 2012) (granting stay pending appeal when harm to interested parties "would, at most, be

minimal and vastly outweighed by the public interest"); Louisiana *ex rel.* Landry v. Biden, 2022 WL 866282, at *3 (5th Cir. Mar. 16, 2022) (similar); Kifafi v. Hilton Hotels Ret. Plan, 2012 WL 13214321, at *2 (D.D.C. Jan. 19, 2012) (similar).

D. Public Interest

The Court must also consider the "public interest in granting the stay." Cuomo, 772 F.2d at 974. "The public interest is a uniquely important consideration in evaluating a request for [a stay]." *In re* Special Proceedings, 840 F. Supp. 2d 370, 376 (D.D.C. 2012) (quoting Nat'l Ass'n of Mfrs. v. Taylor, 549 F. Supp. 2d 68, 77 (D.D.C. 2008)). Because Defendants are government actors whose interests "merge" with the public's, Nken, 556 U.S. at 435, the Court concludes that — while protecting speech is a worthy goal — the public also possesses a significant interest in avoiding harm to the Capitol and the surrounding grounds. As a result, the Court determines that this factor weighs in favor of granting Defendants' proposed stay.

IV.   **Conclusion**

For the foregoing reasons, the Court will grant Defendants' Motion to Stay. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  October 16, 2024

(Page 363 of Total)   J.A. 539