# United States Court of Appeals
# for the District of Columbia Circuit

### No. 24-5207

PATRICK J. MAHONEY, Reverend,

*Plaintiff-Appellee,*

*v.*

UNITED STATES CAPITOL POLICE BOARD, in its Official Capacity;
KAREN H. GIBSON, in her Official Capacity as U.S. Senate Sergeant at Arms
and Doorkeeper and Chair, Capitol Police Board; WILLIAM P. McFARLAND,
in his Official Capacity as U.S. House of Representatives Sergeant at Arms and
Member, Capitol Police Board; THOMAS E. AUSTIN, in his Official Capacity
as Architect of the Capitol and Member, Capitol Police Board; J. THOMAS
MANGER, in his Official Capacity as Chief of Police, Capitol Police,
and Ex-Officio Member, Capitol Police Board,

*Defendants-Appellants.*

*On Appeal from the Order of the United States District Court
for the District of Columbia in No. 1:21-cv-02314-JEB,
Honorable James E. Boasberg, U.S. Chief District Judge.*

## BRIEF FOR PLAINTIFF-APPELLEE

JOSHUA W. DIXON
ERIC A. SELL
CENTER FOR AMERICAN LIBERTY
P.O. Box 200942
Pittsburgh, Pennsylvania, 15251
(703) 687-6212
jdixon@libertycenter.org
esell@libertycenter.org

*Counsel for Plaintiff-Appellee*

April 4, 2025

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A. Parties and Amici**

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants.

**B. Rulings Under Review**

References to the rulings at issue appear in the Brief for Appellants.

**C. Related Cases**

This case was not previously before this Court. This Court addressed a challenge to a different provision of the U.S. Capitol Police Board's regulations by the same plaintiff in *Mahoney v. U.S. Capitol Police Board*, No. 22-5094, 2022 WL 1177313 (D.C. Cir. Apr. 15, 2022) (per curiam). Counsel is not aware of any pending related cases.

*/s/Josh Dixon*
Josh Dixon

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ...................................................................iv

GLOSSARY........................................................................................x

INTRODUCTION .................................................................................1

STATEMENT OF JURISDICTION...........................................................3

PERTINENT STATUTES AND REGULATIONS ........................................3

STATEMENT OF THE ISSUES................................................................3

STATEMENT OF THE CASE..................................................................4

I.     FACTUAL BACKGROUND.........................................................4

    A.    The Capitol Grounds ............................................................4

    B.    History of Demonstrations on the Eastern Steps .................8

    C.    Demonstrations by Members of Congress ...........................11

    D.    Rev. Mahoney's Proposed Demonstrations ........................15

II.    PROCEDURAL HISTORY .........................................................15

SUMMARY OF ARGUMENT ................................................................18

STANDARD OF REVIEW ....................................................................21

ARGUMENT .....................................................................................21

I.     THE DISTRICT COURT DID NOT ERR IN GRANTING
     SUMMARY JUDGMENT TO REV. MAHONEY ......................................21

    A.    The No Demonstration Zone impermissibly restricts speech
        and assembly in a traditional public forum .........................21

        1.    The Eastern Steps are a Traditional Public Forum ..................22

            a.    The entire Capitol Grounds are a traditional
                public forum..................................................................22

           b.     The Board cannot show the Lower Eastern Steps are nonpublic ................................................................23

     2.     The Board cannot show the No Demonstration Zone satisfies intermediate scrutiny....................................32

           a.     *Lederman* controls here ......................................32

           b.     The Board's counterarguments are unavailing...............37

  B.     The Court should affirm on alternate grounds ......................................42

     1.     The No Demonstration Zone is so broad it is constitutionally unreasonable....................................42

     2.     The Member exemption for Member-sponsored demonstrations violates the unbridled discretion doctrine........................................................44

     3.     The Member exemption for Member-organized demonstrations is content based and fails any review .............47

           a.     The Member exemption is content based.......................47

           b.     The Member exemption fails any type of review...........48

     4.     The No Demonstration Zone violates equal protection............51

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING A UNIVERSAL INJUNCTION WOULD NOT CAUSE MANIFEST INJUSTICE ....................................................52

  A.     The injunction is consistent with Article III .......................................53

  B.     The injunction is consistent with equitable principles ........................55

CONCLUSION ....................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
  901 F.3d 356 (D.C. Cir. 2018).................................................................45

*Archdiocese of Wash. v. WMATA*,
  897 F.3d 314 (D.C. Cir. 2018).................................................................48

*Banner v. United States*,
  428 F.3d 303 (D.C. Cir. 2005).................................................................51

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*,
  482 U.S. 569 (1987).................................................................................43

*Boardley v. U.S. Dep't of Interior*,
  615 F.3d 508 (D.C. Cir. 2010).................................................................39

*Brockett v. Spokane Arcades, Inc.*,
  472 U.S. 491 (1985).................................................................................54

*Califano v. Yamasaki*,
  442 U.S. 682 (1979).................................................................................54

*Cannon v. District of Columbia*,
  717 F.3d 200 (D.C. Cir. 2013).................................................................14

*Cent. Radio Co. Inc. v. City of Norfolk*,
  811 F.3d 625 (4th Cir. 2016)...................................................................47

*Chichakli v. Tillerson*,
  882 F.3d 229 (D.C. Cir. 2018)..........................................................43, 52

*Christian Legal Soc. v. Martinez*,
  561 U.S. 661 (2010).................................................................................27

*Ciralsky v. CIA*,
  355 F.3d 661 (D.C. Cir. 2004).................................................................21

*Citizens United v. FEC*,
  558 U.S. 310 (2010)...................................................................47, 53, 56

*City of Chi. v. Barr*,
  961 F.3d 882 (7th Cir. 2020)...................................................................57

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994) ................................................... 36

*Clark v. Jeter*,
    486 U.S. 456 (1988) .................................................. 51

*Cmty. for Creative Non-Violence v. Kerrigan*,
    865 F.2d 382 (D.C. Cir. 1989) .............................. 23

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) .................................................. 21

*Davis v. N.Y.C.*,
    373 F. Supp. 2d 322 (S.D.N.Y. 2005) ................ 29

*Dellums v. Powell*,
    566 F.2d 1673 (D.C. Cir. 1977 .............................. 27

*DHS v. N.Y.*,
    140 S. Ct. 599 (2020) ............................................... 55

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975) .................................................. 54

*Edwards v. District of Columbia*,
    755 F.3d 996 (D.C. Cir. 2014) ................... 38, 39, 42

*Edwards v. South Carolina*,
    372 U.S. 229 (1963) .................................................. 22

*Egbert v. Boule*,
    596 U.S. 482 (2022) .................................................. 59

*FDIC v. Meyer*,
    510 U.S. 471 (1994) .................................................. 59

*Forsyth Cnty. v. Nat'list Movement*,
    505 U.S. 123 (1992) .................................................. 45

*Frisby v. Schultz*,
    487 U.S. 474 (1988) .................................................. 25

*Gill v. Whitford*,
    585 U.S. 48 (2018) .................................................... 54

*Henderson v. Lujan*,
    964 F.2d 1179 (D.C. Cir. 1992) ............. 23, 24, 26, 42

*Hodge v. Talkin*,
  799 F.3d 1145 (D.C. Cir. 2015) ........................................ 23, 29, 30, 43

*Housing Works, Inc. v. Safir*,
  101 F. Supp. 2d 163 (S.D.N.Y. 2000) ................................ 26, 37, 45

*Initiative & Referendum Institute v. USPS*,
  685 F.3d 1066 (D.C. Cir. 2012) ....................................................30

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
  140 S. Ct. 768 (2020) ....................................................................44

*Jaffe-Spindler Co. v. Genesco, Inc.*,
  747 F.2d 253 (4th Cir. 1984) .........................................................58

*Jeannette Rankin Brigade v. Chief of Cap. Police*,
  342 F. Supp. 575 (D.D.C. 1972), *aff'd*, 409 U.S. 972 (1972) ....... 8, 22, 30, 31, 44

*Johanns v. Livestock Mktg. Ass'n*,
  544 U.S. 550 (2005) ......................................................................49

*Labrador v. Poe*,
  144 S. Ct. 921 (2024) ....................................................................55

*Lederman v. United States*,
  291 F.3d 36 (D.C. Cir. 2002). 11, 22, 23, 28, 29, 30, 31, 32, 33, 34, 35, 39, 44, 54

*Lederman v. United States*,
  89 F. Supp. 2d 29 (D.D.C. 2000) ..................................................34

*Leidos, Inc. v. Hellenic Republic*,
  881 F.3d 213 (D.C. Cir. 2018) .......................................................52

*Mahoney v. U.S. Capitol Police Board*,
  No. 22-5094, 2022 WL 1177313 (D.C. Cir. Apr. 15, 2022) .................. 15, 45, 46

*McCarthy v. Pelosi*,
  5 F.4th 34 (D.C. Cir. 2021) ...........................................................49

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ............................................................... 25, 40

*McDonnell Douglas Corp. v. NASA*,
  99 F.3d 448 (D.C. Cir. 1996) .........................................................52

*Minn. Voters All. v. Mansky*,
  58d U.S. 1 (2018) ..........................................................................45

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
   585 U.S. 755 (2018)................................................................47

*Nat'l Min. Ass'n v. U.S. Army Corps of Engs.,*
   145 F.3d 1399 (D.C. Cir. 1998)...........................................58

*O.A. v. Trump,*
   404 F. Supp. 3d 109 (D.D.C. 2019)....................................58

*Oberwetter v. Hilliard,*
   639 F.3d 545 (D.C. Cir. 2011) ............................ 24, 30, 44, 50

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
   460 U.S. 37 (1983) ............................................... 42, 48, 51

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015)..............................................................48

*Se. Promotions, Ltd. v. Conrad,*
   420 U.S. 546 (1975)..............................................................45

*Sec'y of State of Md. v. Joseph H. Munson Co.,*
   467 U.S. 947 (1984)..............................................................56

*Sherrill v. Knight,*
   569 F.2d 124 (D.C. Cir. 1977).............................................57

*Shurtleff v. Boston,*
   596 U.S. 243 (2022)..............................................................50

*Solantic, LLC v. City of Neptune Beach,*
   410 F.3d 1250 (11th Cir. 2005) ...........................................47

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011)..............................................................47

*Thomas v. Chic. Park Dist.,*
   534 U.S. 316 (2002)................................................... 37, 51

*U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.,*
   608 F.3d 871 (D.C. Cir. 2010).............................................27

*United States v. Brewster,*
   408 U.S. 501 (1972)..............................................................49

*United States v. Grace,*
   461 U.S. 171 (1983)................................................... 24, 28, 29

*United States v. Nassif*,
  97 F.4th 968 (D.C. Cir. 2024) ........................................................ 23, 31, 43, 44

*United States v. National Treasury Employees Union*,
  513 U.S. 454 (1995) ................................................................................. 57

*United States v. Nicholson*,
  Nos. 20210-69A *et al.*, 97 Daily Wash. L. Rptr. 1213 (D.C. Ct. of Gen.
  Sess. June 19, 1969), *aff'd*, 263 A.2d 56 (D.C. App. 1970) .................... 26-27, 60

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) ................................................................................. 48

*United States v. Regenerative Scis., LLC*,
  741 F.3d 1314 (D.C. Cir. 2014) .............................................................. 21

*Valley Forge Christian Coll. v.*
  *Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ................................................................................. 59

*Virginia v. Hicks*,
  539 U.S. 113 (2003) ................................................................................. 56

*Wagner v. FEC*,
  793 F.3d 1 (D.C. Cir. 2015) ..................................................................... 36

*Whole Woman's Health v. Hellerstedt*,
  579 U.S. 582 (2016), *abrogated on other grounds by*
  *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) .................. 53, 57

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) ................................................................................. 42

*Zukerman v. USPS*,
  961 F.3d 431 (D.C. Cir. 2020) ................................................................ 42

**Statutes & Other Authorities:**

U.S. Const. amend. XII ............................................................................ 48

U.S. Const. amend. XX ............................................................................ 48

U.S. Const. art. I ..................................................................................... 48

U.S. Const. art. 2 § 1 ............................................................................... 38

2 U.S.C. § 1901b ..................................................................................... 47

2 U.S.C. § 1969(a) ...................................................................4

3 U.S.C. § 15 ...........................................................................38

28 U.S.C. § 1291 .....................................................................3

28 U.S.C. § 1331 .....................................................................3

28 U.S.C. § 1361 .....................................................................3

40 U.S.C. § 5102 .....................................................................4

40 U.S.C. § 5104(e)(2)(E) ......................................................29

40 U.S.C. § 5104(e)(2)(F) ......................................................29

40 U.S.C. § 5104(e)(2)(G) ......................................................28

40 U.S.C. § 6135 ....................................................................43

*Architect of the Capitol, U.S. Capitol Building*, https://perma.cc/YZ5W-
VJNA .................................................................................4

*Architect of the Capitol, Capitol Hill Facts*, https://perma.cc/YZ5W-
VJNA ...............................................................................27

D.C. Code § 22-1307(b)(1) .....................................................9

Fed. R. Civ. P. 23 ..................................................................58

Fed. R. Civ. P. 23(b)(1) .........................................................59

Fed. R. Civ. P. 23(b)(2) .........................................................59

Fed. R. Civ. P. 23(c)(2)(A) ....................................................59

USCP, *USCP Threat Assessment Cases for 2024* (Feb. 3, 2025),
https://perma.cc/NC53-E5RB ...........................................38

## GLOSSARY

**Board**                    United States Capitol Police Board

**Eastern Steps**         The House, Rotunda, and Senate steps on the east side of the Capitol

**Lower Eastern Steps**   The Eastern Steps themselves (up to the barricades only), the sidewalks at the base of the House and Senate steps, and the plaza at the base of the Rotunda steps.

**Traffic Regulations**   Traffic Regulations for the United States Capitol Grounds

**USCP**                    United States Capitol Police

**INTRODUCTION**

Rev. Mahoney is an ordained Presbyterian Minister and a peaceful man of God. He wants to demonstrate on the Lower Eastern Steps of the United States Capitol, as he has done scores of times in the past. But demonstrations there are now illegal under regulations promulgated by the United States Capitol Police Board (the "Board"). These regulations create a 250-foot "No Demonstration Zone" around the Capitol, which includes the Lower Eastern Steps, in which all demonstrations are prohibited.

While Rev. Mahoney is prohibited from demonstrating on the Lower Eastern Steps, Members of Congress may organize demonstrations there, and members of the public may attend Member-organized demonstrations. And Members of Congress may grant special favors to people whose speech they approve. If a Member of Congress sponsors a demonstration that a member of the public wants to hold on the Lower Eastern Steps, the demonstration may go forward. Moreover, members of the public are free to gather on the Lower Eastern Steps for all kinds of non-speech activities, including sightseeing, picnicking, and photographs. But as soon as they begin to express a message, they violate the law.

The district court (Chief Judge Boasberg) correctly concluded the No Demonstration Zone violates the First Amendment. Over fifty years ago, the Supreme Court held that the entire Capitol Grounds are a traditional public forum, a

holding this Court has repeatedly reaffirmed. In our constitutional tradition, the grounds around legislative buildings are a unique location for speech, and the Lower Eastern Steps has been the site of innumerable demonstrations over the last fifty years. Authorizing Members of Congress—but not members of the public—to demonstrate on the Lower Eastern Steps flips the constitution on its head. Our traditions protect *the public's* right to speak to their lawmakers by demonstrating on legislative grounds; it does not countenance reserving those grounds for *Members of Congress* to grandstand for television cameras.

The Board claims the No Demonstration Zone is necessary to secure the Capitol, but the Zone is unconstitutionally overbroad. It prohibits a dizzyingly broad array of speech that could not possibly pose a threat to security, including a lone Presbyterian minister quietly praying by himself. Moreover, the other activity the Board allows on the Lower Eastern Steps—like demonstrations organized and sponsored by Members of Congress and non-speech activity by members of the public—presents security risks that are materially indistinguishable from demonstrations organized by members of the public. Further, the Board has numerous other security measures at its disposal that are substantially less restrictive of speech than the No Demonstration Zone's near-total ban, including crowd-size limitations, durational limitations, a permit requirement, *etc.*

Finally, the district court properly rejected the Board's challenge to the permanent injunction the district court entered. The Board forfeited that challenge by failing to raise it before the injunction was entered. Moreover, Article III does not prohibit permanent injunctions that incidentally benefit third parties, and the district court did not abuse its discretion in concluding the injunction was not manifestly unjust. The No Demonstration Zone is invalid as applied to everyone in the same way it is invalid as applied to Rev. Mahoney, and the district court appropriately balanced equitable principles in enjoining it. The Board may continue to protect the Capitol in other ways that do not trample the constitutional rights of the millions of visitors who come there each year. The Court should affirm.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1361. This Court has jurisdiction under 28 U.S.C. § 1291.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum.

## STATEMENT OF THE ISSUES

The questions presented are: (1) whether the district court erred in granting summary judgment to Rev. Mahoney and (2) whether the district court abused its discretion in concluding the permanent injunction it entered was not manifestly unjust.

# STATEMENT OF THE CASE

## I.     FACTUAL BACKGROUND

### A. The Capitol Grounds

The Capitol building is located on the Capitol Grounds. JA395; *see also* 40 U.S.C. § 5102 (defining the Grounds). The Grounds includes a 58-acre park—commonly referred to as Capitol Square—surrounding the Capitol. JA396.

The Board oversees the United States Capitol Police (the "USCP") in policing the Grounds. JA396; *see also* 2 U.S.C. § 1969(a). Under regulations promulgated by the Board—called the Traffic Regulations—the public generally has pedestrian access to Capitol Square. JA396. While cars are prohibited, members of the public regularly use Capitol Square for sightseeing, socializing, picnicking, and exercising. *Id.*

The Capitol Visitor Center is located on the eastern side of Capitol Square, underground. JA397. While the millions of tourists who visit the Capitol each year are generally free to stroll the Grounds at their leisure, they must enter the Capitol building through the Visitor Center. *See* JA397; *see also* Op. Br at 13 (citing *Architect of the Capitol, U.S. Capitol Building*, https://perma.cc/YZ5W-VJNA (noting that "3-5 million people" visit the Capitol each year)).

The Capitol's east side has three set of stone steps—from north to south, the Senate, Rotunda, and the House steps (collectively, the "Eastern Steps"). JA397. Below is a photograph of the Capitol's East Front from the northeast:



JA101.

The Senate and House steps are almost identical. The base of these steps is three-sided, facing north, east, and south, with all three sides surround by a sidewalk that is raised above the plaza. JA398–99. The individual steps are wide front to back and have a short riser. *Id.* The eighth and eighteenth steps are even wider landings. *Id.* Looking from the east, there are large stone blocks on the north and south side of the steps beginning at the second landing, where a temporary barricade is located.

*Id.* Above the barricade, there are approximately twenty-seven steps before the plaza at the top of the steps. *Id.* Below are photographs of the Senate and House steps, respectively:





JA175, JA119; *see also* JA105-109, JA117–121, JA179 (additional photographs).

The Rotunda steps are slightly different. The base of these steps is also three-sided, and the individual steps are wide and have a short riser. JA398–99. But the base is contiguous with the surrounding plaza, and the landing and temporary barricade is on the seventh step. *Id.* Looking from the east, the large stone blocks on the north and south side begin at this landing. *Id.* Like the House and Senate steps, there are approximately twenty-seven steps above the barricades to the plaza at the top. *Id.* Below is a photograph of the Rotunda steps:



JA177; *see also* JA111–115 (additional photographs).

The Eastern Steps are rarely used to access the Capitol building. Tourists must enter the Capitol through the Visitor Center. JA397. And while it is technically possible for people who work in the Capitol to use the Eastern Steps to access the

building, they "typically [do so] by way of other entrances" that are nonpublic. JA412. Members of the public are allowed to sit, stand, and congregate on the Eastern Steps (up to the barricades), which they regularly do, so long as they do not impede the flow of pedestrian traffic. JA411–12; *see also* JA175–79.

**B. History of Demonstrations on the Eastern Steps**

In 1972, the Supreme Court held that the entire Capitol Grounds are a traditional public forum. JA180 (citing *Jeannette Rankin Brigade v. Chief of Cap. Police,* 342 F. Supp. 575, 578 (D.D.C. 1972), *aff'd* 409 U.S. 972 (1972)). Since then, there has been a rich history of demonstrations on the Grounds, and on the Eastern Steps in particular. JA402, JA405–07.

Before 1976, demonstrations on the Eastern Steps were governed by an unwritten permit system. JA405; *see also* JA180-81. Under that permit system, Members of Congress were allowed to demonstrate on the Eastern Steps, and Members could grant informal permits to non-Members, which they regularly did. JA405; *see also* JA180–81.

In 1976, the Board enacted the Traffic Regulations. JA405. The Traffic Regulations authorized members of the public to demonstrate on the Eastern Steps on terms that have changed throughout the years. JA406-07; *see also* JA181 (noting that demonstration on the Rotunda steps was allowed with a permit before September 11, 2001). From 1976 until September 11, 2001, members of the public

routinely demonstrated on the Eastern Steps. JA402, JA405–07. Rev. Mahoney himself participated in at least forty lawful demonstrations there. JA407. Below is a photograph of Rev. Mahoney (on the right) demonstrating on the Eastern Steps in 1999:



JA131; *see also* JA133.

After September 11, 2001, the Board prohibited members of the public from demonstrating on the Eastern Steps. JA407. That prohibition, which is punishable by criminal penalties, *see* D.C. Code § 22-1307(b)(1), is still in place today. Specifically, under the current version of the Traffic Regulations, JA210–392, demonstrations are only allowed as set forth on the United States Capitol Grounds

Demonstration Areas Map, JA355–56 (§ 12.1.10). This Map, oriented with east at the top, follows:



UNITED STATES CAPITOL GROUNDS
DEMONSTRATION AREAS MAP

JA394.

Under the Map, demonstrations are allowed in green areas for (1) individuals and groups of up to thirty people without a permit and (2) groups of more than thirty people with a permit. JA400–01. Demonstrations are allowed in yellow areas— designated "Pedestrian Walkway[s]"—for individuals and groups of up to thirty people without a permit so long as they do not impede passage. *Id.* Demonstrations are not allowed in red areas, even if being undertaken by a single person. *Id.*; *see also* JA355–56 (§§ 12.2.10, 20). The red area around the Capitol, which extends

10

approximately 250 feet from the building on all sides, is referred to as the "No Demonstration Zone." JA394, JA400–01; *see also Lederman v. United States*, 291 F.3d 36, 40 (D.C. Cir. 2002).

### C. Demonstrations by Members of Congress

While members of the public may not demonstrate in the No Demonstration Zone, Members of Congress may. Specifically, demonstrations are exempt from the No Demonstration Zone if: (1) the demonstration is "organized" or "sponsored" by a Member; (2) the Member is acting in his or her "official capacity"; and (3) "the Member[] is personally in attendance." *See* JA356 (§ 12.2.20). Demonstrations are "organized" by a Member when the Member coordinates the demonstration. JA412–13. Demonstrations are "sponsored" by a Member when the Member supports a demonstration organized by a non-Member. *Id.* Members of the public may attend exempted demonstrations. *Id.*

Pursuant to the Member exemption, Members regularly organize and sponsor protests, press conferences, and ceremonials on the Eastern Steps and areas at their base. Without attempting to catalogue them all, the record contains evidence regarding the following recent demonstrations:

After Congress adjourned for its August 2021 recess, Representative Cori Bush organized a protest on the House steps (up to the barricades) and surrounding sidewalks from July 30–August 3, 2021. JA408–09. Her goal was to convince the

Biden Administration to extend the residential eviction moratorium implemented during the coronavirus pandemic. *Id.* Below is a photograph from Rep. Bush's event:



JA145; *see also* JA135–153 (additional photographs).

On July 25, 2023, Representative Greg Casar organized a protest on the House steps (up to the barricades) and surrounding sidewalks that lasted approximately eight hours. JA410–11. His goal was to convince Texas lawmakers to repeal a law blocking local ordinances that mandated water breaks for workers. *Id.* Below is a photograph of Rep. Casar's event:



JA159; *see also* JA155–163 (additional photographs)

Rep. Bush's and Rep. Casar's protests attracted scores of attendees from the general public. JA408–11. Attendees were not required to register or otherwise make their identities known. *Id.* Instead, they just "showed up" and participated. *Id.*

Members of Congress also frequently hold press conferences on the Eastern Steps and areas at their base. JA411. Members of the public and press may attend these press conferences without registering or otherwise making their identities known. *Id.* Below is a photograph of a press conference that was held on the House steps and surrounding sidewalks on January 18, 2023:



JA171; *see also* JA165–73 (photographs of additional press conferences). Similar

press conferences continue up to today. *See*

https://x.com/SamanthaJoRoth/status/1896978503045984373 (last visited April 3,

2025); https://x.com/RepJeffries/status/1895111850322182434 (last visited April 3,

2025); https://x.com/SenatorHeinrich/status/1877435165628043404 (last visited

April 3, 2025).[1]

Members of Congress also regularly hold ceremonials on the Eastern Steps

and areas at their base, including remembrances of significant events, like September

---

[1] The Court should take judicial notice of these Members' recent X.com posts. *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013).

11, 2001. JA409–10. These ceremonials often involve prayer by a religious leader and statements by Members and their invited guests. *Id.*

### D. Rev. Mahoney's Proposed Demonstrations

Rev. Mahoney wants to conduct demonstrations on the Eastern Steps (up to the barricades), the sidewalks at the base of the House and Senate steps, and the plaza at the base of the Rotunda steps. JA403–04. This Brief refers to these areas collectively as the "Lower Eastern Steps." Under the Demonstration Areas Map, however, while the sliver of the eastern sidewalks at the base of the House and Senate steps are designated as "Pedestrian Walkway[s]," JA394, the rest of the Lower Eastern Steps are in the "No Demonstration Zone." *Id.* Thus, Rev. Mahoney is prohibited from demonstrating there.

## II. PROCEDURAL HISTORY

Rev. Mahoney filed this lawsuit on August 31, 2021. JA1–49. At that time, the Board had closed Capitol Square to all demonstrations organized by members of the public in response to the events of January 6, 2021. JA3. Accordingly, Rev. Mahoney's original focus was on obtaining injunctive relief vis-à-vis areas of Capitol Square that had newly been closed. Those efforts resulted in an appeal to this Court. *See, e.g.*, *Mahoney v. U.S. Cap. Police Bd.*, No. 22-5094, 2022 WL 1177313 (D.C. Cir. Apr. 15, 2022).

Over time, the Board slowly reopened Capitol Square, eventually landing on restrictions similar to those in place before January 6, 2021. *See* Board Status Report dated August 4, 2022 (ECF 58) at 1–2. With Capitol Square reopened, Rev. Mahoney turned his attention to his other claims. One such claim alleged that the No Demonstration Zone violated the First and Fifth Amendments, both facially and as applied to Rev. Mahoney. JA23–24, 28–45; *see also* JA402-04.

Eventually, the parties settled most of Rev. Mahoney's claims, but they were unable to settle his No Demonstration Zone claim. JA472–485. Generally, the terms of the partial settlement were: (1) the Board would revise the Traffic Regulations to correct various constitutional deficiencies not relevant here; (2) Rev. Mahoney would dismiss his claims other than the No Demonstration Zone claim; and (3) as to that claim, the parties would forego discovery and instead file cross-motions for summary judgment on agreed-upon Stipulations of Fact that would be the complete record (other than judicially noticeable materials). *Id.*; *see also* JA395–414. The settlement was confirmed in a Consent Decree. JA90–97.

On January 2, 2024, the Board revised the Traffic Regulations pursuant to the settlement. JA210–392.[2] Thereafter, Rev. Mahoney moved for summary judgment and a permanent injunction against the Board's enforcement of the No

---

[2] The Board disingenuously claims it amended the Traffic Regulations as part of its "continuous evaluation" of Capitol security. Op. Br. at 22. In truth, the Board amended the Traffic Regulations because of the settlement.

Demonstration Zone on the Lower Eastern Steps. In its summary judgment briefing, the Board "did not address the propriety of injunctive relief . . . (let alone its proper scope)." JA490.

On May 17, 2024, the district court granted summary judgment to Rev. Mahoney. JA415–443. On May 28, 2024, the court entered an amended opinion. JA444–71. The court concluded that the Lower Eastern Steps were a traditional public forum and that the No Demonstration Zone failed First Amendment intermediate scrutiny. *Id.* The court permanently enjoined the Board from enforcing the No Demonstration Zone on the Lower Eastern Steps. JA415; *see also* JA446.

The Board filed a Motion to Reconsider, arguing that it would be a "manifest injustice" for the injunction to apply to anyone other than Rev. Mahoney. JA490. Despite the terms of the parties' settlement and the court's Consent Decree, both of which provided that the Stipulations of Fact would govern, *see* JA95, JA483, the Board submitted a new Declaration from Sean P. Gallagher, Assistant USCP Chief, alleging additional facts, some of which contradicted the Stipulations of Fact, JA514–526. Rev. Mahoney filed a Motion for Sanctions, asking the district court to strike the Gallagher Declaration. ECF 118.

On July 31, 2024, the district court granted Rev. Mahoney's Motion for Sanctions in part, striking the Gallagher Declaration, and denied the Board's Motion to Reconsider, concluding that the scope of the injunction was appropriate. JA489–

511. The district court has since entered an Order modifying the injunction to apply to Rev. Mahoney only during this appeal. ECF 143.

## SUMMARY OF ARGUMENT

The district court correctly granted summary judgment to Rev. Mahoney. First, the district court correctly concluded that the Lower Eastern Steps are a traditional public forum. Over fifty years ago, the Supreme Court concluded that the entire Capitol Grounds are a traditional public forum. For this reason, the *Board* bears the burden of showing that specific locations on the Grounds are *not* a traditional public forum. The Board cannot make that showing. The physical features of the Lower Eastern Steps are consistent with demonstrations, and there is a rich history of demonstrations there that continues to this day. And while the Board tries to weasel out of its stipulation otherwise, the Lower Eastern Steps are only rarely used to access the Capitol building. Far from being a special type of enclave, the Lower Eastern Steps are the epicenter of demonstration activity on the Grounds.

Second, the No Demonstration Zone fails intermediate scrutiny. The Board claims the No Demonstration Zone is necessary to secure the Capitol, but in *Lederman*, this Court rejected the Board's near-identical argument. As the Court there concluded, the No Demonstration Zone prohibits a vast amount of speech that creates no threat to Capitol security, the No Demonstration Zone is unconstitutionally underinclusive, and there are alternative security measures that

are substantially less restrictive of speech, like crowd-size restrictions, duration restrictions, a permit requirement, *etc.* These same conclusions are even more true today.

This Court should also affirm on four alternate grounds Rev. Mahoney raised below but the district court did not reach:

First, the No Demonstration Zone prohibits such a vast amount of speech it would violate the First Amendment regardless of the type of forum the Lower Eastern Steps are. The Board has no valid regulatory interest in the No Demonstration Zone's broad prohibitions, a fact that renders the Zone constitutionally unreasonable.

Second, the Member exemption violates the unbridled discretion doctrine. Under that exemption, Members of Congress may decide what non-Member speech to sponsor in their absolute discretion. This creates an impermissible system of cronyism, where people who are politically connected and who have the right views may demonstrate in the shadow of the Capitol while ordinary members of the public are silenced there.

Third, the Member exemption is content based and fails both strict scrutiny and constitutional reasonableness. Allowing Members to organize demonstrations while precluding the public from doing so reflects a content preference for Members' speech. And there is no good reason for giving Members this special treatment.

While Members obviously must have the ability to perform their constitutional duties—like voting on bills—their duties do not include demonstrating outside, on the Grounds. Moreover, the exemption is not appropriately tailored. Like the No Demonstration Zone itself, the exemption is both over- and underinclusive. This preference for Member-organized and -sponsored demonstrations—on the Capitol Grounds, no less—turns the constitution on its head.

Fourth, the No Demonstration Zone violates the equal protection guarantee of the Fifth Amendment. It creates a classification—Members verses non-Members—that infringes speech and assembly. This triggers strict scrutiny, which the Board cannot satisfy.

Finally, the district court did not abuse its discretion in rejecting the Board's argument that the injunction creates a manifest injustice. The Board first raised this argument *after* the injunction was entered, so it is forfeit. Moreover, the Board cannot show the injunction is manifestly unjust. Article III does not prohibit injunctions that incidentally benefit third parties, and the district court correctly concluded the injunction here was appropriate. The No Demonstration Zone is invalid as applied to everyone in exactly the same way, and the Board has no interest in enforcing an unconstitutional restriction on speech. Accepting the Board's argument would effectively mean the end of facial challenges and impermissibly turn the USCP into a roving commission on the Grounds.

## STANDARD OF REVIEW

The Court reviews the entry of summary judgment de novo. *United States v. Regenerative Scis., LLC*, 741 F.3d 1314, 1318 (D.C. Cir. 2014). The Court reviews rulings on motions to reconsider for abuse of discretion. *Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004).

## ARGUMENT

## I. THE DISTRICT COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT TO REV. MAHONEY

On the facts properly before the Court,[3] the district court correctly concluded that the No Demonstration Zone violates the First Amendment.

### A. The No Demonstration Zone impermissibly restricts speech and assembly in a traditional public forum.

When, as here, the plaintiff's proposed speech is indisputably protected, JA403, the Court analyzes the regulation of speech on government property in two steps. First, the Court must "identify the nature of the forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Second, the Court must "assess whether the justifications for [the regulation] satisfy the requisite standard." *Id.* Here, the district court correctly concluded that the Lower Eastern Steps are a

---

[3] Contemporaneously with this Brief, Rev. Mahoney is also filing a Motion to Strike the Gallagher Declaration. For the reasons set forth in that Motion, the Court should strike the Declaration from the Joint Appendix and disregard it on this appeal.

traditional public forum and that the No Demonstration Zone fails intermediate scrutiny.

## 1. The Eastern Steps are a Traditional Public Forum.

The entire Capitol Grounds are a traditional public forum. The Board cannot satisfy its burden of demonstrating that the Lower Eastern Steps are somehow different from the rest of the Grounds.

### a. The entire Capitol Grounds are a traditional public forum.

The Capitol Grounds are a unique location for speech under our constitutional traditions. "[T]he fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion." *Jeannette Rankin Brigade,* 342 F. Supp. at 584. And "the primary purpose for which the Capitol was designed—legislating— [is consistent] with" demonstrations on the Grounds. *Id.* Indeed, demonstrating on legislative grounds is "an exercise of . . . basic constitutional rights in their most pristine and classic form." *Id.* (quoting *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963)). Accordingly, the entire Capitol Grounds are a traditional public forum. *Id.*; *see also Lederman*, 291 F.3d at 41 (recognizing that the Supreme Court's affirmance of *Jeannette Rankin Brigade* makes it "binding precedent").

This Court's decision in *Lederman* is similar. There, the USCP arrested Mr. Lederman for demonstrating on the East Front sidewalk in front of the House and Senate steps. *Id.* at 40. Under the then-applicable Demonstration Areas Map, those

sidewalks were in the No Demonstration Zone. *Id.* at 40. In sustaining Mr. Lederman's challenge to his arrest, this Court concluded that the East Front sidewalk was a traditional public forum, observing that "the Capitol Grounds *as a whole* meet the definition of a traditional public forum." *Id.* at 41–42 (emphasis added); *see also id.* at 42 ("[T]he *entire* Capitol Grounds are a public forum." (emphasis added and cleaned up)). *Accord United States v. Nassif*, 97 F.4th 968, 975 (D.C. Cir. 2024) ("We have long recognized the Capitol grounds . . . as a traditional public forum"); *Hodge v. Talkin*, 799 F.3d 1145, 1161 (D.C. Cir. 2015) ("[T]he Capitol grounds are a public forum[.]"); *Cmty. for Creative Non-Violence v. Kerrigan*, 865 F.2d 382, 387 (D.C. Cir. 1989) ("[T]he Capitol Grounds are a public forum.").

> b. *The Board cannot show the Lower Eastern Steps are nonpublic.*

Because of *Jeannette Rankin Brigade*'s holding that the entire Capitol Grounds are a traditional public forum, the Board bears the burden of establishing that particular areas of the Grounds are not a traditional public forum. *Lederman*, 291 F.3d at 42. To satisfy this burden, the Board must show the property at issue is "overwhelmingly specialized" for non-speech purposes. *Id.* at 43 (cleaned up). The Board makes this showing only when the property has been "dedicated . . . to a use inconsistent with conventional public assembly and debate." *Henderson v. Lujan*, 964 F.2d 1179, 1182, 1185 (D.C. Cir. 1992) (holding sidewalk that served as "entrance" to Vietnam Veterans Memorial a traditional public forum). To evaluate

this question, the Court must look at the property's "the history and characteristics." *Oberwetter v. Hilliard*, 639 F.3d 545, 552 (D.C. Cir. 2011).

The Board chides the district court for concluding the Lower Eastern Steps are a traditional public forum "without any showing." Op. Br. at 28. But the Board has it exactly backward. The burden is on the Board to show the property is not a traditional public forum, which it has not satisfied.

First, the Board cannot show the sidewalks adjacent to the northern and southern bases of the House and Senate steps, *see* JA105, JA109, JA117, JA121, are overwhelmingly specialized. In *Lederman*, this Court concluded that the *entire* "East Front sidewalk is a public forum." 291 F.3d at 41. Presumably in response to *Lederman*, the Board amended the Demonstration Areas Map to designate the precise location where Mr. Lederman was standing—the slivers of sidewalk adjacent to the *eastern* base of the House and Senate steps—as "Pedestrian Walkway[s]." JA394. But despite *Lederman*, the sidewalks adjacent to the *northern and southern* base of the House and Senate steps remain within the No Demonstration Zone. *Id.* Because these sidewalks are indistinguishable from the sidewalk at issue in *Lederman*, they are also a traditional public forum. 291 F.3d at 44; *see also United States v. Grace*, 461 U.S. 171, 177 (1983) (holding sidewalks around Supreme Court a traditional public forum); *Henderson*, 964 F.2d at 1182 (holding sidewalks that are

"physically indistinguishable from ordinary sidewalks" a traditional public forum).
Notably, the Board does not contend otherwise.

Second, the Board also cannot show the paved area immediately around the base of the Rotunda steps, *see* JA111–115, is overwhelmingly specialized. That area differs from the area around the base of the House and Senate steps only insofar as it is not raised. *Id.* But this difference is immaterial. The paved area is akin to a street, which is "the archetype of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988); *see also McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (noting that "public streets" are a traditional public forum). As with the north and south sidewalks, the Board does not contend otherwise.

Third, the Board cannot show the Eastern Steps themselves (below the barricades) are overwhelmingly specialized either. Like the surrounding sidewalks and paved areas, the physical characteristics of the Eastern Steps (below the barricades) readily lend themselves to demonstrations. The steps are wide, have short risers, and are open on three sides up to the barricades where the large stone blocks start. JA398–99; *see also* JA105–21. Until September 11, 2001, the Board allowed members of the public to demonstrate there, which they regularly did. JA402–03, JA406–07. And to this day, Members of Congress regularly demonstrate on the Eastern Steps in the form of protests, press conferences, and ceremonials. JA407–11. Moreover, the Eastern Steps are open to the public to come and go as

they please up to the barricades, which are a visual indicator that the area above is off-limits. JA411–12; *see also* JA175–179. Tourists are not allowed to access the Capitol by way of the Eastern Steps, and while people who work in the Capitol technically can use the Eastern Steps to access the building, they typically enter through other avenues. JA397, JA412. In any event, the rich history of demonstrations on the Eastern Steps, JA402, JA405–11, reveals they are not so specialized that their only practical use is to access the building. On these facts, the Eastern Steps themselves (below the barricades) do not have an overwhelmingly specialized use "inconsistent with . . . public assembly and debate." *Henderson*, 964 F.2d at 1182.

As the district court correctly noted, case after case holds that the exterior grounds of government buildings dedicated to legislating—including exterior steps—constitute traditional public fora. JA458–59 (collecting cases); *see also Housing Works, Inc. v. Safir*, 101 F. Supp. 2d 163, 167 (S.D.N.Y. 2000) (city hall steps). And the only court that has addressed whether the Eastern Steps are a traditional public forum held they are. *United States v. Nicholson*, Nos. 20210-69A *et al.*, 97 Daily Wash. L. Rptr. 1213, at (5-6) (D.C. Ct. of Gen. Sess. June 19, 1969),

*aff'd*, 263 A.2d 56 (D.C. App. 1970); *see also Dellums v. Powell*, 566 F.2d 167, 179–83 (D.C. Cir. 1977) (citing *Nicholson* with approval).[4]

While the Board admits that "the public" may not use the Eastern Steps to access the Capitol, Op. Br. at 29, the Board repeatedly tries to contradict its binding stipulation that people who work in the Capitol typically do not use the Eastern Steps to access the building. *See, e.g.*, Op. Br. at 7, 16, 18, 20, 23, 24, 28, 41, and 42. The Court should emphatically reject these efforts. "Factual stipulations are binding and conclusive . . . and . . . parties [are not] permitted to deny the truth of [stipulated] facts." *Christian Legal Soc. v. Martinez*, 561 U.S. 661, 677 (2010) (cleaned up); *see also U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 889 (D.C. Cir. 2010) ("Stipulations of fact bind the court and parties.").

Moreover, the Board has not produced a shred of evidence supporting its naked assertion that people who work in the Capitol regularly access the building by way of the Eastern Steps. The Board invokes the Architect of the Capitol's statement that "the Capitol's East Front . . . still serves . . . as its principal entrance." Op. Br. at 7, 24 (quoting *Architect of the Capitol, Capitol Hill Facts*, https://perma.cc/KJA5-D2R4). But the East Front is where the Visitor's Center is located, JA397, so of course that's where the Capitol's "principal entrance" is. And even if, contrary to

---

[4] *Nicholson* is not available on Westlaw, but it is reproduced as an Appendix to *Dellums*, *see* 566 F.2d at 197–205, which is.

the Stipulations of Fact, people who work in the Capitol did regularly use the Eastern Steps to access the building, that would not matter. In *Lederman*, the Court noted that the East Front sidewalks were "primarily [used] by people coming to and from the Capitol building." 291 F.3d at 43.[5] Regardless, "that use [was not] sufficiently specialized to warrant distinguishing [the sidewalks] from the remainder of the Grounds." 291 F.3d at 43. The same is true for the Eastern Steps.

The Board contends the Lower Eastern Steps have a specialized use because they "lead to" the Capitol building. Op. Br. at 10. But the question is not what property *leads to*; the question is what the property *is*. *Grace*, 461 U.S. at 180 (noting that a traditional public forum will not lose that character because it "abuts" property not used for expression). If the rule were otherwise, sidewalks would not be traditional public fora, because they often "lead to" nonpublic areas. The Board also asserts that the Lower Eastern Steps are "part of" the building. Op. Br. at 8. But the Eastern Steps merely "abut" the building, *Grace*, 461 U.S. at 180; they are not "part of" it. Indeed, there is an inherent distinction between improvements to the Capitol Grounds—which are *outdoors*—and the *interiors* of Capitol buildings, a distinction federal statutes acknowledge. *See, e.g.*, 40 U.S.C. § 5104(e)(2)(G) (prohibiting "demonstrat[ing]. . . in any of the *Capitol Buildings*" but containing no similar

---

[5] At the time *Lederman* was decided, the Visitor's Center had not yet been built. JA397.

prohibition on the *Grounds* (emphasis added); 40 U.S.C. § 5104(e)(2)(E-F) (distinguishing between Capitol "Grounds" and "Buildings"); *see also Davis v. N.Y.C.*, 373 F. Supp. 2d 322, 331 (S.D.N.Y. 2005) (noting that "being on the exterior of a building, including the . . . exterior stairs, does not constitute entry into a building"). Exterior steps are no more "part of" a building than abutting sidewalks are, which is to say not at all.

The Board argues that the district court erred in relying on the fact that the Lower Eastern Steps are generally open to the public for non-speech activities because government "property does not become a public forum simply because members of the public are permitted to come and go at will." Op. Br. at 30 (cleaned up). But the district court did not rely on this fact alone. Instead, the district court correctly noted that the "more important[]" facts were the "nature of the steps" and "the function they have played" in hosting speech over the years. JA460. That the Board keeps the steps "continually open" to the public is simply icing on the cake. *Id.* (quoting *Lederman*, 291 F.3d at 44).

The primary cases the Board cites are easily distinguishable. *Hodge* held that the Supreme Court plaza is not a traditional public forum. 799 F.3d at 1162. But the plaza is on the grounds of the *judiciary*, not the *legislature*. "Whereas the 'fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion,' the 'judiciary does not decide cases by reference to popular

opinion.'" *Id.* (quoting *Jeannette Rankin Brigade*, 342 F. Supp. at 584). Moreover, unlike the Lower Eastern Steps, "the plaza . . . has never been dedicated to the public's conduct of assemblages, expression, and recreation." *Id.* at 127. Further, unlike the Lower Eastern Steps, which flow gradually upwards from the East Front sidewalk, the architectural features of the plaza—and its marked separation from the surrounding sidewalk—lend themselves to the conclusion that the plaza is a "special type of enclave." *Id.* at 125 (cleaned up).

*Initiative & Referendum Institute v. USPS* held that "interior" USPS sidewalks—*i.e.*, sidewalks that "do not run along public streets"—are nonpublic fora. 685 F.3d 1066, 1068 (D.C. Cir. 2012). But the interior USPS sidewalks at issue were not located on the Capitol Grounds. Indeed, the East Front sidewalk does not run along any public street either, but *Lederman* nevertheless held it is a traditional public forum. 291 F.3d at 42–43. Moreover, the Court in *Initiative & Referendum Institute* noted that interior USPS sidewalks are "neither public thoroughfares nor gathering places" and that "[t]here is no venerable tradition of using [the interior] sidewalks for expressive activities." 685 F.3d at 1071; *see also Oberwetter*, 639 F.3d at 552 (holding interior of the Jefferson Memorial is a nonpublic forum because "[n]ational memorials are places of public commemoration, not . . . forums for open expression"). The opposite is true for the Lower Eastern Steps.

Finally, *Nassif* held that places inside Capitol buildings are nonpublic fora. 97 F.4th at 977. As the Court explained, "[a] visitor entering a Capitol building crosses a doorway's physical threshold separating exterior from interior—itself a familiar signal that the building's interior 'differs from the remainder of the public Grounds in ways that make it uniquely nonpublic." *Id.* at 975 (quoting *Lederman*, 291 F.3d at 42). But the Lower Eastern Steps are outside, and there is no obvious "threshold" separating the steps from the adjacent areas. Moreover, whereas treating places inside Capitol buildings as a public forum would be incompatible with the buildings' purpose as legislators' "workplace," *Nassif*, 97 F.4th at 977, the exterior Grounds— including the Lower Eastern Steps—are "uniquely situated to host the marketplace of ideas," *id.* at 977 (cleaned up).

It is true that, today, the Board prohibits the public from demonstrating on the Lower Eastern Steps. But that prohibition does not make the steps overwhelmingly specialized. Prohibitions on speech in a traditional public forum cannot "bootstrap themselves into validity by their mere existence, even if prolonged." *Lederman*, 291 F.3d at 43 (cleaned up). Rather, such prolonged restrictions just mean that the government has been violating the Constitution a long time. *Id.*; *see also Jeannette Rankin Brigade*, 342 F. Supp. at 586 (enjoining enforcement of statute enacted in 1882).

Finally, the fact that the Board allows Members (and those whose speech they approve) to demonstrate on the Lower Eastern Steps is fatal to its argument. Granting discriminatory rights to favored speakers does not change the nature of the forum. Instead, it *establishes* that the forum is suited for speech. The district court correctly concluded the Board failed to satisfy its burden of demonstrating the Lower Eastern Steps are not a traditional public forum.

2. The Board cannot show the No Demonstration Zone satisfies intermediate scrutiny.

a. *Lederman* controls here.

Because the Lower Eastern Steps are a traditional public forum, intermediate scrutiny applies. *Lederman*, 291 F.3d at 44. To satisfy intermediate scrutiny, the Board must show, at least, that its restrictions are "narrowly tailored to serve a significant government interest." *Id*. Here, the Board argues that the No Demonstration Zone is justified by security concerns. While Capitol security is undoubtedly a significant interest in the abstract, the district court correctly concluded the Board has not shown the No Demonstration Zone is narrowly tailored toward that interest.

This conclusion is compelled by *Lederman*. There, this Court held that the No Demonstration Zone then in place failed intermediate scrutiny. *Id.* at 44–46. First, the Court noted that the No Demonstration Zone prohibited an exceptionally broad amount of speech, including an "almost entire[]" prohibition on "parading,

picketing, leafleting, vigils, sit-ins, and speechmaking." *Id.* at 45. Much of this banned speech could not "reasonably be expected to interfere with" Capitol security, like "a single leafleteer" or "a group of congressional staffers . . . arguing loudly about the latest bill." *Id.* (cleaned up). As the Court observed, "the Constitution does not tolerate regulations that, while serving their purported aims, prohibit a wide range of activities that do not interfere with the Government's objectives." *Id.* (cleaned up).

Second, at the same time, the No Demonstration Zone was underinclusive toward security. While the Board precluded a single leafleteer from distributing handbills, "pedestrians . . . . photographers, star-struck tourists, and landscape painters complete with easels" were allowed to congregate there. *Id.* at 44–45. The Court noted that it has "reject[ed] the proposition that demonstrators . . . pose a greater security risk to the Capitol . . . than . . . pedestrians, who may come and go anonymously, travel in groups of any size, carry any number of bags and boxes, and linger as long as they please." *Id.* at 43.

Third, the "ready availability of substantially less restrictive alternatives that would equally effectively promote safety" put the nail in the No Demonstration Zone's coffin. *Id.* at 45 (cleaned up). Instead of prohibiting demonstrations, the Board could: (1) "restrict the number of individuals who may demonstrate simultaneously"; (2) impose "duration[al limitations]"; (1) "require permits"; (4)

strictly enforce "existing laws" prohibiting disorderly conduct; or (5) "screen[]" demonstrators. *Id.* at 45–46. These alternatives revealed the Board "could achieve its intended objectives while also permitting some demonstrations." *Id.* at 46.

*Lederman* controls here. A copy of the Demonstration Areas Map at issue in *Lederman* is set forth below:



*See* Appendix to *Lederman v. United States*, 89 F. Supp. 2d 29 (D.D.C. 2000). As can be seen by comparing the Map at issue in *Lederman* with the Map in place today, JA394, the two No Demonstration Zones are materially indistinguishable. Accordingly, *Lederman* compels the conclusion that the current No Demonstration Zone also fails narrow tailoring.

Indeed, two features of the current No Demonstration Zone render it even *less* narrowly tailored than in *Lederman*. First, today, the No Demonstration Zone restricts more speech than in *Lederman*. In *Lederman*, the Traffic Regulations prohibited only demonstrations that had the "intent, effect or propensity to attract a crowd" and excluded "wearing Tee shirts, buttons, or other similar articles of apparel that convey a message." 291 F.3d at 39 (cleaned up); *see also* JA182. Today, the Traffic Regulations contain neither of these limitations. JA355 (§ 12.1.10 prohibiting "any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment"). Accordingly, the Traffic Regulations prohibit a dizzyingly broad array of speech in the No Demonstration Zone today, including two friends discussing politics while picnicking, an individual wearing an "I Voted" sticker while walking to work, a lone demonstrator standing with his fist in the air, or a religious leader quietly praying. This does not remotely satisfy narrow tailoring.

Second, the Member exemption adds to the No Demonstration Zone's underinclusivity.[6] When a Member of Congress organizes or sponsors a

---

[6] While the Member exemption existed at the time of *Lederman*, JA181, JA189, Mr. Lederman did not argue it rendered the Traffic Regulations unconstitutional, *see* Br. of Appellant, 2002 WL 34484591 (Feb. 7, 2002).

demonstration, members of the public may join in, and there is no requirement that the Member, the Board, or the USCP know the attendees. JA409, JA411. Thus, in all material respects—*i.e.*, those related to security—demonstrations organized or sponsored by Members of Congress are no different from demonstrations organized by members of the public. In fact, demonstrations organized or sponsored by Members present *heightened* security risks. Under the Traffic Regulations, demonstrations held by the public may not: (1) involve more than thirty people without a permit; (2) exceed certain density thresholds; (3) have certain types of signs, props and equipment; and (4) last more than twenty-four hours. JA356–61 (§§ 12.3.10, 12.3.40(c), 12.3.40(e), 12.5, 12.6). But none of these limitations apply to demonstrations organized or sponsored by Members of Congress. Moreover, Members of Congress must personally be present for the Member exemption to apply, JA356 (§ 12.2.20), which further heightens the security risks at Member-organized or -sponsored demonstrations.

Because Member-organized and -sponsored demonstrations create security risks that are at least as significant than those created by demonstrations organized by members of the public, the Member exemption "raise[s] doubts about whether the government is in fact pursuing the interest it invokes." *Wagner v. FEC*, 793 F.3d 1, 27 (D.C. Cir. 2015); *see also City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) (noting that underinclusivity undermines "the government's rationale for restricting

speech"). Instead, the No Demonstration Zone should be seen for what it is—a way to ensure Members of Congress can grandstand for reporters' cameras in the shadow of the Capitol without having to compete with the unwashed masses for that limited space. This two-tiered speech regime flips the constitution on its head. Even *off* legislative grounds, the Supreme Court has emphatically declared that "[g]ranting waivers to favored speakers" is patently "unconstitutional." *Thomas v. Chic. Park Dist.*, 534 U.S. 316, 325 (2002). That this preference for Members' speech is occurring *on* the Capitol Grounds is an affront to our traditions. *See Safir*, 101 F. Supp. 2d at 170 (holding regulation that created "two standards governing the right to assemble on the steps . . . of City Hall, one for demonstrators, and another for City-sponsored speech" violated the First Amendment).

b. *The Board's counterarguments are unavailing*.

The Board argues that the No Demonstration Zone is justified by the events of September 11, 2001 and January 6, 2021, but the argument fails. As for September 11, 2001, the No Demonstration Zone will obviously not prevent terrorists from flying a hijacked plane into the Capitol. Moreover, *Lederman* was argued and decided after September 11, 2001, so security concerns associated with the events of that day are built into its analysis.

As for January 6, 2021, while the events of that day undoubtedly presented a security threat while they were ongoing, the Board has not shown there is any

lingering threat from those events, which occurred on a specific day tied to a specific constitutional procedure that occurs only once every four years. *See* U.S. Const. art. 2 § 1; 3 U.S.C. § 15; *see also Nassif*, 97 F.4th at 972 (explaining events of January 6, 2021). Those events were not repeated on January 6, 2025, and if the Board fears they might be repeated on January 6, 2029 (or any other day), the Board has the power to temporarily close the Lower Eastern Steps—or even the entire Capitol Grounds—to address that threat. JA356, 363 (§§ 12.2.20 (prohibiting demonstrations "in any area . . . closed or restricted for official use"), 12.13 (empowering the Board to impose additional restrictions "in the interest of safety")). The Board may not, however, impose harsh burdens on speech based on isolated past instances where there is no "real" ongoing risk. *Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014).

The Board also argues that the number of "threats" to Members of Congress is high. Op. Br. at 14. But this includes overzealous social-media posts that plainly do not create any actual risk to Members or the Capitol. *Id.* (citing USCP, *USCP Threat Assessment Cases for 2024* (Feb. 3, 2025), https://perma.cc/NC53-E5RB (noting that "social media" posts have "resulted in more investigations during the past several years")). To be clear: while the number of "threats" must be viewed in context, Rev. Mahoney does not dispute that there are a small number of deranged individuals who would seek to harm Members or the Capitol. But the Board has not

38

shown that the No Demonstration Zone "alleviate[s]" that threat to a "material degree." *Edwards*, 755 F.3d at 1003. The Board's argument depends on the unwarranted inference that someone with nefarious intent might demonstrate as a subterfuge to get closer to the Capitol entrances at the top of the Eastern Steps. But that inference is legally impermissible—the government may not presume the "desire to be communicative" is a proxy for the "likelihood that [an individual] will pose a threat to . . . security." *Boardley v. U.S. Dep't of Interior,* 615 F.3d 508, 522 (D.C. Cir. 2010); *see also Lederman*, 291 F.3d at 43 (rejecting "the proposition that demonstrators . . . pose a greater security risk to the Capitol building . . . than do pedestrians"). Moreover, by their very nature, demonstrations risk drawing attention to the demonstrators. If someone wants to wreak havoc at the Capitol, among the last things they would do is risk drawing the USCP's attention by demonstrating first.

Even if the Court were to indulge that inference, the prohibition on demonstrations on the Lower Eastern Steps has no material impact on Capitol security. Under the Traffic Regulations, individuals may generally demonstrate on the Grounds without a permit in groups of up to thirty people. JA356 (§ 12.3). This includes demonstrating on the portion of the East Front sidewalk immediately east of the Lower Eastern Steps. JA394. It blinks reality to think that demonstrations on

the Lower Eastern Steps somehow creates an unmanageable security threat when the very same activity is allowed on the adjacent East Front sidewalk.

The Board contends that "there is plenty of room . . . to maneuver around" protestors on the sidewalk, Op. Br. at 41, but the Lower Eastern Steps are about the same size as the sidewalk, JA398–99; JA99, so this argument backfires. And because the Eastern Steps are not regularly used to access the Capitol building, demonstrators there will not be in anyone's way. The Board contends that it must have a "buffer" zone and an "elevated platform" from which to defend the Capitol, Op. Br. at 2, 20, but there is not a shred of evidence to support this contention, much less that 250 feet is an appropriate size for the No Demonstration Zone, which extends well beyond the base of the Lower Eastern Steps, JA396. In any event, Rev. Mahoney does not seek—and the district court did not enter—an injunction against the No Demonstration Zone as applied to the *upper* Eastern Steps (*i.e.*, above the barricades). Accordingly, the Board will continue to have both a buffer zone and the high ground even if the Lower Eastern Steps are open to demonstrations. It may well be that the USCP's job is easier with a bigger buffer zone, but "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures . . . would fail to achieve the government's interests, not simply that the chosen [regulatory] route is easier." *McCullen*, 573 U.S. at 495. The Board has failed to make this showing here.

Further, as noted, while members of the public may not demonstrate on the Lower Eastern Steps, they may conduct all manner of non-speech activity there, and in groups of any size. JA355 (§ 12.1.20 (providing that regulations apply only to "demonstration activity")). Accordingly, if an individual is bent on causing harm, he does not need to resort to a disingenuous demonstration to get closer to the Capitol. He may simply—alone or in a large group of people—walk to the top of the Lower Eastern Steps with his mouth closed. Or, if he prefers, he could wait until Members either organize or sponsor a demonstration on the Lower Eastern Steps and just "show up," as he is allowed to do, where he can stand shoulder-to-shoulder with Members. JA135–163.

Finally, while the Board claims the district court "substitut[ed] its own judgment" regarding Capitol security for that of the Board, Op. Br. at 43, the Board did not introduce a shred of evidence to support its bald assertion that the alternative security measures identified in *Lederman*—crowd size restrictions, durational restrictions, a permit requirement, *etc.*—are insufficient. Nor could it. If the Board can handle the security threats presented by demonstrations organized or sponsored by Members of Congress and non-speech activity by members of the public *without* these additional security measures, then the Board can handle threats presented by demonstrations organized by members of the public *with* these measures. On these

facts, the district court correctly refused to "defer to [the Board's] judgment on the constitutional question" before it. *Henderson*, 964 F.2d 1185.

Courts must assiduously guard against allowing the government to raise conclusory "national-security concerns [as] a talisman to ward off inconvenient claims." *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017); *see also Edwards*, 755 F.3d at 1003 (cautioning against unquestioning acceptance of the government's "seemingly talismanic reliance on [assertions of harm]"). While security of the Capitol is certainly a compelling interest in the abstract, that is all the Board has done here. The district court correctly concluded the Board failed to show the No Demonstration Zone is narrowly tailored.

**B. The Court should affirm on alternate grounds.**

Rev. Mahony is entitled to summary judgment on four alternate grounds, each of which he raised below but the district court did not reach.

1. The No Demonstration Zone is so broad it is constitutionally unreasonable.

Regardless of the forum type, regulations governing speech must always be viewpoint neutral and "reasonable in light of the purpose served by the forum." *Zukerman v. USPS*, 961 F.3d 431, 449 (D.C. Cir. 2020). A restriction is "reasonable" when it is "consistent with the [government's] legitimate interest in preserving the property for the use to which it is lawfully dedicated." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 50–51 (1983) (cleaned up).

The No Demonstration Zone's prohibition of speech is so broad it is constitutionally unreasonable. *See Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (holding invalid regulation that prohibited "all First Amendment activities" in airport); *Nassif*, 97 F.4th at 980 ("A categorical prohibition on all expressive activity [even] within Capitol buildings would likely not pass constitutional muster . . . under the relaxed standard applicable to a nonpublic forum."). The Board's interest in security does not "justify such an absolute prohibition of speech." *Jews for Jesus*, 482 U.S. at 575.

The Board contends that the No Demonstration Zone prohibits only demonstrations "aimed to draw attention" to the speaker. Op. Br. at 37. But the Board did not make this argument below. It is therefore forfeit. *Chichakli v. Tillerson*, 882 F.3d 229, 234 (D.C. Cir. 2018).

The Board is also wrong. It is true that *Hodge* held 40 U.S.C. § 6135 applies only to speech "aimed to draw attention" to the speaker. 799 F.3d at 1168. But § 6135 prohibits only "parad[ing], stand[ing], or mov[ing] in processions or assemblages." *Id.* In addition, language near § 6135 in the code prohibits speech "designed . . . to bring [the speaker] into public notice." *Id.* (cleaned up). By contrast, the Traffic Regulations' definition of prohibited "demonstration activity" is much broader than § 6135, *see* JA355 (§ 12.1.10), and the Traffic Regulations contain no contextual language cabining the meaning of that term. Moreover, as noted, *supra*

at 34–35, the Traffic Regulations were previously limited to demonstrations that had the "intent, effect, or propensity to attract a crowd," *Lederman*, 291 F.3d at 39, but they no longer contain that limiting language. The Court should not interpret the Traffic Regulations to imply a limitation the Board previously removed. *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020) (noting that courts must "presume . . . amendment[s] have [a] real and substantial effect").

Even if the Traffic Regulations prohibited only demonstrations "aimed to draw attention" in the No Demonstration Zone, the Board has no legitimate interest in precluding all such speech there. It is one thing to prevent all such speech *inside the Capitol*, where Members "require . . . quiet places to work on legislative proposals and meet with colleagues and constituents." *Nassif*, 97 F.4th at 979; *see also Oberwetter*, 639 F.3d at 552 (noting the "tranquil environment" of the Jefferson Memorial's interior). It is quite another to prevent all such speech *on the Grounds*. As *Jeannette Rankin Brigade* observed in connection with demonstrations on the Grounds, "[t]he desire . . . [for Congress] to function in the 'serenity' of a 'park-like setting' is fundamentally at odds with the principles of the First Amendment." 342 F. Supp. at 585 (cleaned up). This conclusion is no less true today.

2. <u>The Member exemption for Member-sponsored demonstrations violates the unbridled discretion doctrine.</u>

Demonstrations are generally prohibited in the No Demonstration Zone, but members of the public may demonstrate there if a Member of Congress sponsors

their speech. This paradigm creates a prior restraint. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554 (1975) (holding prior restraint exists where government is "empowered to determine whether the applicant should be granted permission [to speak]"). While prior restraints are not *per se* invalid, they must "contain 'narrow, objective, and definite standards'" to guide the decisionmaker. *Forsyth Cnty. v. Nat'list Movement*, 505 U.S. 123, 131 (1992) (cleaned up). Importantly, "objective, workable standards" are required regardless of the type of forum. *Minn. Voters All. v. Mansky*, 58d U.S. 1, 21 (2018) (nonpublic forum); *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 372 (D.C. Cir. 2018) (same).

The Member exemption fails this command. There are no standards governing how Members of Congress decide to sponsor a non-Member's demonstration. Rather, that decision is left up to Members in their absolute discretion. As Judge Millett concluded in Rev. Mahoney's separate case involving the Board's denial of his permit application to hold a prayer vigil on the Capitol Grounds in 2022:

> Making the right to speak in a public forum wholly dependent on the approval and sponsorship . . . of a governmental official flies in the teeth of the First Amendment. The First Amendment does not tolerate a procedure by which government officials may indicate a preference for the substance of what the favored speakers have to say. . . . [I]t is clearly unconstitutional for a law to enable a public official to determine which expressions of view will be permitted and which will not.

*Mahoney*, 2022 WL 1177313, at *3 (Millett, J., concurring) (cleaned up); *see also Safir*, 101 F. Supp. 2d at 170 (holding regulations governing demonstrations on steps

of city hall unconstitutional because "the choice to sponsor or not sponsor [third party speech] is at the sole, subjective discretion" of government officials). This system of cronyism—where Members are empowered to pick and choose at their whim what demonstrations they want to go forward while ordinary members of the public are muzzled—is anathema to the First Amendment.

The Board contends that Judge Millett's analysis is outdated because it has removed an exemption that used to apply when a Member "advocates" for a demonstration by a non-Member. Op. Br. at 40; *see also* JA189, 412–13. But the Member exemption at issue in *Mahoney*—like the one in place today—also applied to demonstrations "sponsored" by Members of Congress, and Judge Millett specifically concluded that allowing Members to decide what demonstrations to "sponsor" violated the unbridled discretion doctrine. 2022 WL 1177313, at *3 (Millett, J., concurring). Accordingly, the Board's revision to the Traffic Regulations does not cure the unbridled discretion infirmity.

Contrary to the Board's suggestion, Op. Br. at 5, it is also irrelevant that the Traffic Regulations state they "shall apply equally . . . regardless of viewpoint." JA355 (§ 12.1.20). The Traffic Regulations set forth the terms of *the Board's* regulation of demonstrations, not *Members'* decisions whether to "sponsor" non-Members' demonstrations. Moreover, the Member exemption is an *exemption* from

those regulations. Accordingly, whether the Traffic Regulations are nominally viewpoint neutral is immaterial.

3. <u>The Member exemption for Member-organized demonstrations is content based and fails any review.</u>

The Member exemption is also content based. Content-based regulations trigger strict scrutiny, which the Member exemption does not satisfy. Moreover, the Member exemption would fail regardless of what type of forum the Lower Eastern Steps are.

*a. The Member exemption is content based.*

The Supreme Court's "precedents are deeply skeptical of laws that "distinguis[h] among different speakers, allowing speech by some but not others." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 778–79 (2018) (quoting *Citizens United v. FEC*, 558 U.S. 310, 340 (2010)). "Speaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Id.* (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011)). That risk is particularly acute when regulations give special status to speech by the government itself or individual government officials. *See Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) (holding exemptions from sign code for governmental signs were content based); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1264 (11th Cir. 2005) (same). And considering the close regulatory authority Congress has over the Board, *see, e.g.*, 2 U.S.C. § 1901b

(establishing Congressional oversight over the Board); *see also* JA211 (noting that Congress "retain[s] exclusive control over the . . . Grounds"), the Member exemption reflects a "content preference" for Members' speech, rendering the Traffic Regulations content based, *Reed v. Town of Gilbert*, 576 U.S. 155, 157 (2015).

b. *The Member exemption fails any type of review.*

<u>Strict Scrutiny</u>. Content-based restrictions on speech in a traditional public forum must satisfy strict scrutiny. *Perry*, 460 U.S. at 45; *Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 322 (D.C. Cir. 2018). That is, the government must show the restriction is "narrowly tailored to promote a compelling [g]overnment interest . . . . by the [least] restrictive means." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). The Board suggests the Member exemption is based on the unique nature of Members' constitutional duties, Op. Br. at 31, but this argument does not satisfy strict scrutiny.

First, exempting Members of Congress from the No Demonstration Zone does not reflect a compelling government purpose. Members do not conduct official Congressional business outdoors, on the Grounds, nor is it within the scope of their duties to demonstrate on the Grounds or elsewhere. *See* U.S. Const. art. I, amend. XII, amend. XX (listing duties of Members of Congress). Members, of course, enjoy special privileges *inside* the Capitol building—where their offices are located, where the House and Senate floors are located, *etc.*—so they can perform their duties. But

it is unreasonable to give Members special privileges to *demonstrate on the Grounds* simply because they work in the Capitol. If the rule were otherwise, everyone who works at the Capitol—Visitor Center receptionists, USCP Officers, Capitol groundskeepers, *etc.*—should have these privileges, which they do not.

The case the Board cites in support of its argument—*United States v. Brewster*—confirms Rev. Mahoney's view. There, the Supreme Court held that Members' "speeches delivered *outside* the Congress" are "political" in nature—not "legislative"—and are therefore not protected by the Speech or Debate Clause. 408 U.S. 501, 512–13 (1972) (emphasis added); *see also McCarthy v. Pelosi*, 5 F.4th 34, 39 (D.C. Cir. 2021) (similar). Under the Board misinterpretation of *Brewster*, Members would be insulated from liability for all manner of speech that has nothing to do with the legislative process, including, for example, Representative Mo Brooks's participation in President Trump's rally on the Ellipse on January 6, 2021. While Members have the same rights as anyone else, their status as Members does not entitle them to special rights to demonstrate on the Grounds.

Trying to analogize the Lower Eastern Steps to the Jefferson Memorial, the Board also suggests that speech at Member-organized and -sponsored demonstrations is somehow the government's "own speech[]" Op. Br. at 31. For speech to be governmental, however, the government "itself" must be conveying a message. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560 (2005). The

government itself speaks only when the speech was "formulated by a person with the power to determine what messages the government will communicate.'" *Shurtleff v. Boston*, 596 U.S. 243, 268 (2022) (Alito, J., concurring). Unlike governmental displays at national memorials, *see Oberwetter*, 639 F.3d at 553–54, Members of Congress are not speaking on behalf of the United States when they demonstrate on the Eastern Steps. Rather, their message is their own. The purpose of Rep. Bush's demonstration, for example, was to protest the Biden Administration's decision to end the coronavirus eviction moratorium. JA408. A *protest* of the government's policy cannot constitute an *announcement* of that policy. And Member-sponsored demonstrations—which are organized by members of the public—are even further removed from government speech.

In any event, as the district court correctly concluded, even if Member-organized or -sponsored demonstrations were the government's own speech (and they are not), that would only justify *allowing* Members to demonstrate on the Lower Eastern Steps; it would not justify *precluding* non-Members from doing so. JA426.

Second, the Member exemption is neither narrowly tailored nor the least restrictive means. Even if Members were entitled to special rights to demonstrate on the Grounds (and they are not), the Board proffers no justification for empowering Members to sponsor non-Members' demonstrations or allowing members of the public to participate in Member-organized or -sponsored demonstrations. Thus, the

Member exemption is unconstitutionally overbroad. Moreover, for reasons already discussed, *supra* at 35–37, demonstrations that Members organize or sponsor stand in the same shoes as demonstrations organized by members of the public vis-à-vis the Board's interest in security. Accordingly, the Member exemption is also unconstitutionally underinclusive.

Again, "[g]ranting waivers to favored speakers" is patently "unconstitutional." *Thomas*, 534 U.S. at 325. Because the Board proffers no legitimate basis for the Member exemption, it is unconstitutional.

Constitutional Reasonableness. Even if the Lower Eastern Steps were not a traditional public forum (and they are), the Member exemption is constitutionally unreasonable. While content-based restrictions in limited public or nonpublic fora can be permissible, they must be consistent with the purposes of the forum. *Perry*, 460 U.S. at 50–51. For the same reasons the Member exemption fails strict scrutiny, it is also constitutionally unreasonable. There is no legitimate basis for granting Members this broad exemption from the No Demonstration Zone.

### 4. The No Demonstration Zone violates equal protection.

Under the Fifth Amendment's Due Process Clause, federal governmental classifications affecting "fundamental rights" are subject to strict scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (cleaned up); *Banner v. United States*, 428 F.3d 303, 307 (D.C. Cir. 2005) (same). The Traffic Regulations' classification between

Members of Congress and members of the public implicates Rev. Mahoney's First Amendment rights. Thus, strict scrutiny applies. And for reasons already discussed, *supra* at 48–51, the Board cannot satisfy strict scrutiny. Accordingly, the No Demonstration Zone violates the Fifth Amendment no less than the First.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING A UNIVERSAL INJUNCTION WOULD NOT CAUSE MANIFEST INJUSTICE

The Board did not dispute either the propriety or scope of Rev. Mahoney's requested injunction in its summary judgment briefing below. JA490. Accordingly, the Board forfeit any challenge to the scope of the injunction. *Chichakli*, 882 F.3d at 234; *see also McDonnell Douglas Corp. v. NASA*, 99 F.3d 448, at *1 (D.C. Cir. 1996) (table) (holding that party forfeit challenge to scope of injunction by failing to raise it "until after judgment was entered").

If the Court considers the Board's argument, it should reject it. The Board first challenged the scope of the injunction in its Motion to Reconsider, claiming that limiting the injunction to Rev. Mahoney only was necessary to prevent "manifest injustice." JA490. To show manifest injustice, the Board must (1) suffer "a clear and certain prejudice" that is (2) "fundamentally unfair in light of governing law." *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018) (cleaned up). But a party cannot show manifest injustice when it "elected not to act until after a final order ha[s] been entered." *Id.* Because the Board failed to raise this argument

until after the injunction was entered, it cannot show manifest injustice as a matter of law.

Even putting the Board's failure to timely raise this argument to the side, the district court did not abuse its discretion in rejecting it. The injunction is permissible under Article III and consistent with equitable principles.

**A. The injunction is consistent with Article III.**

The Board argues that universal injunctions are prohibited by Article III. Op. Br. at 44–45. Supreme Court precedent squarely holds otherwise.

The Board does not dispute that Rev. Mahoney has Article III standing to assert an as-applied challenge to the No Demonstration Zone, which he plainly does. JA403–05. That is all Article III requires to obtain a universal injunction. As the Supreme Court has noted, "the distinction between facial and as-applied challenges is not so well defined that it . . . control[s] the . . . disposition in every case involving a constitutional challenge." *Citizens United*, 558 U.S. at 331. Instead, if the plaintiff "show[s] that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is proper." *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 603 (2016) (cleaned up), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *see also Citizens United*, 558 U.S. at 331 ("[O]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases." (cleaned up)).

As the district court meticulously explained, case after case from both the Supreme Court and this Court conclude that a single plaintiff (or group of plaintiffs) may obtain universal injunctive relief in the appropriate case. JA496–502 (collecting cases). Indeed, in *Lederman* itself, this Court remanded for the district court to enter an injunction "barring enforcement" of the No Demonstration Zone despite the fact Mr. Lederman was the only plaintiff. 291 F.3d at 48.[7]

The Board cites case law standing for the general propositions that: (1) "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018); (2) courts should not "formulate a rule of constitutional law broader than [the] facts to which it is to be applied," *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501 (1985); (3) federal courts should not lightly "interfere with an ongoing state criminal proceeding," *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930 (1975); and (4) injunctions must be "no more burdensome to the defendant than necessary," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). But none of these "old chestnut[s]," JA507, *hold* that universal injunctions are

---

[7] On remand, the district court entered an order—proposed by the parties— permanently enjoining the government from enforcing the No Demonstration Zone on all of Capitol Square, but only against Mr. Lederman. *See Lederman v. United States*, Case No. 1:99-cv-3359-RWR, Memorandum Opinion (ECF 137) at 3 n.2, 4, 6 and Amended Order for Permanent Injunction (ECF 138); *see also* JA182. That agreed-to limitation on remand has no impact on this Court's conclusion in *Lederman* that a universal injunction was proper.

impermissible under Article III. Moreover, the universal injunction here does not violate these general principles. Rev. Mahoney alleges the No Demonstration Zone injured him, and the injunction remedies that injury. Whether others experience an "incidental benefit" of the injunction is immaterial for purposes of Article III. JA499.

The Board also cites Justice Gorsuch's concurrences in two recent shadow-docket cases where he criticized universal injunctions. *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024); *DHS v. N.Y.*, 140 S. Ct. 599, 600-01 (2020). But those cases involved *preliminary* injunctions, not *permanent* ones. Strictly limiting preliminary relief to the plaintiff may be sensible—at that stage of the litigation, the plaintiff has shown only that he is "likely" to succeed on the merits in a "rushed, high-stakes, low-information" adjudication. *DHS*, 140 S. Ct. at 599, 601. For a permanent injunction, by contrast, the plaintiff has prevailed on the merits after a full vetting of his claim. When a court concludes on the merits that a statute is facially invalid, Article III does not require strictly limiting the relief to the plaintiff only.

**B. The injunction is consistent with equitable principles.**

Far from abusing its discretion, the district court carefully explained why universal relief is appropriate here. JA505–11. The Board's arguments do not come close to showing that the injunction will cause manifest injustice.

Most fundamentally, the district court properly rejected the Board's generalized assertion of security concerns allegedly associated with demonstrations

by members of the public on the Lower Eastern Steps. JA506. As the district court noted, the Board has numerous "alternative regulatory options" at its disposal that are less restrictive of speech. *Id.* The Board did not introduce a shred of evidence supporting its bald assertion that these alternatives are insufficient to protect the Capitol. *Id.* Moreover, the district court correctly recognized that the Board has "no interest in enforcing an unconstitutional regulation," and that allowing it to enforce the No Demonstration Zone on the Lower Eastern Steps would be "contrary to public interest." JA470. These conclusions are indisputably correct.

As the district court also correctly observed, granting universal injunctive relief is "particularly appropriate in the First Amendment context." JA497. Broad criminal restrictions on expression "chill" the protected speech of everyone subject to them. *Citizens United*, 558 U.S. at 336. A universal injunction serves as a prophylactic against self-censorship, for which there can be no effective judicial relief. *Id.* ("[A] statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated."); *see also Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 968 (1984) (holding that a "statute [that] creates an unnecessary risk of chilling free speech . . . is properly subject to facial attack"). Indeed, under the First Amendment overbreadth doctrine, plaintiffs may obtain an injunction against "all enforcement" of overbroad speech regulations, even if the regulation can validly be applied to them. *Virginia v. Hicks*, 539 U.S. 113, 119

(2003). As the district court correctly noted, "leaving a statute with *no* legitimate application on the books . . . create[s] an even more intolerable chill on expression." JA501–02 (emphasis added).

The Board invokes *United States v. National Treasury Employees Union*, but as the district court recognized, JA508–09, that case is distinguishable. There, the Supreme Court rejected a universal injunction against a regulation banning all federal employees from receiving honoraria. 513 U.S. 454, 477–78 (1995). The plaintiff employees, however, were not similarly situated with other "high-level" employees who were not plaintiffs. *Id.* On these facts, the Supreme Court concluded that a universal injunction was improper because the government "might advance a different justification" for the ban as to these "more senior" workers. *Id.* at 478. Here, by contrast, because the No Demonstration Zone is unconstitutional as applied to everyone in exactly the same way, universal relief is appropriate. *Hellerstedt*, 579 U.S. at 603; *see also Sherrill v. Knight*, 569 F.2d 124, 131 n.24 (D.C. Cir. 1977) (noting lack of "equitable impediment" to universal relief against universally unlawful policy).

Accordingly, the Board's protestations regarding litigation "asymmetry" ring hollow. Op. Br. at 48. As the district court correctly noted, "by its nature," a universal injunction "concern[s] an issue that is common to all . . . similarly-situated" parties. JA510 (quoting *City of Chi. v. Barr*, 961 F.3d 882, 915 (7th Cir. 2020)). And limiting

the injunction to Rev. Mahoney only would "generate a flood of duplicative litigation" that would all arrive at the same result. *Nat'l Min. Ass'n v. U.S. Army Corps of Engs.*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). "[E]quity . . . does not require [such] unnecessary formalities." *Jaffe-Spindler Co. v. Genesco, Inc.*, 747 F.2d 253, 258 n.7 (4th Cir. 1984).

The Board suggests it should be allowed to pursue a strategy of agency "non-acquiescence," *Nat'l Min. Ass'n*, 145 F.3d at 1409, but as the district court recognized, JA510–11, because this case involves the regulation of property located exclusively in the District, venue for cases challenging the No Demonstration Zone was proper in the District only, and all appeals will come to this Court. Once this Court passes on the question, its decision will govern everyone who comes to the Capitol, subject only to the possibility of Supreme Court review. Agency non-acquiescence has no application here.

Moreover, accepting the Board's argument would unduly deter facial challenges to unconstitutional laws seeking universal relief. Under the Board's logic, a plaintiff can only obtain a universal injunction through a class action. But class actions can be complicated and expensive. *See* Fed. R. Civ. P. 23. Classes may have to be "ascertainable" in this Circuit, *O.A. v. Trump*, 404 F. Supp. 3d 109, 159 (D.D.C. 2019), and it is questionable whether a class comprised of the millions of visitors to the Capitol each year would satisfy this requirement. And providing notice to such

a class, *see* Fed. R. Civ. Pro. 23(c)(2)(A) (noting that court may require "notice" in "Rule 23(b)(1) or (b)(2)" classes), would be impossible. The practical upshot of the Board's argument is that facial challenges to universally unconstitutional laws would effectively end. That result would undermine the important role litigation plays in guarding against the infringement of our constitutional liberties. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) ("[T]he Judicial Branch [must not] shrink from a confrontation with the other . . . branches[.]").

Finally, by seeking to narrow the injunction to apply to Rev. Mahoney only, the Board is asking for a green light for the USCP to violate the constitutional rights of the millions of other Capitol visitors each year. Considering the Board and USCP have sovereign immunity from damages, *FDIC v. Meyer*, 510 U.S. 471, 484–86 (1994), and individual Board members and USCP Officers have an exceptionally strong argument that they are no longer subject to damages actions under *Bivens*, *Egbert v. Boule*, 596 U.S. 482 (2022), limiting the injunction to Rev. Mahoney only would give the USCP license to act as a roving commission on the Capitol Grounds, high above the law. The district court did not abuse its discretion in concluding equity does not require that result.

*    *    *

We live in trying times as a nation, where mistrust and acrimony poison our dialogue. But we have survived prior periods of national unrest precisely because of our constitutional freedoms of speech and assembly. And those freedoms are nowhere more important than the grounds around the Capitol, where our elected representatives gather to decide the laws that will govern the pressing issues of the day. As the Court in *Nicolson* put it over fifty years ago:

> In this day of the violent confrontation, the harsh, non-negotiable demand, the disregard of the most elementary forms of civilized discourse, it is especially important that peaceful speech and courteous persuasion be given their rightful chance. It would be strange, indeed, if our constitutional system . . . were to countenance the congregation on the grounds occupied by the national legislature of all manner of groups except those who wish to speak out peacefully on the controversial issues of the day. That is not the mark set by the Bill of Rights.

97 Daily Wash. L. Rptr. 1213, at (12). These conclusions are no less true today. The Constitution protects Rev. Mahoney's—and the public's—right to demonstrate peacefully on the Lower Eastern Steps.

## CONCLUSION

The Court should affirm.

April 4, 2025                                Respectfully submitted,

                                             By:*/s/Josh Dixon*
                                             Josh Dixon
                                             Eric A. Sell
                                             CENTER FOR AMERICAN
                                             LIBERTY
                                             1311 S. Main Street, Suite 302
                                             Mount Airy, MD 21771
                                             (703) 687-6200

                                             *Counsel for Plaintiff-Appellee Patrick
                                             J. Mahoney*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) and Circuit Rule 28(c) because this brief contains 12,975 words, excluding the parts exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman.

Respectfully submitted,

*/s/ Josh Dixon*
Josh Dixon
Attorney for Plaintiff-Appellee

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2025, I electronically filed the foregoing Certificate with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Josh Dixon*
Josh Dixon
Attorney for Plaintiff-Appellee

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

**Page**

2 U.S.C. § 1901b ........................................................................ A1

3 U.S.C. § 15 ............................................................................. A1

40 U.S.C. § 5102 ...................................................................... A5

40 U.S.C. § 5104(e)(2)(G) ....................................................... A7

40 U.S.C. § 6135 ...................................................................... A11

D.C. Code § 22-1307(b)(1) ...................................................... A11

In addition to the statutes and regulations identified by the Board, Rev. Mahoney identifies the following pertinent statutes and regulations:

## 2 U.S.C. § 1901b

There shall be a Capitol police. There shall be a captain of the Capitol police and such other members with such rates of compensation, respectively, as may be appropriated for by Congress from year to year. The Capitol Police shall be headed by a Chief who shall be appointed by the Capitol Police Board and shall serve at the pleasure of the Board.

## 3 U.S.C. § 15

**(a) In General.—**

Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer.

**(b)Powers of the President of Senate.—**

**(1) Ministerial in nature.—**

Except as otherwise provided in this chapter, the role of the President of the Senate while presiding over the joint session shall be limited to performing solely ministerial duties.

**(2) Powers explicitly denied.—**

The President of the Senate shall have no power to solely determine, accept, reject, or otherwise adjudicate or resolve disputes over the proper certificate of ascertainment of appointment of electors, the validity of electors, or the votes of electors.

**(c) Appointment of Tellers.—**

At the joint session of the Senate and House of Representatives described in subsection (a), there shall be present two tellers previously appointed on the part of the Senate and two tellers previously appointed on the part of the House of Representatives by the presiding officers of the respective chambers.

**(d) Procedure at Joint Session Generally.—**

**(1) In general.—**The President of the Senate shall—

**(A)** open the certificates and papers purporting to be certificates of the votes of electors appointed pursuant to a certificate of ascertainment of appointment of electors issued pursuant to section 5, in the alphabetical order of the States, beginning with the letter A; and

**(B)** upon opening any certificate, hand the certificate and any accompanying papers to the tellers, who shall read the same in the presence and hearing of the two Houses.

**(2) Action on certificate.—**

**(A)** In general.—

Upon the reading of each certificate or paper, the President of the Senate shall call for objections, if any.

**(B)** Requirements for objections or questions.—

**(i)** Objections.—No objection or other question arising in the matter shall be in order unless the objection or question—

**(I)** is made in writing;

**(II)** is signed by at least one-fifth of the Senators duly chosen and sworn and one-fifth of the Members of the House of Representatives duly chosen and sworn; and

**(III)** in the case of an objection, states clearly and concisely, without argument, one of the grounds listed under clause (ii).

**(ii)** Grounds for objections.—The only grounds for objections shall be as follows:

**(I)** The electors of the State were not lawfully certified under a certificate of ascertainment of appointment of electors according to section 5(a)(1).

**(II)** The vote of one or more electors has not been regularly given.

**(C)** Consideration of objections and questions.—

**(i)** In general.—
When all objections so made to any vote or paper from a State, or other question arising in the matter, shall have been received and read, the Senate shall thereupon withdraw, and such objections and questions shall be submitted to the Senate for its decision; and the Speaker of the House of Representatives shall, in like manner, submit such objections and questions to the House of Representatives for its decision.

**(ii)** Determination.—

No objection or any other question arising in the matter may be sustained unless such objection or question is sustained by separate concurring votes of each House.

**(D)** Reconvening.—

When the two Houses have voted, they shall immediately again meet, and the presiding officer shall then announce the decision of the questions submitted. No vote or paper from any other State shall be acted upon until the objections previously made to any vote or paper from any State, and other questions arising in the matter, shall have been finally disposed of.

**(e) Rules for Tabulating Votes.—**

**(1) Counting of votes.—**

**(A)** In general.—Except as provided in subparagraph (B)—

**(i)** only the votes of electors who have been appointed under a certificate of ascertainment of appointment of electors issued pursuant to section 5, or who have legally been appointed to fill a vacancy of any such elector pursuant to section 4, may be counted; and

**(ii)** no vote of an elector described in clause (i) which has been regularly given shall be rejected.

**(B)** Exception.—The vote of an elector who has been appointed under a certificate of ascertainment of appointment of electors issued pursuant to section 5 shall not be counted if—

**(i)** there is an objection which meets the requirements of subsection (d)(2)(B)(i); and

**(ii)** each House affirmatively sustains the objection as valid.

**(2) Determination of majority.—**

If the number of electors lawfully appointed by any State pursuant to a certificate of ascertainment of appointment of electors that is issued under section 5 is fewer than the number of electors to which the State is entitled under section 3, or if an objection the grounds for which are described in subsection (d)(2)(B)(ii)(I) has been sustained, the total number of electors appointed for the purpose of determining a majority of the whole number of electors appointed as required by the Twelfth Amendment to the Constitution shall be reduced by the number of electors whom the State has failed to appoint or as to whom the objection was sustained.

**(3) List of votes by tellers; declaration of winner.—**

The tellers shall make a list of the votes as they shall appear from the said certificates; and the votes having been ascertained and counted according to

the rules in this subchapter provided, the result of the same shall be delivered to the President of the Senate, who shall thereupon announce the state of the vote, which announcement shall be deemed a sufficient declaration of the persons, if any, elected President and Vice President of the United States, and, together with a list of the votes, be entered on the Journals of the two Houses.

## 40 U.S.C. § 5102

### (a) Legal Description.—

The United States Capitol Grounds comprises all squares, reservations, streets, roadways, walks, and other areas as defined on a map entitled "Map showing areas comprising United States Capitol Grounds", dated June 25, 1946, approved by the Architect of the Capitol, and recorded in the Office of the Surveyor of the District of Columbia in book 127, page 8, including all additions added by law after June 25, 1946.

### (b) Jurisdiction.—

(1) Architect of the capitol.—

The jurisdiction and control over the Grounds, vested prior to July 31, 1946, by law in the Architect, is extended to the entire area of the Grounds. Except as provided in paragraph (2), the Architect is responsible for the maintenance and improvement of the Grounds, including those streets and roadways in the Grounds as shown on the map referred to in subsection (a) as being under the jurisdiction and control of the Commissioners of the District of Columbia.

(2) Mayor of the district of columbia.—

(A) In general.—

The Mayor of the District of Columbia is responsible for the maintenance and improvement of those portions of the following streets which are situated between the curblines of those streets: Constitution Avenue from Second Street Northeast to Third Street Northwest, First Street from D Street Northeast to D Street Southeast, D Street from First Street Southeast to Washington Avenue Southwest,

and First Street from the north side of Louisiana Avenue to the intersection of C Street and Washington Avenue Southwest, Pennsylvania Avenue Northwest from First Street Northwest to Third Street Northwest, Maryland Avenue Southwest from First Street Southwest to Third Street Southwest, Second Street Northeast from F Street Northeast to C Street Southeast; C Street Southeast from Second Street Southeast to First Street Southeast; that portion of Maryland Avenue Northeast from Second Street Northeast to First Street Northeast; that portion of New Jersey Avenue Northwest from D Street Northwest to Louisiana Avenue; that portion of Second Street Southwest from the north curb of D Street to the south curb of Virginia Avenue Southwest; that portion of Virginia Avenue Southwest from the east curb of Second Street Southwest to the west curb of Third Street Southwest; that portion of Third Street Southwest from the south curb of Virginia Avenue Southwest to the north curb of D Street Southwest; that portion of D Street Southwest from the west curb of Third Street Southwest to the east curb of Second Street Southwest; that portion of Washington Avenue Southwest, including sidewalks and traffic islands, from the south curb of Independence Avenue Southwest to the west curb of South Capitol Street.

(B) Repair and maintenance of utility services.—

The Mayor may enter any part of the Grounds to repair or maintain or, subject to the approval of the Architect, construct or alter, any utility service of the District of Columbia Government.

**(c) National Garden of the United States Botanic Garden.—**

(1) In general.—Except as provided under paragraph (2), the United States Capitol Grounds shall include—

(A) the National Garden of the United States Botanic Garden;

(B) all grounds contiguous to the Administrative Building of the United States Botanic Garden, including Bartholdi Park; and

(C) all grounds bounded by the curblines of First Street, Southwest on the east; Washington Avenue, Southwest to its intersection with Independence Avenue, and Independence Avenue from such

intersection to its intersection with Third Street, Southwest on the south; Third Street, Southwest on the west; and Maryland Avenue, Southwest on the north.

(2) Maintenance and improvements.—

Notwithstanding subsections (a) and (b), jurisdiction and control over the buildings on the grounds described in paragraph (1) shall be retained by the Joint Committee on the Library, and the Joint Committee on the Library shall continue to be solely responsible for the maintenance and improvement of the grounds described in such paragraph.

(3) Authority not limited.—

Nothing in this subsection shall limit the authority of the Architect of the Capitol under section 307E of the Legislative Branch Appropriations Act, 1989 (40 U.S.C. 216c).[1]

## (d) Library of Congress Buildings and Grounds.—

(1) In general.—

Except as provided under paragraph (2), the United States Capitol Grounds shall include the Library of Congress grounds described under section 11 of the Act entitled "An Act relating to the policing of the buildings [2] of the Library of Congress", approved August 4, 1950 (2 U.S.C. 167j).

(2) Authority of librarian of congress.—

Notwithstanding subsections (a) and (b), the Librarian of Congress shall retain authority over the Library of Congress buildings and grounds in accordance with section 1 of the Act of June 29, 1922 (2 U.S.C. 141; 42 Stat. 715).

## 40 U.S.C. § 5104(e)(2)(G)

## (a) Definitions.—In this section—

(1) Act of physical violence.—The term "act of physical violence" means any act involving—

(A) an assault or other infliction or threat of infliction of death or bodily harm on an individual; or

(B) damage to, or destruction of, real or personal property.

(2) Dangerous weapon.—The term "dangerous weapon" includes—

(A) all articles enumerated in section 14(a) of the Act of July 8, 1932 (ch. 465, 47 Stat. 654); and

(B) a device designed to expel or hurl a projectile capable of causing injury to individuals or property, a dagger, a dirk, a stiletto, and a knife having a blade over three inches in length.

(3) Explosives.—

The term "explosives" has the meaning given that term in section 841(d) of title 18.

(4) Firearm.—

The term "firearm" has the meaning given that term in section 921(3) [1] of title 18.

**(b) Obstruction of Roads.—**

A person may not occupy the roads in the United States Capitol Grounds in a manner that obstructs or hinders their proper use, or use the roads in the area of the Grounds, south of Constitution Avenue and B Street and north of Independence Avenue and B Street, to convey goods or merchandise, except to or from the United States Capitol on Federal Government service.

**(c) Sale of Articles, Display of Signs, and Solicitations.—A person may not carry out any of the following activities in the Grounds:**

(1) offer or expose any article for sale.

(2) display a sign, placard, or other form of advertisement.

(3) solicit fares, alms, subscriptions, or contributions.

**(d) Injuries to Property.—**

A person may not step or climb on, remove, or in any way injure any statue, seat, wall, fountain, or other erection or architectural feature, or any tree, shrub, plant, or turf, in the Grounds.

**(e) Capitol Grounds and Buildings Security.—**

(1) Firearms, dangerous weapons, explosives, or incendiary devices.—An individual or group of individuals—

(A) except as authorized by regulations prescribed by the Capitol Police Board—

(i) may not carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm, a dangerous weapon, explosives, or an incendiary device;

(ii) may not discharge a firearm or explosives, use a dangerous weapon, or ignite an incendiary device, on the Grounds or in any of the Capitol Buildings; or

(iii) may not transport on the Grounds or in any of the Capitol Buildings explosives or an incendiary device; or

(B) may not knowingly, with force and violence, enter or remain on the floor of either House of Congress.

(2) Violent entry and disorderly conduct.—An individual or group of individuals may not willfully and knowingly—

(A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House;

(B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House;

(C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of—

(i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or

(ii) the Library of Congress;

(D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress;

(E) obstruct, or impede passage through or within, the Grounds or any of the Capitol Buildings;

(F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings; or

(G) parade, demonstrate, or picket in any of the Capitol Buildings.

(3) Exemption of government officials.—This subsection does not prohibit any act performed in the lawful discharge of official duties by—

(A) a Member of Congress;

(B) an employee of a Member of Congress;

(C) an officer or employee of Congress or a committee of Congress; or

(D) an officer or employee of either House of Congress or a committee of that House.

**(f) Parades, Assemblages, and Display of Flags.—Except as provided in section 5106 of this title, a person may not—**

(1) parade, stand, or move in processions or assemblages in the Grounds; or

(2) display in the Grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement.

## 40 U.S.C. § 6135

It is unlawful to parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to display in the Building and grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement.

## D.C. Code § 22-1307(b)(1)

**(a)** It is unlawful for a person, alone or in concert with others:

**(1)** To crowd, obstruct, or incommode:

**(A)** The use of any street, avenue, alley, road, highway, or sidewalk;

**(B)** The entrance of any public or private building or enclosure;

**(C)** The use of or passage through any public building or public conveyance; or

**(D)** The passage through or within any park or reservation; and

**(2)** To continue or resume the crowding, obstructing, or incommoding after being instructed by a law enforcement officer to cease the crowding, obstructing, or incommoding.

**(b)**

**(1)** It is unlawful for a person, alone or in concert with others, to engage in a demonstration in an area where it is otherwise unlawful to demonstrate and

to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a demonstration.

**(2)** For purposes of this subsection, the term "demonstration" means marching, congregating, standing, sitting, lying down, parading, demonstrating, or patrolling by one or more persons, with or without signs, for the purpose of persuading one or more individuals, or the public, or to protest some action, attitude, or belief.

**(c)** A person who violates any provision of this section shall be guilty of a misdemeanor and, upon conviction, shall be fined not more than the amount set forth in § 22-3571.01, imprisoned for not more than 90 days, or both.