# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 7, 2025 Decided September 22, 2026

No. 24-5207

PATRICK J. MAHONEY, REVEREND,
APPELLEE

v.

UNITED STATES CAPITOL POLICE BOARD, IN ITS OFFICIAL CAPACITY, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-02314)

*Brian J. Springer*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Yaakov M. Roth*, Acting Assistant Attorney General, *Jeanine Ferris Pirro*, U.S. Attorney, and *Michael S. Raab*, Attorney.

*Joshua W. Dixon* argued the cause for appellee. With him on the brief was *Eric A. Sell*.

*Aditi Shah*, *Scott Michelman*, and *Arthur B. Spitzer* were on the brief for *amicus curiae* the American Civil Liberties Union of the District of Columbia in support of appellee.

Before: HENDERSON and RAO, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

Dissenting opinion filed by *Senior Circuit Judge* ROGERS.

RAO, *Circuit Judge*: Federal regulations prohibit the public from demonstrating on the Eastern Steps of the United States Capitol unless sponsored by a member of Congress. A minister seeking to pray and demonstrate on the Steps brought a First Amendment challenge to these regulations. The district court granted summary judgment for the minister and universally enjoined enforcement of the regulations.

Although the Eastern Steps are a nonpublic forum, the regulations are not reasonable because an individual's right to demonstrate outside the Capitol cannot turn on the discretion of a member of Congress. The universal injunction, however, exceeded the district court's equitable authority. We therefore affirm the grant of summary judgment for Mahoney on his First Amendment claim but vacate the injunction and remand for the district court to determine the appropriate scope of relief.

I.

A.

Access to the Capitol Complex and the Capitol Grounds, the park-like area surrounding the Capitol, is governed by regulations promulgated by the Capitol Police Board. *See* Capitol Police Board, Traffic Regulations for the United States Capitol Grounds (Feb. 14, 2025) ("Traffic Regulations"). The public may freely access the Capitol Grounds for recreational activities such as sightseeing, exercising, and dog walking.

Areas for "demonstration activity," however, are more limited. Demonstration activity is defined as "any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution." *Id.* § 12.1.10. Violations of the Traffic Regulations are punishable by criminal penalties, including imprisonment. *See* 2 U.S.C. § 1969(a); Traffic Regulations § 1.6.10.

The map below shows where demonstration activity is permitted throughout the Capitol Complex and Grounds. *See* Traffic Regulations § 12.2.10 (referencing the map).




*Id.* Appendix G. Demonstration activity is generally permitted in the green areas and permitted in the yellow areas so long as demonstrators do not obstruct the flow of pedestrian traffic. In the red areas, however, demonstration activity is strictly prohibited.

The red areas include the three stairways leading into the Capitol's East Front, known collectively as the Eastern Steps. For decades, the Eastern Steps were open to the public, including for demonstration activity, subject to restrictions that changed over the years. After the September 11 attacks, the Steps were closed to public demonstrations, and fences cordoned off public access to all but the lower section of the Steps. Individuals may recreate on this section but cannot engage in demonstration activity.

The restrictions on access and demonstration activity do not apply to members of Congress. Members and their staff may use the Eastern Steps to enter and exit the Capitol. Under the Member Exception to the Traffic Regulations, members may also sponsor demonstration activity, or organize their own events, in red areas, including the Eastern Steps. *Id.* § 12.2.20. To sponsor an event, a member must undertake the activity in his "official capacity" and must be "personally in attendance at the demonstration activity at all times." *Id.* Outside of this Exception, members have no authority to permit "demonstration activity organized or sponsored by others." *Id.* An individual or group seeking to demonstrate on the Steps must therefore be sponsored by a member.

Members regularly rely on the Exception to organize and sponsor protests with the public on the Eastern Steps. For example, Representative Cori Bush organized an overnight demonstration that drew many individuals to protest the end of the eviction moratorium implemented during the COVID-19 pandemic. *See U.S. Rep. Cori Bush Spends Night Outside Capitol to Protest Return of Evictions*, NBC News (July 31, 2021). More recently, Senator Cory Booker and Representative Hakeem Jeffries hosted a 12-hour-long sit-in on the Eastern Steps, during which they invited supporters to protest a proposed budget. *See Sen. Booker and House Minority Leader*

*Jeffries Live Stream from the Capitol Steps*, C-SPAN (Apr. 27, 2025).

B.

This case was brought by Patrick Mahoney, a Presbyterian minister who would like to pray and demonstrate on the Eastern Steps with his wife and a few others. He seeks to pray for God's intervention in the challenges facing the United States and to hold signs drawing attention to issues of public importance, including the federal funding of abortion. Because Mahoney has not secured congressional sponsorship, he faces arrest and possible imprisonment if he goes forward with these events on the Eastern Steps. Mahoney was previously arrested in August 2021 when he organized a pro-life demonstration with five others on the Steps.

Mahoney has been enmeshed in litigation with the Board over his plans to hold prayer vigils and other demonstrations throughout the Capitol Complex and Grounds since he first filed suit in 2021. After a series of legal proceedings, the parties reached a partial settlement. Mahoney agreed to dismiss some of his claims, leaving only his First and Fifth Amendment challenges to the restrictions in certain parts of the red "No Demonstration Permitted" areas, including the Eastern Steps. Under the settlement agreement, the parties jointly stipulated to facts and proceeded to summary judgment.

The district court granted summary judgment for Mahoney on his First Amendment claim as to the lower section of the Eastern Steps beneath the fencing.[1] *Mahoney v. U.S. Capitol*

---

[1] Mahoney also argued the restrictions on demonstrations in the paved areas surrounding the Eastern Steps violated the First Amendment. The district court, however, cabined its analysis and the injunction to the lower section of the Eastern Steps, and Mahoney

*Police Bd.*, 734 F. Supp. 3d 114 (D.D.C. 2024). The court first held that the lower section of the Eastern Steps is a traditional public forum because, like the surrounding sidewalks on the Capitol Grounds, the Steps have historically been open to expression and do not serve a function incompatible with expressive activity. *Id.* at 125–29. Applying the stringent test for speech restrictions in a traditional public forum, the district court concluded that application of the Traffic Regulations to the lower section of the Eastern Steps violated the First Amendment because the restriction on speech not sponsored by a member prohibited substantially more speech than necessary to secure the Capitol. *Id.* at 122, 129–32.

The district court entered a permanent injunction universally enjoining the Board from enforcing the demonstration ban as to the lower section of the Eastern Steps. Moving for reconsideration under Federal Rule of Civil Procedure 59(e), the Board argued the universal injunction exceeded the district court's jurisdiction and violated equitable principles. The district court denied that motion but later granted the Board a partial stay pending appeal. The stay limited the reach of the injunction to Mahoney and up to 14 other demonstrators.

The Board appealed. We review the grant of summary judgment de novo, *Hodge v. Talkin*, 799 F.3d 1145, 1155 (D.C. Cir. 2015), and the permanent injunction for abuse of discretion. *Cobell v. Norton*, 428 F.3d 1070, 1074 (D.C. Cir. 2005).

---

did not object to this approach. *Mahoney v. U.S. Capitol Police Bd.*, 734 F. Supp. 3d 114, 123–33 (D.D.C. 2024). The government's appeal concerns only the lower section of the Eastern Steps.

II.

The Traffic Regulations prohibit demonstrations by the public on the Eastern Steps unless sponsored by a member of Congress. Mahoney has expressed concrete plans to engage in prayer and political advocacy on the Steps, activity that is unquestionably protected by the First Amendment. Mahoney therefore has standing to bring this pre-enforcement challenge against the Regulations because he faces criminal penalties if he goes forward with his plans.

We hold that the Eastern Steps are a nonpublic forum but that the restriction on demonstration activity is unreasonable considering the history and use of the Steps.

A.

To resolve Mahoney's challenge, we must first determine the forum status of the Eastern Steps. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

1.

The degree of First Amendment protection for public speech on government property turns on the type of forum, which we determine by considering the "history and characteristics" of the property. *Oberwetter v. Hilliard*, 639 F.3d 545, 551–52 (D.C. Cir. 2011).

A traditional public forum is government property that "by long tradition" has "been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). Streets, sidewalks, and parks that "time out of mind, have been used for purposes of assembly" are "quintessential" examples. *Id.* (cleaned up). A designated public forum arises when government property "that has not traditionally been

regarded as a public forum is intentionally opened up for that purpose." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). The government does not need to "indefinitely retain the open character" of a designated public forum. *Perry*, 460 U.S. at 46. Speech restrictions in public fora, whether traditional or designated, are subject to heightened scrutiny because those spaces are devoted to public discourse and therefore most directly implicate the protections of the First Amendment. *See id.* at 45 (explaining courts apply strict scrutiny to content-based regulations and intermediate scrutiny to content-neutral regulations in public fora).

A limited public forum is created when the government opens a space "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Summum*, 555 U.S. at 470. For example, a public university creates a limited public forum when it opens school facilities and programs only to certain student groups. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829–30 (1995).

Most other government property is a nonpublic forum, "a space that is not by tradition or designation a forum for public communication." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (cleaned up). A hallmark of the nonpublic forum is that it serves a purpose incompatible with unfettered expression. Government offices and museums are typical examples. In limited public and nonpublic fora, the government has "much more flexibility to craft rules limiting speech." *Id.* at 11–12. Restrictions on speech "need only be reasonable and viewpoint neutral."[2] *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022).

---

[2] Some government property is not a forum at all, because it serves purposes incompatible with private communicative activity. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215–

2.

Although we have not previously characterized the Eastern Steps for purposes of forum analysis, our inquiry is informed by earlier decisions considering speech restrictions within the Capitol Complex and Grounds. The inside of the Capitol is a nonpublic forum because of its specialized purpose and distinct physical characteristics. *United States v. Nassif*, 97 F.4th 968, 975–78 (D.C. Cir. 2024). The Capitol serves as a workplace for members of Congress and their staff and therefore has a purpose incompatible with unfettered assembly. Moreover, the Capitol doorway's "physical threshold" provides a "familiar signal" that the Capitol interior "differs from the remainder of the public Grounds." *Id.* at 975 (cleaned up). Because the Capitol is a nonpublic forum, regulations prohibiting demonstration were reasonable and appropriately served to prevent disruption to the "very legislative process that the buildings are designed to accommodate." *Id.* at 977–81.

By contrast, the Grounds surrounding the Capitol are generally a traditional public forum. In *Jeannette Rankin Brigade v. Chief of Capitol Police*, a three-judge district court held that a categorical exclusion of demonstrations on the Capitol Grounds violated the First Amendment. 342 F. Supp. 575 (D.D.C. 1972), *aff'd*, 409 U.S. 972 (1972). The Grounds have "traditionally been open to the public," and the "fundamental function of a legislature in a democratic society assumes accessibility to [popular] opinion." *Id.* at 584. The Capitol Grounds are therefore an area "to which access cannot be denied broadly or absolutely." *Id.* at 583–85.

---

19 (2015) (holding state-issued license plates are not a forum for private communication).

We have also specifically held that the sidewalk in front of the Eastern Steps is a traditional public forum. *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002). Like the rest of the Grounds, the sidewalk is compatible with expressive activity. The long history and tradition of assembly on the Capitol Grounds mark its lawns and sidewalks as traditional public fora. *Nassif*, 97 F.4th at 975.

3.

The Eastern Steps are part of the exterior of the Capitol Building. They lie between the interior of the Capitol, a nonpublic forum, and the sidewalks around the Capitol, a traditional public forum. Because the Steps abut a traditional public forum, several factors guide our assessment. First, we consider whether the property serves a "specialized" purpose incompatible with unrestrained speech and assembly. *Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992). Second, we examine the "physical characteristics" of the property to determine whether it is distinguishable from the neighboring public forum. *Oberwetter*, 639 F.3d at 553. Finally, we scrutinize whether there is a "venerable tradition" of using the property for "expressive activities." *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1071 (D.C. Cir. 2012). This fact-specific inquiry focuses on the Eastern Steps' "location, purpose, and history" to determine their forum status. *Id.*

To begin with, the specialized purpose of the Eastern Steps marks them as a nonpublic forum. The Steps provide a secondary entrance and exit to the Capitol for members of Congress and their staff. As with the inside of the Capitol, and unlike neighboring sidewalks, the Eastern Steps have a purpose incompatible with unrestrained assembly. Such gatherings could impede access and create hazards for members and staff.

The Steps are similar to the sidewalks leading into a post office, which we held were a nonpublic forum given their purpose of "provid[ing] efficient access to the post office." *Id.* Unlike sidewalks on the Capitol Grounds, the Eastern Steps serve a "sufficiently specialized" purpose that demonstrates they are "uniquely nonpublic." *Lederman*, 291 F.3d at 42–43 (cleaned up). The Board must be able to close the Steps to the public when necessary to protect the primary purpose of the Steps as well as the safety of members and their staff.

Furthermore, the physical location and architecture of the Eastern Steps suggest they are a nonpublic forum. Unlike the surrounding Capitol Grounds, the Steps are not a "street, sidewalk, or park" entitled to a "working presumption of public-forum status." *Nassif*, 97 F.4th at 975 (cleaned up). Instead, they are physically integrated with the Capitol, which is a nonpublic forum. The Eastern Steps are also structurally distinct from the surrounding walkways on the Capitol Grounds. The Steps' elevation creates a natural boundary from the paved areas below, physically "mark[ing] off" the Steps' "special use." *Henderson*, 964 F.2d at 1182. The Steps are part of the Capitol, and individuals who climb the Steps would recognize they have entered a space with a different purpose than the surrounding Grounds.

We relied on similar reasoning when concluding that the Supreme Court plaza is a nonpublic forum. The plaza is "elevated from the sidewalk by a set of marble steps," making clear to individuals that they have entered "what amounts to the elevated front porch of the Supreme Court building." *Hodge*, 799 F.3d at 1158–59; *see also Initiative & Referendum Inst.*, 685 F.3d at 1071 (holding sidewalk leading to post office was a nonpublic forum in part because it was separated from ordinary sidewalks). The Jefferson Memorial, too, is a nonpublic forum in part because its architectural boundaries

"delineate the nonpublic forum." *Oberwetter*, 639 F.3d at 553. The physical and architectural separation from the Capitol Grounds' lawns and sidewalks indicates the Eastern Steps are a nonpublic forum.

Finally, the history of the Eastern Steps demonstrates they have only sporadically been used for demonstration activity. Before 1976, the public was generally prohibited from engaging in demonstration activity across the Capitol Grounds, including on the Eastern Steps. Following the enactment of the first Traffic Regulations in 1976, the Board opened much of the Capitol Grounds to demonstration activity. Although the record is not entirely clear, it seems the Board permitted some public demonstrations on the Eastern Steps between 1976 and the September 11 attacks, subject to restrictions that changed over the years. This history suggests that at times the Eastern Steps were, at most, a designated public forum because the Board intentionally opened the area to expressive activity.

The occasional designation of the Steps for expressive activity, however, does not mean the Steps are a traditional public forum that must remain indefinitely open to public expression. *See Perry*, 460 U.S. at 46 (recognizing the government is "not required to indefinitely retain the open character" of a designated public forum). The history of regulations concerning access to the Eastern Steps demonstrates they are a nonpublic forum that the government may choose from time to time to designate and open for public expression.

Mahoney argues the Eastern Steps are a traditional public forum because they are best understood as a part of the Capitol Grounds. And on the Grounds, the Board must show the Steps serve an "overwhelmingly specialized" purpose to be classified as a nonpublic forum. *See Lederman*, 291 F.3d at 43 (citing

*Henderson*, 964 F.2d at 1182). As already explained, we find the Eastern Steps are an integrated part of the Capitol Building and distinct from the Grounds' lawns or sidewalks, so the Board need not satisfy the heightened standard.

We are also unpersuaded by Mahoney's efforts to distinguish the Eastern Steps from other property this court has recognized as a nonpublic forum, such as the sidewalks leading into post offices and the Supreme Court plaza. Mahoney emphasizes the distinctive role of the legislative branch in a representative system of government, arguing the Steps must be a traditional public forum that remains open to promote congressional accountability to the public. While the First Amendment certainly protects public demonstrations for individuals to petition their representatives in Congress, it does not require practically unfettered access up to the doorway of the Capitol.

Furthermore, we disagree with our colleague that *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), compels the conclusion that the Eastern Steps are a traditional public forum. *See* Dissenting Op. 2–7. In *Dellums*, this court held that Vietnam War protestors arrested on the Steps could bring a *Bivens* claim for the loss of their First Amendment rights. 566 F.2d at 194–96. The panel did not engage in forum analysis at all, nor did it hold that the Steps must remain open to public demonstrations. This is unsurprising given that *Dellums* predated *Perry*'s framework for forum analysis. Moreover, the fact that the *Dellums* demonstration occurred in 1971 does not support the conclusion that the Steps were a traditional public forum at that time, particularly because the parties stipulated that the public was generally prohibited from engaging in

demonstration activities prior to 1976. *See* J.A. 405; *but see* Dissenting Op. 7–9.

In sum, we hold that the Eastern Steps are a nonpublic forum because they are integrated with the Capitol Building, serve the specialized purpose of providing members and their staff access to the Capitol, and are physically distinct from the surrounding Capitol Grounds. While the Board has occasionally permitted demonstrations on the Eastern Steps in the past, that history is consistent with the conclusion that the Steps are a nonpublic forum that at times may be opened for public expression.

B.

Because the Eastern Steps are a nonpublic forum, speech regulations must be "reasonable in light of the purpose served by the forum" and "viewpoint neutral." *Cornelius*, 473 U.S. at 806. Mahoney does not argue the Traffic Regulations discriminate on the basis of viewpoint, so we assess whether the restrictions are reasonable in light of the purpose and functions of the Eastern Steps.

1.

To be reasonable, a regulation of speech in a nonpublic forum must be "consistent with the [government's] legitimate interest in preserving the property for the use to which it is lawfully dedicated." *Perry*, 460 U.S. at 50–51 (cleaned up). Reasonableness requires "more than the toothless rational basis test used to review the typical exercise of a state's police power." *Price*, 45 F.4th at 1072 (cleaned up). Courts probe the "special attributes" and "characteristic nature and function of the particular forum involved." *United States v. Kokinda*, 497 U.S. 720, 732 (1990) (plurality) (cleaned up). When a forum is "compatible with expressive activity," we apply a "more

demanding" reasonableness inquiry. *See PETA v. Tabak*, 109 F.4th 627, 636 (D.C. Cir. 2024) (assessing reasonableness in a limited public forum).

Furthermore, in a nonpublic forum, the government must exercise its regulatory authority in a manner that follows "objective, workable standards" and does not permit officials to exercise "unbridled discretion over a forum's use." *Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 372 (D.C. Cir. 2018) (cleaned up). The Supreme Court has emphasized the "special dangers inherent in a law placing unbridled discretion directly to license speech … in the hands of a government official." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 767–68 (1988). A regulation that grants the government arbitrary control over who may speak invites the suppression of disfavored viewpoints and undermines the First Amendment's core protections. *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002) (recognizing a permitting decision cannot be left to the "whim of the administrator") (cleaned up); *Ateba v. Leavitt*, 133 F.4th 114, 125 (D.C. Cir. 2025) (holding it would be unreasonable to control access to White House press facilities through standardless discretion). Even when the government may regulate speech, it must avoid "unfair or inconsistent enforcement." *Mansky*, 585 U.S. at 22.

2.

The history and "surrounding circumstances" of the Eastern Steps compel a relatively probing review of the Traffic Regulations. *Cornelius*, 473 U.S. at 809. Although the Eastern Steps are properly treated as a nonpublic forum, they were used for demonstrations before the September 11 attacks. And the Board continues to permit demonstration activity by

individuals who secure congressional sponsorship or participation.

These uses of the Eastern Steps are also part of a wider American tradition of public speech near legislatures. Legislative grounds "occupy a special place in our First Amendment tradition" because their location enables "citizens [to] speak most directly to their elected representatives." *Hulbert v. Pope*, 70 F.4th 726, 738 (4th Cir. 2023). "[T]he fundamental function of a legislature in a democratic society assumes accessibility to [popular] opinion." *Jeannette Rankin Brigade*, 342 F. Supp. at 584. The suppression of disfavored speech on legislative grounds is at odds with our First Amendment tradition. *Cf. Edwards v. South Carolina*, 372 U.S. 229, 238 (1963) (holding unconstitutional the convictions of civil rights protestors for demonstrating on state capitol grounds). This broader context compels a "more demanding" scrutiny when assessing the reasonableness of the Traffic Regulations.[3] *Cf. Tabak*, 109 F.4th at 636.

Because the Eastern Steps are a nonpublic forum, the Board could prohibit demonstrations altogether, as it has done inside the Capitol. *See Nassif*, 97 F.4th at 979–80. This would preserve the purpose of the Steps as a nonpublic entrance into the Capitol. Instead, the Regulations prohibit "gathering … for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment," unless that activity is sponsored by a member of

---

[3] The district court and our colleague rely on similar considerations to conclude the Eastern Steps are a traditional public forum. *Mahoney*, 734 F. Supp. 3d at 125–29; Dissenting Op. 7–9. While we disagree with that categorization, the history of the Steps and the tradition of speech near legislatures compel us to closely assess the reasonableness of the Traffic Regulations.

Congress. Traffic Regulations §§ 12.1.10, 12.2.20. The Board tries to limit the reach of the Regulations by maintaining that they prohibit only "joint conduct that is expressive in nature and aimed to draw attention." Board Br. 37. Even accepting this interpretation, the Regulations broadly restrict expressive activity, including Mahoney's small group prayers and political advocacy. But the same expressive activity is permitted if sponsored by a member of Congress, essentially without other limits.

We hold that the Traffic Regulations as applied to the Eastern Steps are unreasonable because of the Member Exception. The Board justifies the demonstration restrictions as necessary to allow the safe passage of members and staff into and out of the Capitol. Despite this safety rationale, however, the Board permits even large public demonstrations when sponsored by a member of Congress. If a particular cause garners the support of a member, demonstrations are allowed. Individuals and groups that lack the political power to secure a member's support are out of luck.

While the Regulations do not discriminate on the basis of viewpoint, only demonstrations favored by a current member of Congress will be permitted. This type of preferential treatment on the Steps of the Capitol is unreasonable. "It is fundamental to our free speech rights that the government cannot pick and choose between speakers, not when regulating and not when enforcing the laws." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023); *see also Dellums*, 566 F.2d at 179–80 (explaining that a law containing "no standards whatever for its enforcement" gives officials "too much discretion" and may therefore be "enforced selectively against those who hold unpopular points of view"). The Supreme Court has long recognized that it is "clearly unconstitutional to enable a public official to

determine which expressions of view will be permitted." *Cox v. Louisiana*, 379 U.S. 536, 557 (1965); *cf. Miller v. City of Cincinnati*, 622 F.3d 524, 533–36 (6th Cir. 2010) (rejecting discretionary sponsorship requirement for rallies and press conferences held inside a city hall that was characterized as a nonpublic or limited public forum).

Without the support of a member of Congress, Mahoney is prohibited from praying and advocating for the end of the federal funding of abortion on the Eastern Steps. The Exception unreasonably allows members of Congress to serve as gatekeepers of speech on the Eastern Steps. Because the protection of unpopular speech and advocacy is central to the First Amendment, we cannot leave it to the selective enforcement of members.

3.

The Board defends the reasonableness of its Regulations by emphasizing the special status of members of Congress. The Capitol is where members perform their legislative duties, and members are less likely to threaten the security of the Capitol.

We take no issue with the fact that members may be afforded special access to the Eastern Steps, which are a nonpublic forum primarily used to enter and exit the Capitol. The Board may craft reasonable regulations that account for the status of members in their workplace, as well as their interests in speaking in and around the Capitol. These Regulations, however, unreasonably permit the public to demonstrate only after securing congressional sponsorship and attendance.

The Board relatedly points to the fact that any demonstrations must be in a member's "official capacity." Traffic Regulations § 12.2.20. The Board suggests the Exception reasonably accommodates the speech rights of

members in and around the Capitol, and any consequences for public speech are incidental to serving that purpose. But requiring that speech be in the member's official capacity does not limit the total discretion that members have to choose who may join their demonstrations and what messages may be conveyed. The Board has stipulated that to "sponsor" an event simply means that "the Member is supporting the activity of another who is organizing the activity." J.A. 412 n.13. Nothing in this stipulation, or the Regulations, suggests there is any limit to member discretion with regard to sponsoring the speech of others. On the Eastern Steps, it may well be reasonable to permit preferential speech rights for members, but it is unreasonable to allow members unbridled discretion to choose which speech will be sponsored.

The Board also argues the Member Exception is reasonable because events sponsored by members are less likely to pose a safety risk than other events. But the Exception notably provides no limits regarding the size or scale of member sponsored demonstrations on the Eastern Steps, while the Regulations entirely prohibit even small demonstrations that lack member sponsorship. Even accepting the Board's judgment about relative security risks, that rationale cannot justify a wholly discretionary sponsorship system for public speech.

On the Eastern Steps, the Board may craft reasonable regulations to accommodate the interests of lawmakers, but it must do so in a way that respects the First Amendment rights of the public.

* * *

"[T]he government has no authority to license one side to fight freestyle, while forbidding the other to fight at all." *Mahoney v. Babbitt*, 105 F.3d 1452, 1454 (D.C. Cir. 1997). As

applied to the Eastern Steps, the Traffic Regulations are unreasonable because members may not exercise unbridled discretion over which individuals may speak on the Steps of the Capitol. We therefore affirm the grant of summary judgment for Mahoney on his First Amendment claim.[4]

III.

While the district court correctly concluded that the Traffic Regulations violate the First Amendment, it erred in entering a universal injunction.[5] The district court enjoined the Board from enforcing the Traffic Regulations on the lower section of the Eastern Steps against anyone, regardless of any connection to Mahoney. The Supreme Court's decision in *Trump v. CASA, Inc.*, which was issued after the close of briefing in this appeal, holds that district courts lack equitable authority to enter such universal injunctions. 145 S. Ct. 2540, 2554 (2025). Instead, the "maximum a court can provide" is an injunction that provides "complete relief *to the plaintiffs before the court*." *Id.* at 2557–58. In light of *CASA*, the universal injunction was an abuse of discretion.

Mahoney maintains that *CASA* is inapposite because it involved the Fourteenth Amendment and a preliminary injunction, whereas his case raises a First Amendment challenge and the grant of a permanent injunction. These efforts to distinguish *CASA* are unavailing. *CASA* reflects limits

---

[4] Because we conclude summary judgment is appropriate on Mahoney's First Amendment claim, like the district court, we do not reach his Fifth Amendment claim.

[5] The Board does not dispute that Mahoney is entitled to a permanent injunction if he succeeds on his First Amendment claim. We accordingly do not consider the propriety of the district court's injunction beyond its universal nature.

on the judiciary's equitable power under the Judiciary Act of 1789. *Id.* at 2554 ("Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act."). The principle of party-specific relief applies regardless of the substantive basis of a claim or type of injunction.[6]

Alternatively, Mahoney argues the Board forfeited any objection to the universal nature of the injunction because it did not object to the scope of relief in its summary judgment briefing.

It is well established that "issues and legal theories not asserted in the district court ordinarily will not be heard on appeal." *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 686 (D.C. Cir. 2010) (cleaned up). We retain discretion, however, to excuse forfeiture in some circumstances, for example when "the proper resolution is beyond any doubt" or "injustice might otherwise result." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (cleaned up). We are more likely to excuse forfeiture when "both parties have fully addressed the issue on appeal." *Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 919 (D.C. Cir. 2018) (cleaned up). An "intervening change in the law" may also call for an exercise of this discretion. *Flynn v. Commissioner*, 269 F.3d 1064, 1069 (D.C. Cir. 2001).

The circumstances warrant excusing the Board's failure to raise an objection to the universal injunction in its summary judgment briefing. We note the Board objected to the injunction's universal scope in its Rule 59(e) motion, and the

[6] Mahoney points to no other source of equitable authority to support the injunction. Because *CASA*'s holding regarding the Judiciary Act resolves this case, we need not address the Board's argument that universal injunctions violate Article III. *See* 145 S. Ct. at 2550 n.4.

district court considered and rejected the objection.[7] On appeal, both parties briefed the question of whether a universal injunction was within the district court's equitable authority. And the Supreme Court's intervening decision in *CASA* leaves no doubt about the issue's proper resolution. We conclude it is an appropriate exercise of our discretion to reach the Board's challenge to the scope of the injunction.

The district court's universal injunction exceeded its equitable authority because it provided more than complete relief to Mahoney. We therefore vacate the injunction. In doing so, we recognize there may be some "doctrinal complexities" relevant to the scope of relief in the First Amendment context. *See Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (statement of Kavanaugh, J.). Because the parties did not have an opportunity to brief the proper scope of the injunction after *CASA*, we remand for the district court to fashion an appropriate injunction that remedies Mahoney's injury.

* * *

The Eastern Steps are a nonpublic forum because they rise above the surrounding Capitol Grounds and serve as an entrance to the Capitol for members and their staff. The Board is free to take reasonable measures to secure the Capitol and provide members with special access to the Steps. What the Board cannot do, however, is make the public's right to demonstrate at the seat of Congress contingent on securing the goodwill of a member of Congress. We affirm the grant of

---

[7] The district court concluded the Board could properly raise its remedial challenge under Rule 59(e) and considered the issue under that standard. Because we excuse the Board's forfeiture at summary judgment, we assess the legal questions underlying the injunction de novo and do not consider whether the Board was entitled to relief under Rule 59(e).

summary judgment for Mahoney, vacate the injunction, and remand for further proceedings consistent with this opinion.

*So ordered.*

ROGERS, *Senior Circuit Judge*, dissenting: On no fewer than forty occasions since the 1980s, Reverend Mahoney alone or together with a small group of his associates engaged in prayer vigils, protests, marches, rallies, and other forms of peaceful expressive activity at the bottommost parts of the steps of the East Front of the United States Capitol Building (hereinafter, "Eastern Steps"). But regulations promulgated by the United States Capitol Police Board now prohibit Mahoney from engaging in even a quiet prayer vigil under the threat of criminal punishment. *Traffic Regulations for the United States Capitol Grounds*, §§ 12.1, 12.2 ("Traffic Regulations"); *see* D.C. Code § 22-1307(b)(1). The same Traffic Regulations permit Members of Congress and an unlimited number of their unvetted invitees to organize and engage in expressive activities, which they frequently do. Traffic Regs. § 12.2.20. And members of the public can gather and socialize on the steps to engage in any number of non-expressive activities.

The district court ruled in Mahoney's favor on his First Amendment claim, holding that the Eastern Steps are a traditional public forum and that the regulation prohibiting First Amendment activity on the steps sweeps impermissibly wide, banning nearly all expressive activities without a compelling justification. *Mahoney v. United States Capitol Police Bd.*, 734 F. Supp. 3d 114, 127, 130 (D.D.C. 2024). On appeal by members of the Board and others, Mahoney maintains that the district court was correct because "the entire Capitol Grounds [including the Eastern Steps] are a traditional public forum." Appellee's Br. 22. In the alternative, he maintains that the exception in the Traffic Regulations allowing Members of Congress and their invitees to engage in expressive activities "creates an impermissible system of cronyism, where people who are politically connected . . . may demonstrate in the shadow of the Capitol while ordinary members of the public are silenced there." *Id.* at 19.

I agree the Traffic Regulations' selective exception for Members of Congress fails upon judicial review. *See* Op. 14–20. In accord with *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), I join in remanding the injunction to the district court to reconsider the proper scope of relief in the first instance. *See* Op. 20–22. But I respectfully otherwise dissent from the majority opinion. *First*, I would affirm the district court's ruling that the Eastern Steps are a traditional public forum because a "loss of an opportunity to express to Congress [on the Eastern Steps] one's dissatisfaction with the laws . . . constitutes [a] loss of First Amendment rights 'in their most pristine and classic form.'" *Dellums v. Powell*, 566 F.2d 167, 195 (D.C. Cir. 1977) (quoting *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963)). *Second*, I would affirm the district court's conclusion that the Traffic Regulations' near total ban on expressive activity on the steps is not narrowly tailored to serve the government's security interest, failing upon even intermediate scrutiny review.

**I.**

The First Amendment limits the government's ability to restrict speech, including speech on government property. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). "As a general principle, 'the extent to which the Government can control access [to a forum it owns or controls] depends on the nature of the relevant forum.'" *Ateba v. Leavitt*, 133 F.4th 114, 121 (D.C. Cir. 2025) (alteration in original) (quoting *Bryant v. Gates*, 532 F.3d 888, 894 (D.C. Cir. 2008)). There are "three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius*, 473 U.S. at 802. The district court held the Eastern Steps are a traditional public forum, *i.e.*, "the kind of public property that has been historically associated with the exercise of First Amendment

rights." *Mahoney*, 734 F. Supp. 3d at 127 (citation and internal quotation marks omitted). Under binding precedent, including *Dellums*, 566 F.2d 167, the district court is correct. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (*en banc*).

In *Dellums*, this court held that Vietnam-war protestors arrested on the Eastern Steps under the District of Columbia unlawful entry statute, D.C. Code § 22–3102, could bring a First Amendment *Bivens* claim against the Capitol Police. 566 F.2d at 173, 194–96. A cause of action for damages would lie upon the protestors' arrest on the Eastern Steps because the protestors' "loss of an opportunity to demonstrate" on those steps "constitutes loss of First Amendment rights 'in their most pristine and classic form.'" *Id.* at 195 (quoting *Edwards*, 372 U.S. at 235). Relying on *United States v. Nicholson*, Nos. 20210-69A, *et al.* (D.C. Ct. of Gen. Sess. June 19, 1969) (Harold H. Greene, C.J.), *aff'd*, 263 A.2d 56 (D.C. 1970) (appended to *Dellums* as 566 F.2d at 197–205), this court affirmed the judgment of liability against the Chief of the Capitol Police and held that the unlawful entry statute would be enforceable only under the limiting construction adopted in *Nicholson*. *Dellums*, 566 F.2d at 183, 197. In so doing, the court unambiguously adopted *Nicholson*'s holding that the Eastern Steps are a public forum as a correct statement of the law.

In *Nicholson*, the Capitol Police had arrested thirteen Quakers "while standing on the steps of the Capitol reading names of Vietnam War dead from the Congressional Record" for violating the same unlawful entry statute. 566 F.2d at 197. Upon engaging in a forum analysis that anticipated the framework adopted by the Supreme Court in *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983), Chief Judge Green held that "[t]he Capitol of the United States, a

national historical shrine and the political centerpiece of the Republic," including the Eastern Steps, is a public forum that "may not ordinarily be closed to the public for reasonable use." *Id*. at 198. Therefore, "individual citizens could not be held to be 'without lawful authority to remain . . . thereon', within the meaning of the unlawful entry statute, in the absence of some other, specific bar to their presence." *Id.* A separate statute, D.C. Code § 9–124, which banned all use of the Capitol as a public forum "except as permitted by the Speaker of the House and the President of the Senate," could not serve as such a bar because it was unconstitutionally vague as enacted. *Id.* at 198–200. Chief Judge Greene proceeded to adopt a limiting construction of Section 124 as permitting "the imposition of criminal punishment" solely "for acts or conduct which interferes with the orderly processes of the Congress, or with the safety of individual legislators, staff members, visitors, or tourists, or their right to be free from intimidation, undue pressure, noise, or inconvenience." 566 F.2d at 204.

*Dellums*, following *Nicholson*, held that the "plaintiffs could not constitutionally have been arrested as a group under either [D.C. Code § 9–124] or [D.C. Code § 22–3102] unless [the Chief of the Capitol Police] had reason to believe: (1) that the plaintiffs comprised one of the groups that could be banned or ordered from the Capitol under [the construction of Section 124 in] *Nicholson*; (2) that orders to disperse had been given which apprised the crowd as a whole that it was under an obligation to leave; and (3) that a reasonable opportunity had been given the plaintiffs to leave the Capitol." 566 F.2d at 183. The court thus embraced Chief Judge Greene's construction of the statutes at issue in light of his antecedent holding that the Eastern Steps are a public forum.

"[A]t stake" in *Dellums* was the "loss of an opportunity to express to Congress one's dissatisfaction with the laws and

policies of the United States" in a forum likely to attract "the attention of a mass audience and, in turn, . . . the attention of a national legislature." *Id.* at 195. The stakes are no different today when the Board's regulations prohibit Mahoney and his associates from engaging in a peaceful vigil on the Eastern Steps to call the attention of Members of Congress and the public to their cause. Unlike other forms of communication with the legislative branch of the government, "[t]he demonstration, the picket line, and the myriad other forms of protest which abound in our society each offer peculiarly important opportunities in which speakers may at once persuade, accuse, and seek sympathy or political support, all in a manner likely to be noticed. Loss of such an opportunity is surely not insignificant." *Id.*

The majority begins its analysis on the faulty premise that this court "ha[s] not previously characterized the Eastern Steps for purposes of forum analysis." Op. 9. It thereafter attempts to diminish the persuasive force of *Dellums* by stating this court neither engaged in a forum analysis nor held that the steps must remain open to public demonstrations. *Id.* at 13. The majority, ignoring *Dellums* and subsequent decisions by this court, is wrong on both the law and the facts.

<u>*First*</u>, the majority, focusing solely on the *Bivens* holding in *Dellums*, overlooks that this court applied *Nicholson* to resolve questions about the *Dellums* defendants' First Amendment right to protest peacefully on the Eastern Steps. This court reviewed the First Amendment holding and forum analysis in *Nicholson* before relying on it as "the controlling case" and a correct statement of the law, *Dellums*, 566 F.2d at 185, in affirming the jury's verdicts for false arrest, false imprisonment, and violation of the plaintiffs' First Amendment rights, *id.* at 179–183; *see id.* at 197 n.89. That review included Chief Judge Greene's prescient forum analysis citing Supreme

Court decisions from 1939 through 1969, which led him to conclude that the Capitol is a "preeminently public building," and that its surrounding grounds could not "be declared off limits to the people," unless the activity in question was obstructive, dangerous, or destructive. *Nicholson*, 566 F.2d at 198, 204. All the parties to *Dellums*, including the Justice Department and the Chief of the Capitol Police conceded that *Nicholson* was a correct and controlling statement of the law. *Id.* at 177.

*Dellums* is not an outlier, for this court has repeatedly characterized the Capitol grounds, including the Eastern Steps, as a traditional public forum. *See, e.g.*, *Lederman v. United States*, 291 F.3d 36, 43 (D.C. Cir. 2002), and *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972), discussed *infra*. The majority also ignores the import of Supreme Court precedent characterizing State legislative sites as traditional public *fora*, including in *Edwards*, 372 U.S. 229, cited in *Dellums*, 566 F.2d at 195. *See Cox v. Louisiana*, 379 U.S. 536 (1965); *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 757, 766 (1995); *Hulbert v. Pope*, 70 F.4th 726, 738 (4th Cir. 2023); *Occupy Columbia v. Haley*, 738 F.3d 107, 121 (4th Cir. 2013); *cf. Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1146 (10th Cir. 2001); *Pouillon v. City of Owosso*, 206 F.3d 711, 716–17 (6th Cir. 2000).

Chief Judge Greene's statement regarding the legal status of the Eastern Steps remains true today:

> In this day of the violent confrontation, the harsh, non-negotiable demand, the disregard of the most elementary forms of civilized discourse, it is especially important that peaceful speech and courteous persuasion be given their rightful chance. It would be strange, indeed, if our constitutional system,

> and especially the First Amendment, were to countenance the congregation on the grounds occupied by the national legislature of all manner of groups except those who wish to speak out peacefully on the controversial issues of the day. That is not the mark set by the Bill of Rights.

*Id.* at 202. *Dellums* and the court's subsequent decisions are the controlling First Amendment law in this Circuit.

Furthermore, the majority overlooks that *Dellums* and *Nicholson* were controlled by the Supreme Court precedent in *Edwards*, 372 U.S. 229. *See Dellums*, 566 F.2d at 194–95, 195 nn.82 & 86; *Nicholson*, *id.* at 202–03. In *Edwards*, the Supreme Court reversed state breach-of-peace convictions of 187 African American students who peacefully demonstrated against South Carolina's segregationist laws on the grounds of the South Carolina State Capitol. 372 U.S. at 238. The Court concluded that the students' peaceful demonstration was "an exercise of [free speech] in [its] most pristine and classic form" and that the students' arrest and conviction was therefore contrary to the First Amendment of the Constitution. *Id.* at 235.

<u>*Second*</u>, the majority errs as a matter of fact in concluding that the Eastern Steps are not a traditional public forum. Op. 14. In fact, there is a rich First Amendment tradition of expressive activity at or near legislative buildings marking important moments of civic resistance in this Nation's history. For example, in *Cox*, 379 U.S. 536, college students assembled at the Louisiana State Capitol before marching to the courthouse to protest racial segregation and discrimination. *Id.* at 539, 545–46. And Reverend Martin Luther King Jr. delivered his famous "How Long, Not Long" speech campaigning for voting rights on the steps of the Alabama State Capitol to thousands of nonviolent demonstrators following a

five-day March from Selma to Montgomery. *Selma to Montgomery March*, THE MARTIN LUTHER KING, JR. RESEARCH AND EDUCATION INSTITUTE, https://perma.cc/HDC4-8UBT.

This tradition of civic activity at or near legislative buildings has been equally strong on the Eastern Steps. For example, on May 9, 1914, thousands of women marched across Washington, D.C., ending on the Eastern Steps to deliver petitions demanding constitutional amendment to guarantee women's right to vote. Photograph (May 9, 1914), LIBRARY OF CONGRESS, https://perma.cc/F4GX-75XQ. In the summer of 1932, thousands of jobless World War I veterans surrounded the Capitol, including the Eastern Steps, demanding payments for their services. *Senate Stories, The Senate and the Bonus Expeditionary Force of 1932*, UNITED STATES SENATE (Nov. 9, 2023), https://perma.cc/6LDM-99LV. And *Dellums* and *Nicholson* themselves constitute clear evidence of historic expressive activities that took place on the steps, cataloguing two of the many anti-war protests on the Eastern Steps in the sixties and seventies. *Dellums*, 566 F.2d at 173; *Nicholson*, *id.* at 197. More recently, March 12, 1990, marked the day of a pivotal disability rights protest where over sixty activists crawled up the Capitol steps to demand the passage of the American with Disabilities Act. *The Iconic Civil Rights Protest You Don't Know About*, PBS (Mar. 11, 2025), https://perma.cc/E432-E63Z. It is also significant that the parties in the instant case agree that Mahoney himself participated in "no fewer than forty" events on the steps. Stipulations of Fact ¶¶ 43–46.

In accordance with this long tradition, the three-judge district court in *Jeannette Rankin Brigade*, 342 F. Supp. 575, held unconstitutional a federal statute that made it unlawful "'to parade, stand, or move in processions or assemblages' in

the Capitol Grounds" absent express authorization by a Member of Congress because "[t]he Capitol Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have *traditionally* been open to the public." *Id.* at 583–84 (emphasis added) (citation omitted). The court emphasized the "fundamental function of a legislature in a democratic society assumes accessibility" to "popular opinion," *id.*, and distinguished between the whole exterior grounds of the Capitol, a traditional public forum, and the interior of the Capitol buildings themselves, *id.* at 584. The Supreme Court affirmed. *Chief of Capitol Police v. Jeannette Rankin Brigade*, 409 U.S. 972 (1972) (Misc. Order, Nov. 6, 1972). Other Circuit Courts of Appeals, such as the Fourth Circuit, too have recognized that "capitol grounds occupy a special place in our First Amendment tradition." *Hulbert*, 70 F.4th at 738; *see Occupy Columbia*, 738 F.3d at 121.

Yet despite the long line of precedent and tradition of expressive activity on the Eastern Steps, the majority concludes that the Eastern Steps are a nonpublic forum, largely because the steps are "physically integrated with the Capitol," and their "specialized purpose" is to "provide a secondary entrance and exit to the Capitol for members of Congress and their staff." Op. 11, 12. This conclusion too rests on faulty premises.

First, the physical characteristics of the steps do not "warrant distinguishing" them from the rest of the Capitol Grounds. *Lederman*, 291 F.3d at 43. Again, contrary to precedent, the majority ignores that this court has concluded the Eastern Steps are "architectural[ly] integrat[ed]," *Hodge v. Talkin*, 799 F.3d 1145, 1158 (D.C. Cir. 2015), with the surrounding East Front Plaza. The marble steps and the paving of the Plaza create an impression of a unified, open gathering space that gradually ascends to the Capitol's entrance. The base of the Eastern Capitol Steps, in particular, is entirely

blended with the nearby sidewalk, making it impossible to tell where the sidewalk starts and the steps end. The bases of the Eastern House and Senate Steps are only slightly elevated from the Plaza. These steps unfold above the bases in broad cascading marble terraces that readily serve as speaking platforms and places for congregating, rather than steps solely dedicated to entering and exiting a building. So integrated with the surrounding East Front Plaza and Capitol Grounds, the Eastern Steps function no differently than a sidewalk leading up to a legislative building where people can sit on benches, congregate, and engage in expressive activity. *See Jeannette Rankin Brigade*, 342 F. Supp. at 584; *Edwards*, 372 U.S. at 231–32, 235.

Second, the Eastern Steps are distinguishable in their appearance and function from the other nonpublic *fora* identified by the majority. Unlike the Supreme Court plaza and the steps leading thereto, the East Front Plaza and the Eastern Steps are not significantly "elevated from the sidewalk" nor cordoned off by a "patterned marble wall" defining their "boundaries." *Hodge*, 799 F.3d at 1158. Neither is there any other "physical threshold" separating the Eastern Steps from "the remainder of the public Grounds in ways that make it uniquely 'nonpublic.'" *United States v. Nassif*, 97 F.4th 968, 975 (D.C. Cir. 2024) (quoting *Lederman*, 291 F.3d at 42).

The open and accessible architecture of the East Front Plaza and Eastern Steps underscores that the main function of the legislative branch of the government is to legislate for and on behalf of its citizenry. In *Jeannette Rankin Brigade*, the court observed that "traditionally, the judiciary does not decide cases by reference to popular opinion," while "the fundamental function of a legislature in a democratic society assumes accessibility to such opinion." 342 F. Supp. at 584. Similarly, this court's holding in *Ateba*, 133 F.4th 114, that the White

House Press Area is a nonpublic forum, is also distinguishable because the Press Area is within the interior of the official residence of the President, the head of the executive branch, and "not generally open to a class of speakers" or to the public at large. *Id.* at 117, 121–23. Similarly, the court's holding in *Oberwetter v. Hilliard*, 639 F.3d 545, 552 (D.C. Cir. 2011), that the interior of the Jefferson Memorial is a nonpublic forum is inapposite. Unlike the exterior spaces of legislative buildings, "the interior space of national memorials has not traditionally 'been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Id.* (quoting *Perry*, 460 U.S. at 45).

Third, the majority's perception that the Eastern Steps are predominantly used to enter and exit the Capitol Building is contrary to the stipulated facts in the instant case that "for the most part, those who work in the Capitol typically enter the building by way of other entrances." Stipulations of Fact ¶ 68. The record shows that Members of Congress and their invitees have regularly been demonstrating on the steps. And before September 11, 2001, members of the public had done so as well. This record does not support a conclusion that the steps have served a "specialized use [that] may outweigh the attributes that would otherwise mark [them] as [a] public forum." *Lederman*, 291 F.3d at 43 (alteration omitted) (quoting *Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992)). The record and this court's precedent support the district court's conclusion that the Eastern Steps, a part of the Capitol Grounds, have historically been opened to the public "for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 45 (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)).

In sum, the majority charts a path of its own, ignoring precedent as well as Supreme Court decisions on when a tradition has been established for purposes of the exercise of First Amendment rights.

**II.**

Because the Eastern Steps are a traditional public forum, "the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *United States v. Grace*, 461 U.S. 171, 177 (1983) (quoting *Perry*, 460 U.S. at 45). Mahoney principally contends, and the district court agreed, that the Traffic Regulations' prohibition on demonstrations captures "a vast amount of speech that creates no threat to Capitol security," and is therefore unconstitutionally overinclusive because "there are alternative security measures that are substantially less restrictive of speech." Appellee's Br. 18–19. Mahoney is correct.

After the September 11, 2001, terrorist attacks, the Board promulgated the Traffic Regulations, which prohibit "any one (1) person or group of persons" from engaging in "[d]emonstration activity . . . defined as any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment," Traffic Regs. §§ 12.1.10, 12.1.20, on areas of the Capitol Grounds designated as "No Demonstration Permitted," Stipulations of Fact ¶¶ 25–27. The area on which no demonstration activity is permitted is depicted on the Capitol Grounds Demonstration

Areas Map; it encompasses the Eastern Steps. *Id.* ¶¶ 26, 29; *see* Traffic Regs. §§ 12.2.10, 12.2.20. The Eastern Steps comprise the Eastern Senate, Eastern House, and Eastern Capitol Steps. Stipulations of Fact ¶¶ 12–22. The Board appeals the district court's ruling finding the Traffic Regulations unconstitutional as applied on the lower parts of each set of steps on which Mahoney wishes to demonstrate.

The Board's ban on nearly all expressive activities on the steps is unconstitutionally overinclusive. The plain text of the regulations "prevents even a single person from holding a quiet vigil on the bottom House or Senate steps" or two persons from "gathering on the Eastern Steps to oppose or support the latest editorial in the *New York Times.*" *Mahoney*, 734 F. Supp. at 130 (citing Traffic Regs. §§ 12.1.10, 12.1.20).

The Board does not dispute the district court's conclusion that a single person peacefully engaging in expressive activity would be prohibited from doing so or that entire types of expressive activity including a "vigil, gathering, assembly, [or] projecting of images" by any number of people and at any time are categorically prohibited under the regulations. Instead, the Board faults the court and the stipulated facts for failing to "include any meaningful explanation of why demonstrating on the adjacent sidewalks or other open spaces, rather than on the stairways, would be less effective to convey plaintiff's (or anyone else's) message." Appellants' Br. 20. But this court has never held the government may impose overinclusive restrictions on expressive activity in a public forum merely because another, adjacent public forum exists. To the contrary. Because the Capitol Grounds "have traditionally been open to the public; indeed, thousands of people visit them each year," *Jeannette Rankin Brigade*, 342 F. Supp. at 584, and because the Eastern Steps are integrated with the Capitol Grounds and

serve a similar function, the steps are subject to the same First Amendment protections as the Capitol Grounds.

The Board's prohibition on expressive activity here is no different than the Board's restriction on demonstration activity on the sidewalk at the foot of the Eastern Steps. In *Lederman*, 291 F.3d 36, the court held that a "'total' restriction on certain types of speech," including "parading, picketing, leafleting, vigils, sit-ins, and speechmaking," on the sidewalk abutting the Eastern Steps could not be justified by the government's "stated objectives of traffic control and safety" because, *inter alia*, "a single leafleteer standing on the East Front sidewalk will no more likely block traffic or threaten security than will photographers, star-struck tourists, and landscape painters complete with easels." *Id.* at 45. "Freedom of expression . . . would rest on a soft foundation indeed if government could distinguish between demonstrators and pedestrians on a wholesale and categorical basis, without providing evidence that demonstrators pose a greater risk to identified government interests than do" other members of the public. *Id.* (internal quotation marks omitted) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101 (1972)).

The Board would minimize the district court's concern that the regulations are overinclusive, appearing to cover, for example, "a pair of individuals gathering on the Eastern Steps to oppose or support the latest editorial in the *New York Times*." *Mahoney*, 734 F. Supp. 3d at 130 (citing Traffic Regs. § 12.1.10). But as the majority's conclusion indicates, Op. 19–20, the district court's interpretation of the regulations, which proscribe "gathering[s]" on the steps "for the purpose of expressing . . . views or concerns," is plainly plausible. Traffic Regs. § 12.1.10. For another example, a meeting of two friends wearing T-shirts supporting a cause or silently holding a prop could come within the ambit of the regulations.

The Board's reasoning also reveals another critical flaw of the Traffic Regulations: they permit two friends to gather on the steps to discuss the particulars of the latest action of Congress but prohibit the same two friends from gathering on the steps while carrying a banner asking for Congress to take action in support of their cause. In this regard, the Traffic Regulations are so underinclusive as to "raise[] serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

The Board offers no persuasive security justification for distinguishing between members of the public who are permitted to "sit, stand or congregate on the Eastern Steps" in potentially unlimited numbers, Stipulations of Fact ¶ 67, and members of the public who wish to engage in a silent vigil or a peaceful two-person call for congressional action. It posits that "situations" involving "tourists and other public visitors . . . . tend to be less prone to volatility and more fleeting in duration" than demonstrations. Appellants' Br. 39. Maybe so, but thus far its conclusion is bereft of any explanation grounded in the facts or binding caselaw. The Board's security rationale is also undermined by the exception to the Traffic Regulations allowing Members of Congress to invite potentially unlimited and unvetted members of public for expressive activities on the steps. Stipulations of Fact ¶¶ 56, 64.

To the extent that appellants deny the existence of "'substantially less restrictive' alternatives that would 'equally effective[ly]' promote safety," *Lederman*, 291 F.3d at 45 (alteration in text) (quoting *Cmty. for Creative Non-Violence v. Kerrigan*, 865 F.2d 382, 390 (D.C. Cir. 1989)), the district court identified some: for example, the Board could: (1) "limit

the number of people who can demonstrate on the Eastern Steps at one time"; (2) "require individuals like Plaintiff to obtain a permit, as they already do for groups wishing to demonstrate on different areas of the Capitol Grounds"; (3) "ban the use of props"; or (4) "ban expressive activities at certain times of the day, or force prospective demonstrators to submit to police screening." *Mahoney*, 734 F. Supp. 3d at 131; *see Lederman*, 291 F.3d at 45–46. The Board responds that limiting the number of demonstrators "would not achieve [its] objectives as effectively given that the presence of demonstrators on the stairways is what gives rise to the access and security concerns in the first place," while time restrictions "ignore[] that employees enter and exit at all hours and that the threat of damage to the buildings persists around the clock." Appellants' Br. 42. In essence, the Board's response is circular: any group of demonstrators engaging in any expressive activity is a threat simply because they are demonstrators. And the Board's insistence that the danger to the building persists "around the clock" is undercut by its relaxed attitude toward expressive activity of unvetted invitees of Members of Congress and other members of the public congregating on the steps. In sum, the Board fails to explain why alternative measures implemented separately or together could not effectively promote its security interest.

Because the Board's prohibition on demonstration on the Eastern Steps is not narrowly tailored to achieve the Board's security interest and there appear to be less restrictive alternatives that would, the regulations fail even intermediate scrutiny.

## III.

Having granted summary judgment for Mahoney, the district court on May 17, 2024, permanently enjoined the Board

from enforcing the regulations forbidding demonstration on the Eastern Steps against anyone. On October 16, 2024, the district court granted the Board's motion to stay the injunction as to nonparties to this action pending appeal after initially denying the Board's motion for reconsideration, which sought a narrowing of the injunction to cover Mahoney alone.

While this appeal was pending, the Supreme Court on June 27, 2025, in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), limited the scope of injunctive relief available under the Judiciary Act of 1789, holding that Article III courts have authority to issue preliminary injunctions no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861. The Court acknowledged that its holding does not disturb the principle that injunctions may "incidentally" benefit nonparties. *Id.* at 851. It "decline[d] to take up" the parties' arguments about the appropriate scope of the injunction, instructing that "[t]he [three] lower courts should determine whether a narrower injunction is appropriate." *Id.* at 854.

The parties disagree on the proper scope of injunctive relief under *CASA* in the First Amendment context. So far their views are confined to Appellants' Rule 28(j) letter (July 8, 2025) and the Response to Appellants' Rule 28(j) letter (July 17, 2025). The *CASA* decision arose under the Fourteenth Amendment's Citizenship Clause, *CASA*, 606 U.S. at 839, while the instant case raises questions under the First Amendment. Two Justices have noted that an overbreadth challenge under the First Amendment "presents its own doctrinal complexities about the scope of relief." *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (statement of Kavanaugh, J., joined by Barrett, J., except as to footnote 1).

It is well established that a plaintiff may bring a facial First Amendment challenge "not because [the plaintiff's] own rights

of free expression are violated, but because of a judicial prediction or assumption that the [challenged law]'s very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). Facing the threat of prosecution, some people, rather than "vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech — harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citation omitted). "(T)he point of ultimate interest (of the First Amendment) is not the words of the speakers, but the minds of the hearers, and manifestly a speaker will be deprived of an opportunity to affect those minds if his audience is arrested and carted away. Certainly the harm is as great as if the speaker had himself been silenced." *Dellums*, 566 F.2d at 195 (citations and internal quotation marks omitted). So a successful challenge to a law that is overbroad in restricting speech "suffices to invalidate all enforcement of that law" to protect "an uninhibited marketplace of ideas" and "reduce[] the[] social costs caused by the withholding of protected speech." *Hicks*, 539 U.S. at 119 (emphasis omitted); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 335–36 (2010).

Because of the doctrinal complexities presented by the question of appropriate injunctive relief in the First Amendment context, it is prudent in accord with *CASA*, 606 U.S. at 854, to remand the parties' contentions regarding the appropriate scope of the injunction to the district court to resolve in the first instance.